UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

FILED

2016 DEC -7  AM 10: 24

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FL
OCALA FLORIDA

DONALD OTIS WILLIAMS.
        Petitioner.

VS                              Case No.: 5:16-cv-357-Oc-WTH-PRL

SECRETARY, DEPARTMENT OF
CORRECTIONS AND FLORIDA
ATTORNEY GENERAL,
            Respondents.      /
_____

PETITIONER'S REPLY TO RESPONDENTS' RESPONSE

COMES NOW Petitioner in the above-styled cause pursuant to the Honorable Court's Order dated November 28, 2016 granting Petitioner's pleading for an extension of time to submit this reply. This reply, in accordance with the Honorable Court's Order above-referenced, is timely presented and in adherence to Rules Governing Section 2254 cases. Support of this respectfully submitted responsive reply is as follows:

PRELIMINARY STATEMENT

The following Memorandum of Law will include basic abbreviations recognized by the Honorable Court as standard referencing. Additionally this Reply to Respondents' Response also includes responsive statements from Petitioner regarding case nos: 5:11-cv-359-Oc-WTH which Respondents reference extensively in their Response and 5:04-cv-427-Oc-WTH also extensively referenced.

# MEMORANDUM OF LAW

## Statement of the Case and Facts

Respondents' Response dated September 30, 2016 (Response) is as analogously obfuscating as the sophism Respondents submitted in case nos. 5:04-cv-427 and 5:11-cv-359 aforementioned. Nevertheless Petitioner will address the Response adding many critical issues Respondents intentionally divested their Response of. Note Martinez v Ryan. 132 S. Ct. 1309 (2012)

There are numerous instances Respondents have deliberately chosen to conceal from the Honorable Court. These instances are crucial to this action.

As Petitioner has provided the Honorable Court recently in Petitioner's motion for extension of time and a preliminary reply Petitioner initially sought procedurally correct application with the Fifth District Court of Appeal (5thDCA) in respect to the circuit court's order dated March 30, 2016 (Response at p. 4) but the 5th DCA rejected Petitioner's appeal on May 4, 2016. [FN 1] The 5th DCA May 4, 2016 rejection order was provided to Petitioner on May 18, 2016. Petitioner, having been rejected from access with the 5th DCA immediately filed with the Honorable Court this instant action. (Response at p. 4) [FN 2]

Petitioner on May 5, 2016 sent to the 5th DCA a motion for leave to file a Florida Rule of Appellate Procedure (FRAP) Rule 9.141(d) petition but the 5th DCA's rejection order dated May 4, 2016 denied Petitioner's First Amend. right to seek redress, inter alia, due process. [FN 3]

Petitioner courting dangerous physical harm that was imposed on him in previous prohibition order by the 5th DCA [FN 4] petitioned the Florida Supreme Court on May 23, 2016 regarding the 5th DCA rejection order above referenced. On July 7, 2016 the Florida Supreme Court in respect to

2

case no: SC16-990 provided a directive to the 5th DCA and Respondents that generated admissions from the 5th DCA's legal representative and Respondents [FN5] conceding the 5th DCA had unconstitutionally denied Petitioner's access with the 5th DCA. [FN6]

Florida Supreme Court case no. SC16-990 caused to be produced from the 5th DCA case nos: 5D16-2355 and 5D16-2358. [FN7] The SC16-990 case metastasized into case nos: SC16-1940 and 5D16-3553. As of the execution date of this instrument case nos: 5D16-2358, 5D16-3553 and SC16-1940 have resulted in 3 separate orders to respond to Petitioner's meritorious material facts. [FN8]

As Petitioner has provided to the Honorable Court by recent filings Petitioner had absolutely no reason whatsoever to remotely believe the above state court actions would occur. Had Petitioner possessed clairvoyance matters would certainly not be as they are presently and, the Honorable Court is assured Petitioner would have never sought habeas action with the Honorable Court, bearing in mind the monetary expenses and time expended, had Petitioner had foreknowledge the Florida Supreme Court would establish a directive resulting in concomitant reactions by several state judicial entities confessing the injurious acts imposed against Petitioner were anticonstitutional. [FN9]

Despite the above state court actions pending respective rulings Bain v State, 730 So. 2d 296, 305 (Fla. 2nd DCA 1999) holds firmly to the Honorable Court's eternal stance inasmuch as "An institution charged with the duty to punish illegal conduct must not itself be seen to engage in illegality. When we discover we have done so, we must undo

our transgression regardless of when or how it was uncovered." The Honorable Court has established the indisputable unity of plain error and prejudicial error are companionized as synonymous errors which affects substantial rights. See Rule 52, Federal Rules of Criminal Procedure. Herzog v United States, 226 F. 2d 561 (Cal. 9th Cir. 1955) Regardless of when, where or how a substantial constitutional right was presented the doctrine of plain error applies to arguments submitted for the first time in habeas proceedings. First Amendment rights and Fifth and Fourteenth Amendment rights are connected when liberty and property are at risk. Respondents have suggested "Petitioner's time for withdrawing his plea expired on December 5, 2001." (Response at P. 2) Respondent is in error. Compare Thompson v Wainwright, 714 F. 2d 1495 (11th Cir. 1983)

Petitioner brings to the Honorable Court's attention the proceeding on November 5, 2001 is illegal holding no force or effect due to unmistakable grave errors that resulted in an unconstitutional adjudication. It is error by trial court to prevent Petitioner from retaining counsel when trial court granted Petitioner right to self representation and continuance to acquire counsel. [FN10] It is plain error to allow Petitioner to attend and accept a plea in a closed to the public court proceeding when trial court and public defender knew Petitioner was under the influence of multiple mind-controlling drugs. [FN11] It is error for public defender to fail to state for the record Petitioner was under the control of mind-altering medications during the November 5, 2001 plea proceeding. [FN12] It is plain error for trial court to not pronounce to Petitioner the constitutional mandates required during plea proceeding, sentencing proceeding, adjudication of guilt. [FN13]

4

The numerous grave errors that resulted in the illegal judgment on November 5, 2001 are extensive and should be recognized as gross disregard for the Constitution and should not be subjected to time limitations. When Petitioner invoked his right to represent his cause without adversarial public defender [FN 14] during the August 28, 2001 proceeding [FN 15] Petitioner's First Amendment rights and Fourteenth Amendment rights remained inseparable, and have union on "the premise that the rights to assemble peaceably and to petition for a redress for grievances are among the most precious of the liberties safeguarded by the Bill of Rights. These rights, moreover, are intimately connected both in origin and in purpose, with the other First Amendment rights of free speech and free press." that although not identical, are inseparable. See United Mine Workers of America, District 12 v Illinois State Bar Association, 389 U.S. 217, 222 (1967). These conjoined rights are tied permanently whereas when trial court failed to respect the Constitution and without reason. hearing or consideration pushed sedated Petitioner into a proceeding trial court fundamentally erred and this error is an egregious infringement on Petitioner's rights and are not permissible time, place or manner restrictions on those rights as cited in Martha Miles v City of Edgewater Police Department, et al., 41 Fla. L. Weekly D985, D989 (Case No. 1D15 - 0165) (See "Conclusion" at D989). It is clear error for any court to allow an accused time to retain counsel but without cause simply reverse trial court's mind without a hearing almost as if it never happened. Notwithstanding Nelson [FN 16] violations and Faretta [FN 17] violations trial judge proceeded as if August 28, 2001 never occurred. And

5

there is not one single strand of tenable support disputing this plain error as the record reflects. [FN 18] Tennis v State, 997 So. 2d 375 (Fla. 2008)

Respondents provide the Honorable Court with case no. 5:11-cv-359. And strangely enough Respondents provide also the date of Petitioner's habeas petition filing date as July 8, 2011. (Response at P.4) What is so very unusual now as opposed to the Respondents' rebuttal when, through tricky sophistry and extensive obfuscating Respondents convinced the Honorable Court to view the 5:11-cv-359 case as an attack on the November 21, 2013 judgment. (Response at P. 3). Petitioner was then and remains presently dumbfounded as to how the Honorable Court allowed itself to be so confused by Respondents' false arguments inasmuch Respondents swayed the Honorable Court to confuse itself between the June 4, 2010 violation of probation proceeding which Petitioner challenged (Hence the date of the case – 2011 as in 5:11-cv-359), not the November 21, 2013 which had not even commenced. How does that happen? And to compound matters not allow Petitioner to show the Honorable Court it was mistaken.

Nevertheless Petitioner moves the Honorable Court to revisit the June 4, 2010 proceeding. The Honorable Court must note constitutional errors were unequivocal then in that Petitioner was denied his right to access the state courts, namely the circuit court due to an order antipodal to the Constitution [FN 19] and an anticonstitutional order from the 5th DCA. [FN 20] The Florida Supreme Court and Respondents including the 5th DCA [FN 21] provided clear assertions that rejections of the many pleadings Petitioner submitted were constitutional errors. The rejections of April 2016 and May 2016 by the 5th DCA [FN 22] of Petitioner's pleadings

6

hold the same constitutional significance as the rejections of Petitioner's pleadings by the 5th DCA and the circuit court in April 2010, May 2010, June 2010 and in timely subsequent pleadings. There is no difference in the violations of Petitioner's rights the entities of the State of Florida committed and conceded to in case nos: SC16-990, 5D16-2355 and 5D16-2358 [FN23] than the violations of rights committed in the same manner in 2010 except this Court was alerted to this fact in 2011 in case 5:11-cv-359 [FN24] where Petitioner literally begged the Honorable Court to correct the State's anticonstitutional rejections of Petitioner's rights. See U.S.C.A. First, Fifth, Sixth, Eighth, Fourteenth Amend.. U.S. Const. Tennis id citing Faretta. Trevino v Thaler. 133 S.Ct.1911 (2013)

Granted, after this federal action was filed the Florida Supreme Court became involved and ruled favorably respective of Petitioner's asserted material facts that have cascaded into rapid state court actions and multiple companionized admissions of wrongdoings from numerous entities of Judiciary including two concessions in seperate cases by the 5th DCA itself. [FN25] These acknowledgments of unlawfulness committed by the 5th DCA should alert the Honorable Court to the validity of Petitioner's factual attestments in case nos. 5:04-cv-427 and 5:11-cv-359 filed respectfully and respectively with the Honorable Court. [FN26] Had this Court not been distorted by Respondents' capriciousness in the above-referenced federal cases with specificity to case no: 5:11-cv-359 the anticonstitutionalities imposed illegally upon Petitioner on April 9, 2010 [FN27] by illegal state court orders [FN28] that amputated Petitioner's rights [FN29] through and including the June 4, 2010 circuit court judgment and beyond the Honorable Court's decision in this instant

cause would not be sought, but the Honorable Court's judgment dated January 25, 2016 was, is, and remains antipodal to the Constitution and was rendered contrary to laws and contrary to Florida Supreme Court rulings and state judiciary confessions inasmuch as Petitioner begged the Honorable Court to take action against the circuit court and 5th DCA's rejections of Petitioner's rights inherent to the violation of probation (VOP) charge of April 9, 2010. The Honorable Court accepted the egregious baseless assumptions of Respondents which one was that Petitioner had never claimed Petitioner had moved to withdraw the June 4, 2010 plea (Court Order dated January 25, 2016 at p 5). The Honorable Court is, as Respondents are, in complete error blinded by the fact of the force of the illegal state court orders in effect on April 9, 2010 through, with respect to the 5th DCA, until July 12, 2016. [FN30] The circuit court order [FN31] currently remains in effect defiant of the Constitution but the 5th DCA in case no. 5D16-3553 [FN32] has ordered a response directed at Respondents due on or before December 27, 2016

The Honorable Court having embraced the above is respectfully requested to expand its view in respect to plain error claims. Petitioner will forever maintain that constitutional error occurs when Petitioner shows unequivocally Petitioner was convicted illegally while under the influence of mind altering drugs on November 5, 2001 especially when public defender knew Petitioner was under the control of multiple mind-converting medications and through deliberate indifference refused to adhere to laws of The Bar and laws of the State (F Cr. P. Rules 3.215 (c)(1)(2) requiring alerting trier of fact Petitioner's condition, among other things) and laws of the Constitution. [FN33] This unequivocal misrepresentation may, by the Honorable Court's view be

subjected to procedural default barred by time limitations but, there is no time bar on the untenable fact public defender committed numerous abuses and intentionally misrepresented Petitioner's cause in 2001 (Case No: 5:11-cv-427) and as shown in 5:11-cv-359 [FN 34] (Order Dated January 26, 2016 at P. 2). The indefensible facts that public defender refused to alert trial court trier of fact that Petitioner was under the influence of multiple drugs [FN35] and, inter alia, public defender refused to convey State's proffered plea [FN 36] firmly supported by 2 officers of court, me the prosecutorix and a sworn statement by a paralegal [FN37] provides enough opening to conclude public defender and Petitioner had a serious adversarial relationship well beyond the vanishing point of reparation. This Court can, should and must understand that Petitioner's statements made during the involuntary plea of November 5, 2001 was, again, under the control of medications and newly acquired evidence from multiple mental health experts [FN38] need to be accepted here and addressed as the reports affect the legality of the judgments of November 5, 2001, [FN39] and June 4, 2010

The misrepresentations of public defender in 2001 metastasized into 2010 when public defender misrepresented Petitioner's cause [FN40], but due to the circuit court order dated October 22, 2004 [FN41] and the 5th DCA order dated August 18, 2006 [FN42] Petitioner was prohibited from exercising his constitutional rights. See U.S.C.A. First, Fifth, Sixth, Eighth, Fourteenth Amend. U.S. Const. The entire panoply of access with the courts through pro se pleadings were prohibited illegally, potently rejected by court clerks contrary to law pursuant to unconstitutional orders. This assertion, again was provided to this Court in 5:11-cv-359. Petitioner informed the Honorable Court the rejections of pleadings from Petitioner by trial court and the 5th DCA were

anticonstitutional. To say Petitioner did not object to the many abuses imposed upon Petitioner is intoxicatingly ridiculous. For all intents and purposes 2 gags made from 2 unlawful orders were shoved and packed down the throat of Petitioner as Petitioner's hands were cuffed and chained behind his back while Petitioner pleaded to this Court to order the state courts to recognize Petitioner's rights. If the stakes were not so high it would be an intense comedic event when the Court denied Petitioner's claims as unexhausted. How did the Honorable Court expect Petitioner to exhaust the claims when the state courts rejected his pleadings and refused to allow Petitioner to exercise his constitutional rights? If this Court would recall the Florida Supreme Court in 2006 refused to get involved with the 5th DCA prohibition order but in SC16-990 did.

In reference to exhausted claims the Honorable Court erred when the Court did not review Florida Supreme Court rulings in respect to valid timely claims submitted to the Florida Supreme Court in the course of case no. 5:04-cv-427. Respondents purposely misled the Court as Petitioner tried vainly to explain which 5:04-cv-427 and the timely claims bled into inherency with 5:11-cv-359. To conclude Petitioner defaulted by not introducing timely claims in state court is an immense error or suggest Petitioner was mentally capable when FDOC had refused to provide life-sustaining medications to Petitioner from 2002 through and until his wrongful arrest on October 23, 2010. Does this Honorable Court believe a man diagnosed by 6 and more doctors of psychology and psychiatry with medical doctorates as having severe brain traumas and chronic seizures seen on MRI, PET, CAT images and PTSD with severe bipolar 1 mania can function in the remotest sense of

normalcy without medications? Can this Court hold Petitioner responsible for accepting or not accepting or failing to adhere to rules when non-medicated or when administered adverse medications because Petitioner has been intensely pleading for the Honorable Court to consider this material fact for some very significant time. However in 2013 four world-renowned mental health experts have provided examination reports that should cause the November 5, 2001 plea proceeding to be vacated but due to circuit court order dated October 22, 2004 Petitioner is prohibited from submitting newly discovered material evidence.

The Honorable Court in 2011 in 5:11-cv-359 should have determined the circuit court order [FN43] and 5th DCA order [FN44] held no force or effect in VOP proceedings as determined in case nos: SC16-990. SD16-2355 and 5D16-2358. The Honorable Court is requested to review 5:11-cv-359 because Petitioner did provide the Honorable Court that the courts were denying Petitioner his right to access the courts and redress of Grievances among a number of underlying companion rights. These subissues were never addressed by the Honorable Court's Order dated January 25, 2016 respective of case no: 5:11-cv-359-WTH-PRL

Petitioner, at this time moves the Honorable Court to take judicial notice of case nos: SC16-990; SC16-1940 [FN45]; SD16-2355; 5D16-2358; SD16-3553 [FN46]

Petitioner moves the Honorable Court to consider as well more chronological dated events and the constitutional significance of each in an addendum or amended form clearly showing Respondents had concealed critical portions of the record supporting failure to convey plea timely claim and a mass of constitutional violations.

11

## FOOTNOTES

[FN 1] See Petitioner's "Notice to the Court..."(Notice, hereafter) executed on November 28, 2016 Exhibit-A 5th DCA Rejection Notice Dated Mar 4, 2016

[FN 2] See "Notice" at PP 1-2 satisfying § 2254 requirements

[FN 3] See Notice Exhibit-B. Case No. SC16-990. 1st. 5th, 6th, 8th. 14th U.S.Const. Amend. U.S.C.A. U.S. Const.

[FN 4] See Notice Exhibit-A case law in case no. 5D05-4254, see this instrument's (Reply hereafter) supplemental Appendix to the Notice Exhibit-H. It is clear and unmistakeable plain error to deny Petitioner his substantial constitutional right. And this matter cannot be used against Petitioner because (a) the Court in case no. 5:11-cv-359 failed to address the claim (b) the claim by egregious anticonstitutional acts of and from Respondents beginning on April 9, 2016 and beyond until July 12, 2016 prevented Petitioner from submitting the claims in the 5th DCA. Note Habeas Rule 9(b). The reason Petitioner sought federal review in 5:11-cv-359 is because the circuit court and 5th DCA refused to accept Petitioner's right to access the state courts which by admissions from every state court involved the rejections of Petitioner's rights were fundamental errors. See § 2254 (b)(1)(A)(B)(i)(ii). Please note Exhibit-I. Exhibit-H which resulted in FDOC Sumter Corr. Inst. staff beating and kicking Petitioner after he was secured in full restraints, cuffed behind back, waist chain to leg shackles in an attack without cause or any reason other than given permission by the 5th DCA to act like starving dobermans on a piece of chained raw meat. And also to state the failure to convey Plea was untimely is outrageously untrue because the Florida Supreme Court was provided with the claim as well.

[FN 5] Filed on July 21, 2016 and July 22, 2016 respectively.

[FN 6] The Honorable Court can easily deduce the 5th DCA rejection unequivocally announced in Exhibit-A was an emulation of 2010, 2011, 2012, 2013, 2014, 2015. The 5th DCA's intake clerk was following strict orders based on an anticonstitutional order notwithstanding the fact Petitioner was ordered not to plead with the 5th DCA. Please take judicial notice of case nos: 5C16-990, 5D16-3553. 5C16-1940 all expansive of splitting the judicial atom on July 7, 2016 (Exhibit-B)

[FN 7] Exhibit-I

[FN 8] Deadline dates: December 5, 2016; December 27, 2016; and December 5, 2016 respectively noted in Exhibit-J, Exhibit-K, Exhibit-L

[FN 9] Exhibits-J and B (See above footnote 5 (FN5))

[FN 10] Exhibit-M

[FN 11] Exhibit-N1 and Exhibit-N2

[FN 12] See West's FSA FCr.P Rule 3.215 (c)(1)(2)

[FN 13] Exhibit-O. Please be cognizant of what public defender states compared to trial judge. Trial judge committed numerous blatant unmistakeable clear fundamental errors when trial judge failed to conduct sentencing and judgment pursuant to constitutional mandates. Trial judge's addressing of Petitioner was divested of constitutional requirements resulting in plain errors. Trial judge must announce all requirements to Petitioner not simply ask if Petitioner understood what public defender stated. This is egregious error that can be raised in federal habeas proceedings which Petitioner hereby moves the Court to address. Please bear in mind the under the influence of mind-altering drugs condition of Petitioner during the November 5, 2001 proceeding which is

uneQuivocally clear in Exhibits- N1 and N2 and the Honorable Court should be very aware of the date on the cover sheet of Exhibit- N2 where Dr. Olander provides public defender the report on November 2. 2001 just two days before the proceeding held on November 5, 2001 and where Dr. Olander alerts public defender to the fact Petitioner is being administered mind-altering drugs (Exhibit- N2 at p 3) notwithstanding Exhibit- N1 where the trial Judge. assistant state attorney and public defender are notified personally (See "Circ" on page 1 of Exhibit- N1 meaning "circulate" and see also Exhibit- P at August 7. 2001 circuit court filing of Exhibit- N1 and absorbing the contents of the document filed by Petitioner's Attorney-In-Fact.

[FN 14] Exhibit- M

[FN 15] Exhibit- P

[FN 16] Nelson v State, 274 So. 2d 256 (Fla. 4th DCA 1973)

[FN 17] Faretta v California, 422 U.S. 806 (1975)

[FN 18] Exhibit- P

[FN 19] Exhibit- B

[FN 20] Exhibit - B

[FN 21] Exhibits- B, J (Note Orders Dated August 23. 2016)

[FN 22] Exhibit- A

[FN 23] See above footnotes 4, 21

[FN 24] 

[FN 25] Exhibit- J (Note Orders Dated August 23. 2016)

[FN 26] The Honorable Court should be reminded Petitioner pleaded to the Honorable Court about Respondents' Exhibits (Namely the courts' records) were not complete and the federal record was divested of critical documents

14

[FN 27] The first charge of violation of probation

[FN 28] Circuit Court Order Dated October 22. 2014 (Exhibit-Q) and 5th DCA Order Dated August 18. 2006 (Exhibit-H)

[FN 29] Please see above footnote 3

[FN 30] Exhibit-J

[FN 31] Exhibit-Q

[FN 32] Exhibit-F

[FN 33] Exhibit-N1, N2

[FN 34] Public defender misrepresentations are numerous and as Petitioner has provided the Honorable Court public defender was forced upon Petitioner due to orders prohibiting pro se access with the courts which Petitioner was illegally divested of the right to invoke self representation, plead for extraordinary writs and the mass of constitutionally available pleadings with the courts available to other defendants

[FN 35] Noting Exhibit-N1, N2 where Petitioner is under the control of mind-altering drugs and public defender is cognizant of Petitioner's condition in the November 5. 2001 Proceeding (Exhibit-O) but through malice and dereliction does not alert trial court (although State and trial judge knew or should have known (Exhibit-N1) despite Petitioner's inadvertent incorrect answer to the question of drugs (Exhibit-O, Page B, lines 18-20) which Petitioner should not be held responsible for since the condition he was in prevented him from understanding the proceeding or comprehend the consequences of his actions

[FN 36] Exhibit-R. See West's FSA FCr P Rule 3.171 (c) and Cottle v State. 733 So. 2d 963 (Fla. 1999); Morales v State. 731 So. 2d 91 (Fla. 4th DCA 1999). The Honorable Court must be aware trial court committed

plain error in failing to adhere to F.Cr.P. Rule 3.171 (d) (Exhibit-O )

[FN 37] Exhibit-R. The Honorable Court should again grasp the many untenable misrepresentations of public defender in respect to Petitioner's cause that involved the November 5.2001 judgment which should have caused trial court not to force public defender upon Petitioner in April 2010, May 2010 and culminating on June 4, 2010 due to clear adversarial conflicts regarding public defender and Petitioner. notwithstanding the fact that due to unconstitutional orders prohibiting Petitioner illegally Petitioner's rights to address the courts were rejected resulting in an illegal judgment as the Florida Supreme Court firmly holds and stated in SC16-990

[FN 38] Exhibit-S

[FN 39] Petitioner sought to introduce the Healthworks (Exhibit-S6) and Hope Counseling (Exhibit-S5) in 2010 but was rejected as were rejected Exhibits-S3.S4.S5.S6.S7.S8 in 2013 all in a timely manner submitted but denied due to October 22.2004 unconstitutional order

[FN 40] Public defender had an enormous amount of evidence to support a FCrP Rule 3.216 filing but informed Petitioner Rule 3.216 was not available in VOP proceedings. Hird v State. 41 FLW D1638-39

[FN 41] Exhibit-    anticonstitutional circuit court order

[FN 42] Exhibit-    anticonstitutional 5th DCA order

[FN 43] See footnote 41 above

[FN 44] See footnote 42 above

[FN 45] Florida Supreme Court cases

[FN 46] Fifth District Court of Appeal cases

## UNNOTARIZED OATH

Under penalties of perjury, I declare that I have read the foregoing motion and the facts stated in it are true.

Executed this 5th day of December , 20 16 .

/s/ Donald Otis Williams

## APPENDIX

| Document | Exhibit |
|---|---|
| 5th DCA Order and Correspondence Dated August 18, 2006 | H |
| Transcript Excerpt (PP 1, 2, 16, 17) of Proceeding Dated August 2, 2013 | I |
| Dockets and Correspondences Regarding Cases 5D16-2355; 5D16-2358 | J |
| Case Docket of 5th DCA Case Number - 5D16-3553 | K |
| Florida Supreme Court Order Dated November 18, 2016 (SC16-1940) | L |
| Public Defender Fla. Bar Response (Page 2) Date September 25, 2001 | M |
| Petitioner's Attorney-In-Fact August 2, 2001 Correspondence to Trial Judge | N1 |
| Dr. J. Olander's Report Dated November 2, 2001 (Excerpt) | N2 |
| November 5, 2001 Proceeding Transcript Case No. 2000-CF-2130 | O |
| Case Docket on Appeal (5D04-2823) Regarding Case 2000-CF-2130 | P1 |
| Case Docket on Appeal (5D13-4404) Regarding Case 2000-CF-2130 | P2 |
| Case Docket Circuit Court Case Number: 2000-CF-2130 (Excerpt) | P3 |
| Circuit Court Prohibition Order Dated October 22, 2004 | Q |
| Assistant State Attorney Fla. Bar Response Dated October 11, 2002 | R1 |
| Sheryl Coolbaugh Sworn Statement Dated July 20, 2004 | R2 |

| Document | Exhibit |
|---|---|
| Private Attorney Brenda H. Smith Fla. Bar Response Dated July 27, 2004 | R3 |
| Dr. Michael Maher Evaluation Report Dated January 17, 2013 (Excerpt) | S1 |
| Dr. Alan Berns Evaluation Report Dated October 27, 2012 (Excerpt) | S2 |
| Dr. Eric Mings Evaluation Report Dated January 7, 2013 (Excerpt) | S3 |
| Dr. Steven Gold Evaluation Report Dated March 5, 2013 (Excerpt) | S4 |
| Hope Counseling Examination Report Dated October 23, 2009 | S5 |
| Health Works Examination Report Dated October 30, 2009 | S6 |
| Online Acquired Information Regarding Bipolar Disorder (Wikipedia. 8/14/13) | S7 |
| Online Acquired Information Regarding PTSD (NIH. 8/14/13) | S8 |
| Epilepsy Assoc. of Cen. Fla. Fact Sheet Information | S9 |
| Online Acquired Information Regarding Epilepsy (Web MD) | S10 |
| Online Acquired Information Regarding Psychiatric Medication Doxepin Also Referenced as Sinequan (Stanford Medical Department) | S11 |
| University of South Florida Selim R. Benbadis M.D. Director of USF College of Medicine and Tampa General Hospital Report Regarding Psychogenic (Non-Epileptic) Seizures | S12 |
| Online Acquired Information Regarding Frontal Lobe Epilepsy (American Academy of Neurology) Dated 6/19/2015 | S13 |
| Online Acquired Information Regarding Misprescribing and Over Prescribing of Drugs (WorstPills.org) Dated 3/19/2015 | S14 |
| November 4, 2013 Proceeding Transcript (Excerpt pp 1, 2, 15, 16, 17, 18) Circuit Court Case Number: 2000-CF-2130 (VOP) | T1 |
| November 21, 2013 Proceeding Transcript (Excerpt pp 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13) Circuit Court Case Number: 2000-CF-2130 (VOP) | T2 |

## CERTIFICATE OF SERVICE

*I HEREBY CERTIFY,* that I placed this document in the hands of prison officials at Florida State Prison.

for mailing via U.S. Mail to: United States District Court . 207 NW

**PARTIES SERVED**

Second Street . Room 337 . Ocala . Florida 34475 . 66666; Florida

Attorney General . 444 seabreeze Blvd . Fifth Floor, Daytona Beach.

Florida 32118

on this __5th__ day of __December__, 20 __16__
     DAY            MONTH         YR.


/S/ Donald Otis Williams
    Donald Otis Williams
DC#__413474__
**Florida State Prison**
**P.O. Box 800**
**Raiford, FL 32083**

19

H

Exhibit - H

08/23/2006   09:57     352-569-6191               CLASSIFICATION                    PAGE   82



ROBERT J. PLEUS, JR.
CHIEF JUDGE

WINIFRED J. SHARP
JACQUELINE R. GRIFFIN
EMERSON R. THOMPSON, JR.
THOMAS D. SAWAYA
WILLIAM D. PALMER
RICHARD B. ORFINGER
DAVID A. MONACO
VINCENT G. TORPY, JR.
C. ALAN LAWSON
JUDGES

SUSAN WRIGHT
CLERK

TY W. BERDEAUX
MARSHAL

**DISTRICT COURT OF APPEAL**
FIFTH DISTRICT
300 SOUTH BEACH STREET
DAYTONA BEACH, FLORIDA 32114

CLASSIFICATION / RECORDS

AUG 2 2 2006

SUMTER C.I.

August 18, 2006

Warden
Sumter Correctional Institution
P.O. Box 667
Bushnell, FL 33513-0667

    RE:  Donald O. Williams
         D.C. No. U13479

    Enclosed herewith is the August 18, 2006, Opinion of this Court relative to Donald O.
Williams, D.C. No. U13479.  This opinion is forwarded pursuant to the Court's directive
for consideration by the Department of Corrections for disciplinary procedures because
of Mr. Williams' abuse of the judicial process.  See Section 944.279(1), Florida Statutes
(2004).

Sincerely,

Susan Wright
CLERK

SW/dd

Enclosure

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT                                        JULY TERM 2006

DONALD O. WILLIAMS,

     Petitioner,

v.

STATE OF FLORIDA,

     Respondent.

Case No.  5D05-4254

Opinion filed  August 18, 2006

Petition for Writ of Mandamus,
Victor J. Musleh, Respondent Judge.

Donald O. Williams, Bushnell, *pro se*.

No Appearance for Respondent.

PER CURIAM.

     Because of his ten previous unsuccessful collateral appearances here, when Petitioner filed his eleventh pleading, a mandamus petition, this court issued a show cause order pursuant to *State v. Spencer*, 751 So. 2d 47 (Fla. 1999). This court, *sua sponte*, withdraws its March 28, and April 6, 2006, orders to the extent that Williams' Response is accepted as timely filed.

     We now deny Williams' mandamus petition on the merits and hold that he is barred from further *pro se* filings in this court on the basis that his present petition is frivolous and an abuse of process. *See Isley v. State*, 652 So. 2d 409, 410 (Fla. 5th DCA 1995) ("Enough is enough."); *see also Glasco v. State*, 914 So. 2d 512, 512 (Fla. 5th DCA 2005) (recognizing frivolous collateral appeals clog the courts and hurt meritorious appeals by inviting sweeping rulings and by engendering judicial impatience with all defendants); *Britt*

*v. State*, 931 So. 2d 209, 210 (Fla. 5th DCA 2006) (finding that defendant's *pro se* filings had become frivolous, an abuse of process, and a waste of the taxpayers' money).

Accordingly, in order to conserve judicial resources, we prohibit Williams from filing with this Court any further *pro se* pleadings concerning Fifth Judicial Circuit Court No. 2000-2130-CF. The Clerk of this Court is directed not to accept any further *pro se* filings concerning this case from Petitioner. Any more pleadings regarding this case will be summarily rejected by the Clerk, unless they are filed by a member in good standing of The Florida Bar. The Clerk is further directed to forward a certified copy of this opinion to the appropriate institution for consideration of disciplinary procedures. *See* § 944.279(1), Fla. Stat. (2005); *Simpkins v. State*, 909 So. 2d 427, 428 (Fla. 5th DCA 2005).

PETITION DENIED; Future *Pro Se* Filings PROHIBITED; Certified Opinion FORWARDED to Department of Corrections.

GRIFFIN, MONACO, and TORPY JJ., concur.

2

Exhibit - I

Exhibit-1

# Fifth District Court of Appeal Case Docket

## Case Number: 5D16-2355

## Final Criminal 3.850 Notice from Lake County

## DONALD OTIS WILLIAMS vs. STATE OF FLORIDA

### Lower Tribunal Case(s): 2000-CF-2130

Right-click to copy shortcut directly to this page

11/17/2016 01:59

| Date Docketed | Description | Date Due | Filed By | Notes |
|---|---|---|---|---|
| 07/12/2016 | Notice of Appeal Filed | | Pro Se - Appellant | |
| 07/12/2016 | ORD-Denying Lower CT. Motion | | | |
| 07/12/2016 | Acknowledgement Letter 1 | | | |
| 07/12/2016 | REC-3.850 SUMM DENIAL | | | |
| 07/25/2016 | Notice of Change of Address | | Pro Se - Appellant | |
| 08/10/2016 | Notice | | Pro Se - Appellant | |
| 08/23/2016 | Miscellaneous Order | 09/02/2016 | | |
| 08/23/2016 | Miscellaneous Order | | | |
| 08/24/2016 | Notice | | | |
| 08/24/2016 | Motion To File Supplemental Record | | Pro Se - Appellant | |
| 09/16/2016 | Motion To Compel | | Pro Se - Appellant | |
| 09/20/2016 | Miscellaneous Order | | | |
| 09/26/2016 | Motion To File Supplemental Record | | Pro Se - Appellant | |
| 09/26/2016 | Miscellaneous Motion | | Pro Se - Appellant | |
| 09/27/2016 | Order Deny Motion to Compel | | | |
| 09/30/2016 | Motion To File Supplemental Record | | Pro Se - Appellant | |
| 09/30/2016 | Miscellaneous Motion | | Pro Se - Appellant | |
| 10/04/2016 | RESPONSE | | Pro Se - Appellant | |
| 10/05/2016 | Miscellaneous Motion | | Pro Se - Appellant | |

| Date Docketed | Description | Date Due | Filed By | Notes |
|---|---|---|---|---|
| 10/05/2016 | Motion To File Supplemental Record | | Pro Se - Appellant | |
| 10/10/2016 | Miscellaneous Motion | | Pro Se - Appellant | |
| 10/13/2016 | Notice | | Pro Se - Appellant | |
| 10/14/2016 | ORD-Stricken | | | |
| 10/25/2016 | Order Deny Motion to Supplement Record | | | |
| 11/03/2016 | Miscellaneous Motion | | Pro Se - Appellant | |

**FIFTH DISTRICT COURT OF APPEAL**
**300 South Beach Street**
**Daytona Beach, FL 32114**
**(386) 255-8600**

DATE  November 17, 2016                         CASE NO. **5D16 - 2355**
                                    **DONALD OTIS WILLIAMS  vs. STATE OF**
**FLORIDA**
**DONALD OTIS WILLIAMS,**

In response to your recent correspondence, please see the paragraph(s) marked below,

      There is no case pending in this Court on your behalf.

      Please contact the clerk of the trial court for additional information on your case.

X      This proceeding is still pending in this Court.  You or your attorney, if you are represented, will be notified by mail when a decision is rendered. Please notify the Court promptly of any change in address.

      Your appointed counsel is              .

      Please direct your inquiry to your court appointed or retained counsel.

      The          has not been filed as of this date.

      The Clerk's office cannot provide legal services.  Please contact an attorney or consult the Florida Rules of Appellate Procedure.

      Every order signed by the Clerk is authorized by the Judges.  The Clerk's signature is merely certification that the order is the Judges' decision.

      The above-numbered case was disposed of on              .

      The motion for rehearing

      The Court's mandate was issued on              .

      A mandate is not issued when a case is disposed of by order.

      Canon 3 of the Code of Judicial Conduct prohibits the judges from reading or considering your correspondence.

X      Copies are $1.00 per page §35.22, 28.24, Florida Statutes.  The documents requested must be clearly stated.  A self-addressed envelope with sufficient postage must be provided.

      All parties, whether represented by counsel or not, must comply with the Florida Rules of Appellate Procedure.  The rules may be found in law libraries or accessed on line at http://www.5dca.org.  This Court cannot provide copies of rules or forms.

X      Docket Sheet enclosed.

X      The records of this Court reflect the "Motion to Direct the Lower Court to Re-Copy the Record on Appeal and Resubmit" was filed on 11/03/16 and is still under advisement. You will be notified when the decision has been rendered. There are no email transmissions to provide you with. The only document we have close to the date you have requested a copy of is an Order dated 10/25/16 (copy enclosed).

Joanne P. Simmons, Clerk                    BY: _____
                                                 Deputy Clerk

# *Fifth District Court of Appeal Case Docket*

## Case Number: 5D16-2358

## Criminal Petition - Ineffective Assistance of Counsel from Lake County

### DONALD OTIS WILLIAMS vs. STATE OF FLORIDA

#### Lower Tribunal Case(s): 2000-CF-2130

<u>Right-click to copy shortcut directly to this page</u>

11/17/2016 01:44

| Date Docketed | Description | Date Due | Filed By | Notes |
|---|---|---|---|---|
| 07/12/2016 | Petition Filed | | Pro Se - Appellant | |
| 07/12/2016 | Acknowledgement Letter 1 | | | |
| 07/12/2016 | Miscellaneous Order | | | |
| 07/25/2016 | Miscellaneous Motion | | Pro Se - Appellant | |
| 07/25/2016 | Notice of Change of Address | | Pro Se - Appellant | |
| 07/27/2016 | Grant Miscellaneous Motion | | | |
| 08/23/2016 | Miscellaneous Order | | | |
| 10/05/2016 | Miscellaneous Motion | | Pro Se - Appellant | |
| 10/05/2016 | Motion To File Supplemental Record | | Pro Se - Appellant | |
| 10/13/2016 | Motion To File Supplemental Record | | Pro Se - Appellant | |
| 10/25/2016 | Order Deny Motion to Compel | 11/09/2016 | | |
| 11/07/2016 | Motion For Rehearing/Interim Order | | Pro Se - Appellant | |
| 11/10/2016 | Miscellaneous Docket Entry | | | |
| 11/14/2016 | ORD-Respondent to Respond | | | |

**FIFTH DISTRICT COURT OF APPEAL**
**300 South Beach Street**
**Daytona Beach, FL  32114**
**(386) 255-8600**

DATE  November 17, 2016

CASE NO. **5D16 - 2358**
**DONALD OTIS WILLIAMS  vs. STATE OF**
**FLORIDA**

**DONALD OTIS WILLIAMS,**

In response to your recent correspondence, please see the paragraph(s) marked below,

There is no case pending in this Court on your behalf.

Please contact the clerk of the trial court for additional information on your case.

X    This proceeding is still pending in this Court.  You or your attorney, if you are represented, will be notified by mail when a decision is rendered. Please notify the Court promptly of any change in address.

Your appointed counsel is            .

Please direct your inquiry to your court appointed or retained counsel.

The            has not been filed as of this date.

The Clerk's office cannot provide legal services.  Please contact an attorney or consult the Florida Rules of Appellate Procedure.

Every order signed by the Clerk is authorized by the Judges.  The Clerk's signature is merely certification that the order is the Judges' decision.

The above-numbered case was disposed of on            .

The motion for rehearing            .

The Court's mandate was issued on            .

A mandate is not issued when a case is disposed of by order.

Canon 3 of the Code of Judicial Conduct prohibits the judges from reading or considering your correspondence.

Copies are $1.00 per page §35.22, 28.24, Florida Statutes.  The documents requested must be clearly stated.  A self-addressed envelope with sufficient postage must be provided.

All parties, whether represented by counsel or not, must comply with the Florida Rules of Appellate Procedure.  The rules may be found in law libraries or accessed on line at http://www.5dca.org.  This Court cannot provide copies of rules or forms.

X    Docket Sheet enclosed.

X    The records of this Court reflect the petition in this case was filed on 07/12/16. This Court has order on 11/14/16 for the Respondent to respond within 20 days to the Amended Petition for Ineffective Assistance of Counsel (copy enclosed). You will be notified when the decision has been rendered. There are no email transmissions to provide you with.

Joanne P. Simmons, Clerk

BY: _____
            Deputy Clerk

K

Exhibit - K

# *Fifth District Court of Appeal Case Docket*

## Case Number:  5D16-3553

### Criminal Mandamus Petition from Lake County

## DONALD OTIS WILLIAMS  vs.  STATE OF FLORIDA

### Lower Tribunal Case(s): 2000-CF-2130

Right-click to copy shortcut directly to this page

11/17/2016 01:41

| Date Docketed | Description | Date Due | Filed By | Notes |
|---|---|---|---|---|
| 10/18/2016 | Petition Filed | | Pro Se - Appellant | |
| 10/18/2016 | Case Filing Fee | | | |
| 10/18/2016 | Acknowledgement Letter 1 | | | |
| 10/18/2016 | Order to pay filing fee - Writ (300) | | | |
| 11/07/2016 | Affidavit | | | |
| 11/07/2016 | ORD-Waive Petition | | | |
| 11/07/2016 | Miscellaneous Motion | | Pro Se - Appellant | |
| 11/07/2016 | Miscellaneous Docket Entry | | | |
| 11/08/2016 | ORD-Response from RS and Judge | | | |

Exhibit. L

# 𝔖𝔲𝔭𝔯𝔢𝔪𝔢 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔍𝔩𝔬𝔯𝔦𝔡𝔞

### FRIDAY, NOVEMBER 18, 2016

**CASE NO.: SC16-1940**
Lower Tribunal No(s).:
5D05-4254;
352000CF002130AXXXXX

DONALD OTIS WILLIAMS          vs.     STATE OF FLORIDA

Petitioner(s)                                    Respondent(s)

Petitioner has filed a petition to invoke this Court's all writs jurisdiction that the Court has treated as a petition for writ of mandamus. Respondent is requested to file a response to the above-referenced petition on or before December 5, 2016. The Fifth District Court of Appeal may file a separate response pursuant to Florida Rule of Appellate Procedure 9.100(e)(3), should it choose to do so; however, this Court is not requesting a response from the district court at the present time. The petitioner may file his reply on or before December 15, 2016.

A True Copy
Test:

John A. Tomasino
Clerk, Supreme Court

ca
Served:

WESLEY HAROLD HEIDT
DONALD OTIS WILLIAMS
HON. JOANNE P. SIMMONS, CLERK
HON. NEIL KELLY, CLERK

m

Exhibit - M

After having the waiver of speedy trial and the need for the medical records fully explained to you, you signed the medical record release forms and gave me the names of 4 or 5 hospitals where you claimed you had been treated for head injuries. I immediately wrote those hospitals requesting a copy of all the records they had for you, and enclosed a copy of your signed release form with each letter. Unfortunately for you, exactly ONE of the hospitals you named had actually ever seen you as a patient, and they treated you for chest pains, not a head injury. Thus, while my goose chase for your medical records was mostly fruitless (bad for you), the pursuit was not undertaken without your fully informed consent regarding the necessary waiver of your right to a speedy trial (good for me).

Adding to the hypocrisy discrediting this portion of your complaint is the fact that, when faced with the opportunity to take your case to trial, you balked at the chance. If you will recall, on August 28 (two full days before your bar complaint was written) you asked for, and Judge Briggs granted, a continuance of your case to give you an opportunity to look into hiring a private lawyer. (By the way, I haven't heard, how is that search going?)

Thus, while I admit that I did waive your right to a speedy trial, the waiver was not made without your knowing request for such, so that I could investigate your case. Furthermore, if you were so enthusiastic about getting your case to trial, you would not have requested a continuance on August 28.

In the middle portion of your complaint, you seem concerned with other issues relating to a possible insanity defense. As both Judge Briggs and I have told you, because insanity is an affirmative defense, it is absolutely inconsistent with what you have claimed to this point (i.e. that you were with the victim and at the scene of the crime, but you didn't do it). In addition, in our meetings since Dr. Olander evaluated you (an evaluation that took place at YOUR request) you have stated that because of the implications regarding the nature of the acts alleged against you, you are not interested in pursuing insanity or any other affirmative defense. (I have enclosed a copy of my letter of July 23, 2001 in order to refresh your recollection on these points.)

As for the rest of your concerns:

1.   Yes, I told the judge that the eyewitness's testimony was very damaging to your case. However, that's the nature of an eyewitness. They help the State and hurt you. In addition, the State Attorney was at the depo, and she knows how good that witness was. Thus, nothing I said at the Nelson Inquiry you requested was either privileged or false, and I have done nothing wrong.

277

N

Exhibit-N (N1.N2)

**Shifley Harvey**

Home Phone (352)742-0075

P.O. Box 492734
Leesburg, FL 34749

August 02, 2001

Don F. Briggs
550 W. Main Street
Tavares, FL 32778

MENTAL ILLNESS HEARING, CASE #00-2130-CF

Your Honor,

Mr. Donald O. Williams has been represented by Mr. Jeffery Higgins, of the Public Defender's Office, since Oct. 28, 2000. Mr. Williams had not spoken to Mr. Higgins, or anyone from the Public Defender's Office, until Dec. 19, 2000. However, Mr. Williams did write a ten page letter to Mr. Higgins explaining what had occurred and the seriousness of the mental state that he was in at that time. That letter was written at the beginning of November 2000. Mr. Higgins had never responded or acknowledged the acceptance of that letter. In fact, Mr. Higgins has never acknowledged any letter that Mr. Williams had wrote.
Mr. Williams wrote Mr. Higgins a letter on Nov. 28, 2000, asking his thoughts on seeing a psychiatrist and there was no response. Mr. Williams wrote him again on Dec. 29, 2000, again asking for his advice, still no response. On Jan. 11, 2000, Mr. Williams was seen by Dr. Torres, a psychiatrist, and was prescribed medication for hallucinations. Mr. Higgins was made aware of this, but he showed no interest at all. Mr. Higgins has been aware of all medical visits, blood withdrawals, and prescription changes ever since January 2000. Mr. Higgins has not in the least taken any interest at all in Mr. Williams mental condition or any aspect concerning his case.
On April 5, 2001, Mr. Higgins provided the discovery of the papers that had been sent to him by Mr. Williams after asking, begging, and pestering on that matter. Mr. Higgins was asked to acknowledge the acceptance of those papers over and over again since their initial meeting that took place on Dec. 19, 2000. In fact, on April 5, 2001, Mr. Higgins stated that he had not yet spoken to the D.A.'s office about any plea concerning Mr. Williams.
Sir, Mr. Higgins has been aware of Mr. Williams' mental state since November 2000. He has be aware that Mr. Williams has been diagnosed as a By-Polar Manic Depressive. He has in fact, been made aware of Mr. Williams intentions as to how he plans to defend himself since November 2000. Mr. Higgins, on May 8, 2001, told Mr. Williams he would try to get a psychiatric evaluation order from the court. We all are extremely grateful that your honor granted that evaluation.
However, Mr. Higgins does not want to file for a mental illness defense even though the psychologist informed Mr. Higgins that Mr. Williams is indeed mentally ill. Mr. Higgins has informed Mr. Williams that he will not call Dr. Torres, who diagnosed Mr. Williams, or any of his family members that have witnessed his mental behavior. This is unacceptable when a man's life is at stake.
Your Honor, Mr. Higgins has already set a trial date in September. Mr. Williams' friends and family members are outraged that Mr. Higgins has not given Mr. Williams the respect and the consideration that he should have as a lawyer of the Public Defender's Office. Mr. Williams has asked me to ask the court for a hearing concerning his right to file for a mental illness defense.

000036

If the court is so gracio... ...s to grant a hearing, Mr. Williams would like ... voice his concern about Mr. Higgins representing him further. Sir, I have included an enclosure of the names of the people that Mr. Williams would like the court to hear.

Thank You,

Shirley Harvey

SH

Enc: 1

000037

J.M. Ranck
P.O. Box 254
Live Oak, FL 32064
Phone: (904) 362-4167

Shirley Harvey
P.O. Box 492734
Leesburg, FL 34749
Phone: (352) 742-0075

Randy & Gail Williams
Live Oak, FL 32064
Phone: (904) 362-6428

Dr. Torres
101 E. Maud Street
Tavares, FL 32778
Phone: (352) 742-8300

# PSYCHOLOGICAL AFFILIATES

DEBORAH O. DAY, PSY.D.
LICENSED PSYCHOLOGIST
CERTIFIED FAMILY MEDIATOR
LICENSED MENTAL HEALTH COUNSELOR

JACQUELYN OLANDER, PH.D. - LICENSED PSYCHOLOGIST
BARBARA E. BAHAROGLU KELLY, PH.D. - LICENSED PSYCHOLOGIST
DARLENE BARRETT ANTONIO, PH.D. - LICENSED PSYCHOLOGIST
KRISTIN P. GIRARDOT, PH.D. - LICENSED PSYCHOLOGIST
AARON A. BRODSKY, PH.D. - LICENSED PSYCHOLOGIST
ROBERT L. MOSELEY, PSY.D. - LICENSED PSYCHOLOGIST
ROBIN MEADE, PSY.D. - LM.H.C. and Psychological Resident with Dr. Kelly as Supervisor
NICOLE P. JUNG, PSY.D - Psychological Resident with Dr. Brodsky as supervisor

2737 WEST FAIRBANKS AVENUE
WINTER PARK, FLORIDA 12780
PHONE (407) 740-6838
FAX (407) 740-0902

405 NORTH SINCLAIR AVENUE
TAVARES, FLORIDA 12776
PHONE (352) 343-1023
FAX (352) 343-2069

## FACSIMILE COVER SHEET

NAME: Jeff Higgins          ORGANIZATION: PnL

FAX NO: 352-742-4297 TELEPHONE NO:

FROM: Deborah

DATE: 11/2/01

REGARDING: Donald Williams

NUMBER OF PAGES (INCLUDING THIS PAGE): 7

COMMENTS:

Call if you have any questions

IF THERE ARE ANY PROBLEMS IN RECEIVING THIS TRANSMISSION, PLEASE
CALL PSYCHOLOGICAL AFFILIATES AT (407) 740-6838.

## CONFIDENTIALITY NOTE

The documents accompanying this facsimile transmission are legally privileged and
contain confidential information belonging to the sender. The information is intended
only for the use of the individual or entity named above. If you are not the intended
recipient, you are hereby notified that any disclosure, copying, distribution or the taking
of any action in reliance on the contents of this facsimile information is strictly
prohibited. If you have received this facsimile in error, please immediately notify us by
telephone to arrange for return of the original documents.

Copy to △ 9-21-11

# PSYCHOLOGICAL AFFILIATES *AMENDED*

Deborah O. Day, Psy.D.
Licensed Psychologist
Certified Family Mediator
Licensed Mental Health Counselor

Jacquelyn Olander, Ph.D. - Licensed Psychologist
Barbara E. Baharoglu Kelly, Ph.D. - Licensed Psychologist
Darlene Barrett Antonio, Ph.D. - Licensed Psychologist
Kristen P. Girardot, Ph.D. - Licensed Psychologist
Aaron A. Brunskt, Ph.D. - Licensed Psychologist
Robert L. Moseley, Psy.D. - Licensed Psychologist
Ruben Meade, Psy.D. - L.M.H.C. and Psychological Resident with Dr. Kelly as Supervisor
Nicole P. Jung, Psy.D - Psychological Resident with Dr. Bradley as Supervisor

2737 West Fairbanks Avenue
Winter Park, Florida 12789
Phone (407) 740-6818
Fax (407) 740-0902

405 North Sinclair Avenue
Tavares, Florida 32776
Phone (352) 343-1023
Fax (352) 343-2069

## FORENSIC COMPETENCY EVALUATION

CONFIDENTIAL AND PRIVILEGED

THIS INFORMATION HAS BEEN DISCLOSED TO YOU FROM RECORDS WHOSE CONFIDENTIALITY IS PROTECTED BY FEDERAL LAW. IT IS PROVIDED FOR YOUR FILES ONLY. IT SHOULD NOT BE REVEALED TO ANY PERSON(S) WHATSOEVER, NOT EVEN TO THE PERSON(S) TO WHOM IT PERTAINS.

**NAME:** DONALD O. WILLIAMS
**CASE NUMBER:** 00-2130-CF-A-04
**DATE OF BIRTH:** 07/20/60 (Age: 40 years)
**DATE SEEN:** 07/17/01

**REASON FOR REFERRAL:** Mr. Williams participated in a forensic competency evaluation pursuant to a court order by the Honorable Don F. Briggs, Circuit Judge in the Circuit Court of the Fifth Judicial Circuit in and for Lake County, Florida. Mr. Williams has a significant history for Bipolar Disorder. This evaluation was requested to assess his competency to proceed and his sanity/insanity at the time of the commission of the alleged offense.

Prior to the commencement of the evaluation, Mr. Williams was informed of the nature of the evaluation, issues pertaining to confidentiality, the limits, and to whom the evaluation would be shared. He expressed an understanding of the instructions and consented to participate in the evaluation.

**BACKGROUND INFORMATION:** Background information was obtained through a clinical interview with Mr. Williams, telephone conversations with his fiancée, Kay Hardy, a telephone interview with his mother, Janie Rank, review of medical records at Lake County Jail, review of a letter sent by Janie Rank, a letter from Donald Williams, and the following records supplied by Jeffrey Higgins, Office of the Public Defender. These records include:

1. Arrest affidavit/first appearance form, Lake County, Florida.
2. Probable cause affidavit.
3. First appearance findings and orders.
4. Offense incident report, Lake County Sheriff's Office.
5. Narrative continuation(s), Lake County Sheriff's Office.
6. Victim/witness, Lake County Sheriff's Office.
7. Records, Winter Haven Hospital.
8. Records, Florida Hospital Waterman.



**FAMILY HISTORY:** Mr. Williams reported that he is the biological child of Dewey Williams, deceased, and Janie Rank, age 64. Mr. Dewey Williams died at the age of approximately sixty-three in 1996 from hemachromotosis. Mr. Donald Williams stated his parents divorced when he was age seven. He initially lived with his mother until age eleven, when he moved in with his father. Mr. Williams reported that while living at his father's, he often stayed in abandoned homes or lived in a car. He revealed that his father had significant problems with mood swings and often beat both he and his mother. On another occasion, he observed his father pulling a gun on his mother as well as slashing her tires. Mr. Williams stated that his father was a retired, Korean veteran and that they often shot rabbits for food when they lived in the woods. When Mr. Williams was age thirteen, his father was violently abusive and gave him two black eyes. His father subsequently sent Mr. Williams to live with his mother.

Mr. Williams stated that he also had significant mood swings and had difficulties with his stepfather. Thus, around the age of seventeen or eighteen, he joined the Marine Corps and in April of 1979, he graduated from basic training at the top of the 400 recruits. He revealed, "I was honor man and it felt great." Mr. Williams stated he continued to have problems with mood swings.

In 1986, age 25, Mr. Williams married, however divorced in 1987. He explained that he had lots of problems in his marriage, particularly with drinking. Mr. Williams has been involved with his fiancée, Kay Hardy, for approximately 12½ years. They have one child, Ron Jon, who was born on January 24, 1992.

**PSYCHOLOGICAL/MEDICAL HISTORY:** Mr. Williams was observed to have a scar on the left frontal lobe above his eyebrow. He stated that it occurred when he was accidentally hit by his brother with a baseball bat while they were playing ball. In 1989, Mr. Williams reported that he was hit by a car and experienced a severe concussion and compound fracture. He had been out walking and his dog jumped in front of a truck. In 1991, he slipped while working at Kash n' Karry and had a concussion. He was given a CT and that is when they found out that he had broken his neck while playing football in high school. There were no x-rays done at that time, but he found out it was broken when he was given his CT in 1991.

Mr. Williams stated he had a significant history of mood swings and tried to cope with them through the use of alcohol. However, he recognized that it was causing him difficulties and he stopped drinking for approximately three or four months prior to his arrest. Instead, he started taking Formula One, a natural product with Ephedra. However, he then began to experience blackouts and hallucinations. Mr. Williams stated that he saw people skiing behind a boat, but no one else saw them. In addition, he would go for days without sleeping. Mr. Williams acknowledged that he had periods of four or five days with no sleep and then things would get better. He also experienced racing thoughts that were often very weird. He then began drinking again in order to go to sleep.



FORENSIC COMPETENCY EVALUATION      DONALD O. WILLIAMS    PAGE 3 OF 6

A review of his medical records at Florida Hospital Waterman, reported that he was alert and fully oriented however had problems with anxiety when he was seen in July, 2000. A review of his medical records at Lake County Jail revealed that Mr. Williams has been diagnosed with Bipolar Disorder and prescribed Depakote, 500 mg, and Sinequan, 100 mg.

TELEPHONE INTERVIEW WITH JANIE RANK: Ms. Ranck stated that Mr. Williams' father was diagnosed with Bipolar Disorder. She stated Donald had significant problems with mood swings and was diagnosed as having a split personality when he was younger. For example, he would be fine one minute and then would have problems the next minute. She explained that Mr. Williams experienced lots of physical, emotional, and mental abuse. His father beat him up and left marks on him. She also described current periods he went through as an adult. For example, at one point, he would be fine and then he would go into another stage and experience four or five days without sleeping as well as hallucinations.

TELEPHONE INTERVIEW WITH KAY HARVEY, MR. WILLIAMS' FIANCEE: Ms. Harvey stated that she has lived with Mr. Williams for approximately twelve years. She sees him mainly on the weekends because he has to travel a lot for his work in construction. She described him as experiencing periods when he had difficulty sleeping. She also stated that at times he seemed to see things that nobody else would. She also acknowledged that he had a drinking problem, however drank for what she believed was self-medication. He was previously hit by a car and experienced much physical pain. She added that around the time he was arrested he was having significant problems with hallucinations and delusions.

MENTAL STATUS EXAMINATION/BEHAVIORAL OBSERVATIONS: Mr. Williams presented as a 40-year-old, Caucasian male who appeared his stated age. Height and weight appeared within the average range. His behavior was cooperative and he was well mannered. Mr. Williams' speech was fluent, coherent, and goal directed. The content was relevant to the examiner's questions. Mood was flat and affect appropriate. Mr. Williams denied any current hallucinations or delusions, but acknowledged previous ones. There were no current perceptual disturbances noted. Recent and remote memory appeared generally intact except for periods of reported blackouts characterized by loss of memory regarding some events surrounding his arrest.

COMPETENCY EVALUATION: During the competency evaluation, Mr. Williams was asked a number of questions related to his competency to proceed as stipulated in the Florida Rules of Criminal Procedures.

FORENSIC COMPETENCY EVALUATION        DONALD O. WILLIAMS    PAGE 6 OF 6

**RECOMMENDATION:**   Continued psychopharmacological treatment of his Bipolar Disorder.

Thank you referring Mr. Donald Williams for a forensic competency evaluation. Should you have any questions or concerns, please do not hesitate to contact me.

Sincerely,

Jacquelyn Olander, Ph.D.
Licensed Psychologist

JO/seb

Exhibit-O

1

IN THE CIRCUIT COURT OF THE
FIFTH JUDICIAL CIRCUIT, IN AND
FOR LAKE COUNTY, FLORIDA

CASE NO. 00-2130-CF-A

STATE OF FLORIDA,

     Plaintiff,

vs.                      *EXCERPT OF PROCEEDINGS*

DONALD WILLIAMS,

     Defendant.

_____/


     Transcript of the PROCEEDINGS held on the 5th day of
November, 2001, taken at the Lake County Judicial Center,
550 West Main Street, Tavares, Florida, before the
HONORABLE DON BRIGGS, Circuit Court Judge. Reported by
Tina M. Gallant-Williams, Certified Verbatim Reporter.

APPEARANCES:

ANITA GERACI, ESQ., Assistant State Attorney, 550 West
Main Street, Tavares, Florida 32778, on Behalf of the
State of Florida.

JEFFREY HIGGINS, ESQ., Assistant Public Defender, 550
West Main Street, Tavares, Florida 32778, on Behalf of
the Defendant, Donald Williams.


KERR & ASSOCIATES
614 SINCLAIR AVENUE
TAVARES, FLORIDA 32778
(352)742-3144

000290

1    * EXCERPT OF PROCEEDINGS *

2    THE COURT: Okay. Are we ready?

3    MR. HIGGINS: Judge, as Miss Geraci has

4 previously discussed, it appears that we have

5 reached an agreement with the State Attorney's

6 Office.

7    Obviously, this is case number 00-2130-CF-A,

8 the State versus Donald Williams. Mr. Williams

9 was initially charged by Information with one

10 count of Sexual Battery, using force not likely

11 to cause injury, one count of Kidnapping, one

12 count of Grand Theft.

13    Sexual Battery is a second degree felony

14 punishable by a maximum of fifteen years in

15 prison and a ten thousand dollar fine.

16    Kidnapping is a life felony, punishable

17 by a maximum of life in prison and a fifteen

18 thousand dollar fine.

19    And, Grand Theft is a third degree felony

20 punishable by a maximum of five years in prison

21 and a five thousand dollar fine.

22    Pursuant to plea negotiations with the

23 State, Mr. Williams is prepared to withdraw

24 any previously entered plea of not guilty and

25 tender to the Court a plea of no contest with

26 the understanding that he will be adjudicated

949

3

1   guilty of the amended charge of Car-Jacking,

2   a first degree felony.

3        Pursuant to this plea, he will be sen-

4   tenced to thirty years D.O.C., with twenty

5   years suspended on a condition that he com-

6   plete five years sex offender probation,

7   followed by fifteen years supervised felony

8   probation.  Special conditions of his super-

9   vision are that he shall submit a DNA sample

10  to F.D.L.E., make restitution to the victim

11  in the amount of three hundred and fifty

12  dollars, I believe that was the car, pay a

13  fine of ten thousand dollars and shall have

14  no contact with the victim.  And for the

15  record, the victim's name is Darla Pruitt.

16  He shall receive credit for all time served

17  since his initial arrest on October 28th

18  2000.  Standard costs and fines shall be

19  paid over the course of Mr. Williams' super-

20  vision and are included in this Cost Order.

21       I have gone over the plea with Mr.

22  Williams and I have explained to him and

23  he understands that by signing this Plea

24  Agreement before you today he is waiving

25  his right to a trial, his right to call

4

```
 1      witnesses, his right to cross-examine the
 2      State's witnesses, as well as his right
 3      to testify on his own behalf or to remain
 4      silent without comment from the State.
 5      He further understands he is waiving his
 6      right to claim any affirmative defenses,
 7      including the fact that he did not commit
 8      the crime alleged.
 9          We stipulate to a factual basis for
10      the charge, to which Mr. Williams is plead-
11      ing based on the documents contained in the
12      court file, and I would tender Mr. Williams
13      to the Court, at this time.
14          I have also, incidently, Judge, explain-
15      ed to Mr. Williams that if he violates any
16      of the terms and conditions of his probation-
17      ary supervision, the Court will have no dis-
18      cretion but to sentence him to twenty years
19      in prison, the remaining twenty years, no
20      more, no less.
21          THE COURT:  I don't procedurally under-
22      stand what we are doing in terms of the
23      charge.
24          MS. GERACI:  We wanted to make sure,
25      since it is not a lesser included offense
```

5

1     for any of the offenses that I did file --

2         THE COURT:  Can you do that after --

3         MS. GERACI:  I can give you a factual

4     basis for the Car-Jacking --

5         MR. HIGGINS:  Judge, we will waive any

6     objection in terms of the timing on it, be-

7     cause given the nature of the way the plea

8     has come about, I'm assuming that Miss

9     Geraci will file the Unarmed Car-Jacking

10    Information --

11        MS. GERACI:  I can provide that to

12    you --

13        THE COURT:  Well, is the State ore

14    tenus moving to amend the Information to

15    include a charge of Car-Jacking only?

16        MS. GERACI:  Yes, sir.

17        THE COURT:  All right.  The motion is

18    granted.

19        Mr. Higgins, you're waiving any objec-

20    tion to the filing of the Information post

21    sentencing?

22        MR. HIGGINS:  Yes, sir.

23        THE COURT:  Okay.  And understand that

24    we could postpone the sentencing until after

25    that is done --

6

1    MR. HIGGINS:  The gang is all here, so --

2    THE COURT:  Which would not happen, be-

3  cause we have a jury down the hall, so it is

4  now or never.

5    MR. HIGGINS:  Yes, sir.

6    THE COURT:  You have talked with the

7  victim?

8    MS. GERACI:  I have spoken with the

9  victim and she is in agreement with this

10  Plea Agreement that has been signed.  I have

11  spoken with Detective Watkins of the Sheriff's

12  Office, he would have liked it to have in-

13  cluded a sentence that would have labeled

14  Mr. Williams as a sex offender, however,

15  that doesn't qualify under the Car-Jacking

16  that he is pleading to, he discussed that,

17  he is present in the courtroom and I believe

18  that he is fine with the plea as it stands.

19    THE COURT:  Detective Watkins, are you

20  alright with this plea?

21    MR. WATKINS:  Like State Attorney Geraci

22  said, there was a sex offense included and

23  I think he should be labeled as such, but...

24    MS. GERACI:  The reason that I'm -- that

25  we are doing this against what Detective

1 Watkins wants is that when I spoke with Miss

2 Pruitt, I advised her what the plea was, and

3 she really does not want to have to come in

4 and relate in front of the jury, and especially

5 in front of the defendant, what occurred, and

6 she doesn't want to see him, and that was the

7 reason that she accepted the Plea Agreement,

8 and that's why we reached the agreement --

9  THE COURT:  I mean, I just don't want to

10 be reading in the newspaper tomorrow that the

11 Sheriff's Office is adamantly opposed to this

12 plea and getting a bunch of correspondence

13 about it.

14  MR. WATKINS:  You won't hear that from

15 me, Judge.

16  THE COURT:  Okay.  I mean, if you've

17 got to say it, say it now and we will deal

18 with it.

19  MR. WATKINS:  If it will make the victim

20 happy, sir, I will do what the victim says.

21  THE COURT:  Okay.  All right, sir, raise

22 your right hand.

23  THE DEFENDANT:  (So doing.)

24  THE COURT:  Do you swear the evidence

25 you're about to give will be the truth, the

8

1      whole truth and nothing but the truth, so

2      help you God?

3              THE DEFENDANT:  I do.

4              THE COURT:  Did you sign this agreement?

5              THE DEFENDANT:  I did.

6              THE COURT:  Did you read it?

7              THE DEFENDANT:  Yes, sir.

8              THE COURT:  Do you understand it?

9              THE DEFENDANT:  Yes, sir.

10             THE COURT:  Did you sign it voluntarily?

11             THE DEFENDANT:  Yes, sir.

12             THE COURT:  Are you satisfied with the

13     advice of your counsel?

14             THE DEFENDANT:  Yes, sir.

15             THE COURT:  Do you understand what Mr.

16     Higgins told me and is what he told me correct?

17             THE DEFENDANT:  Yes, sir.

18             THE COURT:  Are you under the influence

19     of any drugs, alcohol, medication or narcotics?

20             THE DEFENDANT:  No, sir.

21             THE COURT:  Do you believe this plea to

22     be in your best interest?

23             THE DEFENDANT:  Yes, sir.

24             THE COURT:  Has Mr. Higgins or anyone else

25     made any promises, guarantees or assurances to

955

9

1    you as to when you will be released?

2         THE DEFENDANT:  No, sir.

3         THE COURT:  You understand that initially

4    you may serve the entire ten years depending on

5    how you behave and whatever rules the department

6    has?

7         THE DEFENDANT:  Yes.

8         THE COURT:  And you understand, sir, that

9    if you violate any terms or conditions of your

10   release, that you will be sentenced to twenty

11   years, or the remainder of the sentence, in

12   the Department of Corrections?

13        THE DEFENDANT:  I understand.

14        THE COURT:  All right.  The Court finds

15   that you are competent, that you understand

16   the charges, that you signed the agreement

17   voluntarily.  I further find that there is

18   a factual basis for the plea after consider-

19   ation of the Probable Cause Affidavit in

20   the court file.  I'm going to accept the

21   agreement to the amended charge of Car-

22   Jacking.  You are adjudicated guilty.  You

23   are sentenced to thirty years in the Depart-

24   ment of Corrections, special conditions that

25   the final twenty years be suspended on the

10

1          condition that you complete five years sex

2          offender probation, followed by fifteen

3          years supervised felony probation, special

4          conditions of that supervision that you

5          submit a DNA sample, make restitution to

6          the victim in the amount of three hundred

7          and fifty dollars, that you pay a fine of

8          ten thousand dollars, and that you have no

9          contact, direct or indirect with the victim

10         in the case.  You will receive credit for

11         time served since your date of initial arrest

12         on October 28th 2000.  The court costs and

13         fines indicated in the Plea Agreement will

14         be paid over the period of your probation,

15         unless otherwise indicated and you are other-

16         wise to comply with the standard conditions

17         of probation, which are attached to and made

18         a part of the agreement, as well as the

19         standard conditions of sex offender probation,

20         which are attached and made part of the

21         agreement.

22              Do you understand the sentence, sir?

23              THE DEFENDANT:  I understand.

24              MR. HIGGINS:  Judge, while Mr. Williams

25         is in the courtroom, I would like to go ahead

11

1    and make, if I could, the initial sort of

2    informal Plea Agreement part of the court

3    file, if possible.

4          THE COURT:  Yes, sir.

5          MR. HIGGINS:  Assuming there is no

6    objection from the State.

7          MS. GERACI:  No, sir.

8          THE COURT:  Okay.

9    (WHEREUPON, the above proceedings were adjourned.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

12

1

C E R T I F I C A T E

STATE OF FLORIDA )

COUNTY OF LAKE    )

I, TINA M. GALLANT-WILLIAMS, Certified Verbatim Reporter
and Notary Public, State of Florida at Large, do hereby
certify that I was authorized to and did report in shorthand
the above and foregoing proceedings and that thereafter my
shorthand notes were transcribed and reduced to typewriting
by me, and that they contain a full, true and correct
transcription of my shorthand notes taken therein.

Done and signed this 3rd day of July, 2003, in the County
of Lake, State of Florida.

TINA M. GALLANT-WILLIAMS, C.V.R.


Tina M. Gallant
MY COMMISSION # DD159433 EXPIRES
November 13, 2006
BONDED THRU TROY FAIN INSURANCE, INC.

9⁵9

P

Exhibit-P (P1.P2.P3)

| DONALD WILLIAMS | APPEAL CASE NO. | 5D04-2823 |
|---|---|---|
| Appellant | | |
| STATE OF FLORIDA | TRIAL COURT CASE NO. | 00-2130-CF |
| Appellee | | |

**INDEX TO RECORD ON APPEAL**
**CRIMINAL/OTHER**
**VOLUME I PAGE 1 OF 3**

| DATE | INSTRUMENT FILED | PAGE NUMBER |
|---|---|---|
| Oct 31, 2000 | Affidavit And Order Determining Probable Cause | 1-5 |
| Oct 31, 2000 | Affidavit Of Indigency, Application/Order Appointing The Public Defender | 6 |
| Nov 20, 2000 | Decline To File As Minimum Mandatory Memorandum | 7-8 |
| Nov 20, 2000 | Announcement Of No Information | 9-12 |
| Nov 20, 2000 | Information For Count I Sexual Battery Involving Physical Force Not Likely To Cause Serious Personal Injury; Count II Kidnaping; Count III Grand Theft | 13-14 |
| Nov 28, 2000 | Defendant's Plea Of Not Guilty | 15 |
| Nov 28, 2000 | Defense Notice Of Discovery | 16-17 |
| Nov 30, 2000 | State's Discovery Exhibit | 18-22 |
| Feb 12, 2001 | Motion For Continuance And Waiver Of Speedy Trial | 23 |
| Jun 14, 2001 | *****SEALED*****Ex Parte Motion To Appoint Confidential Expert Under Seal *****SEALED***** | 24 |
| Jun 14, 2001 | *****SEALED*****Order Appointing Confidential Psychiatric Expert And Sealing The Motion For Appointment And Sealing This Order Appointing Confidential Expert *****SEALED***** | 25-29 |
| Jul 05, 2001 | Correspondence From Defendant's Mother | 30-35 |
| Aug 07, 2001 | Letter From Shirley Harvey Regarding Legal Representation Of Donald Williams By APD Higgins | 36-38 |
| Aug 08, 2001 | Correspondence From Defendant's Mother | 39-46 |
| Aug 16, 2001 | Order Setting Cases For Criminal Jury Trial And Establishing Trial Priority | 47-48 |
| Aug 16, 2001 | Order Setting Cases For Criminal Jury Trial And Establishing Trial Priority | 49-50 |
| Aug 20, 2001 | Correspondence From Defendant Requesting That APD Higgins Be Removed From His Case | 51-52 |
| Aug 20, 2001 | Addendum To State's Witness List | 53 |
| Aug 27, 2001 | Correspondence From Defendant's Brother | 54 |
| Aug 28, 2001 | State's Motion and Order To Continue | 55 |

RECEIVED

Office of the Attorney General
Daytona Beach, Florida



| | | |
|---|---|---|
| **DONALD WILLIAMS**<br><br>Appellant | **APPEAL CASE NO.** | **5D04-2823** |
| **STATE OF FLORIDA**<br><br>Appellee | **TRIAL COURT CASE NO.** | **00-2130-CF** |

**INDEX TO RECORD ON APPEAL**
**CRIMINAL/OTHER**
**VOLUME I PAGE 2 OF 3**

| DATE | INSTRUMENT FILED | PAGE NUMBER |
|---|---|---|
| Aug 28, 2001 | Order Granting State's Motion For Continuance | 56 |
| Aug 31, 2001 | Defendant's Request For A New Public Defender | 57 |
| Sep 13, 2001 | Letter Enclosed With Jury Summons To Prospective Jurors | 58 |
| Sep 20, 2001 | Letter Enclosed With Jury Summons To Prospective Jurors | 59 |
| Oct 10, 2001 | Order Setting Cases For Criminal Pre-Trial Conference And Establishing Trial Priority | 60-61 |
| Oct 10, 2001 | Order Setting Cases For Criminal Jury Trial And Establishing Trial Priority | 62-63 |
| Oct 25, 2001 | Addendum To State's Tangible Evidence List | 64 |
| Oct 29, 2001 | Addendum To State's Witness List | 65-66 |
| Oct 31, 2001 | Addendum To State's Tangible Evidence List | 67 |
| Nov 02, 2001 | Addendum To State's Witness List | 68 |
| Nov 05, 2001 | Plea Agreement (Rough Draft) | 69 |
| Nov 05, 2001 | Waiver Of Rights And Agreement To Enter Plea | 70-75 |
| Nov 05, 2001 | Scoresheet | 76-77 |
| Nov 05, 2001 | Restitution Order | 78 |
| Nov 05, 2001 | Victim Information Form | 79 |
| Nov 05, 2001 | Order Assessing Additional Charges, Costs, And Fines And Entering Final Judgment (If Indicated) To Be Recorded | 80 |
| Nov 05, 2001 | Uniform Commitment To Custody Of Department Of Corrections | 81 |
| Nov 05, 2001 | Clerk's Certification For DOC Paperwork | 82 |
| Nov 05, 2001 | Nolle Prosequi | 83-85 |
| Nov 05, 2001 | Amended Information For: Car Jacking | 86-88 |
| Nov 14, 2001 | Judgment And Fingerprints | 89-90 |
| Nov 14, 2001 | Sentence | 91-94 |
| Nov 14, 2001 | Judgment Of Guilt And Placing Defendant On Sex Offender Probation | 95-100 |

| DONALD OTIS WILLIAMS | Appeal Case No: 5D13-4404 |
| Appellant | |
| | Trial Case No:    2000 CF 002130 |
| STATE OF FLORIDA | |
| Appellee | |

INDEX TO RECORD ON APPEAL
JUDGEMENT AND SENTENCE
VOLUME  I

| Date | INSTRUMENT FILED | Page Number |
|------|------------------|-------------|
| Oct 31, 2000 | FILED:  AFFIDAVIT AND ORDER DETERMINING PROBABLE CAUSE *NO VICTIM CONTACT* | 1-5 |
| Nov 20, 2000 | FILED:  ANNOUNCEMENT OF NO INFORMATION-CAR JACKING; BATTERY & AGGRAVATED ASSAULT | 6-10 |
| Nov 20, 2000 | FILED:  INFORMATION-CT I SEXUAL BATTERY INVOLVING PHYSICAL FORCE NOT LIKELY TO CAUSE SERIOUS PERSONAL INJURY (F2); CT II KIDNAPING (F1PBL); CT III GRAND THEFT (F3) | 11-12 |
| Nov 28, 2000 | FILED:  DEFENDANT'S PLEA OF NOT GUILTY BY JEFFERY HIGGINS/APD | 13 |
| Nov 28, 2000 | FILED:  DEFENSE NOTICE OF DISCOVERY | 14-15 |
| Nov 30, 2000 | FILED:  STATE'S DISCOVERY EXHIBITS | 16-20 |
| Feb 12, 2001 | FILED:  MOTION/ORDER FOR CONTINUANCE AND WAIVER OF SPEEDY TRIAL | 21 |
| Aug 16, 2001 | FILED:  ORDER SETTING CASES FOR CRIMINAL PRE-TRIAL CONFERENCE AND ESTABLISHING TRIAL PRIORITY-082801-1:30PM | 22-23 |
| Aug 16, 2001 | FILED:  ORDER SETTING CASES FOR CRIMINAL JURY TRIAL AND ESTABLISHING TRIAL PRIORITY-091001 AND/OR 091701 9:00A | 24-25 |
| Aug 20, 2001 | FILED:  PRO SE COMMUNICATION FROM DEFT-SEEKING THE REMOVAL OF APD HIGGINS AS COUNSEL | 26-27 |

| DONALD OTIS WILLIAMS<br>Appellant | Appeal Case No:  5D13-4404 |
| STATE OF FLORIDA<br>Appellee | Trial Case No:   2000 CF 002130 |

INDEX TO RECORD ON APPEAL
JUDGEMENT AND SENTENCE
VOLUME  I

| Date | INSTRUMENT FILED | Page Number |
|------|------------------|-------------|
| Aug 20, 2001 | FILED:  ADDENDUM TO STATES WITNESS LIST | 28 |
| Aug 28, 2001 | FILED:  STATE'S MOTION AND ORDER TO CONTINUE | 29 |
| Aug 28, 2001 | FILED:  ORDER GRANTING STATE'S MOTION FOR CONTINUANCE | 30 |
| Oct 10, 2001 | FILED:  ORDER SETTING CASES FOR CRIMINAL PRE TRIAL CONFERENCE AND ESTABLISHING TRIAL PRIORITY-102301-1:30PM | 31-32 |
| Oct 10, 2001 | FILED:  ORDER SETTING CASES FOR CRIMINAL JURY TRIAL AND ESTABLISHING TRIAL PRIORITY-110501/111301-9AM | 33-34 |
| Oct 25, 2001 | FILED:  ADDENDUM TO STATES TANGIBLE EVIDENCE LIST | 35 |
| Oct 29, 2001 | FILED:  ADDENDUM TO STATES WITNESS LIST | 36-37 |
| Oct 31, 2001 | FILED:  ADDENDUM TO STATE'S TANGIBLE EVIDENCE LIST | 38 |
| Nov 02, 2001 | FILED:  ADDENDUM TO STATE'S WITNESS LIST | 39 |
| Nov 05, 2001 | FILED:  WAIVER OF RIGHTS AND AGREEMENT TO ENTER PLEA | 40-45 |
| Nov 05, 2001 | FILED:  SCORESHEET | 46-47 |
| Nov 05, 2001 | FILED:  RESTITUTION ORDER-$350 (VICTIM) | 48 |
| Nov 05, 2001 | FILED:  CHARGES/COSTS/FEES ASSESSMENT ORDER FROM SENTENCING | 49 |

|  |  |  |
|---|---|---|
| | ATTY PRESENT-CONT TO 11/26/2001 FOR SNT | |
| 10/29/2001 | FILED: ADDENDUM TO STATES WITNESS LIST | 0.00 |
| 10/29/2001 | FILED: STATE SUBP FRO TRIAL TERM 110501/111301-8 WITNESSES | 0.00 |
| 10/25/2001 | FILED: ADDENDUM TO STATES TANGIBLE EVIDENCE LIST | 0.00 |
| 10/25/2001 | FILED: DEPOSITIONS TAKEN ON LAURA HARGROVE, DARLA PRUITT, CLAY WATKINS. ATTYS WERE GERACI AND HIGGINS. | 0.00 |
| 10/23/2001 | DEFT W/M PRES FOR PRE-TRIAL CONFERENCE-ATTY HIGGINS/APD PRES-DEFT DOES NOT ACCEPT STATE'S OFFER; CASE REMAINS ON TRIAL DOCKET, 2 DAY TRIAL, 10 CHALLENGES EACH | 0.00 |
| 10/10/2001 | FILED: ORDER SETTING CASES FOR CRIMINAL JURY TRIAL AND ESTABLISHING TRIAL PRIORITY-110501/111301-9AM | 0.00 |
| 10/10/2001 | FILED: ORDER SETTING CASES FOR CRIMINAL PRE TRIAL CONFERENCE AND ESTABLISHING TRIAL PRIORITY-102301-1:30PM | 0.00 |
| 10/05/2001 | FILED: NOTICE TO DEFT FOR 10/19/2001 PNC / 10/29/2001 SENT | 0.00 |
| 10/01/2001 | FILED: RETURN OF SERVICE-DEFENSE SUBP FOR TAKING DEPO-102501-CLAY WATKINS SERVED 091301;LAURA HARGOVE SERVED 091801; DARLA PRUITT NOT SERVED | 0.00 |
| 10/01/2001 | DEFT NOT PRESENT FOR SENT-ATTY PRESENT-CONT TO 10/29/2001 FOR SNT | 0.00 |
| 09/20/2001 | FILED: LETTER ENLCOSED WITH JURY SUMMONS TO PROSPECTIVE JURORS | 0.00 |
| 09/14/2001 | FILED: RETURN OF SERVICE PRAECIPE/SUBPOENA FOR TRIAL TERM-091001 AND/OR 091701 (SA) LAURA HARGROVE SERVED ON 09801 | 0.00 |
| 09/13/2001 | FILED: LETTER ENCLOSED WITH JURY SUMMONS TO PROSPECTIVE JURORS | 0.00 |

| | | |
|---|---|---|
| 09/12/2001 | FILED: RETURN OF SERVICE PRAECIPE/SUBPOENA FOR TRIAL TERM-091001-SHAWN JOHNSON SERVED ON 083001 | 0.00 |
| 09/10/2001 | FILED: NOTICE TO DEFT FOR 09/21/2001 PNC / 10/01/2001 SENT | 0.00 |
| 09/10/2001 | FILED: NOTICE, PRAECIPE & SUBPOENA FOR TAKING DEPO-102501 (PD) 3 WITNESSES | 0.00 |
| 09/07/2001 | FILED: RETURN OF SERVICE PRAEICPE/SUBPOENA FOR TRIAL TERM-091001 AND/OR 091701 (SA) GREG HALL SERVED ON 082701; SHIRLEY HARVEY NOT SERVED | 0.00 |
| 09/04/2001 | FILED: RETURN OF SERVICE PRAECIPE/SUBPOENA FOR TRIAL TERM-091001 AND/OR 091701 (SA) CHAD HARMON SERVED ON 083101 | 0.00 |
| 09/04/2001 | DEFT NOT PRESENT FOR SENT-ATTY PRESENT-CONT TO 10/01/2001 FOR SNT | 0.00 |
| 08/31/2001 | FILED: PRO-SE COMMUNICATION REQUESTING A NEW PUBLIC DEFENDER **CIRCULATE** | 0.00 |
| 08/30/2001 | FILED: RETURN OF SERVICE PRAECIPE/SUBPOENA FOR TRIAL TERM-091001 AND/OR 091701 (SA) BRIAN MELOY NOT SERVED; ROB BEAR NOT SERVED | 0.00 |
| 08/29/2001 | FILED: RETURN OF SERVICE PRAECIPE/SUBPOENA FOR TRIAL TERM-091001 AND/OR 091701 (SA) MARY JO RICHARDSON SERVED ON 082901; MICHELLE DOLAN SERVED ON 082801; ROY DOBBS SERVED ON 082801; MIKE GOSS SERVED ON 082801; TIM GREEN SERVED ON 082401 CLAY WATKINS NOT SERVED; DARLA PRUITT NOT SERVED; JULIA DUNCAN SERVED ON 082901 | 0.00 |
| 08/28/2001 | DEFT W/M PRES FOR PRE-TRIAL CONFERENCE-ATTY HIGGINS/APD PRES-CASE CONTINUED TO NEXT DOCKET | 0.00 |
| 08/28/2001 | FILED: ORDER GRANTING STATE'S MOTION FOR CONTINUANCE | 0.00 |

| | | |
|---|---|---|
| 08/28/2001 | DEFT W/M PRES FOR MOTION HEARING-ATTY HIGGINS/APD PRES- ASA ASKS FOR A CONTINUANCE; FDLE IS STILL ANALYZING FINGERPRINTS & FINGERNAIL SCRAPINGS; COURT GRANTS CONTINUANCE | 0.00 |
| 08/28/2001 | FILED: STATE'S MOTION AND ORDER TO CONTINUE | 0.00 |
| 08/27/2001 | FILED: CORRESONDANCE FROM RANDY WILLIAMS-REQUESTING A NEW PUBLIC DEFENDER **CIRCULATE** | 0.00 |
| 08/23/2001 | FILED: SUBPOENA FOR TRIAL TERM BEG 091001 TO 091701-STATE-15 WITNESSES | 0.00 |
| 08/21/2001 | FILED: RETURN OF SERVICE PRAECIPE/SUBPOENA FOR DEPO- 090401 (PD) CLAY WATKINS SERVED ON 081401; LAURA HARGROVE SERVED ON 081501; DARLA PRUITT NOT SERVED | 0.00 |
| 08/20/2001 | FILED: ADDENDUM TO STATES WITNESS LIST | 0.00 |
| 08/20/2001 | FILED: PRO SE COMMUNICATION FROM DEFT-SEEKING THE REMOVAL OF APD HIGGINS AS COUNSEL | 0.00 |
| 08/16/2001 | FILED: ORDER SETTING CASES FOR CRIMINAL JURY TRIAL AND ESTABLISHING TRIAL PRIORITY- 091001 AND/OR 091701 9:00A | 0.00 |
| 08/16/2001 | FILED: ORDER SETTING CASES FOR CRIMINAL PRE-TRIAL CONFERENCE AND ESTABLISHING TRIAL PRIORITY-082801-1:30PM | 0.00 |
| 08/10/2001 | FILED: JUDGE'S REVIEW FORM RE: CORRESPONDENCE **CIRCULATE** | 0.00 |
| 08/10/2001 | FILED: NOTICE TO DEFT FOR 08/24/2001 PNC / 09/04/2001 SENT | 0.00 |
| 08/09/2001 | FILED: NOTICE, PRAECIPE & SUBPOENA FOR TAKING DEPO- 090401 (PD) 3 WITNESSES | 0.00 |
| 08/08/2001 | FILED: CORRESPONDENCE FROM DEFT'S MOTHER JANIE RANCK | 0.00 |
| 08/07/2001 | FILED: LETTER FROM SHIRLEY HARVEY REGARDING DONALD O | 0.00 |

|  |  |  |
|---|---|---|
| | WILLIAMS LEGAL REPRESENTATION BY APD HIGGINS | |
| 08/06/2001 | DEFT NOT PRESENT FOR SENT-ATTY PRESENT-CONT TO 09/04/2001 FOR SNT | 0.00 |
| 07/23/2001 | FILED: DEPOSITIONS TAKEN ON JULIA DUNCAN, MARY JO RICHARDSON. ATTYS HIGGINS AND GERACI. | 0.00 |
| 07/18/2001 | FILED: RETURN OF SERVICE PRAECIPE/SUBPOENA FOR DEPO-072301 (PD) CLAY WATKINS SERVED ON 062201; LAURA HARGROVE SERVED ON 062501; MARY JO RICHARDSON SERVED ON 070201; JULIA DUNCAN SERVED ON 071701 | 0.00 |
| 07/13/2001 | FILED: NOTICE TO DEFT FOR 07/25/2001 PNC / 08/06/2001 SENT | 0.00 |
| 07/09/2001 | DEFT NOT PRESENT FOR SENT-ATTY PRESENT-CONT TO 08/06/2001 FOR SNT | 0.00 |
| 07/05/2001 | FILED: CORRESPONDENCE FROM DEFT'S MOTHER JANIE RANCK | 0.00 |
| 06/20/2001 | FILED: RETURN OF SERVICE PRAECIPE/SUBPOENA FOR DEPO-072301 (PD) GREG HALL NOT SERVED-NO EMPLOYEE BY THAT NAME; ROB BEAR NOT SERVED-NO LONGER EMPLOYED WITH LCSO | 0.00 |
| 06/19/2001 | FILED: NOTICE, PRAECIPE & SUBPOENA FOR TAKING DEPO-072301 (PD) 6 WITNESSES | 0.00 |
| 06/19/2001 | FILED: NOTICE TO DEFT FOR 06/28/2001 PNC / 07/09/2001 SENT | 0.00 |
| 06/14/2001 | FILED: ORDER **SEALED** | 0.00 |
| 06/14/2001 | FILED: MOTION **SEALED** | 0.00 |
| 06/11/2001 | DEFT NOT PRESENT FOR SENT-ATTY PRESENT-CONT TO 07/09/2001 FOR SNT | 0.00 |
| 05/21/2001 | FILED: NOTICE TO DEFT FOR 06/06/2001 PNC / 06/11/2001 SENT | 0.00 |
| 05/14/2001 | DEFT NOT PRESENT FOR SENT-ATTY PRESENT-CONT TO 06/11/2001 FOR SNT | 0.00 |
| 04/24/2001 | FILED: NOTICE TO DEFT FOR 05/08/2001 PNC / 05/14/2001 SENT | 0.00 |

Exhibit- Q

IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT OF FLORIDA,
IN AND FOR LAKE COUNTY

CASE NUMBER: 2000-2130-CF

STATE OF FLORIDA

vs.

DONALD O. WILLIAMS
    Defendant

_____/

## ORDER PROHIBITING PRO SE FILINGS

THIS CAUSE, having come before the Court and the Court finding that it entered an Order to Show Cause on September 16, 2004, and that the Defendant has failed to show cause why this Court should not restrict future pro se pleadings filed by the Defendant and require that all future pleadings be signed by attorney licensed to practice law in the State of Florida, and the Defendant having ignored that Order and continued to file pro se pleadings requesting relief which this Court has numerous times denied, it is thereupon;

ORDERED and ADJUDGED that the Defendant is prohibited from filing future pro se pleadings and all future pleadings filed on behalf of the Defendant shall be signed by an attorney licensed to practice law in the State of Florida and the Clerk of the Court shall refuse to accept for filing any further pro se pleadings by this Defendant.

This Order shall not affect the "Motion to Review Violations of Constitutional Laws and Rights" filed by the Defendant pro se, which the Supreme Court of Florida has transferred to this Court to treat as a petition for post-conviction relief, or the Petition for Writ of Mandamus transferred to this Court by the Florida Supreme Court.



DONE AND ORDERED in chambers at Tavares, Lake County, Florida on this

_____ day of October, 2004.

_____
LAWRENCE J. SEMENTO
Circuit Court Judge

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been

forwarded by US mail on this _____ day of October, 2004 to:

Donald Williams # U13479 B1 117H
Sumter Correctional Institution
Post Office Box 667
Bushnell, Florida 33513

State Attorney
550 W. Main Street
Tavares, Florida 32778

_____
Deputy Clerk

STATE OF FLORIDA, COUNTY OF LAKE
I HEREBY CERTIFY the above and foregoing
is a true copy of the document filed in this office.
Neil Kelly, Clerk of Circuit Court
By _____ Deputy Clerk
Dated _____
This document may be redacted as required by law.

R

Exhibit - R (R1, R2, R3)

October 11, 2002

Donald O. Williams
C-1 118U C.C.I.
Route 7 Box 376
Lake City, Florida  32055

     Re:    Florida Bar Complaint, Case No.: 2003-30,452(05B)

Dear Mr. Williams:

On October 28, 2000, while at the Lake County Jail, Deputy Hargrove spoke with you, after reading you your Miranda rights, concerning your involvement in a carjacking, kidnapping, sexual battery and aggravated assault that had been committed early that morning. During your conversation with her you stated that you no longer wished to speak with her and that you wanted an attorney. Deputy Hargrove did not continue the interview.

Detective Clay Watkins entered the room to advise you what he, as the investigating detective, was charging you with. Before he could advise you of the charges, you asked him what you were arrested for. At that time Detective Watkins, on tape, read you Miranda. He stressed to you that you had requested an attorney, and asked if you wanted to continue the conversation without an attorney. You answered, "sure, sure." You also signed a Certificate of Miranda Warning and Waiver. (Exhibit A).

On November 1, 2000 you completed a Request Form (Exhibit B). On that form you wrote, "I need to speak to the detective investigator on my case - # 087134." On November 2, 2000, Detective Watkins returned to the jail, at your request, to speak with you again. This was also a tape recorded conversation. Detective Watkins read you Miranda again and also had you sign your name on the Request Form. You had previously only printed your name.

You have alleged that I "concealed the fact that [your] rights had been violated . . ." I did not conceal any facts or evidence from your attorney. Also, your rights were not violated. The State's Discovery Exhibit states that "All tangible objects may be inspected, copied . . . at the Lake County Sheriff's Office." The Discovery Exhibit was prepared on

# 4009 v1

November 7, 2000 and copied by your attorney's secretary on December 6, 2000. Therefore, your attorney had access to everything the State did. However, whenever I received any evidence in my office, I turned over copies to your attorney. Your attorney was provided copies of the tapes, copies of the reports which summarized your interviews, and property receipts stating what physical evidence, such as the tapes, existed.

Transcripts of the tapes were ordered after the pre-trial conference when the case was set for trial. This is common practice due to the expense in transcribing. Unless a case is proceeding to trial, transcripts are not necessary. Listening to the tapes is sufficient. The court reporter provided the transcripts to my office on November 3, 2001. On that day copies were provided to your attorney. He had use of the transcripts over the weekend before the jury was to be selected. Any evidence I was made aware of was provided to your attorney. The State also has no obligation to transcribe taped interviews. However, since we chose to do so, copies were provided to your attorney upon receipt of the transcript.

Secondly, your rights were not violated. Once a defendant invokes his right to an attorney, a law enforcement officer cannot continue questioning. However, if a defendant initiates a conversation with a law enforcement officer concerning his case, the law enforcement officer is permitted to speak with the defendant. You instigated the conversation with Detective Watkins. He then read you Miranda again, and clarified whether you wanted to talk to him or whether you wanted an attorney. You chose to talk to him at that time. Then, on November 1, 2000 you again initiated an interview with Detective Watkins by submitting the Request Form. You initiated the conversations both times with Detective Watkins, therefore, those statements would have been admissible had your case proceeded to trial.

Finally, you entered into a negotiated plea waiving your rights to appeal anything except an illegal sentence. You voluntarily entered a plea to carjacking in exchange for the other charges being dismissed. You agreed to a sentence of 30 years Department of Corrections, 20 years suspended upon the completion of 5 years sex offender probation, and 15 years regular probation, DNA sample, no victim contact and restitution of $500.00.

Your second complaint, alleges that I "purposely, blatantly and with extreme malice lied to outside parties that include: Attorney Brenda Smith, her para-legal, a private investigator, a defense witness and though I am not positive, to my defense attorney that D.N.A. evidence would show no doubt that I had committed a sexual battery as well. She told those people that evidence obtained thru D.N.A. testing had shown "without a shadow of a doubt" that only I had done the vile act." First, I did not lie to any of those persons concerning any matter. I do not even recall speaking with a private investigator, or a defense witness.

My conversations with Ms. Smith and her paralegal were regarding a plea offer. I stated numerous times that I would not offer her better plea for you than I had offered

# 4009 v1

To Fla Bar Association:

TO Ms. JoAnn M. Stalcup

My name is Sheryl M. Coolbaugh and at the time of this case involving Donald O. Williams case no: 00-2130-Cf was employed by Brenda H Smith as her Legal Assistant.

When Brenda and I spoke of this case she said NO she would not take his case.

Kay Harvey however hired by us to look at the evidence, speak with Mr Higgins to verify the he was covering all aspects of this case, and 3 rd to speak with Mr. Williams for his recollection of the events that occurred leading up to his arrest. We did as she requested and once again Kay asked her to represent Mr. Williams and Ms. Smith declined. Ms. Smith also refunded $900.00 to Ms. Harvey.

I spoke with Mr. Williams on 2 occasions the first to hear his recollection of events as we informed Ms Harvey our client we would do. I informed him of that in the beginning of our conversation. The second was on Nov 3, 2001 when Ms. Anita Geraci, Brenda Smith, myself and Mr. Higgins was speaking about the case again Ms Smith said she would not represent Mr. Williams. However Ms. Geraci offered him 10 years this would be he final offer that would not be available after 5 p.m Nov 3, 2001. We were across the street from the correctional facility where he was I agreed to go over and present this offer to him, he declined.

Sincerely,

*Sheryl Coolbaugh*
*July 20, 2004*

Mary J. Hartwright
Commission # CC 956160
Expires Sep. 3, 2004
Bonded Thru
Atlantic Bonding Co., Inc.

*Mary J. Hartwright*
*7/20/04*

Mary J. Hartwright



# BRENDA H. SMITH

## ATTORNEY AT LAW

59 North Central Avenue                                    (352) 669-4667
Umatilla, Florida 32784                                    (352) 669-6103 (Fax)

July 27, 2004

Mr. Donald O. Williams
Sumter Correctional Institution
Post Office Box 667
Bushnell, Florida 33513-0667

Re:    Complaint by Donald O. Williams
       Case No. 2005-30,039 (05B)

Dear Mr. Williams:

Thank you for taking the time to write to me regarding the referenced matter. First, I would like to state that the only correspondence I received from you was given to me by the Clerk of the Circuit Court, Felony Division sometime near the beginning of July, 2004. A copy of the letter, along with the envelope addressed to Judge Semento, is enclosed. Due to time constraints, I did not have an opportunity to reply to that letter before I received the referenced complaint from the Florida Bar.

I would like to state my recollection of events and then address your specific concerns. I was retained by Ms. Harvey, not to represent you, but to get copies of the discovery, talk with your public defender Mr. Higgins and determine whether there was a possibility that the trial judge would continue the scheduled trial. At not time did I undertake to represent you in your criminal matter and this was clearly explained to Ms. Harvey. Furthermore, I told Ms. Harvey that it was extremely unlikely that the matter would be continued by the trial judge and, in any event, changing attorney's this close to trial would, more likely than not, be adverse to your interests. I did exactly what Ms. Harvey retained me to do – I obtained copies of the discovery and provided copies to her, had you interviewed and assessed the possibility that the trial judge would continue the trial. In addition, I spoke with Mr. Higgins and the State Attorney concerning the status of plea negotiations. At no time did Mr. Higgins attempt to bribe me to take your case, although he did inform me that you had grieved him with the Florida Bar and tried to convince the trial judge to replace him with another attorney.

I was not present when my paralegal interviewed you at the Lake County Detention Center. Even though she no longer works for me, I was able to find her and have her come in and type a statement to provide to you and the Florida Bar. A copy of that statement is attached. As you can see, Ms. Coolbaugh states that you were informed at the outset that I had been retained by Ms. Harvey, not to represent you, but to explore whether everything was being done that could be done. The only other time Ms. Coolbaugh spoke with you was on or about November 3, 2001 when she conveyed a plea offer that had been made by the State Attorney, Ms. Anita Geraci. That was done as a courtesy to Mr. Higgins because I happened to be talking with him when the offer was conveyed. Ms. Coolbaugh also recollects that I declined to represent you again after reviewing the evidence.

C0793



Page 2 – Bar Response
Donald O. Williams

In closing, let me address your numbered concerns which appear on pages 4 and 5 of your letter:

*Concern number one*: I am more than willing to appear before Judge Lawrence Semento and testify truthfully. I would, however, appreciate receiving a notice regarding the date and time of any hearing.

*Concern number two*: In regard to the fee refund, I did not believe that a refund was necessary since I expended a considerable amount of time reviewing the evidence and talking with Mr. Higgins. Initially, Ms. Harvey and I agreed that I would retain ½ and refund ½. That was done immediately upon her request. Then I was notified by Ms. Harvey that the remaining ½ had been given to her by her mother and that her mother desperately need the funds. I refunded everything but $100 which I kept to cover costs.

*Concern number three*: Mr. Higgins informed my paralegal that copies of all the discovery had already been provided to you so I relied upon that information and did not send copies to you. I provided copies to Ms. Harvey.

*Concern number four*: Again, I do not remember Mr. Higgins trying to bride me. I do remember that he told me that you were a difficult client, had grieved him with the Florida Bar and had tried to convince the trial judge that he was not doing his job.

*Concern number five*: I was not retained or paid to attend any depositions. In fact, I did not know a deposition was scheduled. In any event, I would not have been allowed to attend because I was not attorney of record.

*Concern number six*: As you can see from my former paralegal's statement, she does not recall telling you anything about DNA or scrapings. If you review copies of the discovery you received from Mr. Higgins, you can see that the FDLE report, generated as a result of its testing of such evidence, is there. The report speaks for itself. At no time did I instruct my paralegal to provide you with false evidence.

The remainder of your letter is better addressed by Mr. Higgins, Judge Briggs, Judge Semento and Ms. Anita Geraci and a court of competent jurisdiction.

In closing, I am truly sorry to hear that Ms. Harvey is ill. If you feel that she needs anything, please let me know. In the event that you feel I have not addressed all of your concerns, please feel to write or call. Please note that, if you choose to call, my office has been instructed not to accept collect calls from a correctional facility unless I am available to answer the call. You may have to make several attempts as I am often in court.

Sincerely,

Brenda H. Smith

cc:    JoAnn Marie Stalcup, Esq.
       The Florida Bar
       1200 Edgewater Drive
       Orlando, Florida 32804-6314

Exhibit - S (S1 through S14)

S1

South Tampa Medical Center
Suite 337
508 S. Habana Avenue
Tampa, Florida 33609-4181

# Michael S. Maher, M.D.

### General & Forensic Psychiatry
### Individual Psychotherapy
#### DIPLOMATE AMERICAN BOARD OF PSYCHIATRY & NEUROLOGY

Hours By Appointment
Telephone (813) 801-9100
Fax (813) 801-9150

## FORENSIC PSYCHIATRIC EVALUATION

## CRIMINAL COMPETENCY ASSESSMENT

January 17, 2013

State of Florida
-v-
Donald Williams
Case: 2011-CF-000105

## REASON FOR EVALUATION

This evaluation has been requested by defense counsel, Morris Carranza, Assistant Public Defender, with regard to the Defendant's pending criminal charges. This is a confidential evaluation requested for the purpose of obtaining both general and specific information regarding the Defendant's present state of mind as well as prior condition as it may be relevant to this case. Additionally, when requested the issue of legal competency at the time of the alleged offense(s) has been addressed. The Defendant's suitability for commitment under the appropriate mental health commitment statutes has also been addressed when indicated.

## SUMMARY OF EVALUATION

Mr. Williams has a history of significant criminal behavior. Mr. Williams has a history of significant physical, emotional and psychological childhood trauma; this includes head injuries and a self-reported Seizure Disorder. He developed Post Traumatic Stress Disorder evident in adolescence and continuing throughout adulthood. This pattern became associated with antisocial behavior and criminal convictions.

Recent substantial evaluation of Epileptic Seizure Disorder did not identify present evidence to substantiate this diagnosis. However, the history strongly supports the diagnosis of a non-epileptic seizure or seizure-like phenomenon. This is consistent with his past history of head injuries and Post Traumatic Stress Disorder.

FORENSIC PSYCHIATRIC EVALUATION
CRIMINAL COMPETENCY ASSESSMENT
STATE OF FLORIDA -V- DONALD WILLIAMS
CASE:       2011-CF-000105
M.S. MAHER, M.D.
January 17, 2013
PAGE 6


## MEDICAL CONCLUSIONS AND OPINIONS

Diagnostic Formulation:

Axis I:       Post Traumatic Disorder, based on childhood experiences with a chronic long-term and continuing influence on experience and behavior,

Bipolar Disorder associated with Post Traumatic Stress Disorder and complicated by severe alcohol abuse,

Alcohol abuse in remission secondary to incarceration.

Axis II:      None.

Axis III:     Non-Epileptic "seizure" Disorder, Traumatic Brain Injury.


M. S. MAHER, M.D.
MSM/ldj

DONALD OTIS WILLIAMS     FORENSIC EVALUATION     PAGE 9     10/27/2012     S 2

Review of the Florida Department of Correction records did not show treatment with psychiatric medication during the defendant's incarceration.

It should be noted that the defendant did tell this examiner that he often lived and slept in cemeteries and that prior to the current alleged offenses, the defendant reports that Randy Williams dropped him off at a cemetery where he slept.

It should also be noted that the defendant has reported witnessing two construction workers being buried alive in a ditch and that he tried to rescue them and that one of them died.

## DIAGNOSTIC IMPRESSION:

Axis I:     (Presence of a Major Mental Disorder) – Bipolar affective disorder I with associated psychotic features, most recent episode depressed, in partial remission.
            Post-traumatic stress disorder.
            History of alcohol abuse, rule out dependence.
            History of cannabis abuse.
            Rule out history of abuse of Ephedra.

Axis II:    (Presence of a Personality Disorder and/or Intellectual Deficit) – Rule out personality disorder, not otherwise specified with antisocial and schizotypal features.

Axis III:   (Presence of a Medical Disorder) – Rule out seizure disorder.
            History of closed head injuries resulting most likely in frontal lobe syndrome.

Axis IV:    (Psychosocial Stressors) – Mental illness, substance abuse, history of abuse, involvement with criminal justice system.

Axis V:     (Current Global Assessment of Functioning, 0 - 100)

## DISCUSSION OF CLINICAL AND FORENSIC ISSUES:  From review of the records made available and from my examination of this defendant, I find him to be suffering most probably from bipolar affective disorder, post-traumatic stress disorder, frontal lobe syndrome and has reported having closed head injuries and a history of polysubstance abuse of alcohol and marijuana.  It is my opinion that the defendant is suffering from bipolar affective disorder as he reports having a history of experiencing mood swings, racing thoughts, rage in which he will yell and scream, history of shopping sprees in which he has spent thousands of dollars on impulse, making many phone calls late into the night as well as having excess energy in which he could stay up without having to sleep for a period of up to three weeks in duration.  The above-stated symptoms are cardinal symptoms of mania.  There is also a family history of bipolar disorder as the defendant's father is reported to have suffered from this condition.  This is corroborated by reports from family members including the defendant's mother, Janie Rank, who reported to Dr. Jacquelyn Olander in 2001 that the defendant's father was diagnosed with bipolar disorder and that the defendant himself had significant problems with mood swings.  Dr. Olander also learned from Mr.

Eric Mings Ph.D. PA
16877 East Colonial Drive #405
Orlando, FL 32820
Phone 407-977-0377
Fax   407-359-8892

February 1 2013                          In The Circuit Court Of The
                                         Fifth Judicial Circuit,
                                         In And For Lake County, Florida

                                         Case Number:2011-CF-000105-04

State of Florida,
              Plaintiff,

        Versus

Donald Williams,
              Defendant.

Pursuant to a court order, this evaluator did assess the defendant for the purposes of
determining competency to proceed and competency to represent himself in the
proceedings against him. This evaluation was conducted on January 30 2013 and audio
recorded at the request of the defendant.   The defendant was advised of the limits of
confidentiality.

Evaluative procedures utilized in this assessment included a clinical interview, mental
status evaluation, a structured competency interview, and a review of offense related
records and other records as described below, and prior neuropsychological testing as
described below.  Much of the background information and assessment results were
obtained during my prior evaluations conducted on multiple dates including June 20
2012, July 30 2012, and October 17 2012 for defense counsel for the purposes of
mitigation during sentencing. That information is largely unchanged from my prior report
and  included in this report for background and context of my opinions.

Donald Williams
Legal Evaluation
Page 9

## DIAGNOSTIC OPINION

Axis I:        Dementia Mild Due To Traumatic Brain Injury  (static)
              Alcohol Abuse Severe in forced remission by incarceration
              Bipolar Disorder
Axis II:       None
Axis III:      Traumatic Brain Injury.
              Possible Seizure Disorder
Axis IV:      Psychosocial stressors – cognitive impairment, psychiatric illness and
              criminal litigation.
Axis V:       Global Assessment of Functioning 61-70.

Respectfully submitted,

Eric L. Mings, Ph.D.
Psychologist PY 0004089



# Steven N. Gold Ph.D.

Clinical Psychologist
Psychology License #PY0003230

Executive Square
7501 N.W. 4th St., Suite 215
Plantation, Florida 33317
(954) 587-0977

## FORENSIC PSYCHOLOGICAL EVALUATION

**Name:** Donald O. Williams
**DOB:** July 20, 1960
**Level of Education:** 11th Grade
**Ethnicity:** Caucasian

**Examiner:** Steven N. Gold, Ph.D.
**Date of Examination:** 10/4/12
**Date of Report:** 3/5/13

**Reason for Referral:** Mr. Donald "Donnie" O. Williams is currently incarcerated at the Lake County Jail in Tavares, Florida, charged with First Degree Murder. He was referred to this examiner for forensic psychological evaluation by Attorney Morris Carranza to assess for a history of psychological trauma and the possible presence of posttraumatic stress disorder (PTSD).

**Data Obtained:** The current evaluation is based on seven hours of psychological interviewing of Mr. Donald "Donnie" O. Williams by this examiner. In addition, the examiner reviewed the following records: a mitigation report on Donnie assembled by Mitigation Specialist Ms. Lola Gonzales; extensive school military, medical, social service, and legal documents pertaining to Donnie; a report of a forensic competency evaluation by Dr. Jacquelyn Oleander dated 2001; scores on the Wechsler Adult Intelligence Scale IV and the Wechsler Memory Scale administered to Donnie by Neuropsychologist Dr. Eric Mings and Dr. Mings' notes on these test findings and on his findings from the Delis Kaplan Executive Function System Battery, the Connors Continuous Performance Test, and the Test of Memory Malingering; copies of correspondence written by Donnie's mother between 2000 and 2001 to Public Defender Mr. Jeffrey Higgins and Judge Don Briggs; correspondence from Donnie to the Public Defender's Office; transcripts of Donnie's interviews with Detective Keller dated 12/10/10, with Channel 6 News dated 9/8/11, with Detective Keller and Officer Watkins dated 1/14/11, with Orlando Sentinel newspaper reporter Ms. Arelis Hernandez dated 1/27/11, with Detectives Watkins and Keller dated 9/8/11, with Detectives Dilimone and Keller dated 9/12/11, and with the media dated 9/12/11. Finally, this examiner also conducted telephone interviews with Donnie's cousin Ms. Debbie White on 1/4/13, with his older brother Mr. David Williams on 1/4/13, with his paramour Ms. Shirley Harvey and his son Mr. Ron Jon Williams on 1/4/13, and with his oldest brother Mr. Randy Williams on 1/5/13.

**Family of Origin Background and Early Childhood:** Donnie reports that he was born in Kissimmee, Florida on July 20, 1960. He stated that he is the third of three brothers, and that his

**FORENSIC PSYCHOLOGICAL EVALUATION: DONALD O. WILLIAMS 1**

acknowledges that "Donnie made some very wrong choices that led him down this path" he insists that nevertheless "there are circumstances that led him down that way." David elaborated by explaining that "the things that happened to him [Donnie] shouldn't have happened to him," – he should never have been left the choice to be with Daddy." He claims that in the proceedings after the second divorce Donnie was allowed by the judge to decide which parent to go with. He alleges that since he and Randy went with their mother, Donnie took the position that "Mom's got you and Randy but Daddy's got nobody. Who's going to look after Daddy?" Donnie expressed with some anger and resentment that the judge who allowed Donnie to choose between his parents knew that their father had an alcohol problem and shouldn't have allowed him the choice to be in his father's care.

As an example of his father's extreme volatility and dangerousness, David reported that his father once came to Live Oak "and basically kidnapped us" (meaning all three boys) but that their mother called the police and they stopped his father and picked the boys up. He claims that his father was crying, but at the same time was telling the boys, who were also crying, that he would kill them if they didn't come with him or if they left him (cf. the incident of father putting a gun to their mother's head and pulling the trigger). David said that his father's alcohol problem was so bad that he couldn't work and hardly ever paid alimony or child support. He reports that he and his brothers were very embarrassed about all this because people in town including some of their friends found out that their father was in jail. He stated that "it's as clear in my mind as if it happened the other day" and that even talking about his father threatening to kill them is distressing to him. David also described an earlier similar incident in which he heard their father through the other side of a door tell Randy he should be living with him. He claims that his father told Randy "if you don't stay with me I'm going to kill you," and then slapped him.

David says Donnie talks lucidly and then suddenly goes off on a tangent and rambles off and has to be alerted to get back on track. He reports that his father often could not remember what he had done when he had been drinking and "Donnie does the same thing." He said that he and Randy and his mother had talked about his father's behavior and how erratic it could be, shifting from very kind to very mean. They strongly believe that his father had bipolar disorder. David does believe that Donnie is bipolar as well, as did their mother "because Daddy would flip flop so fast that you wouldn't know how to react to it." David says it was the same thing with Donnie, i.e., he would blow up over nothing. David acknowledged that this is a tendency that he struggles with himself.

David was in Special Forces working in military intelligence on classified projects. He confirmed that Donnie was awarded top honors upon completion of basic training, and insisted that "Donnie was a very good Marine ·



of the house "he [Donnie] was the only one left there I'm sure he got the brunt of it [Dad's abuse]." He also is certain that Donnie's difficulties were compounded because during his time alone with their father Donnie was influenced by him to abuse alcohol and drugs. "Because my Dad was an alcoholic," Randy stated, "I guess that was the path he [Donnie] took." Ironically, however, he noted that when in his father stopped abusing alcohol and drugs during "the last several years of his life" he became much more reasonable and "he was the kind of person he should have been the rest of his life."

Randy also noted that Donnie has sustained "several head traumas. I know that for a fact." He confirmed that he hit Donnie in the head with a baseball bat accidentally. He says Donnie was about 6 years old at the time and that the bat hit Donnie on the left temple. According to Randy, "I was terrified. The blood was everywhere. I ran to the house with him. He was covered in blood." He also substantiated Donnie was hit by a truck.

Randy confirms that when Donnie first went in the Marine Corp that "he did great, he was a Distinguished Honor Graduate." When asked by this examiner how he knows this is true Randy asserted that he saw the documentation "and I was very proud of him then, he found his niche I thought."[1]

Randy acknowledged that Donnie can be manipulative, noting that "My dad was like that. He learned from him I suppose." Randy says he and his brothers "all have the potential to be that way" [i.e., actively alcoholic and volatile]. He firmly believes that "the military and my wife saved my life. I was very, very hotheaded for many, many years, and the military gave me a channel to direct all that anger."

Beyond this, Randy expressed with certainty that Donnie's previous 10 year prison term radically changed him, contending that when his incarceration ended Donnie "was a totally different person." "When I think of my little brother Donnie, the first thing I thought of when the detectives first called me was this blond little boy with freckles on his face and it just broke my heart." "He was always respectful and nice and agreeable when he was around us [Randy and his wife]" and "he never lost his temper around us." More recently, however, Randy says, "there's something in his eyes, something's just not right with him [Donnie]."

Randy expressed that "these last couple of years have been very hard on me." He expressed that it has been very difficult for him to deal with Donnie's arrest and the allegations against him, and yet that "I just couldn't turn my back on him." He stated regarding the murder victim that "I just can't get the picture of that old lady out of my mind" and that "just the whole realization that



Donnie also reported experiencing nightmares about traumatic events he says he encountered at Mormons Ranch over a span of 3 to 4 consecutive nights once every few months to a year. He also indicated that he has "flashbacks" of witnessing a woman staring at him as she burned to death at Mormons Ranch. He acknowledged difficulty concentrating. When asked to provide instances of his problems with concentration, he stated that he can't remember what he reads, explaining that he notices periodically that he has gone several pages and that they haven't registered. He also indicated that he loses track of conversations. In addition, he described startling easily, stating that once this happens "I get irritated."

**Diagnostic Formulation:** Donnie's response to questioning during this examiner's interview of him, in combination with material obtained in interviews with his relatives, letter written by his mother in 2000 and 2001, and Dr. Olander's forensic competency report on him in 2001 suggest the presence of several mental disorders. His substantial difficulty controlling his drinking and the impairment he manifests in response to drinking indicate the presence of Alcohol Dependence. The extreme swings in mood and behavior he exhibits and Dr. Olander's diagnosis in the course of her 2001 forensic competency evaluation, in conjunction with reports by Donnie, his mother and his son Ron-Jon, indicate that he suffers from Bipolar I Disorder with Psychotic Features that include delusional thinking and visual hallucinations. In addition, his report of nightmares and flashbacks of experiences involving death, difficulty concentrating, exaggerated startle response, irritability and anger, sense of detachment from others, restricted range of emotional responding and sense of a foreshortened future and his extensive periods of amnesia indicate the presence of Posttraumatic Stress Disorder with Dissociative Features.

**Clinical Formulation and Conclusions:** A notable component of Donnie's personality style is that he often appears glib, dramatic, energetic and talkative. This presentation comes across as insincere and is likely to lead many to doubt the accuracy of his reports. However, it is striking to this examiner that essentially all of the claims he made that were open to corroboration were confirmed by other individuals and sources.

Like his brother Randy and David, Donnie's extremely abusive and traumatic childhood and having grown up with a severely alcoholic father left him vulnerable to a range of substance abuse and psychiatric disorders, including Alcohol Dependence, Bipolar Disorder with Psychotic Features, and Posttraumatic Stress Disorder. Randy and David both acknowledged to this examiner during interviews that they have had to struggle mightily to maintain adequate psychological adjustment and refrain from active substance abuse. They credit the discipline they learned in the military and the support of their wives and family in helping them avoid the destabilization exhibited by their brother Donnie. Moreover, both of them (and via letters written in 2000 and 2001, Donnie's mother) indicate that their brother Donnie's two years under the exclusive control of their father when he was ages 11 to 13 exposed him to much more severe

FORENSIC PSYCHOLOGICAL EVALUATION: DONALD O. WILLIAMS 14



RQID:20091009000506                    SITE:S12 DR:S
SSN:262451014 DOCTYPE:0002 RF:0 CS:2e87

## AUTHORIZATION AND BILLING INVOICE

**RETAIN A COPY OF THIS INVOICE OR THE INVOICE NUMBER FOR RECONCILING PAYMENT AS YOUR CHECK WILL ONLY LIST THIS INVOICE NUMBER:** _A09604925_

DISABILITY DETERMINATIONS P.O. BOX 5340 - TALLAHASSEE, FL 32314-5340

A7 ZJAMESS/zmartib                October 9, 2009          20091009000506 / 1556658  0001220B

US HEALTH WORKS MEDICAL GROUP OF FLORIDA INC          DONALD OTIS WILLIAMS
PO BOX 404473                                         35028 S HAINES CRK RD
ATLANTA, GA 30384-4473                               LEESBURG FL 34788

Doctor's Phone: 352-314-9300
                                                     PH:  352-702-0982
CB OFFICE ADDRESS                                    SSN: 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  DOB: 07/20/1960
US HEALTHWORKS MEDICAL GROUP-LEESBURG
312 S LAKE ST STE 2                                  Appt. Date: October 30, 2009
LEESBURG, FL 34748                                   Appt. Time: 10:00 AM

Fee no          Services Itemized                              Net Amount Authorized

99243          INITIAL CONSULTATION (IM/GM)                         $125.00

(GENERAL MEDICAL)
                                                     Totals: $125.00

| S. L. JAMES/zmartib<br>850-487-1363, EXT 1079<br>Authorizing Adjudicator<br>DATE: October 9, 2009<br>Approval for payment<br><br>DATE: | VENDOR:<br>PLEASE<br>SIGN<br>INVOICE<br>AND<br>RETURN | "Services herewith authorized are to be provided without regard to the client's race, color, sex or national origin in accordance with State and Federal regulations."<br>COMPLETE & RETURN WITH MEDICAL REPORTS<br><br>ORIGINAL Signature of Vendor    Date Services Rendered<br>Certifying Above Services Have Been Rendered   10/30/09 |

| ORG CODE | EO | OBJECT | Description | AMOUNT | Vendor ID | Invoice# |
|----------|-----|--------|-------------|--------|-----------|----------|
| 64-27-20-10-000 | 10 | 131772 | WILLIAMS, DONALD | | F582654983016 | A09604925 |

### PLEASE SEND REPORT VIA SECURE WEBSITE OR FAX TO: 1-866-223-4031
### PLEASE DO NOT USE ANY OTHER FAX COVER SHEET

This transmission contains information that is confidential under federal and state statutes. Unauthorized use of this information may be a criminal violation. If this information is received by anyone other than the named addressee, immediately notify this office at the phone number below for instructions. Under no circumstances shall this material be shared, retained, or copied by anyone other than the named addressee.

Page 1

## HOPE COUNSELING CENTERS

160 Avenue E, NW
Winter Haven, FL 33881
Phone: 863-292-8292
Fax: 863-292-8283

**EVALUATION DATE:** October 23, 2009
**FOR:** Division of Disability Determination
**SUBJECT:** Donald Williams
**SSN:** 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
**DOB:** 07/20/1960

### GENERAL OBSERVATIONS:

HOW THEY CAME TO THE EXAMINATION: Donald arrived at the evaluation on time. He drove himself to the office from Leesburg, Florida. He was identified by his Florida Driver's License.

ATTITUDE & COOPERATION: Donald was cooperative with the examiner and answered questions posed to him.

**INFORMANT/RELIABILITY:** Donald is a 49-year-old, right-handed, single, white male. He weighs approximately 180 pounds and is about 5 feet 9 inches in height. He provided the information for this report. He was considered to be a reliable source of information.

**Claimant's statement:** When asked why he was here he stated that he has memory and sleep problems that are effecting his ability to get along with people. He also stated that he has been diagnosed with bipolar manic depression by a local psychiatrist.

**CHIEF COMPLAINT:** Claimant Williams was referred for an evaluation in order to assist in a determination of eligibility for Social Security disability benefits. The nature and purpose of the examination was explained to the claimant. The claimant was informed that due to the nature of the evaluation, no doctor-patient relationship would exist, and if they had any questions about the exam they should ask the disability office. He appeared to understand, and agreed to undergo the exam. A disability claim was submitted due to Bipolar Disorder

**HISTORY OF PRESENT ILLNESS/ CONDITION:** He last worked full time in 2000. He was working construction. He was at that time incarcerated for a car jacking and sentenced to 30 years. He is presently on 20 years probation. He has been seeking employment, but has not been able to find employment due to his physical condition. He has a left leg injury that he incurred in prison that limits his physical ability. He has been diagnosed with a bipolar disorder that has made it impossible at times to sleep. He can go for 7 to 14 days without sleep and he begins to hallucinate. He experiences racing thoughts when he is in a manic phase. When in depression he has difficulty concentrating and sleeping. He suffers with irritability. He also suffers with short-term memory problems. He feels hopeless and helpless at times. His motivation level is low. He refused to answer the question, "Do you ever have suicidal thoughts." He is not suicidal at the present time.

ONSET OF CONDITION: 2000

HOW THE CONDITION BEGAN TO INTERFERE WITH WORK: He is unable to do physical construction work because of his physical condition.

DATE OF INABILITY TO WORK: 2000

ATTEMPTS TO RETURN TO WORK: He reports he has been seeking employment but has been unable to find employment due to his physical condition.

OUTPATIENT TREATMENT HISTORY: He has received outpatient treatment for mental health.

INPATIENT TREATMENT HISTORY: The client has never received inpatient treatment for mental health.

MEDICATIONS AND SIDE EFFECTS: He is presently on no medications.

TESTING INFORMATION:
Psychological: No testing information was supplied to the examiner.

ACTIVITIES OF DAILY LIVING:
Social functioning: He reported he arises from his bed at various times depending on how he slept. He spends his day working in the yard and the house, and looking for work. He is able to cook and clean. He reports he tries to retire around 9 p.m. He has difficulty sleeping. He wakes up a number of times during the night. He reported he is able to bathe, dress and toilet independently. He does not belong to any local organizations. He said he has very few friends. He is unable to handle his own finances. He lives with his domestic partner.

SOCIAL HISTORY: Donald was born in Florida. His mother raised him. He has 3 brothers. He has been married once. He has 1 son.

PHYSICAL/SEXUAL ABUSE: He reports being physically and sexually abused. His father physically abused him. He reports he was sexually abused at a Mormon ranch as a child.

ACCIDENTS/TRAUMAS: He reports significant traumas. He was shot twice in the Marine Corp.

SUBSTANCE ABUSE: There is no history of drug or alcohol abuse.

ACADEMIC/EMPLOYMENT HISTORY: He graduated from the 12th grade.

LEGAL/MILITARY HISTORY: He has one felony conviction for auto theft. He served in the Marine Corp for 4 years. He was honorably discharged.

MEDICAL HISTORY: Left leg and neck chronic pain

MENTAL STATUS:
Behavioral Observations and Mental Status Evaluation:
Donald is a 49 year old male. He said he is about 180 pounds and 5 feet 10 inches tall. The client was dressed appropriately. He/would not be identified as unusual in a group situation on the basis of physical appearance. The client was oriented to person, place, situation and time. The client had no problems in gait, or motor functioning. He had difficulty with posture due to a neck problem. The client provided

adequate eye-contact. Speech was unremarkable. Voice quality was normal. Energy of speech was normal paced. Speech was understandable and communication with examiner was not impeded. The client reported no hearing problems. He reported vision problems.

Mood seemed normal. Affect seemed restricted. The client reported hallucinations when suffering with sleep deprivation. The client denied any substance abuse. The client denied having current suicidal/homicidal ideations/gestures/attempts.

Attention and concentration were unremarkable. Speed of processing was within normal limits. Construction was unremarkable. Mental flexibility was—. Auditory and written receptive and expressive language were —. Immediate memory was unremarkable. Recent and Remote memory were moderately impaired. Funds of knowledge were unremarkable. Mental computation and written computation were unremarkable. Reasoning was unremarkable. Judgment related to self care and social problem-solving were unremarkable. Awareness of physical, psychological, interpersonal, and social deficits were unremarkable. Insight was normal. Cooperation and effort were normal.

**DIAGNOSTIC IMPRESSIONS:**
> Axis I: 296.64 Bipolar I Disorder (By client's report)
> Axis II: V799.9 Diagnosis Deferred on Axis II (R/O Personality Disorder)
> Axis III: Left leg and neck chronic pain.
> Axis IV: Unemployment and financial problems
> Axis V: GAF 55

**PROGNOSIS:** Guarded

**ABILITY TO MANAGE FUNDS:** Donald's ability to manage his own funds appears limited. His domestic partner manages his finances.

**RECOMMENDATIONS:** It is recommended that he be evaluated for psychotropic medications and referred for therapy.

Thank you for this referral. If you have any questions, please do not hesitate to contact me at this office.

Sincerely,


Peter D. Nordstrom, D.Min.
Licensed Mental Health Counselor, MH6961

Steven Abraham, Psy.D.
Licensed Psychologist, Py7039



# health**Works**
## M E D I C A L   G R O U P
### *The Right Care, Right Away*

October 30, 2009

Department of Health
Office of Disability Determinations
PO Box 5340
Tallahassee, Florida 32314-5340

RE : Donald Otis Williams
SSN: 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      DOB: 07/20/1960

To whom it may concern,

This is a 49-year-old, right hand dominant, Caucasian male referred to us by the Office of Disability Determinations for medical evaluation.

CHIEF COMPLAINT:
1.  Left tibial and fibular fracture.
2.  Right knee injury.
3.  Seizures.
4.  Headaches.
5.  Neck injury.

HISTORY OF PRESENT ILLNESS:
The patient complains of being in involved in a motor vehicle accident on July 07, 1989 and was a pedestrian struck by a car. The patient states that he suffered a compound fracture of the left tibia. The patient relates that he underwent three surgeries to the tibia with the placement of three rods. The patient states that sometimes he is unable to bend his knee. The patient states that he also injured his right knee in the accident. the patient states that he has developed arthritis in the left knee. The patient reports that he has a non-healed fracture of the left fibula.

The patient states that he has suffered from seizures which started in 1965 after he fractured his skull due to a baseball bat injury.  The patient reports that he was in a coma for one week. The patient was hospitalized in Haines City which is in Polk County. The patient denies taking any medications for seizures. The patient states that his last seizure episode was in August of 2009.

Nagy Shanawany, M.D.
*Medical Director*
312 South Lake Street
Leesburg, FL 34748
Tel: 352-314-9300
Fax: 352-314-9212

Kevin B. Hardmon, D.O.
4806 N. Orange Blossom Trail
Orlando, FL 32810
Tel: 407-206-3326
Fax: 407-206-3316

William Newsome, M.D.
*Medical Director*
9500 Satellite Blvd.
Orlando, FL 32873
Tel: 407-859-5656
Fax: 407-859-2124

Edward L. Demmi, M.D.
*Medical Director*
5406 N. Hoover Blvd. # 21
Tampa, Florida 33634
Tel: 813-490-8231
Fax: 813-490-8237

Robert Haight. M.D.
9325 Bay Plaza Blvd., Ste 201
Tampa, FL 33619
Tel: 813-490-0099
Fax: 813-490-0204



The patient reports that he has experienced headaches which started after the motor vehicle accident. The patient states that these occur with the frequency of two times per month. The patient states that he takes Tylenol and Excedrin for his headache pain.

The patient states that he suffered a fracture to his neck in 1975 and wore a splint for several months. The patient states that this fracture was due to a football injury.

PAST MEDICAL HISTORY:
The patient's past medical history is unremarkable, other than that as above.

ALLERGIES:
The patient has no known allergies to medication, but is allergic to Gain detergent.

CURRENT MEDICATIONS:
The patient is currently taking no medications.

SOCIAL HISTORY:
The patient is married and lives with his spouse and son. The patient holds a Bachelor's Degree. The patient has smoked one-half pack of cigarettes per day for 30 years. The patient drinks alcohol occasionally. The patient denies the use of illicit drugs.

OCCUPATIONAL HISTORY:
The patient is retired.

PAST SURGICAL HISTORY:
The patient's past surgical history is significant for left leg surgery, skull surgery and right knee surgery.

VITAL SIGNS:
The patient is 69 inches tall in stocking feet and weighs 173 lbs. Temperature 98.2º. Blood pressure in the left arm with large cuff was 130/82. Respirations 12. Pulse 64 and regular.

SKIN: The skin had normal color and turgor. *There is a scar to the left forehead. There is a scar to the right knee, right forearm and right hand.*

HEAD, EYES, EARS, NOSE, THROAT:

HEAD: Head shape and size normal. No lesions noted to the scalp or face. No bony abnormalities noted to skull or facial bones. *There is a scar to the left forehead.*

EYES: Pupils equal and reactive to light and accommodation. Extraocular motions normal. *Visual acuity taken without glasses: 20/50 right eye, 20/40 left eye, 20/40 bilaterally.* Color vision is normal.

EARS: Canals clear. Tympanic membranes normal. At frequencies of 500 Hz; 1,000 Hz; 2,000 Hz and 4,000 Hz, the patient was able to hear 40 decibels with both ears.

NOSE: Normal.

MOUTH AND THROAT:  No lesions noted to buccal mucosa or gingiva.  Teeth normal.  Speech was normal.

HEART:  Normal size by percussion.  Cardiac sounds - S1, S2, without gallops, clicks, rubs or murmurs noted.

LUNGS:  No wheezes, rales or rhonchi.

ABDOMEN:   Soft and non-distended.  There is no tenderness, guarding or rebound noted.  Bowel sounds normal in all quadrants.

EXTREMITIES:  No edema, cyanosis or trophic changes to toes or fingers.  No clubbing to fingers or toenails.  No swelling or pitting edema of the ankles. *There is a swelling deformity to the shin of the left leg.  There is a scar to the right knee, right forearm, right wrist and right hand.  There is decreased range of motion of the bilateral knees to flexion.*

PULSES:  Posterior tibialis and dorsalis pedis normal.  Radial and ulnar pulse normal.

MUSCULOSKELETAL:

NECK:  No carotid bruit noted.  Trachea midline.  Thyroid without palpable nodules.  No jugular venous distention noted. *Range of motion cervical spine:  Forward flexion 0-40°; extension 0-50 °; lateral flexion right 0-30 °; lateral flexion left 0-30°; right rotation 0-50 °; and left rotation 0-50°.*

THORACOLUMBAR:   No scoliosis or increase kyphosis.  Range of motion:  Flexion forward 0-90°; extension 0-25°; lateral flexion right and left 0-25°.

SHOULDERS:  No swelling or deformity.  Range of motion:  Forward elevation 0-150°; abduction 0-150°; adduction 0-30°; external rotation 0-90°; internal rotation 0-80°.  Motor strength 5/5.

ELBOWS:  No swelling or tenderness.  Range of motion:  Flexion 0-150°; pronation 0-80°; supination 0-80°.  Motor strength 5/5.

FOREARM AND WRIST:  No swelling, crepitus, or tenderness.  Range of motion:  Dorsiflexion 0-60°; palmar flexion 0-70°; ulnar deviation 0-30°; radial deviation 0-20°.  Motor strength 5/5. *There is a scar to the right forearm and wrist.*

HANDS:  No swelling or deformity to fingers or thumb.  Grip strength 5/5 bilaterally.  Fine manipulation of hands normal.  Sensory fingertips normal.  Range of motion thumb:  Flexion - CMC joint 0-15°; extension - CMC joint 0-30°.  Range of motion fingers:  Flexion MCP joints 0-90°; flexion PIP joints 0-100 °; flexion DIP joints 0-70°. *There is a scar to the right hand.*

HIPS:  Range of motion:  Forward flexion 0-100°; extension 0-30°; abduction 0-40°; adduction 0-20°; internal rotation 0-40°; external rotation 0-50°.  Motor strength 5/5.

KNEES:  Lachman, Drawer, Allen, McMurray tests normal.  No swelling or effusion. *Range of motion bilaterally: Flexion 0-100°; extension 0 °. Motor strength 4/5 bilaterally. There is a scar to the right knee.*

ANKLE:  Dorsiflexion 0-20°; plantar flexion 0-40°; inversion 0-30°; eversion 0-20°.  Motor strength 5/5.

GREAT TOES:  No swelling or effusion.  Range of motion:  Dorsiflexion MTP joint 0-50°; plantar flexion MTP joint 0-30°; flexion IP joint 0-30°.  Motor strength 5/5.

GAIT AND STATION KEEPING:   *The patient's gait is antalgic.*  The patient walks without assistance or an assistive device. The patient is able to squat. *The patient is able to heel-to-toe walk with difficulty.*

NEUROLOGICAL:   Cranial nerves II – XII grossly intact.  Reflexes on Biceps and Triceps 2+/4 bilaterally.  No sensory defects noted.  Supine and seated straight leg lift negative.  Cerebella function and Romberg normal. *Motor strength is decreased to 4/5 of the bilateral knees.*

MENTAL STATUS:  Patient is alert and oriented times three.  Affect and mood tone normal.  Intellectual functioning appears normal. No overt signs of psychosis or obvious signs of an unstable personality disorder noted.

DIAGNOSTIC IMPRESSION:
1.  Compound fracture of the left tibia.
2.  Right knee injury.
3.  Seizure disorder.
4.  Headaches.
5.  Neck pain.
6.  Left knee arthritis.

PATIENT'S FUNCTIONAL ASSESSMENT:
The patient's subjective complaints are consistent with the objective medical findings.

If you have any further questions please feel free to call me.

Sincerely,
Nagy Shanawany, M.D.
Lake

NS:dlk

8/14/13    Case 5:16-cv-00357-WFJ-PRL    Document 18    Filed 12/07/16    Page 95 of 133 PageID
226
Bipolar disorder - Wikipedia, the free encyclopedia

S7

# Bipolar disorder

From Wikipedia, the free encyclopedia

**Bipolar disorder**, also known as **bipolar affective disorder, manic-depressive disorder**, or **manic depression**, is a mental illness classified by psychiatrists as a mood disorder. Individuals with bipolar disorder experience episodes of a frenzied mood known as mania alternating with episodes of depression.

Mania can occur with different levels of severity. At milder levels of mania, or "hypomania", individuals appear energetic, excitable, and may in fact be highly productive. As mania becomes more severe, individuals begin to behave erratically and impulsively, often making poor decisions due to unrealistic ideas about the future, and may have great difficulty with sleep. At the most severe level, individuals can experience very distorted beliefs about the world known as psychosis.

Individuals who experience manic episodes also commonly experience depressive episodes; some experience a mixed state in which features of both mania and depression are present at the same time. Manic and depressive episodes last from a few days to several months.

About 4% of people suffer from bipolar disorder. Prevalence is similar in men and women and, broadly, across different cultures and ethnic groups. Genetic factors contribute substantially to the likelihood of developing bipolar disorder, and environmental factors are also implicated. Bipolar disorder is often treated with mood stabilizing medications and psychotherapy. In serious cases,

## Bipolar disorder

*Classification and external resources*



Bipolar disorder is characterized by transitions between depression and mania

| | |
|---|---|
| **ICD-10** | F31 (http://apps.who.int/classifications/icd10/browse/2010/en#/F31) |
| **ICD-9** | 296.0 (http://www.icd9data.com/getICD9Code.ashx?icd9=296.0), 296.1 (http://www.icd9data.com/getICD9Code.ashx?icd9=296.1), 296.4 (http://www.icd9data.com/getICD9Code.ashx?icd9=296.4), 296.5 (http://www.icd9data.com/getICD9Code.ashx?icd9=296.5), 296.6 (http://www.icd9data.com/getICD9Code.ashx?icd9=296.6), 296.7 (http://www.icd9data.com/getICD9Code.ashx?icd9=296.7), 296.8 (http://www.icd9data.com/getICD9Code.ashx?icd9=296.8) |
| **OMIM** | 125480 (http://omim.org/entry/125480) 309200 (http://omim.org/entry/309200) |
| **DiseasesDB** | 7812 (http://www.diseasesdatabase.com/ddb7812.htm) |
| **MedlinePlus** | 000926 (http://www.nlm.nih.gov/medlineplus/ency/article/000926.htm) |
| **eMedicine** | med/229 (http://www.emedicine.com/med/topic229.htm) |
| **MeSH** | D001714 (http://www.nlm.nih.gov/cgi/mesh/2013/MB_cgi?field=uid&term=D001714) |

Case 5:16-cv-00357-WFJ-PRL    Document 18    Filed 12/07/16    Page 96 of 133 PageID 227

in which there is a risk of harm to oneself or others, involuntary commitment may be used. These cases generally involve severe manic episodes with dangerous behavior or depressive episodes with suicidal ideation. There are widespread problems with social stigma, stereotypes, and prejudice against individuals with a diagnosis of bipolar disorder. People with bipolar disorder exhibiting psychotic symptoms can sometimes be misdiagnosed as having schizophrenia.

The current term *bipolar disorder* is of fairly recent origin and refers to the cycling between high and low episodes (poles). The term "manic–depressive illness" or psychosis was coined by German psychiatrist Emil Kraepelin in the late nineteenth century, originally referring to all kinds of mood disorder. German psychiatrist Karl Leonhard split the classification in 1957, employing the terms unipolar disorder (major depressive disorder) and bipolar disorder.

# Contents

- 1 Signs and symptoms
    - 1.1 Manic episodes
    - 1.2 Hypomanic episodes
    - 1.3 Depressive episodes
    - 1.4 Mixed affective episodes
    - 1.5 Associated features
- 2 Causes
    - 2.1 Genetic
    - 2.2 Physiological
    - 2.3 Environmental
    - 2.4 Neurological
- 3 Prevention
- 4 Diagnosis
    - 4.1 Bipolar spectrum
    - 4.2 Criteria and subtypes
        - 4.2.1 Rapid cycling
    - 4.3 Differential diagnosis
- 5 Comorbid conditions
- 6 Management
    - 6.1 Psychosocial
    - 6.2 Medication
- 7 Prognosis
    - 7.1 Functioning
    - 7.2 Recovery and recurrence
    - 7.3 Mortality
- 8 Epidemiology
- 9 History
- 10 Society and culture
- 11 Specific populations
    - 11.1 Children
    - 11.2 Elderly
- 12 See also

- 13 References
- 14 External links

# Signs and symptoms

In bipolar disorder, people experience abnormally elevated (manic or hypomanic) mood states which interfere with the functions of ordinary life. Many people with bipolar disorder also experience periods of depressed mood, but this is not universal. There is no simple physiological test to confirm the disorder. Diagnosing bipolar disorder is often difficult, even for mental health professionals. In particular, it can be difficult to distinguish depression caused by bipolar disorder from pure unipolar depression.

The younger the age of onset, the more likely the first few episodes are to be depressive.[1] Because a bipolar diagnosis requires a manic or hypomanic episode, many patients are initially diagnosed and treated as having major depression.[2]

## Manic episodes

Mania is the defining feature of bipolar disorder. Mania is a distinct period of elevated or irritable mood, which can take the form of euphoria, and lasts for at least a week (less if hospitalization is required).[3] People with mania commonly experience an increase in energy and a decreased need for sleep, with many often getting as little as three or four hours of sleep per night. Some can go days without sleeping.[4] A manic person may exhibit pressured speech, with thoughts experienced as racing.[5] Attention span is low, and a person in a manic state may be easily distracted. Judgment may be impaired, and sufferers may go on spending sprees or engage in risky behavior that is not normal for them. They may indulge in substance abuse, particularly alcohol or other depressants, cocaine or other stimulants, or sleeping pills. Their behavior may become aggressive, intolerant, or intrusive. They may feel out of control or unstoppable, or as if they have been "chosen" and are "on a special mission", or have other grandiose or delusional ideas. Sexual drive may increase. At more extreme levels, a person in a manic state can experience psychosis, or a break with reality, where thinking is affected along with mood.[6] This can occasionally lead to violent behaviors.[7] Some people in a manic state experience severe anxiety and are irritable (to the point of rage), while others are euphoric and grandiose. The severity of manic symptoms can be measured by rating scales such as the Altman Self-Rating Mania Scale[8] and clinician-based Young Mania Rating Scale.[9][10]

The onset of a manic episode is often foreshadowed by sleep disturbances. Mood changes, psychomotor and appetite changes, and an increase in anxiety can also occur up to three weeks before a manic episode develops.[11]

## Hypomanic episodes

Hypomania is a mild to moderate level of elevated mood, characterized by optimism, pressure of speech and activity, and decreased need for sleep. Generally, hypomania does not inhibit functioning as mania does.[12] Many people with hypomania are actually more productive than usual, while manic individuals have difficulty completing tasks due to a shortened attention span. Some hypomanic people show increased creativity, although others demonstrate poor judgment and irritability. Many experience hypersexuality. Hypomanic people generally have increased energy and increased activity levels. They do not, however, have delusions or hallucinations.

Hypomania may feel good to the person who experiences it. Thus, even when family and friends recognize mood swings, the individual often will deny that anything is wrong.[13] What might be called a "hypomanic event", if not accompanied by depressive episodes, is often not deemed as problematic, unless the mood changes are uncontrollable, volatile or mercurial. If left untreated, an episode of hypomania can last anywhere from a few days to several years. Most commonly, symptoms continue for a few weeks to a few months.[14]

## Depressive episodes

Signs and symptoms of the depressive phase of bipolar disorder include persistent feelings of sadness, anxiety, guilt, anger, isolation, or hopelessness; disturbances in sleep and appetite; fatigue and loss of interest in usually enjoyable activities; problems concentrating; loneliness, self-loathing, apathy or indifference; depersonalization; loss of interest in sexual activity; shyness or social anxiety; irritability, chronic pain (with or without a known cause); lack of motivation; and morbid suicidal thoughts. In severe cases, the individual may become psychotic, a condition also known as severe bipolar depression with psychotic features. These symptoms include delusions or, less commonly, hallucinations, usually unpleasant. A major depressive episode persists for at least two weeks, and may continue for over six months if left untreated.[15]

## Mixed affective episodes

In the context of bipolar disorder, a mixed state is a condition during which symptoms of mania and depression occur simultaneously. Typical examples include weeping during a manic episode or racing thoughts during a depressive episode. Individuals may also feel very frustrated in this state, for example thinking grandiose thoughts while at the same time feeling like a failure. Mixed states are often the most dangerous period of mood disorders, during which the risks of substance abuse, panic disorder, suicide attempts, and other complications increase greatly.[16]

## Associated features

*Main article: Associated features of bipolar disorder*

Associated features are clinical phenomena that often accompany the disorder but are not part of the diagnostic criteria. In adults with the condition, bipolar disorder is often accompanied by changes in cognitive processes and abilities. These include reduced attentional and executive capabilities and impaired memory. How the individual processes the world also depends on the phase of the disorder, with differential characteristics between the manic, hypomanic and depressive states.[11] Some studies have found a significant association between bipolar disorder and creativity.[17] Some patients may have difficulty in maintaining relationships.[18]

There are several common childhood precursors seen in children who later receive a diagnosis of bipolar disorder. These include mood abnormalities, full major depressive episodes, and ADHD.[19]

# Causes

The causes of bipolar disorder likely vary between individuals. Twin studies have been limited by relatively small sample sizes but have indicated a substantial genetic contribution, as well as environmental influence. For bipolar I, the (probandwise) concordance rates in modern studies have been consistently put at around 40% in monozygotic twins (same genes), compared to 0 to 10% in dizygotic twins.[20] A combination of bipolar I, II and cyclothymia

Case 5:16-cv-00357-WFJ-PRL    Document 18    Filed 12/07/16    Page 99 of 133 PageID 230

produced concordance rates of 42% vs 11%, with a relatively lower ratio for bipolar II that likely reflects heterogeneity. The overall heritability of the bipolar spectrum has been put at 0.71.[21] There is overlap with unipolar depression and if this is also counted in the co-twin the concordance with bipolar disorder rises to 67% in monozigotic twins and 19% in dizigotic.[22] The relatively low concordance between dizygotic twins brought up together suggests that shared family environmental effects are limited, although the ability to detect them has been limited by small sample sizes.[21]

## Genetic

Genetic studies have suggested many chromosomal regions and candidate genes appearing to relate to bipolar disorder's development, but the results are not consistent and often not replicated.[23]

Although the first genetic linkage finding for mania was in 1969,[24] the linkage studies have been inconsistent.[25] Meta-analyses of linkage studies detected either no significant genome-wide findings or, using a different methodology, only two genome-wide significant peaks, on chromosome 6q and on 8q21.[citation needed] Neither have genome-wide association studies brought a consistent focus—each has identified new loci.[25] Nonparametric linkage analysis using rank based methods did not detect genome-wide significant linkage findings[26] whereas joint analysis of all linkage data sets identified two genome wide significant peaks on chromosome 6q and on 8q21. [27]

Findings point strongly to heterogeneity, with different genes being implicated in different families.[28] Individual genes are likely to have only a small effect and to be involved in some aspect related to the disorder (and a broad range of "normal" human behavior) rather than the disorder per se.[29] Robust and replicable genome-wide significant associations showed several common polymorphisms, including variants within the genes CACNA1C, ODZ4, and NCAN.[30]

Advanced paternal age has been linked to a somewhat increased chance of bipolar disorder in offspring, consistent with a hypothesis of increased new genetic mutations.[31]

## Physiological

Abnormalities in the structure and/or function of certain brain circuits could underlie bipolar. Meta-analyses of structural MRI studies in bipolar disorder report an increase in the volume of the lateral ventricles, globus pallidus and increase in the rates of deep white matter hyperintensities.[32][33][34] Functional MRI findings suggest that abnormal modulation between ventral prefrontal and limbic regions, especially the amygdala, likely contribute to poor emotional regulation and mood symptoms.[35]



Brain imaging studies have revealed differences in the volume of various brain regions between BD patients and healthy control subjects

According to the "kindling" hypothesis, when people who are genetically predisposed toward bipolar disorder experience stressful events, the stress threshold at which mood changes occur becomes progressively lower, until the episodes eventually start (and recur) spontaneously. There is evidence of hypothalamic-pituitary-adrenal axis (HPA axis) abnormalities in bipolar disorder due to stress.[36][37][38][39]

Other brain components which have been proposed to play a role are the mitochondria,[40] and a sodium ATPase pump,[41] causing cyclical periods of poor neuron firing (depression) and hypersensitive neuron firing (mania). This may only apply for type one, but type two apparently results from a large confluence of factors.[*citation needed*] Circadian rhythms and melatonin activity also seem to be altered.[42]

## Environmental

Evidence suggests that environmental factors play a significant role in the development and course of bipolar disorder, and that individual psychosocial variables may interact with genetic dispositions.[29] There is fairly consistent evidence from prospective studies that recent life events and interpersonal relationships contribute to the likelihood of onsets and recurrences of bipolar mood episodes, as they do for onsets and recurrences of unipolar depression.[43] There have been repeated findings that between a third and a half of adults diagnosed with bipolar disorder report traumatic/abusive experiences in childhood, which is associated on average with earlier onset, a worse course, and more co-occurring disorders such as PTSD.[44] The total number of reported stressful events in childhood is higher in those with an adult diagnosis of bipolar spectrum disorder compared to those without, particularly events stemming from a harsh environment rather than from the child's own behavior.[45]

## Neurological

Less commonly bipolar disorder or a bipolar-like disorder may occur as a result of or in association with a neurological condition or injury. Such conditions and injuries may include (but are not limited to) stroke, traumatic brain injury, HIV infection, multiple sclerosis, porphyria and rarely temporal lobe epilepsy.[46]

# Prevention

Prevention of bipolar has focused on stress (such as childhood adversity or highly conflictual families) which, although not a diagnostically specific causal agent for bipolar, does place genetically and biologically vulnerable individuals at risk for a more pernicious course of illness.[47] There has been debate regarding the causal relationship between usage of cannabis and bipolar disorder.[48]

# Diagnosis

Diagnosis is based on the self-reported experiences of an individual as well as abnormalities in behavior reported by family members, friends or co-workers, followed by secondary signs observed by a psychiatrist, nurse, social worker, clinical psychologist or other clinician in a clinical assessment. There are lists of criteria for someone to be so diagnosed. These depend on both the presence and duration of certain signs and symptoms. Assessment is usually done on an outpatient basis; admission to an inpatient facility is considered if there is a risk to oneself or others. The most widely used criteria for diagnosing bipolar disorder are from the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, the current version being DSM-IV-TR, and the World Health Organization's International Statistical Classification of Diseases and Related Health Problems, currently the ICD-10. The latter criteria are typically used in Europe and other regions while the DSM criteria are used in the USA and other regions, as well as prevailing in research studies. The DSM-V, to be published in 2013, will likely include further and more accurate sub-typing.[49]

8/14/13

An initial assessment may include a physical exam by a physician. Although there are no biological tests which confirm bipolar disorder, tests may be carried out to exclude medical illnesses such as hypo- or hyperthyroidism, metabolic disturbance, a systemic infection or chronic disease, and syphilis or HIV infection. An EEG may be used to exclude epilepsy, and a CT scan of the head to exclude brain lesions. Investigations are not generally repeated for relapse unless there is a specific *medical* indication.

Several rating scales for the screening and evaluation of bipolar disorder exist, such as the Bipolar spectrum diagnostic scale.[50] The use of evaluation scales can not substitute a full clinical interview but they serve to systematize the recollection of symptoms.[50] On the other hand instruments for the screening of bipolar disorder have low sensitivity and limited diagnostic validity.[50]

## Bipolar spectrum

Bipolar spectrum refers to a category of mood disorders that feature abnormally elevated or depressed mood. These disorders range from bipolar I disorder, featuring full-blown manic episodes, to cyclothymia, featuring less prominent hypomanic episodes, to "subsyndromal" conditions where only some of the criteria for mania or hypomania are met. These disorders typically also involve depressive symptoms or episodes that alternate with the elevated mood states, or with mixed episodes that feature symptoms of both.[51] The concept of the bipolar spectrum is similar to that of Emil Kraepelin's original concept of manic depressive illness.[52] Currently, manic depressive illness is usually referred to as bipolar disorder or simply bipolar. A simple nomenclature system was introduced in 1978 to classify more easily individuals' affectedness within the spectrum.[53]

Points on the spectrum using this nomenclature are denoted using the following codes:

- *M*—severe mania
- *D*—severe depression (unipolar depression)
- *m*—less severe mania (hypomania)
- *d*—less severe depression

Thus, *mD* represents a case with hypomania and major depression. A further distinction is sometimes made in the ordering of the letters, to represent the order of the episodes, where the patient's normal state is euthymic, interrupted by episodes of mania followed by depression (*MD*) or vice versa (*DM*).

Employing this schema, major depression would be denoted *D*. Unipolar mania (*M*) is, depending on the authority cited, either very rare,[54] or nonexistent with such cases actually being *Md*.

Unipolar hypomania (*m*) without accompanying depression has been noted in the medical literature.[55] There is speculation as to whether this condition may occur with greater frequency in the general, untreated population; successful social function of these potentially high-achieving individuals may lead to being labeled as normal, rather than as individuals with substantial dysregulation.

## Criteria and subtypes

There is no clear consensus as to how many types of bipolar disorder exist.[56] In DSM-IV-TR and ICD-10, bipolar disorder is conceptualized as a spectrum of disorders occurring on a continuum. The DSM-IV-TR lists three specific subtypes and one for non-specified:[57][58]

Bipolar I disorder: One or more manic episodes. Subcategories specify whether there has been more than one episode, and the type of the most recent episode.[59] A depressive or hypomanic episode is not required for diagnosis, but it frequently occurs.

Bipolar II disorder: No manic episodes, but one or more hypomanic episodes and one or more major depressive episode.[60] Hypomanic episodes do not go to the full extremes of mania (*i.e.*, do not usually cause severe social or occupational impairment, and are without psychosis), and this can make bipolar II more difficult to diagnose, since the hypomanic episodes may simply appear as a period of successful high productivity and is reported less frequently than a distressing, crippling depression.

Cyclothymia: A history of hypomanic episodes with periods of depression that do not meet criteria for major depressive episodes.[61] There is a low-grade cycling of mood which appears to the observer as a personality trait, and interferes with functioning.

Bipolar disorder NOS (not otherwise specified): This is a catchall category, diagnosed when the disorder does not fall within a specific subtype.[62] Bipolar NOS can still significantly impair and adversely affect the quality of life of the patient.

The bipolar I and II categories have specifiers that indicate the presentation and course of the disorder. For example, the "with full interepisode recovery" specifier applies if there was full remission between the two most recent episodes.[63]

### Rapid cycling

Most people who meet criteria for bipolar disorder experience a number of episodes, on average 0.4 to 0.7 per year, lasting three to six months.[64] *Rapid cycling*, however, is a course specifier that may be applied to any of the above subtypes. It is defined as having four or more episodes per year and is found in a significant proportion of individuals with bipolar disorder. The definition of rapid cycling most frequently cited in the literature (including the DSM) is that of Dunner and Fieve: at least four major depressive, manic, hypomanic or mixed episodes are required to have occurred during a 12-month period.[65] Ultra-rapid (days) and ultra-ultra rapid or ultradian (within a day) cycling have also been described.[66] The literature examining the pharmacological treatment of rapid cycling is sparse and there is no clear consensus with respect to its optimal pharmacological management.[67]

## Differential diagnosis

There are several other mental disorders which may involve similar symptoms to bipolar disorder. These include schizophrenia, attention deficit hyperactivity disorder (ADHD), and some personality disorders, including borderline personality.[68][69][70]

It has been noted that the bipolar disorder diagnosis is officially characterised in historical terms such that, technically, anyone with a history of (hypo)mania and depression has bipolar disorder whatever their current or future functioning and vulnerability. This has been described as "an ethical and methodological issue", as it means no one can be considered as being recovered (only "in remission") from bipolar disorder according to the official criteria. This is considered especially problematic given that brief hypomanic episodes are widespread among people generally and not necessarily associated with dysfunction.[11]

# Comorbid conditions

The diagnosis of bipolar disorder can be complicated by coexisting (comorbid) psychiatric conditions such as obsessive-compulsive disorder, social phobia, panic disorder and attention-deficit hyperactivity disorder. Substance abuse may predate the appearance of bipolar symptoms, further complicating the diagnosis. A careful longitudinal analysis of symptoms and episodes, enriched if possible by discussions with friends and family members, is crucial to establishing a treatment plan where these comorbidities exist.[71]

# Management

*Main article: Treatment of bipolar disorder*

There are a number of pharmacological and psychotherapeutic techniques used to treat bipolar disorder. Individuals may use self-help and pursue recovery.

Hospitalization may be required especially with the manic episodes present in bipolar I. This can be voluntary or (if mental health legislation allows and varying state-to-state regulations in the USA) involuntary (called civil or involuntary commitment). Long-term inpatient stays are now less common due to deinstitutionalization, although these can still occur.[72] Following (or in lieu of) a hospital admission, support services available can include drop-in centers, visits from members of a community mental health team or Assertive Community Treatment team, supported employment and patient-led support groups, intensive outpatient programs. These are sometimes referred to partial-inpatient programs.[73]



Light therapy is one of several approaches to treating bipolar disorder. No one method is universally successful and most persons suffering from the illness need several forms of support.

## Psychosocial

Psychotherapy is aimed at alleviating core symptoms, recognizing episode triggers, reducing negative expressed emotion in relationships, recognizing prodromal symptoms before full-blown recurrence, and, practicing the factors that lead to maintenance of remission[74][75][76] Cognitive behavioural therapy, family-focused therapy, and psychoeducation have the most evidence for efficacy in regard to relapse prevention, while interpersonal and social rhythm therapy and cognitive-behavioural therapy appear the most effective in regard to residual depressive symptoms. Most studies have been based only on bipolar I, however, and treatment during the acute phase can be a particular challenge.[77] Some clinicians emphasize the need to talk with individuals experiencing mania, to develop a therapeutic alliance in support of recovery.[78]

## Medication

A number of medications are used to treat bipolar disorder.[79] The medication with the best evidence is lithium, which is effective in treating acute manic episodes,[80] and preventing relapses, more so for manic than for depressive episodes.[81] Lithium reduces the risk of suicide, self-harm, and death in people with bipolar disorder.[82] Initially used as an anticonvulsant, sodium valproate has become a commonly prescribed treatment, and is effective in treating manic episodes.[83] Three other anticonvulsants are used in the treatment of bipolar

Case 5:16-cv-00357-WFJ-PRL     Document 18     Filed 12/07/16     Page 104 of 133 PageID 235.

disorder. Carbamazepine became widely used to treat bipolar disorder in the late 1980s and early 1990s, but was displaced by sodium valproate in the 1990s. Carbamazepine is effective in treating manic episodes, with some evidence it has greater benefit in rapid-cycling bipolar disorder, or those with more psychotic manic symptoms or a more schizoaffective clinical picture. It is less effective in preventing relapse than lithium.[84] Lamotrigine has some efficacy in treating bipolar depression, and this benefit is greatest in more severe depression.[85] It has also been shown to have some benefit in preventing further episodes, though there are concerns about the studies done, and is of no benefit in rapid cycling disorder.[86] The effectiveness of topiramate is unknown.[87] Depending on the severity of the case, anti-convulsants may be used in combination with lithium or on their own.[88]



Antipsychotics have been found to be useful in managing mania associated with bipolar disorder however the long term effects are not clear.[89] Olanzapine is effective in preventing relapses, although the evidence is not as solid as for lithium.[90] Antidepressants have not been found to be of any benefit over that found with mood stabilizers.[91]

Sodium valproate is the best supported treatment for bipolar

Short courses of benzodiazepines may be used as adjunct to medications until mood stabilizing become effective.[92]

Omega 3 fatty acids, in addition to normal pharmacological treatment, may have beneficial effects on depressive symptoms, although studies have been scarce and of variable quality.[93]

# Prognosis

For many individuals with bipolar disorder a good prognosis results from good treatment, which, in turn, results from an accurate diagnosis. Because bipolar disorder can have a high rate of both under-diagnosis and misdiagnosis,[1] it is often difficult for individuals with the condition to receive timely and competent treatment.

Bipolar disorder can be a severely disabling medical condition. However, many individuals with bipolar disorder can live full and satisfying lives. Quite often, medication is needed to enable this. Persons with bipolar disorder may have periods of normal or near normal functioning between episodes.[94]

## Functioning

A recent 20-year prospective study on bipolar I and II found that functioning varied over time along a spectrum from good to fair to poor. During periods of major depression or mania (in BPI), functioning was on average poor, with depression being more persistently associated with disability than mania. Functioning between episodes was on average good — more or less normal. Subthreshold symptoms were generally still substantially impairing, however, except for hypomania (below or above threshold) which was associated with improved functioning.[95]

Another study confirmed the seriousness of the disorder as "the standardized all-cause mortality ratio among patients with bipolar disorder is increased approximately two-fold." Bipolar disorder is currently regarded "as possibly the most costly category of mental disorders in the United States." Episodes of abnormality are associated with distress and disruption, and an elevated risk of suicide, especially during depressive episodes.[96]

## Recovery and recurrence

A naturalistic study from first admission for mania or mixed episode (representing the hospitalized and therefore most severe cases) found that 50% achieved syndromal recovery (no longer meeting criteria for the diagnosis) within six weeks and 98% within two years. Within two years, 72% achieved symptomatic recovery (no symptoms at all) and 43% achieved functional recovery (regaining of prior occupational and residential status). However, 40% went on to experience a new episode of mania or depression within 2 years of syndromal recovery, and 19% switched phases without recovery.[97]

Symptoms preceding a relapse (prodromal), specially those related to mania, can be reliably identified by people with bipolar disorder.[98] There have been intents to teach patients coping strategies when noticing such symptoms with encouraging results.[99]

### Mortality

Bipolar disorder can cause suicidal ideation that leads to suicidal attempts. One out of three people with bipolar disorder report past attempts of suicide or complete it,[100] and the annual average suicide rate is 0.4%, which is 10 to 20 times that of the general population.[101] The standardized mortality ratio from suicide in bipolar disorder is between 18 and 25.[102]

# Epidemiology

About 4% of people have one of the types of bipolar disorder at some point in their life.[103] Lifetime prevalence of bipolar disorder type I, which includes at least one manic episode during a lifetime, has generally been estimated at 2%.[104] However, a reanalysis of data from the National Epidemiological Catchment Area survey in the United States suggested that 0.8% of the population experience a manic episode at least once (the diagnostic threshold for bipolar I) and a further 0.5% have a hypomanic episode (the diagnostic threshold for bipolar II or cyclothymia). Including sub-threshold diagnostic criteria, such as one or two symptoms over a short time-period, an additional 5.1% of the population, adding up to a total of 6.4%, were classified as having a bipolar spectrum disorder.[105] A more recent analysis of data from a second US National Comorbidity Survey found that 1% met lifetime prevalence criteria for bipolar I, 1.1% for bipolar II, and 2.4% for subthreshold symptoms.[106] There are conceptual and methodological limitations and variations in the findings. Prevalence studies of bipolar disorder are typically carried out by lay interviewers who follow fully structured/fixed interview schemes; responses to single items from such interviews may suffer limited validity. In addition, diagnoses (and therefore estimates of prevalence) vary depending on whether a categorical or spectrum approach is used. This consideration has led to concerns about the potential for both underdiagnosis and overdiagnosis.[107]



Burden of bipolar disorder around the world: disability-adjusted life years per 100,000 inhabitants in 2002.

| | |
|---|---|
| no data | 205–210 |
| <180 | 210–215 |
| 180–186 | 215–220 |
| 186–190 | 220–225 |
| 190–195 | 225–230 |
| 195–200 | 230–235 |
| 200–205 | |

Rates are similar in men and women and, broadly, across different cultures and ethnic groups.[108] A 2000 study by the World Health Organization found that prevalence and incidence of bipolar disorder are very similar across the world. Age-standardized prevalence per 100,000 ranged from 421.0 in South Asia to 481.7 in Africa and Europe for men and from 450.3 in Africa and Europe to 491.6 in Oceania for women.[109] However, severity may differ widely across the globe. Disability-adjusted life year rates, for example, appear to be higher in developing countries, where medical coverage may be poorer and medication less available.

Within the United States, African and European Americans have similar rates of bipolar disorder, while Asian Americans have lower rates.[110]

Late adolescence and early adulthood are peak years for the onset of bipolar disorder.[111][112] One study also found that in 10% of bipolar cases, the onset of mania had happened after the patient had turned 50.[113]

# History

*Main article: History of bipolar disorder*



German psychologist Emil Kraeplin first distinguished between manic–depressive illness and "dementia praecox" (now known as schizophrenia) in the late 19th century

Variations in moods and energy levels have been observed as part of the human experience since time immemorial. The words "melancholia" (an old word for depression) and "mania" originated in Ancient Greek. The word melancholia is derived from *melas*/μελας, meaning "black", and *chole*/χολη, meaning "bile" or "gall",[114] indicative of the term's origins in pre-Hippocratic humoral theories. Within the humoral theories, mania was viewed as arising from an excess of yellow bile, or a mixture of black and yellow bile. The linguistic origins of mania, however, are not so clear-cut. Several etymologies are proposed by the Roman physician Caelius Aurelianus, including the Greek word *ania*, meaning "to produce great mental anguish", and *manos*, meaning "relaxed" or "loose", which would contextually approximate to an excessive relaxing of the mind or soul.[115] There are at least five other candidates, and part of the confusion surrounding the exact etymology of the word mania is its varied usage in the pre-Hippocratic poetry and mythologies.[115]

In the early 1800s, French psychiatrist Jean-Étienne Dominique Esquirol's lypemania, one of his affective monomanias, was the first elaboration on what was to become modern depression.[116] The basis of the current conceptualisation of manic–depressive illness can be traced back to the 1850s; on January 31, 1854, Jules Baillarger described to the French Imperial Academy of Medicine a biphasic mental illness causing recurrent oscillations between mania and depression, which he termed *folie à double forme* ("dual-form insanity").[117] Two weeks later, on February 14, 1854, Jean-Pierre Falret presented a description to the Academy on what was essentially the same disorder, and designated *folie circulaire* ("circular insanity") by him.[118]

These concepts were developed by the German psychiatrist Emil Kraepelin (1856–1926), who, using Kahlbaum's concept of cyclothymia,[119] categorized and studied the natural course of untreated bipolar patients. He coined the term *manic depressive psychosis*, after noting that periods of acute illness, manic or depressive, were generally punctuated by relatively symptom-free intervals where the patient was able to function normally.[120]

National Institutes of Health

Contact Us    Get Email Updates


**National Institute
of Mental Health**

Search the NIMH website    SEARCH

HEALTH & EDUCATION    OUTREACH    RESEARCH PRIORITIES    FUNDING    LABS AT NIMH    NEWS    ABOUT US

Mental Health Information    Publications    Educational Resources    Clinical Trials    Statistics    Help for Mental Illnesses

Home > Health & Education > Mental Health Information

# Post-Traumatic Stress Disorder (PTSD)

What Is Post-Traumatic Stress
Disorder (PTSD)?

Causes

Signs & Symptoms

Who Is At Risk?

Diagnosis

Treatments

Living With

Clinical Trials

## What is Post-traumatic Stress Disorder (PTSD)?

When in danger, it's natural to feel afraid. This fear triggers many split-second changes in the body to prepare to defend against the danger or to avoid it. This "fight-or-flight" response is a healthy reaction meant to protect a person from harm. But in post-traumatic stress disorder (PTSD), this reaction is changed or damaged. People who have PTSD may feel stressed or frightened even when they're no longer in danger.

PTSD develops after a terrifying ordeal that involved physical harm or the threat of physical harm. The person who develops PTSD may have been the one who was harmed, the harm may have happened to a loved one, or the person may have witnessed a harmful event that happened to loved ones or strangers.

PTSD was first brought to public attention in relation to war veterans, but it can result from a variety of traumatic incidents, such as mugging, rape, torture, being kidnapped or held captive, child abuse, car accidents, train wrecks, plane crashes, bombings, or natural disasters such as floods or earthquakes.

## Causes

**Genes.** Currently, many scientists are focusing on genes that play a role in creating fear memories. Understanding how fear memories are created may help to refine or find new interventions for reducing the symptoms of PTSD. For example, PTSD researchers have pinpointed genes that make:

Stathmin, a protein needed to form fear memories. In one study, mice that did not make stathmin were less likely than normal mice to "freeze," a natural, protective response to danger, after being exposed to a fearful experience. They also showed less innate fear by exploring open spaces more willingly than normal mice.

GRP (gastrin-releasing peptide), a signaling chemical in the brain

### Science News About Post-Traumatic Stress Disorder


NIMH Twitter Chat on Post-traumatic Stress Disorder


Sleep Brain Wave Key to Conquering Fear Memories


Threat Bias Predicts PTSD Risk


+ MORE ▶

### Posts from the Director's Blog About Post-Traumatic Stress Disorder

Healing Invisible Wounds: An Action Plan
August 13, 2013

Getting Serious About Mental Illnesses
July 31, 2013

Serving Those Who Served
May 28, 2012


+ MORE ▶

### Featured Publications About Post-Traumatic Stress Disorder

GRP (gastrin-releasing peptide), a signaling chemical in the brain released during emotional events. In mice, GRP seems to help control the fear response, and lack of GRP may lead to the creation of greater and more lasting memories of fear.

Researchers have also found a version of the 5-HTTLPR gene, which controls levels of serotonin — a brain chemical related to mood-that appears to fuel the fear response. Like other mental disorders, it is likely that many genes with small effects are at work in PTSD.

**Brain Areas.** Studying parts of the brain involved in dealing with fear and stress also helps researchers to better understand possible causes of PTSD. One such brain structure is the amygdala, known for its role in emotion, learning, and memory. The amygdala appears to be active in fear acquisition, or learning to fear an event (such as touching a hot stove), as well as in the early stages of fear extinction, or learning not to fear.

Storing extinction memories and dampening the original fear response appears to involve the prefrontal cortex (PFC) area of the brain, involved in tasks such as decision-making, problem-solving, and judgment. Certain areas of the PFC play slightly different roles. For example, when it deems a source of stress controllable, the medial PFC suppresses the amygdala an alarm center deep in the brainstem and controls the stress response.5The ventromedial PFC helps sustain long-term extinction of fearful memories, and the size of

this brain area may affect its ability to do so.

Individual differences in these genes or brain areas may only set the stage for PTSD without actually causing symptoms. Environmental factors, such as childhood trauma, head injury, or a history of mental illness, may further increase a person's risk by affecting the early growth of the brain. Also, personality and cognitive factors, such as optimism and the tendency to view challenges in a positive or negative way, as well as social factors, such as the availability and use of social support, appear to influence how people adjust to trauma. More research may show what combinations of these or perhaps other factors could be used someday to predict who will develop PTSD following a traumatic event.

**The Next Steps for PTSD Research**

In the last decade, rapid progress in research on the mental and biological foundations of PTSD has lead scientists to focus on prevention as a realistic and important goal.

For example, NIMH-funded researchers are exploring new and orphan medications thought to target underlying causes of PTSD in an effort to prevent the disorder. Other research is attempting to enhance cognitive, personality, and social protective factors and to minimize risk factors to ward off full-blown PTSD after trauma. Still other research is attempting to identify what factors determine whether someone with PTSD will respond well to one type of intervention or another, aiming to develop more personalized, effective and efficient treatments.

As gene research and brain imaging technologies continue to improve, scientists are more likely to be able to pinpoint when and where in the brain PTSD begins. This understanding may then lead to better targeted treatments to suit each person's own needs or even



**Post-Traumatic Stress Disorder (PTSD)**

**A booklet on Post-Traumatic Stress Disorder (PTSD) that explains what it is, treatment options, and how to get help.**



**Anxiety Disorders**

**A detailed booklet that describes the symptoms, causes, and treatments of the major anxiety disorders, with information on getting help and coping**

**More Publications About Post-Traumatic Stress Disorder**

---

Post-Traumatic Stress Disorder Research

Clinical Trials: Current Studies on Post-Traumatic Stress Disorder
PubMed: Journal Articles About Post-Traumatic Stress Disorder

---

Research Results

PubMed: Journal Articles about Post-Traumatic Stress Disorder

NIMH · Post-Traumatic Stress Disorder (PTSD)

prevent the disorder before it causes harm.

## Signs & Symptoms

PTSD can cause many symptoms. These symptoms can be grouped into three categories:

### 1. Re-experiencing symptoms

Flashbacks—reliving the trauma over and over, including physical symptoms like a racing heart or sweating
Bad dreams
Frightening thoughts.

Re-experiencing symptoms may cause problems in a person's everyday routine. They can start from the person's own thoughts and feelings. Words, objects, or situations that are reminders of the event can also trigger re-experiencing.

### 2. Avoidance symptoms

Staying away from places, events, or objects that are reminders of the experience
Feeling emotionally numb
Feeling strong guilt, depression, or worry
Losing interest in activities that were enjoyable in the past
Having trouble remembering the dangerous event.

Things that remind a person of the traumatic event can trigger avoidance symptoms. These symptoms may cause a person to change his or her personal routine. For example, after a bad car accident, a person who usually drives may avoid driving or riding in a car.

### 3. Hyperarousal symptoms

Being easily startled
Feeling tense or "on edge"
Having difficulty sleeping, and/or having angry outbursts.

Hyperarousal symptoms are usually constant, instead of being triggered by things that remind one of the traumatic event. They can make the person feel stressed and angry. These symptoms may make it hard to do daily tasks, such as sleeping, eating, or concentrating.

It's natural to have some of these symptoms after a dangerous event. Sometimes people have very serious symptoms that go away after a few weeks. This is called acute stress disorder, or ASD. When the symptoms last more than a few weeks and become an ongoing

problem, they might be PTSD. Some people with PTSD don't show any symptoms for weeks or months.

### Do children react differently than adults?

Children and teens can have extreme reactions to trauma, but their symptoms may not be the same as adults. In very young children, these symptoms can include:

Bedwetting, when they'd learned how to use the toilet before
Forgetting how or being unable to talk
Acting out the scary event during playtime
Being unusually clingy with a parent or other adult.

Older children and teens usually show symptoms more like those seen in adults. They may also develop disruptive, disrespectful, or destructive behaviors. Older children and teens may feel guilty for not preventing injury or deaths. They may also haDve thoughts of revenge. For more information, see the NIMH booklets on helping children cope with violence and disasters. (from **Post-Traumatic Stress Disorder (PTSD)** )

## Who Is At Risk?

PTSD affects about 7.7 million American adults, but it can occur at any age, including childhood. Women are more likely to develop PTSD than men, and there is some evidence that susceptibility to the disorder may run in families.

Anyone can get PTSD at any age. This includes war veterans and survivors of physical and sexual assault, abuse, accidents, disasters, and many other serious events.

Not everyone with PTSD has been through a dangerous event. Some people get PTSD after a friend or family member experiences danger or is harmed. The sudden, unexpected death of a loved one can also cause PTSD.

**Why do some people get PTSD and other people do not?**

It is important to remember that not everyone who lives through a dangerous event gets PTSD. In fact, most will not get the disorder.

Many factors play a part in whether a person will get PTSD. Some of these are risk factors that make a person more likely to get PTSD. Other factors, called resilience factors, can help reduce the risk of the disorder. Some of these risk and resilience factors are present before the trauma and others become important during and after a traumatic event.

Risk factors for PTSD include:

- Living through dangerous events and traumas
- Having a history of mental illness
- Getting hurt
- Seeing people hurt or killed
- Feeling horror, helplessness, or extreme fear
- Having little or no social support after the event
- Dealing with extra stress after the event, such as loss of a loved one, pain and injury, or loss of a job or home.

Resilience factors that may reduce the risk of PTSD include:

Seeking out support from other people, such as friends and

ramily

Finding a support group after a traumatic event

Feeling good about one's own actions in the face of danger

Having a coping strategy, or a way of getting through the bad event and learning from it

Being able to act and respond effectively despite feeling fear.

Researchers are studying the importance of various risk and resilience factors. With more study, it may be possible someday to predict who is likely to get PTSD and prevent it.

## Diagnosis

Not every traumatized person develops full-blown or even minor PTSD. Symptoms usually begin within 3 months of the incident but



occasionally emerge years afterward. They must last more than a month to be considered PTSD. The course of the illness varies. Some people recover within 6 months, while others have symptoms that last much longer. In some people, the condition becomes chronic.

A doctor who has experience helping people with mental illnesses, such as a psychiatrist or psychologist, can diagnose PTSD. The diagnosis is made after the doctor talks with the person who has symptoms of PTSD.

To be diagnosed with PTSD, a person must have all of the following for at least 1 month:

   At least one re-experiencing symptom

   At least three avoidance symptoms

   At least two hyperarousal symptoms

Symptoms that make it hard to go about daily life, go to school or work, be with friends, and take care of important tasks.

PTSD is often accompanied by depression, substance abuse, or one or more of the other anxiety disorders.

## Treatments

The main treatments for people with PTSD are psychotherapy ("talk" therapy), medications, or both. Everyone is different, so a treatment that works for one person may not work for another. It is important for anyone with PTSD to be treated by a mental health care provider who is experienced with PTSD. Some people with PTSD need to try different treatments to find what works for their symptoms.

If someone with PTSD is going through an ongoing trauma, such as being in an abusive relationship, both of the problems need to be treated. Other ongoing problems can include panic disorder, depression, substance abuse, and feeling suicidal.

Psychotherapy

Psychotherapy

Psychotherapy is "talk" therapy. It involves talking with a mental health professional to treat a mental illness. Psychotherapy can occur one-on-one or in a group. Talk therapy treatment for PTSD usually lasts 6 to 12 weeks, but can take more time. Research shows that support from family and friends can be an important part of therapy.

Many types of psychotherapy can help people with PTSD. Some types target the symptoms of PTSD directly. Other therapies focus on social, family, or job-related problems. The doctor or therapist may combine different therapies depending on each person's needs.

One helpful therapy is called cognitive behavioral therapy, or CBT. There are several parts to CBT, including:

**Exposure therapy.** This therapy helps people face and control their fear. It exposes them to the trauma they experienced in a safe way. It uses mental imagery, writing, or visits to the place where the event happened. The therapist uses these tools to help people with PTSD cope with their feelings.

**Cognitive restructuring.** This therapy helps people make sense of the bad memories. Sometimes people remember the event differently than how it happened. They may feel guilt or shame about what is not their fault. The therapist helps people with PTSD look at what happened in a realistic way.

**Stress inoculation training.** This therapy tries to reduce PTSD symptoms by teaching a person how to reduce anxiety. Like cognitive restructuring, this treatment helps people look at their memories in a healthy way.

Other types of treatment can also help people with PTSD. People with PTSD should talk about all treatment options with their therapist.

**How Talk Therapies Help People Overcome PTSD**

Talk therapies teach people helpful ways to react to frightening events that trigger their PTSD symptoms. Based on this general goal, different types of therapy may:

Teach about trauma and its effects.

Use relaxation and anger control skills.

Provide tips for better sleep, diet, and exercise habits.

Help people identify and deal with guilt, shame, and other feelings about the event.

Focus on changing how people react to their PTSD symptoms.

For example, therapy helps people visit places and people that are reminders of the trauma.

**Medications**

The U.S. Food and Drug Administration (FDA) has approved two medications for treating adults with PTSD:

sertraline (Zoloft)

paroxetine (Paxil)

Both of these medications are antidepressants, which are also used to treat depression. They may help control PTSD symptoms such as sadness, worry, anger, and feeling numb inside. Taking these medications may make it easier to go through psychotherapy.

Sometimes people taking these medications have side effects. The effects can be annoying, but they usually go away. However, medications affect everyone differently. Any side effects or unusual reactions should be reported to a doctor immediately.

The most common side effects of antidepressants like sertraline and paroxetine are:

> Headache, which usually goes away within a few days.
> Nausea (feeling sick to your stomach), which usually goes away within a few days.
> Sleeplessness or drowsiness, which may occur during the first few weeks but then goes away.
> Agitation (feeling jittery).
> Sexual problems, which can affect both men and women, including reduced sex drive, and problems having and enjoying sex.

Sometimes the medication dose needs to be reduced or the time of day it is taken needs to be adjusted to help lessen these side effects.

**FDA Warning on Antidepressants**

Despite the relative safety and popularity of SSRIs and other antidepressants, some studies have suggested that they may have unintentional effects on some people, especially adolescents and young adults. In 2004, the U.S. Food and Drug Administration (FDA) conducted a thorough review of published and unpublished controlled

clinical trials of antidepressants that involved nearly 4,400 children and adolescents. The review revealed that 4 percent of those taking antidepressants thought about or attempted suicide (although no suicides occurred), compared to 2 percent of those receiving placebos.

This information prompted the FDA, in 2005, to adopt a "black box" warning label on all antidepressant medications to alert the public about the potential increased risk of suicidal thinking or attempts in children and adolescents taking antidepressants. In 2007, the FDA proposed that makers of all antidepressant medications extend the warning to include young adults up through age 24. A "black box" warning is the most serious type of warning on prescription drug labeling.

The warning emphasizes that patients of all ages taking antidepressants should be closely monitored, especially during the initial weeks of treatment. Possible side effects to look for are worsening depression, suicidal thinking or behavior, or any unusual changes in behavior such as sleeplessness, agitation, or withdrawal from normal social situations. The warning adds that families and caregivers should also be told of the need for close monitoring and report any changes to the physician. The latest information can be found on the FDA website.

Results of a comprehensive review of pediatric trials conducted between 1988 and 2006 suggested that the benefits of antidepressant medications likely outweigh their risks to children and adolescents with major depression and anxiety disorders. The study was funded in part by the National Institute of Mental Health.

Other Medications

Other Medications

Doctors may also prescribe other types of medications, such as the ones listed below. There is little information on how well these work for people with PTSD.

1. **Benzodiazepines.** These medications may be given to help people relax and sleep. People who take benzodiazepines may have memory problems or become dependent on the medication.

2. **Antipsychotics.** These medications are usually given to people with other mental disorders, like schizophrenia. People who

   take antipsychotics may gain weight and have a higher chance of getting heart disease and diabetes.

3. **Other antidepressants.** Like sertraline and paroxetine, the antidepressants fluoxetine (Prozac) and citalopram (Celexa) can help people with PTSD feel less tense or sad. For people with PTSD who also have other anxiety disorders or depression, antidepressants may be useful in reducing symptoms of these co-occurring illnesses.

**Treatment After Mass Trauma**

Sometimes large numbers of people are affected by the same event. For example, a lot of people needed help after Hurricane Katrina in 2005 and the terrorist attacks of September 11, 2001. Most people will have some PTSD symptoms in the first few weeks after events like these. This is a normal and expected response to serious trauma, and for most people, symptoms generally lessen with time. Most people can be helped with basic support, such as:

Getting to a safe place
Seeing a doctor if injured
Getting food and water
Contacting loved ones or friends
Learning what is being done to help.

But some people do not get better on their own. A study of Hurricane Katrina survivors found that, over time, more people were having problems with PTSD, depression, and related mental disorders. This pattern is unlike the recovery from other natural disasters, where the number of people who have mental health problems gradually lessens. As communities try to rebuild after a mass trauma, people may experience ongoing stress from loss of jobs and schools, and trouble paying bills, finding housing, and getting health care. This delay in community recovery may in turn delay recovery from PTSD.

In the first couple weeks after a mass trauma, brief versions of CBT may be helpful to some people who are having severe distress. Sometimes other treatments are used, but their effectiveness is not known. For example, there is growing interest in an approach called psychological first aid. The goal of this approach is to make people feel safe and secure, connect people to health care and other resources, and reduce stress reactions. There are guides for

carrying out the treatment, but experts do not know yet if it helps prevent or treat PTSD.

In single-session psychological debriefing, another type of mass trauma treatment, survivors talk about the event and express their

feelings one-on-one or in a group. Studies show that it is not likely to reduce distress or the risk for PTSD, and may actually increase distress and risk.

**Mass Trauma Affects Hospitals and Other Providers**

Hospitals, health care systems, and health care providers are also affected by a mass trauma. The number of people who need immediate physical and psychological help may be too much for health systems to handle. Some patients may not find help when they need it because hospitals do not have enough staff or supplies. In some cases, health care providers themselves may be struggling to recover as well.

NIMH scientists are working on this problem. For example, researchers are testing how to give CBT and other treatments using the phone and the Internet. In one study, people with PTSD met with a therapist to learn about the disorder, made a list of things that trigger their symptoms, and learned basic ways to reduce stress. After this meeting, the participants could visit a website with more information about PTSD. Participants could keep a log of their symptoms and practice coping skills. Overall, the researchers found the Internet-based treatment helped reduce symptoms of PTSD and depression. These effects lasted after treatment ended.

Researchers will carry out more studies to find out if other such approaches to therapy can be helpful after mass trauma.

## Living With

"I was raped when I was 25 years old. For a long time, I spoke about the rape as though it was something that happened to someone else. I was very aware that it had happened to me, but there was just no feeling."

"Then I started having flashbacks. They kind of came over me like a splash of water. I would be terrified. Suddenly I was reliving the rape. Every instant was startling. I wasn't aware of anything around me, I was in a bubble, just kind of floating. And it was scary. Having a flashback can wring you out."

"The rape happened the week before Thanksgiving, and I can't believe the anxiety and fear I feel every year around the anniversary date. It's as though I've seen a werewolf. I can't relax, can't sleep, don't want to be with anyone. I wonder whether I'll ever be free of this terrible problem."

## Clinical Trials

NIMH supports research studies on mental health and disorders. See also: A Participant's Guide to Mental Health Clinical Research.

Participate, refer a patient or learn about results of studies in ClinicalTrials.gov, the NIH/National Library of Medicine's registry of

Post-Traumatic Stress Disorder (PTSD)

federally and privately funded clinical trials for all disease.

Find NIH-funded studies currently recruiting participants with **PTSD**.

| Bookmark & Share | Newsletters | RSS Feeds | Facebook | Twitter | YouTube | NIMH New Items Widget |

Contact Us

Staff Directories

Privacy Notice

Policies

FOIA

Accessibility

Topic Finder

The National Institute of Mental Health (NIMH) is part of the National Institutes of Health (NIH), a component of the U.S. Department of Health and Human Services.



# Epilepsy Association of Central Florida
## Epilepsy Fact Sheet
### *Epilepsy affects 3 million Americans, making it more common than multiple sclerosis and Parkinson's disease combined.*

**Epilepsy is:**
- A chronic neurological condition caused by abnormal electrical activity in the brain.
- Characterized by two or more unprovoked seizures.
- Most often managed with antiepileptic drugs (AEDs).
  - Around 30 percent of people diagnosed with epilepsy still live with uncontrolled seizures or undesirable side effects.
  - Less than half (47%) of newly-diagnosed people become seizure free with their first AED.
  - Eventually, most individuals are successfully treated with one or a combination of AEDs.
- Not always evident.
  - There are over 40 different epilepsy syndromes and nine types of seizures.
  - Some people have one type of seizure, while others can experience two or more different types.
  - Seizures range from small hand twitches or staring spells to lip smacking or full-body movements, or a combination of these.

**A Growing At-risk Population**
- Anyone can develop epilepsy; it occurs across all ages, races and genders.
- Certain groups are at greater risk including children under two years and adults over 65.
- Each year, 200,000 people are diagnosed, but this number is expected to rise as the population ages.

**Finding the Proper Treatment**
- Each individual must have a personalized diagnosis and treatment based on an accurate classification of his or her seizure type and epilepsy syndrome.
  - Seizures are generally classified as either partial or generalized.
    - Partial seizures affect only one side of the brain, but can become generalized as the seizure continues. More than 50 percent of all new cases of epilepsy diagnosed involve partial-onset seizures.
    - Generalized seizures occur in both sides of the brain at the same time.
  - Someone experiencing seizures should see a doctor familiar with epilepsy, such as a neurologist or an epileptologist—a neurologist who specializes in epilepsy—to ensure greater likelihood of diagnosis and access to the most up-to-date treatment options.
    - Doctors need to know what happens before, during and after a seizure to diagnose and determine appropriate treatment, so bringing someone who has witnessed the seizures to the appointment is recommended.
- More than 20 medications—used alone or in combination with other AEDs—are available to treat epilepsy.
- Some people, whose seizures cannot be controlled with medication alone, may qualify for other therapies such as brain surgery, vagal nerve stimulator (VNS) or the ketogenic diet.

**Seizure Control and Minimal Side Effects is the Treatment Goal**
- The goal of epilepsy therapy is seizure freedom with minimal side effects.
- Medication compliance, or taking medications exactly as prescribed, can ensure the success of an epilepsy treatment regimen. Poor compliance can cause breakthrough seizures, resulting in serious challenges to one's independence and quality of life.
- Uncontrolled seizures or medication side effects pose challenges to independent living, learning and employment.
- Numerous new medications and treatments in development give hope to those living with uncontrolled seizures.

**Resources**
Many resources provide information and support for people living with epilepsy, including:
- www.epilepsyasssociation.com
- www.epilepsy.com
- www.epilepsyadvocate.com
- www.epilepsyclassroom.com
- www.canineassistants.org
- www.epilepsyu.com

UCB VE306-0608 April 2009

## Epilepsy Association of Central Florida, Inc.
## 109 North Kirkman Road, Orlando, FL 32811 407-422-1416

Epilepsy and Seizures: Provoked Seizures, Seizure Disorder, and More                                          Page 1 o

 Williams, Donald C1

Article Link: http://www.webmd.com/epilepsy/guide/understanding-seizures-and-epilepsy

# Epilepsy Health Center

### Tools & Resources

6 Common Types of Seizures

Tests for Epilepsy

Epilepsy: Alternative Treatments

First Aid for Seizures: 16 Tips

New Moms with Epilepsy

Exploring Epilepsy Solutions

Listen

## Understanding Seizures and Epilepsy

### What Is a Seizure and What Is Epilepsy?

Seizures — abnormal movement or behavior due to unusual electrical activity in the brain — are a symptom of epilepsy. But all people who appear to have seizures have epilepsy. In contrast, epilepsy is a group of related disorders characterized b tendency for recurrent seizures.

- Non-epileptic seizures (called pseudoseizures) are not accompanied by abnormal electrical activity in the brain and may caused by psychological issues orstress. This type of seizure may be treated with psychiatric intervention.

- Provoked seizures are single seizures that may occur as the result of trauma, low blood sugar (hypoglycemia), low blood sodium, high fever, or alcohol or drug abuse. Fever-related (or febrile) seizures may occur during infancy and children usually outgrow them by age 6. After a careful evaluation to estimate the risk of recurrence, patients who suffer a single seizure may not need treatment.

- Seizure disorder is a general term used to describe any condition in which seizures may be a symptom. In fact, seizure disorder is so general that it is not a useful term. Unfortunately, "seizure disorder" is often used to avoid the term epilepsy.

### Who Is Affected by Epilepsy?

Epilepsy is a relatively common condition, affecting 0.5% to 1% of the population. In the United States, about 2.5 million people have epilepsy. In fact, about 9% of Americans will have at least one seizure during their lives

### What Causes Epilepsy?

Epilepsy occurs as a result of abnormal electrical activity originating from the brain. Brain cells communicate by sending electrical signals in an orderly pattern. In epilepsy these electrical signals become abnormal, giving rise to an "electrical storm" that produces seizures. These storms may be within a specific part of the brain or be generalized, depending on the type of epilepsy.

### Types of Epilepsy

Patients with epilepsy experience more than one seizure type. This is because seizures are only symptoms. Therefore, it i essential that your neurologist diagnose your type of epilepsy, not just the type(s) of seizure you are having.

### How Is Epilepsy Treated?

The majority of epileptic seizures are controlled through drug therapy. Diet may also be used along with medications.

In certain cases in which medications and diet are not working, surgery may be used. The type of treatment prescribed wil depend on several factors including the frequency and severity of the seizures as well as the person's age, overall health, medical history.

**Recommended Related to Epilepsy**

**Working With Your Doctor for the Best Epilepsy Treatment**

If you have been diagnosed with epilepsy, you will have many questio One of the first will probably be, "How can my epilepsy be treated?" There no single answer to this question. Th is because doctors have identified hundreds of different epilepsy syndromes, which involve many different types of seizures. Your epilepsy may be inherited, or it may One study has found that some peop with epilepsy have inherited an abnormally active version of a gene makes them resistant to drugs...

Read the Working With Your Doct for the Best Epilepsy Treatment article > >

HEALTH CARE    RESEARCH    EDUCATION    GIVE    ABOUT    Q

Stanford Medicine » School of Medicine » Departments » Psychiatry » Child and Adolescent Psychiatry » What Meds? » The Medications

# Psychiatric Medications

**Doxepin**

**Brand Names: Adapin, Prudoxin, Sinequan, Zonalon**

### Overview

Doxepin is a tricyclic antidepressant and anxiolytic (anti-anxiety) drug that reduces reuptake of norepinephrine and serotonin (neurotransmitters) to bring their levels back to normal. Doxepin is an anticholinergic - a drug that blocks the parasympathetic nerves - and a sedative. It is the only tricyclic antidepressant to relieve itching as well as several types of pain.

Doxepin usually takes effect within two to four weeks, but the time may be longer due to dosage and an individual's reaction to the drug. Some effects may be felt on the first day.

### Why is this drug prescribed?

Doxepin is FDA-labeled in adults for treatment of depression and/or anxiety associated with alcoholism, depression and/or anxiety associated with organic disease, depression, and pruritis/itching. It is also FDA-labeled in adolescents and children above 12 years old for depression and/or anxiety. Doxepin has shown to be useful in treating insomnia, neuropathic pain, anxiety, and chronic pain as well.

Doxepin is used to treat several types of depression including:

- refractory depression
- major depression
- mixed depression anxiety
- neurotic depression
- spontaneous endogenous depression
- depression or anxiety due to alcoholism
- manic-depressive illness

Doxepin has also been used to treat:

- anxiety
- chronic skin disorders
- itching
- panic disorders
- peptic ulcer disease
- postprandial hypoglycemia
- posttraumatic stress disorder ( PTSD )

- sleep disorders
- cravings of smoking
- swelling
- excessive nighttime urination
- chronic pain associated with: arthritis, diabetic disease, herpes lesions, migraines, pain in cancer patients, tension headaches, or tic douloureux

**How much of this drug is typically used?**
Capsule: 10 mg, 25 mg, 50 mg, 75 mg, 100 mg, 150 mg
Cream: 30 g, 45 g
Solution, oral concentrate: 10 mg/mL

**Warnings and Precautions**
Doxepin is not recommended for children under twelve years old because Doxepin's effects on children have not been adequately studied. Children over twelve years old are recommended the same dosage as adults.

Doxepin can cause photosensitivity and can reduce sweating which impairs the body's ability to adapt to heat. Patients should avoid saunas and other very hot environments.

Doxepin is not addictive. Suddenly discontinuing Doxepin may cause withdrawal symptoms including headache and nausea. Dosages should be gradually tapered to minimize withdrawal.

Doxepin can cause drowsiness and dizziness: a patient taking Doxepin should not drive or operate heavy machinery until he knows that it does not impair his ability do engage in these activities.

For Nursing Mothers: Controlled studies have not been done in pregnant women, but there have been reports of newborns suffering from muscle spasms and heart, breathing, and urinary problems when their mothers had taken tricyclic antidepressants immediately before delivery. Animal studies show that some tricyclic antidepressants may have undesirable effects on a fetus. Tricyclic antidepressants pass into breast milk and are reported to cause drowsiness in nursing infants.

**Contraindications**
Doxepin should **Not** be used for people with the following medical conditions:

- schizophrenia — Doxepin may aggravate the condition
- liver or kidney disease — patients may need careful monitoring while on Doxepin
- a recent heart attack
- narrow-angle glaucoma
- a history of epilepsy, diabetes, glaucoma, heart / liver disease, an overactive thyroid, or an enlarged prostate gland — Doxepin may still be used in many cases, but with extra caution
- a history of blood disease

**Adverse Reactions**
Doxepin may cause the following reactions:

- sedation
- drowsiness/fatigue
- anxiety
- dizziness
- insomnia

- seizures
- impaired cognitive function
- cholestatic jaundice
- suicidal thinking
- sudden death

**Interactions with Drugs and Other Substances**

Drugs or substances that may interact with Doxepin are:

- MAO Inhibitors (within 14 days) serious, even fatal, interactions can occur when taken with Doxepin
- All atropine like drugs, all sedative drugs, antihistamines, norepinephrine, Dilantin (phenytoin), and Coumadin (warfarin) — Doxepin may increase the effects of these
- Catapres (clonidine), Hylorel (guanadrel), Ismelin / Esimil (guanethidine), Primatene tablets(ephedrine) and Tenex (guanfacine) — Elavil may decrease the effects of these drugs
- Tagamet (cimetidine), estrogens, Prozac (fluoxetine), Luvox (fluvoxamine), Normodyne (labetalol), Ritalin (methylphenidate), oral contraceptives, phenothiazines, Quinaglute (quinidine), ACE inhibitors, Calan (verapamil), and Zantac (ranitidine) — these drugs may increase the effects of Doxepin
- Norvir (ritonavir) and other protease inhibitors may lead to drug toxicity when taken with Doxepin
- Stimulant drugs (such as cocaine, amphetamines, Proventil, sutafed) — these medications can cause severe high blood pressure and/or high fever when taken with Doxepin
- Thyroid medications can increase the risk of heart rhythm disorders when taken with Doxepin
- Demerol (meperidine) can cause a lower rate of breathing when taken with Doxepin
- Alcohol — when taken with Doxepin or another TCA can increase the intoxicating effects of alcohol and combination can depress brain function significantly; alcohol should be avoided completely

**Sources**

- http://www.rxlist.com/scripts/patient/piumore.pl?mononum=502& dc_category=

    Depression&order=0&type=&item=

- http://www.mentalhealth.com/drug/p30-s03.html
- http://www.psyweb.com/Drughtm/doxepi.html
- http://www.health-center.com/db/PageReq?SessionID=8816& TopicID=376&PageID=1529&Action=view
- www.uptodate.com "Doxepin: Drug Information"
- www.micromedex.com "DrugPoint® Summary: Doxepin"
- Stahl, Stephen M. Essential Psychopharmacology: The Prescriber's Guide. New York: Cambridge University Press, 2006, pp 147-153

©2016 Stanford School of Medicine | Terms of Use

- weight gain or loss
- blurred vision
- rash
- dry mouth
- constipation
- gastric reflux
- urinary retention
- photosensitivity
- ringing in ears
- agitation
- diarrhea
- low blood pressures when sitting/standing
- hair loss
- increased or decreased libido
- nausea
- sweating
- swelling
- seizures
- delirium
- delusions
- hallucinations
- Tourette's syndrome
- liver / kidney toxicity
- heart rhythm disturbances
- abnormally low white blood cell and platelet count
- tremors
- weakness
- nightmares
- high blood pressure
- increased appetite
- racing heartbeat
- irritation of the tongue or mouth
- confusion

**Rarely:**

- sudden cardiac death
- arrhythmias
- cardiomyopathy
- agranulocytosis
- leucopenia
- extra movements



# Psychogenic (Non-Epileptic) Seizures



A Guide
for Patients
& Families

Selim R. Benbadis, MD
Leanne Heriaud, RN



● **Comprehensive Epilepsy Program**



Tampa
General
Hospital



University of
South Florida
College of Medicine

# Table of Contents

* What are psychogenic (non-epileptic) seizures? ............... 3

I have never heard of this. Is it rare? ................................... 3

How can we be sure that this is the right diagnosis? ........ 3

Why did my other doctor say that I had epilepsy? ........... 4

What about my abnormal EEG? ........................................... 4

What causes psychogenic (non-epileptic) seizures? ......... 4

Do I really need psychiatric treatment? ............................... 5

What is the outlook? ............................................................. 6

............ ive? ................................................................. 6

......... about my disability? ............................................. 6

......... about children? ..................................................... 7

......... thought ..................................................................... 7

......... onal information ......................................................... 8

## Comprehensive Epilepsy Program

◆ **Selim R. Benbadis, MD**
Associate Professor
Department of Neurology & Neurosurgery
Director, Comprehensive Epilepsy Program and
Clinical Neurophysiology Laboratory
University of South Florida &
Tampa General Hospital
(813) 259-0605
sbenbadi@hsc.usf.edu
http://hsc.usf.edu/~sbenbadi/

◆ **Leanne Heriaud, RN, BSN**
Coordinator, Comprehensive Epilepsy Program
Tampa General Hospital
(813) 844-4675
lheriaud@tgh.org

2

 **Psychogenic (non-epileptic) seizures:** A guide for patients & families

**WHAT ARE PSYCHOGENIC NON-EPILEPTIC SEIZURES?**

A seizure is a temporary loss of control, often with abnormal movements, unconsciousness, or both. Epileptic seizures are caused by sudden abnormal electrical discharges in the brain. Psychogenic (non-epileptic) seizures are attacks that look like epileptic seizures, but are not caused by abnormal electrical discharges. They are stress-related or "emotional." They are sometimes called pseudoseizures, but "psychogenic non-epileptic seizures" (PNES) is now the preferred term.

**I HAVE NEVER HEARD OF THIS. IS IT RARE?**

PNES are the most common condition misdiagnosed as epilepsy. PNES are not rare, with a frequency comparable to multiple sclerosis. In general, 1 in 5 of patients sent to epilepsy centers for difficult seizures is found to have PNES instead of epileptic seizures.

**HOW CAN WE BE SURE THAT THIS IS THE RIGHT DIAGNOSIS?**

Your physician may suspect PNES when the seizures have unusual features (e.g., type of movements, duration, triggers, frequency, etc.). PNES may look like generalized convulsions (similar to "grand-mal" seizures) with falling and shaking. Less often, they may mimic "petit mal" or "complex partial" seizures with temporary loss of attention, or "staring."

The routine, 20-minute electroencephalogram (EEG) is often helpful in diagnosing epilepsy because it can detect the abnormal electrical discharges in the brain that indicate epilepsy. However, the EEG is very often normal in patients with proven epilepsy, so it cannot be used alone to exclude epilepsy.

The most reliable test to make the diagnosis is EEG-video monitoring, which is the only way to be sure. This procedure monitors a patient for several hours to several days with a video camera and an EEG until a seizure occurs. By analyzing the video and EEG recordings, the diagnosis can be made with a nearly 100% certainty. However, this can only be done if the episodes in question occur frequently enough (once a week or more). Sometimes techniques can also be used to trigger seizures during monitoring.

 **Psychogenic (non-epileptic) seizures:** A guide for patients & families

## WHY DID MY OTHER DOCTOR SAY THAT I HAD EPILEPSY?

Most patients (about 80%) with PNES have been treated with antiepileptic drugs for several years before the correct diagnosis is made. This does not mean that doctors who have treated you for epilepsy have been incompetent. Here is why.

Remember that the diagnosis of seizures relies on the descriptions by observers, who may not notice important details. Few physicians have access to EEG-video monitoring, which has to be performed by a neurologist who specializes in epilepsy (epileptologist). Because epileptic seizures are potentially more harmful than PNES, physicians, when in doubt, will treat for the more serious condition. If seizures continue despite medications, then either the treatment needs to be changed or the diagnosis is not epilepsy. At that point, patients are sent to an epilepsy center, where the diagnosis is usually made.

## WHAT ABOUT MY ABNORMAL EEG?

As mentioned above, most patients with PNES have received a diagnosis of epilepsy before being correctly diagnosed. Similarly, many have had EEGs reported as "abnormal." This is because neurologists who do not specialize in EEG or epilepsy frequently "over-read" as abnormal what specialists would consider normal. This is one reason why the diagnosis of PNES should only be made by epileptologists.

If you have had abnormal EEGs in the past, it is important that you obtain the actual tracings so the specialist (epileptologist) can review them. A small proportion (only about 10%) of patients with PNES also have epilepsy. If you have both types, it is very important that you and your family learn to distinguish the two types.

## WHAT CAUSES PSYCHOGENIC (NON-EPILEPTIC) SEIZURES?

PNES, unlike epileptic seizures, are not the result of a physical brain disease. Rather, they are emotional, stress-induced, and result from traumatic psychological experiences, sometimes from the forgotten past. It is well known that emotional or psychological stresses can produce physical reactions in people with no physical illness. For example, everyone has blushed in embarrassment or been nervous and anxious as part of a "stage fright" reaction. Today, we also know that more extreme emotional stresses can actually cause physical illnesses.

Some physical illnesses can be greatly influenced by psychological or emotional factors. These illnesses are called psychosomatic or "mind-body" illnesses. Examples include angina (chest pain), asthma, and headaches. Other conditions are thought to be influ-

 **Psychogenic (non-epileptic) seizures:** A guide for patients & families

**Psychogenic (Non-epileptic) Seizures, continued...**

enced by stress and are often associated with PNES, including fibromyalgia and other pain syndromes, and irritable bowel syndrome.

Disorders where emotional stresses cause symptoms that look like physical illnesses are called somatoform ("taking form in the body") disorders, and the most common type is conversion disorder. In fact the official psychiatric classification (DSM-IV) has a specific category called *conversion disorder with seizures.* This is the category PNES usually fall into.

It is important to remember that somatoform disorders, including conversion disorder, are real conditions that arise in response to real stresses; patients are not faking them. The fact that the vast majority of PNES are not consciously produced is often poorly understood by family members and even by health care professionals. A specific traumatic event, such as physical or sexual abuse, incest, divorce, death of a loved one, or other great loss or sudden change, can be identified in many patients. Often the underlying trauma has been blocked from consciousness, and patients can recall the event only with help from a trained therapist. The unconscious processes that cause PNES may also cause or contribute to other conditions, such as depression and anxiety, which may also be present.

**DO I REALLY NEED PSYCHIATRIC TREATMENT?**

Thus, as mentioned above, PNES (and other conversion disorders) are a psychiatric condition. Some patients are reluctant to believe the diagnosis. Keep in mind that PNES represent a well-recognized condition that can be diagnosed with nearly 100% certainty. This is different from other psychogenic symptoms, are simply a "diagnosis of elimination." With EEG video monitoring performed by an epileptologist, PNES can be shown with near 100% reliability to be of psychological origin.

Some people believe that treatment by a psychiatrist is a sign of being "crazy" or otherwise mentally incompetent. Such is not the case with PNES. Many patients become upset when told that their seizures are psychological. Remember that PNES are not purposely produced — it is not your "fault" that you have them.

It makes sense to seek treatment from a person most able to help you. The psychological factors can best be identified with the help of those with special training in psychological issues: psychiatrists, psychologists, or clinical social workers. As with all other medical conditions, sometimes the exact cause remains unknown; even then we can concentrate on the most important goal: reducing or eliminating the seizures.

 **Psychogenic (non-epileptic) seizures:** A guide for patients & families

**Psychiatric Treatment, continued...**

Your neurologist may continue to see you, but treatment will be provided primarily by a mental health professional. Treatment may involve psychotherapy, stress-reduction techniques (such as relaxation and biofeedback training), and personal support to help you cope with the seizures during the course of treatment.

**WHAT IS THE OUTLOOK?**

Overall, the outlook is good.

With proper treatment, the seizures eventually disappear in 60-70% of adults; the percentages are even higher for children and adolescents. Keep in mind that psychiatric treatments are not a quick fix and take time. A common mistake is to refuse the diagnosis and not follow up with the proper treatment. Unfortunately, patients who make this choice will continue antiepileptic drugs, which have already failed and are not likely to work.

An important factor is early diagnosis. The shorter patients have carried the wrong diagnosis of epilepsy, the better the chances of full recovery. With the supervision of the neurologist, antiepileptic drugs should be gradually (not abruptly) stopped.

**CAN I DRIVE?**

Many people with PNES have stopped driving, since they have carried a diagnosis of epilepsy. There is no law that regulates driving in patients with PNES, and neurologists vary in what they recommend. The decision as to whether you should be driving has to be made individually with both your psychiatrist and your neurologist.

**WHAT ABOUT MY DISABILITY?**

If you have received benefits or been unable to work because of your seizures, this should not change based on this new diagnosis. Your seizures are real, and they may be disabling whether they are epileptic or psychological in origin. However, if your disability is now related to PNES (and not epilepsy), decisions are best made by your psychiatrist rather than your neurologist.

6

 **Psychogenic (non-epileptic) seizures:** A guide for patients & families

**WHAT ABOUT CHILDREN?**

PNES can also occur in adolescents and young children. More common psychogenic (stress-induced) symptoms in these age groups include headaches and stomach aches. Most of the points made in this guide apply to children as well as to adults. Young patients generally differ from adult patients only in that the stresses are typically less severe and are often related to the stresses experienced by younger patients, such as school or dating.

Children and adolescents also have a higher rate of recovery.

**A FINAL THOUGHT**

We realize this booklet may not have answered all your questions. It is not intended to replace discussions with your physician, but rather to help you understand that you have a known and treatable condition. You are not alone in having this. Treatment is available and is effective for most of the patients who seek it.

# ADDITIONAL INFORMATION

PNES are constantly the subject of new research. Each year at the Annual Meeting of the American Epilepsy Society, many presentations are devoted to this topic. Each year, many articles on PNES are published in the medical literature. The following gives some idea of the attention being directed to this well-recognized disorder.

In 2001, there were over 60 articles on PNES published in the medical literature. In 2001, there were 21 presentations on PNES at the Annual Meeting of the American Epilepsy Society.

## BOOKS

Riley TL, Roy A. Pseudoseizures. Baltimore: Williams & Wilkins, 1982.

Fischer RS. Imitators of Epilepsy. New York: Demos Medical Publishers, 1994.

Gates J, Rowan AJ (eds). Non-epileptic seizures. 2nd edition. Boston: Butterworth-Heinemann, 2000.

American Psychiatric Association. Diagnostic and statistical manual of mental disorders : DSM-IV. 4th ed. Washington, DC: American Psychiatric Association, 1994.

## RECENT SELECTED ARTICLES

Andriola MR, Ettinger AB. Pseudoseizures and other nonepileptic paroxysmal disorders in children and adolescents. Neurology 1999;53(5 Suppl 2):S89-95.

Benbadis SR, Agrawal V, Tatum WO. How many patients with psychogenic nonepileptic seizures also have epilepsy? Neurology 2001;57:915-7.

Benbadis SR, Blustein JN, Sunstad L. Should patients with psychogenic nonepileptic seizures be allowed to drive? Epilepsia 2000;41:895-7.

Benbadis SR, Hauser WA. An estimate of the prevalence of psychogenic nonepileptic seizures. Seizure 2000;9:280-281.

Benbadis SR, Johnson K, Anthony K, et al. Induction of psychogenic nonepileptic seizures without placebo. Neurology 2000;55:1904-5.

Benbadis SR, Tatum WO IV, Vale FL. When drugs don't work: an algorithmic approach to medically intractable epilepsy. Neurology 2000;55:1780-1784.

Benbadis SR. How many patients with pseudoseizures receive antiepileptic drugs prior to diagnosis? European Neurology 1999;41:114-5.

Benbadis SR. What can EEG-video monitoring do for you and your patients? Journal of the Florida Medical Association 1997;84:320-322.

Bowman ES. Nonepileptic Seizures. Current Treatment Options in Neurology 2000;2:559-570.

Bowman ES. Nonepileptic seizures: psychiatric framework, treatment, and outcome. Neurology 1999;53(5 Suppl 2):S84-8.

DeToledo JC, Lowe MR, Puig A. Nonepileptic seizures in pregnancy. Neurology 2000;55:120-1.

8

# ARTICLES, continued...

Ettinger AB, Devinsky O, Weisbrot DM, et al.A comprehensive profile of clinical, psychiatric, and psychosocial characteristics of patients with psychogenic nonepileptic seizures. Epilepsia 1999;40:1292-8.

Ettinger AB, Dhoon A, Weisbrot DM, et al. Predictive factors for outcome of nonepileptic seizures after diagnosis. Journal of Neuropsychiatry Clin Neurosci 1999;11:458-63.

Frances PL, Baker GA, Appleton PL. Stress and avoidance in Pseudoseizures: testing the assumptions. Epilepsy Research 1999;34(2-3):241-9.

Gates J. Nonepileptic seizures: time for progress. Epilepsy & Behavior 2000;1:2-6.

Gatzonis SD, Siafakas A, Chioni A, et al. Nonepileptic seizures. Epilepsia 1999;40:387.

Groppel G, Kapitany T, Baumgartner C. Cluster analysis of clinical seizure semiology of psychogenic nonepileptic seizures. Epilepsia 2000;41:610-4.

Gudmundsson O, Prendergast M, Foreman D, et al. Outcome of pseudoseizures in children and adolescents: a 6-year symptom survival analysis. Developmental Medicine and Child Neurology 2001;43:547-51.

Kalogjera-Sackellares D, Sackellares JC. Intellectual and neuropsychological features of patients with psychogenic pseudoseizures. Psychiatry Research 1999;86:73-84.

Krawetz P, Fleisher W, Pillay N, et al. Family functioning in subjects with pseudoseizures and epilepsy. Journal of Nerve and Mental Diseases 2001;189:38-43.

Krumholz A. Nonepileptic seizures: diagnosis and management. Neurology 1999;53(5 Suppl 2):S76-83.

Lesser RP. Psychogenic seizures. Neurology 1996;46:1499-2507.

Reeves AL, McAuley JW, Moore JL, et al. Medication use, self-reported drug allergies, and estimated medication cost in patients with epileptic versus nonepileptic seizures. Journal of Epilepsy 1998;11:191-194.

Selwa LM, Geyer J, Nikakhtar N, et al. Nonepileptic seizure outcome varies by type of spell and duration of illness. Epilepsia 2000;41:1330-

Shen W, Bowman ES, Markand ON: Presenting the diagnosis of psychogenic seizure. Neurology 1990; 40; 5: 756-759.

Silva W, Giagante B, Saizar R, et al. Clinical features and prognosis of nonepileptic seizures in a developing country. Epilepsia 2001;42:398-401.

Sirven JI, Glosser DS. Psychogenic nonepileptic seizures: theoretic and clinical considerations. Neuropsychiatry Neuropsychology and Behavioral Neurology 1998;11:225-35.

Szaflarski JP, Ficker DM, Cahill WT, et al. Four-year incidence of psychogenic nonepileptic seizures in adults in Hamilton county, OH. Neurology 2000 28;55:1561-3.

Tojek TM, Lumley M, Barkley G, Mahr G, et al. Stress and other psychosocial characteristics of patients with psychogenic nonepileptic seizures. Psychosomatics 2000;41:221-6.

Wyllie E, Glazer JP, Benbadis S, et al. Psychiatric features of children and adolescents with pseudoseizures. Archives of Pediatric and Adolescent Medicine 1999;153:244-8.

T

Exhibit - I (I1, I2)



# United States Marine Corps

*This is to certify that*

**WILLIAMS    DO 262451014**

*has completed the course prescribed by the*

**COMMANDANT OF THE MARINE CORPS FOR**

**MOS 0331, MACHINEGUNNER**

*Given at*

*Infantry Training School*

Marine Corps Base, Camp Pendleton, California

*this* ———— *day of* ———— June ———— 19 —— 79

**J. P. GAGLIARDO, JR.**
**COLONEL, U. S. MARINE CORPS**
**COMMANDING**

AVMC 184 (REV. 5-76) (Supersedes NAVMC 184a) SN: 000-00-000-4803 U/I: SH

(1560)