UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

LEGAL MAIL
PROVIDED TO SF
FLORIDA STATE PRISON
DATE 12-9-16 FOR MAILING.
INMATES INITIALS _DW_

DONALD OTIS WILLIAMS,
    Petitioner,

v                                    Case No: 5:16-cv-357-Oc-WTH-PRL

SECRETARY, DEPARTMENT OF
CORRECTIONS AND FLORIDA
ATTORNEY GENERAL, et al.,
        Respondents

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FL
OCALA FLORIDA

2016 DEC 15 AM 10: 22

FILED

## MOTION TO INCLUDE
## PETITIONER'S SUPPLEMENTAL APPENDIX

Petitioner herein provides the Honorable Court with exhibits that were divested in the Petitioner's Reply to Respondents' Response mailed to the Honorable Court by U.S. Mail on December 5, 2016.

Exhibits I, S13, S14, T1 and T2 were not included in the December 5, 2016 Reply through no fault of Petitioner. Petitioner's timely Reply, Petitioner prays, will be supplemented by the acceptance of this addendum to the Reply's Appendix.

Due to circumstances beyond Petitioner's control the exhibits abovementioned and contained in this instruments appendix were not available on December 5, 2016 because all the exhibits' copies were double-sided (printed on both sides of a page) which the Court will not allow. Petitioner prays for forgiveness of this inadvertent act.

## APPENDIX

Document                                                                  Exhibit

Transcript Excerpt (pp 1.2.16.17) of Proceeding Dated August 2. 2013 . . . . I

Online Acquired Information Regarding Frontal Lobe Epilepsy (American

Academy of Neurology) Dated 6/19/2015 . . . . . . . . . . . . . . S 13

Online Acquired Information Regarding Misprescribed and

Overprescribing Drugs (WorstPills.org) Dated 3/19/2015 . . . . . . S14

November 4. 2013 Proceeding Transcript (Excerpt pp 1,2,15.16.17.18). . . . T 1

November 21. 2013 Proceeding Transcript (Excerpt pp 1.2.3.4.5.6.7.8.

9.10.11.12.13) . . . . . . . . . . . . . . . . . . . . . . . . . T 2

## CERTIFICATE OF SERVICE/OATH

    I hereby certify the instrument heretowith including the appendix was sent by U S Mail on December 9   , 2016 to United States District Court . 207 NW Second Street , Room 337, Ocala, Florida 34475·6666: with an exact copy sent by U.S. Mail on December 9   . 2016 to Florida Attorney General . 444 Seabreeze Blvd. . Fifth Floor . Daytona Beach . Florida 32118

## OATH

    I declare under the penalty of perjury the foregoing statement is true and correct.

## UNNOTARIZED OATH

Under penalties of perjury, I declare that I have read the foregoing motion and the facts stated in it are true.

Executed this _9th_ day of ~~November~~ December , 20 16 .

Respectfully submitted by /s/ Donald Otis Williams

Donald Otis Williams

U13479

Florida State Prison

P. O. Box 800

Raiford, Florida 32083

3

Exhibit - I

IN THE CIRCUIT COURT, FIFTH
JUDICIAL CIRCUIT, IN AND FOR
LAKE COUNTY, FLORIDA
CASE NO.:  2011-CF-000105

STATE OF FLORIDA,

      Plaintiff,

vs.

DONALD OTIS WILLIAMS,

      Defendant.

_____/


TRANSCRIPT ON APPEAL


HELD BEFORE:   The Honorable Mark A. Nacke
DATE TAKEN:    August 2, 2013
TIME:          10:02 A.M. - 10:44 A.M.
PLACE:        Lake County Judicial Center
               550 West Main Street
               Tavares, Florida 32778


      This cause came on to be heard at the time and place
aforesaid, when and where the following proceedings were
reported by:


Cheryl McDonough, RPR, FPR
Kerr & Associates
614 North Sinclair Avenue
Tavares, Florida 32778
(352) 742-3144



KERR & ASSOCIATES, INC.
1-800-246-1753

#130

2970

2

A P P E A R A N C E S:


WILLIAM M. GROSS, ESQUIRE

OF:   Office of the State Attorney

      550 West Main Street

      Tavares, Florida 32778

      P:  352-742-4236

           APPEARING ON BEHALF OF THE STATE


DONALD OTIS WILLIAMS, PRO SE

16

1   is another example of a baseless motion.

2       There has been no lying to the Defendant.  There may

3   have been some disagreement, but no lying.  There is no

4   conflict.  There never has been a conflict.  It's

5   intriguing to me that when the Defendant is asking you to

6   find that they were ineffective, he never mentions

7   anything about any dispute about mitigation, it only

8   comes up now.  That was never brought up.  And he says

9   that was the at the point or it was at that point that

10  the relationship went downhill, he just told us, and yet

11  it never came up.  It was always about this other

12  allegation about the insanity defense.  So I think this

13  is another example, like the Fifth District Court of

14  Appeals has found of a frivolous, nonsensical, baseless

15  motions wasting the Court's time once again today.

16      MR. WILLIAMS:  Your Honor, may I say one final word?

17      THE COURT:  Yes, sir.

18      MR. WILLIAMS:  The one other, the proceeding that we

19  had before this, Mr. Gross mentioned the Fifth District

20  Court of Appeal case that was ruled frivolous on me and

21  in passing I told him that the Federal Court didn't see

22  it that way.  I filed in the Federal Court a federal

23  habeas corpus in 2004.  That Fifth District Court of

24  Appeal was a petition for writ of mandamus to try to save

25  the medical records at the jail so I could get them.  I

17

1    asked Judge Semento to give me the records and he would

2    not do it, so I had to go to the Fifth District Court of

3    Appeal and I asked him and then I told him I wanted to

4    withdraw the petition and just tell them that they could

5    file a letter to them, they didn't have to go through the

6    formal writ to do this.

7        Well, then, therefore it went to the order to show

8    cause and then I just went ahead and let it all out and

9    told them the whole basis about that 2000 case there.

10   When they found that that was a frivolous motion or

11   frivolous pleading, I spent 60 days in a box, 364 days of

12   my gain time was taken out.  I got some of my teeth

13   kicked out in the box.  But while this was going, was

14   ticking around, federal habeas, the federal habeas corpus

15   was granted and I went down to Marion County in front of

16   Judge, Magistrate, Judge Gary R. Jones and Senior Judge

17   William Terrell Hodges was presiding over this case.

18   Also I almost had that case won but I could not bring

19   enough witnesses to the Court to persuade the Court to

20   see what the truth actually was actually, but as far as

21   the Fifth District Court of Appeal ruling my motion

22   frivolous, it was not, because in that ruling that the

23   Federal Court dissented on that case that I had showed

24   otherwise.

25       THE COURT:  All right.  I do not find that there is a

Exhibit S (S13, S14)

# Neurology®

THE MOST WIDELY READ AND HIGHLY CITED PEER-REVIEWED NEUROLOGY JOURNAL

The Official Journal of the American Academy of Neurology

Neurology. 2009 Nov 24; 73(21): 1804–1806.
doi: 10.1212/WNL.0b013e3181c2933f

PMCID: PMC2849702

# DIRECTED AGGRESSIVE BEHAVIOR IN FRONTAL LOBE EPILEPSY: A VIDEO-EEG AND ICTAL SPECT CASE STUDY

Jerry J. Shih, MD, Thabele LeslieMazwi, MD, Germano Falcao, MD, and Jay Van Gerpen, MD

From the Department of Neurology (J.J.S., G.F., J.V.), Mayo Clinic, Jacksonville, FL; and the Department of Neurology (T.L.), Partners Healthcare WAC7, Massachusetts General Hospital, Boston, MA.

Copyright © 2009 by AAN Enterprises, Inc.

This article has been cited by other articles in PMC.

Frontal lobe seizures may manifest bizarre behaviors such as thrashing, kicking, genital manipulation, unusual facial expressions, and articulate vocalizations.[1] Aggressive and violent behaviors have also been associated with epilepsy, especially temporal or frontal lobe seizures.[2] However, this behavior is rare in the ictal state. Aggressive ictal behavior is generally believed to not be goal directed. Interactive behavior with the ability to respond to visual and verbal stimuli is also rare in complex partial seizures. We report the case of a patient with seizures manifesting with interactive directed aggressive behaviors.

**Case report.** An 18-year-old right handed man was brought in by his mother for a second opinion regarding possible seizures after being suspended from junior college for threatening to shoot his teacher and classmates. The patient had been born prematurely and had a grade 1 periventricular hemorrhage. Motor milestones were delayed by 4 months, but development was otherwise normal. He had a generalized tonic-clonic seizure at age 9, and subsequently had complex partial seizures characterized by confusion, hand automatisms, and drawing up of the legs. These seizures resolved on carbamazepine, which was discontinued after 2 years. At age 15, the patient started having stereotyped episodes characterized by a feeling of "stage fright" and followed by verbal profanities and using his hand as a stylized gun to "shoot" people and objects. The patient never physically struck another person or object during the episodes. He was not postictally confused, was aware that he had a behavioral change, but was amnestic for details of his behavior. He did not respond to trials of zonisamide, carbamazepine, or topiramate. An outside EEG performed during an episode of coprolalia was interpreted as normal and the patient was given a diagnosis of Tourette syndrome (TS). A psychiatrist diagnosed him with obsessive-compulsive disorder but found no evidence for psychosis, anxiety, or mood disorder. Events increased to up to 40 events daily at time of presentation, despite multiple medication trials to treat TS.

Video-EEG monitoring captured 11 seizures in the awake state and 3 seizures during sleep. All seizures were stereotyped and lasted between 15 and 45 seconds. Three seizures occurred within a 15-minute period in the presence of the attending and resident physician. During these 3 seizures, the patient partially followed simple commands and demonstrated comprehension of spoken language (video 1 on the Neurology® Web site at www.neurology.org), and struck a nonthreatening hand held 2 feet from him (video 2).

During uninterrupted seizures, the patient would speak profane language with threatened aggression, using his hands as stylized guns to track moving people and "shoot" them (video 3). He appeared to alter his actions in reaction to external visual and verbal stimuli. Lip smacking automatisms were present in the latter half of the

seizure. The patient was amnestic for the major portion of his seizures, but could accurately identify the person who questioned him during the seizure (video 4). EEG analysis found bifrontal 5- to 6-Hz rhythmic activity during seizures (figure). Ictal SPECT showed areas of hyperperfusion in the right lateral and orbitofrontal cortex. An area of hyperperfusion is also seen in the left medial frontal lobe.



**Figure** Ictal EEG and ictal SPECT results

Carbatrol® was instituted at a daily divided dose of 900 mg. His previous highest daily dose of carbamazepine was 600 mg. The patient is seizure-free at 12 months follow-up.

**Discussion.** More so than seizures arising from other brain locations, frontal lobe seizures may exhibit bizarre and unusual behaviors.[3] It is generally agreed among neurologists and epileptologists that well-organized, purposeful, complex, goal-directed behavior is highly unlikely during a seizure.[4,5] Our patient is an unusual case demonstrating ictal aggressive behavior with complex motor and vocal features that could be misinterpreted as goal-directed actions. While up to 30% of frontal lobe epilepsy patients have articulate vocalizations including swearing,[2] our patient's seemingly voluntary actions are likely involuntary, representing complex gestural-hyperkinetic automatisms and vocalizations. The pathophysiology of this behavior is likely related to activation of circuitry in the primary somatomotor and premotor cortex by epileptic activity.[6,7] The florid emotional outburst and aggressive behavior could localize to the prefrontal cortex, considered to be connected with higher psychic functions, as well as limbic regions involvement. The fact that he is partially amnestic to the ictal events points toward a complex partial event with possible spread to mesial temporal structures.

This study demonstrates a rare case of directed and interactive aggressive verbal and physical behavior during frontal lobe seizures. This case highlights the potential for certain frontal lobe seizures to cause behavior with significant adverse legal ramifications. The diagnosis of seizures should always be considered in cases of episodic stereotyped behavior.

## Supplementary Material

Go to:

[Data Supplement]

Click here to view.

## Notes

Go to:

Editorial, page 1720

Supplemental data at www.neurology.org

e-Pub ahead of print on October 21, 2009, at www.neurology.org.

Disclosure: Dr. Shih serves as a consultant to URL Pharma, Inc., and receives research support from GlaxoSmithKline, NeuroPace, Inc., Eisai Inc., the NIH (ad hoc study section reviewer), and the National Science Foundation. Dr. LeslieMazwi, Dr. Falcao, and Dr. Van Gerpen report no disclosures.

Received March 21, 2009. Accepted in final form July 22, 2009.

* Address correspondence and reprint requests to Dr. J.J. Shih, Mayo Clinic, 4500 San Pablo Road, Jacksonville, FL 32224; Shih.jerry@mayo.edu

&NA;                                                                                          Go to:

1. Williamson PD, Spencer DD, Spencer SS, Novelly RA, Mattson RH. Complex partial seizures of frontal lobe origin. Ann Neurol 1985;18:497–504. [PubMed]

2. Jobst BC, Seigel AM, Thadani VM, Roberts DW, Rhodes HC, Williamson PD. Intractable seizures of frontal lobe origin: clinical characteristics, localizing signs, and results of surgery. Epilepsia 2000;41:1139–1152. [PubMed]

3. Manford M, Fish DR, Shovron SD. An analysis of clinical seizure patterns and their localizing value in frontal and temporal lobe epilepsies. Brain 1996;119:17–40. [PubMed]

4. Marsh L, Krauss GL. Aggression and violence in patients with epilepsy. Epilepsy Behav 2000;1:160–168. [PubMed]

5. Mendez MF. Postictal violence and epilepsy. Psychosomatics 1998;39:478–480. [PubMed]

6. Ridderinkhof KR, van den Wildenberg WP, Segalowitz SJ, Carter CS. Neurocognitive mechanisms of cognitive control: the role of prefrontal cortex in action selection, response inhibition, performance monitoring, and reward-based learning. Brain Cogn 2004;56:129–140. [PubMed]

7. Hasselmo ME. A model of prefrontal cortical mechanisms for goal-directed behavior. J Cogn Neurosci 2005;17:1115–1129. [PMC free article] [PubMed]

Articles from Neurology are provided here courtesy of American Academy of Neurology

# Worst Pills, Best Pills

**An expert, independent second opinion on more than 1,800 prescription drugs, over-the-counter medications, and supplements**

LOG IN | SUBSCRIBE

Search Worst Pills  `GO!`

Home    Search    Research & Alert Center    Glossary    Free Drug Information

[ 🖶 print friendly]

## Misprescribing and Overprescribing of Drugs

- Seven all-too-often-deadly sins of prescribing
- Evidence of Misprescribing and Overprescribing
- The Causes of Misprescribing and Overprescribing

The numbers are staggering: in 2003, an estimated 3.4 billion prescriptions were filled in retail drugstores and by mail order in the United States. That averages out to 11.7 prescriptions filled for each of the 290 million people in this country.[1] But many people do not get any prescriptions filled in a given year, so it is also important to find out how many prescriptions are filled by those who fill one or more prescriptions. In a study based on data from 2000, more than twice as many prescriptions were filled for those 65 and older (23.5 prescriptions per year) than for those younger than 65 (10.1 prescriptions per year).[2] Another way of looking at the high rate of prescriptions among older people is the government finding that although Medicare beneficiaries comprise only 14% of the community population, they account for more than 41% of prescription medicine expenses.[3]

There is no dispute that for many people, prescriptions are beneficial, even lifesaving in many instances. But hundreds of millions of these prescriptions are wrong, either entirely unnecessary or unnecessarily dangerous. Inappropriate prescribing is an academically gentle euphemism for prescriptions for which the risks outweigh the benefits, thus conferring a negative health impact on the patient. A recent comprehensive review of studies of such inappropriate prescribing in older patients found that 21.3% of community-dwelling patients 65 years or older were using at least one drug inappropriately prescribed. Much more so than age, per se, the total number of drugs being prescribed was an important predictor of inappropriate prescribing, as was female gender.[4] Another study found that, conservatively—using very narrow criteria for inappropriate prescribing—elderly United States patients were prescribed at least one inappropriate drug at an estimated 16.7 million visits to physician offices or hospital outpatient departments in the year 2000.[5] Examples of specific drugs that have been inappropriately prescribed, including studies involving younger adults and children, are given later in this section.

At the very least, misprescribing wastes tens of billions of dollars, barely affordable by many people who pay for their own prescriptions. But there are much more serious consequences. As discussed in Adverse Drug Reactions, more than 1.5 million people are hospitalized and more than 100,000 die each year from largely preventable adverse reactions to drugs that should not have been prescribed as they were in the first place.[6] What follows is a summary of the **seven all-too-often-deadly sins of prescribing.**

**First: The "disease" for which a drug is prescribed is actually an adverse reaction to another drug, masquerading as a disease** but unfortunately not recognized by doctor and patient as such. Instead of lowering the dose of the offending drug or replacing it with a safer alternative, the physician adds a second drug to the regimen to "treat" the adverse drug reaction caused by the first drug. Examples discussed on this web site (see later in this section and in Drug-Induced Diseases) include drug-induced parkinsonism, depression, sexual dysfunction, insomnia, psychoses, constipation, and many other problems.

**Second: A drug is used to treat a problem that, although in some cases**

susceptible to a pharmaceutical solution, should first be treated with
commonsense lifestyle changes. Problems such as insomnia and abdominal pain
often have causes that respond very well to nondrug treatment, and often the
physician can uncover these causes by taking a careful history. Other examples
include medical problems such as high blood pressure, mild adult-onset diabetes,
obesity, anxiety, and situational depression. Doctors should recommend lifestyle
changes as the first approach for these conditions, rather than automatically reach
for the prescription pad.

**Third: The medical problem is both self-limited and completely unresponsive
to treatments such as antibiotics or does not merit treatment with certain
drugs.** This is seen most clearly with viral infections such as colds and bronchitis
in otherwise healthy children or adults.

**Fourth: A drug is the preferred treatment for the medical problem, but
instead of the safest, most effective—and often least expensive—treatment,
the physician prescribes one of the Do Not Use drugs listed on this web
site or another, much less preferable alternative.** An example of a less
preferable alternative would be a drug to which the patient has a known allergy
that the physician did not ask about.

**Fifth: Two drugs interact. Each on its own may be safe and effective, but
together they can cause serious injury or death.**

**Sixth: Two or more drugs in the same therapeutic category are used, the
additional one(s) not adding to the effectiveness of the first but clearly
increasing the risk to the patient.** Sometimes the drugs come in a fixed
combination pill, sometimes as two different pills. Often heart drugs or mind-
affecting drugs are prescribed in this manner.

**Seventh: The right drug is prescribed, but the dose is dangerously high.** This
problem is seen most often in older adults, who cannot metabolize or excrete
drugs as rapidly as younger people. This problem is also seen in small people who
are usually prescribed the same dose as that prescribed to people weighing two to
three times as much as they do. Thus, per pound, they are getting two to three
times as much medicine as the larger person.

### Evidence of Misprescribing and Overprescribing

Here are some examples from recent studies by a growing number of medical
researchers documenting misprescribing and overprescribing of specific types of
drugs:

*Treating Adverse Drug Reactions with More Drugs*

Researchers at the University of Toronto and at Harvard have clearly documented
and articulated what they call the prescribing cascade. It begins when an adverse
drug reaction is misinterpreted as a new medical condition. Another drug is then
prescribed, and the patient is placed at risk of developing additional adverse
effects relating to this potentially unnecessary treatment.[7] To prevent this
prescribing cascade, doctors—and patients—should follow what we call Rule 7 of
the Ten Rules for Safer Drug Use (see Protecting Yourself and Your Family from
Preventable Drug-induced Injury): Assume that any new symptom you develop
after starting a new drug might be caused by the drug. If you have a new
symptom, report it to your doctor.

Some of the instances of the prescribing cascade that these and other researchers
have documented include:

• The increased use of anti-Parkinson's drugs to treat drug-induced parkinsonism
caused by the heartburn drug metoclopramide[7] (REGLAN) or by some of the older
antipsychotic drugs.

• A sharply increased use of laxatives in people with decreased bowel activity that
has been caused by antihistamines such as diphenhydramine (BENADRYL),
antidepressants such as amitriptyline (ELAVIL)—a **Do Not Use** drug—or some

antipsychotic drugs such as thioridazine (MELLARIL).[8]

• An increased use of antihypertensive drugs in people with high blood pressure that was caused or increased by very high doses of nonsteroidal anti-inflammatory drugs (NSAIDs), used as painkillers or for arthritis.[9]

*Failing to Treat Certain Problems with Nondrug Treatments*

Research has shown that many doctors are too quick to pull the prescription trigger. In one study, in which doctors and nurse practitioners were presented with part of a clinical scenario—as would occur when first seeing a patient with a medical problem—and then encouraged to ask to find out more about the source of the problem, 65% of doctors recommended that a patient complaining of insomnia be treated with sleeping pills even though, had they asked more questions about the patient, they would have found that the patient was not exercising, was drinking coffee in the evening, and, although awakening at 4 a.m., was actually getting seven hours of sleep by then.[10]

In a similar study, doctors were presented with a patient who complained of abdominal pain and whose endoscopy showed diffuse irritation in the stomach. Sixty-five percent of the doctors recommended treating the problem with a drug—a histamine antagonist (such as Zantac, Pepcid, or Tagamet). Had they asked more questions they would have discovered that the patient was using aspirin, drinking a lot of coffee, smoking cigarettes, and was under considerable emotional stress—all potential contributing factors to abdominal pain and stomach irritation.

In summarizing the origin of this overprescribing problem, the authors stated: "Apparently quite early in the formulation of the problem, the conceptual focus [of the doctor] appears to shift from broader questions like 'What is wrong with this patient?'or 'What can I do to help?' to the much narrower concern, 'Which prescription shall I write?'" They argued that this approach was supported by the "barrage" of promotional materials that only address drug treatment, not the more sensible lifestyle changes to prevent the problem.[11]

In both of the above scenarios, nurse practitioners were much more likely than doctors to take an adequate history that elicited the causes of the problems and, not surprisingly, were only one-third as likely as the doctors to decide on a prescription as the remedy instead of suggesting changes in the patient's habits.

Throughout this web site, in the discussions about insomnia, high blood pressure, situational depression, mild adult-onset diabetes, and other problems, you will find out about the proven-effective nondrug remedies that should first be pursued before yielding to the riskier pharmaceutical solutions.

*Treating Viral Infections with Antibiotics or Treating Other Diseases with Drugs That Are Not Effective for Those Problems*

Two recently published studies, based on nationwide data from office visits for children and adults, have decisively documented the expensive and dangerous massive overprescribing of antibiotics for conditions that, because of their viral origin, do not respond to these drugs. Forty-four percent of children under 18 years old were given antibiotics for treatment of a cold and 75% for treatment of bronchitis. Similarly, 51% of people 18 or older were treated with antibiotics for colds and 66% for bronchitis. Despite the lack of evidence of any benefit for most people from these treatments, more than 23 million prescriptions a year were written for colds, bronchitis, and upper respiratory infections. This accounted for approximately one-fifth of all prescriptions for antibiotics written for children or adults.[12, 13] An accompanying editorial warned of "increased costs from unnecessary prescriptions, adverse drug reactions, and [subsequent] treatment failures in patients with antibiotic-resistant infections" as the reasons to try to reduce this epidemic of unnecessary antibiotic prescribing.[14]

Similar misprescribing of a drug useful and important for certain problems, but not necessary or effective, and often dangerous, for other problems can be seen in another recent study. In this case, 47% of the people admitted to a nursing home who were taking digoxin, an important drug for treating an abnormal heart rhythm

called atrial fibrillation or for treating severe congestive heart failure, did not have either of these medical problems and were thereby being put at risk for life-threatening digitalis toxicity without the possibility of any benefit.[15]

A final example in this category involves the overuse of a certain of drugs, in this case calcium channel blockers, which have not been established as effective for treating people who have had a recent heart attack. The study shows that this prescribing pattern actually did indirect damage to patients because their use was replacing the use of beta-blockers, drugs shown to be very effective for reducing the subsequent risk of death or hospitalization following a heart attack. Use of a calcium channel blocker instead of a beta-blocker was associated with a doubled risk of death, and beta-blocker recipients were hospitalized 22% less often than nonrecipients.[16]

**The Causes of Misprescribing and Overprescribing**

*The Drug Industry*

The primary culprit in promoting the misprescribing and overprescribing of drugs is the pharmaceutical industry, which now sells about $216 billion worth of drugs in the United States alone.[1] The industry uses loopholes in the law not requiring proof of superiority over existing drugs for approval, and otherwise intimidates the Food and Drug Administration (FDA) into approving record numbers of me-too drugs (drugs that offer no significant benefit over drugs already on the market) that often have dangerous adverse effects. In addition, the industry spends well in excess of $21 billion a year to promote drugs[17] using advertising and promotional tricks that push at or through the envelope of being false and misleading. This industry has been extremely successful in distorting, in a profitable but dangerous way, the rational processes for approving and prescribing drugs. Two studies of the accuracy of ads for prescription drugs widely circulated to doctors both concluded that a substantial proportion of these ads contained information that was false or misleading and violated FDA laws and regulations concerning advertising.[18, 19]

The fastest-growing segment of drug advertising is directed not at doctors but at patients. It has been estimated that from 1991 to 2002 DTC (direct-to-consumer) advertising expenditures in the United States grew from about $60 million a year to $3 billion a year,[17] an increase of 50-fold in just eleven years, employing misleading advertising campaigns similar to those used for doctors. A study by Consumer Reports of 28 such ads found that "only half were judged to convey important information on side effects in the main promotional text," only 40% were "honest about efficacy and fairly described the benefits and risks in the main text," and 39% of the ads were considered "more harmful than helpful" by at least one reviewer.[20] This campaign has been extremely successful. According to a drug industry spokesman, "There's a strong correlation between the amount of money pharmaceutical companies spend on DTC advertising and what drugs patients are most often requesting from physicians." The advertising "is definitely driving patients to the doctor's office, and in many cases, leading patients to request the drugs by name."[21] The problems with DTC advertising are best summed up in an article written by a physician more than 15 years ago in the New England Journal of Medicine, before the current binge had really begun: "If direct [to consumer] advertising should prevail, the use of prescription medication would be warped by misleading commercials and hucksterism. The choice of a patient's medication, even of his or her physician, could then come to depend more on the attractiveness of a full-page spread or prime-time commercial than on medical merit...such advertising would serve only the ad-makers and the media, and might well harm our patients."[22]

*The Food and Drug Administration (FDA)*

Attempting to fend off FDA-weakening legislation even worse than that which was signed into law in 1997, the FDA has bent over backwards to approve more drugs, culminating in 1996 and 1997 when the agency approved a larger number than had ever been approved in any two-year period. Thousands of people were injured or killed after taking one of three such recently approved drugs (which have subsequently been recalled from the market). These drugs were the weight-loss

drug dexfenfluramine (REDUX), the heart drug mibefradil (POSICOR), and the painkiller bromfenac (DURACT). Other drugs that would not have gotten approved in a more cautious era at the FDA have also been approved, but are likely either to be banned or to be forced to carry severe warnings that will substantially reduce their use. Many of these are included on this web site and listed as **Do Not Use** drugs.

In the more than 30 years since the Public Citizen's Health Research Group started monitoring the FDA and the drug industry, the current pro-industry attitude at the FDA is as bad and dangerous as it has ever been. In addition to record numbers of approvals of questionable drugs, FDA enforcement over advertising has all but disappeared. From a peak number of 157 enforcement actions to stop illegal prescription drug ads that understate risks and/or overstate benefits in 1998, the number has decreased to only 24—an 85% decrease—in 2003.[23] There is no evidence that the accuracy or legality of these ads has increased during this interval, and the amount of such advertising has clearly increased. The division at FDA responsible for policing prescription drug advertising has never been given adequate resources to keep up with the torrent of newly approved drugs. More recently, however, it has also been thwarted by marching orders from higher up in the agency to, effectively, go easy on prescription drug advertising. As a result, the drug industry correctly believes it can get away with more violative advertising than in the past. The role of the United States Congress in pushing the FDA into approving more drugs, and passing, with the FDA's reluctant approval, legislation to further weaken the FDA's ability to protect the public, cannot be overlooked.

*Physicians*

The well-financed promotional campaigns by drug companies would not have as much of an impact as they do were there not such an educational vacuum about proper prescribing of drugs, a serious problem that must be laid at the feet of medical school and residency training. The varieties of overprescribing and misprescribing of drugs by doctors—**the seven all-too-often-deadly sins of prescribing referred to above**—are all strongly enhanced by the mind-altering properties of drug promotion. The best doctors, of whom there are many, do not waste their time talking to drug sales people, toss promotional materials away, and ignore drug ads in medical journals. Too many other doctors, however, are heavily influenced by drug companies, accepting free meals, free drinks, and free medical books in exchange for letting the drug companies "educate" them at symposia in which the virtues of certain drugs are extolled. Unfortunately, many of these doctors are too arrogant to realize that there is no such thing as a free lunch. The majority of doctors attending such functions have been found to increase their prescriptions for the targeted drugs following attendance at the "teach-in."[24]

Beyond traditional advertising and promotion and their influence, bias of drug-company-sponsored research, as published in medical journals, also can sway doctors toward more favorable impressions about drugs. An analysis was done of 56 trials that were paid for by drug companies and reported in 52 medical journals about drugs for arthritis and pain—NSAIDs. (These drug-company-sponsored studies represented 85% of those that the researchers originally looked at.) In studies identifying the company's drug as less toxic than another drug, in barely one-half of the studies was there justification for the finding of less toxicity. This certainly explains why, contrary to fact, newer arthritis drugs almost always "seem" safer than older, usually much less expensive ones.[25]

A final example demonstrates the ignorance of many physicians, especially in dealing with prescribing drugs to older adults. A study of physicians who treat Medicare patients found that 70% of the doctors who took an examination concerning their knowledge of prescribing for older adults failed to pass the test. The majority of physicians who were contacted for participation in the study refused to take the test, often giving as their reason that they had a "lack of interest in the subject." The authors concluded "many of these physicians [who failed the exam] had...not made good use of the best information on prescribing for the elderly."[26]

*Pharmacists*

A small fraction of pharmacists have, in our view, betrayed their professional ethics and are working for drug companies, engaging in such activities as calling doctors to get them to switch patients from drugs made by a company other than the one the pharmacist works for to the pharmacist's employer's drugs. In addition, pharmacy organizations such as the American Pharmaceutical Association and others have fought hard to prevent the FDA from requiring accurate patient package information to be dispensed with each prescription filled.

Too many pharmacists, despite having computers to aid them, have been willing to fill prescriptions for pairs of drugs that, because of life-threatening adverse drug interactions if used at the same time, should never be dispensed to the same person.

• Sixteen (32%) of 50 pharmacies in Washington, D.C., filled prescriptions for erythromycin and the now-banned terfenadine (SELDANE) without comment.[27] These two drugs, if used in combination, can cause fatal heart arrhythmias.

• In another study, of 245 pharmacists in seven cities, about one-third of pharmacists did not alert consumers to the potentially fatal and widely publicized interaction between Hismanal, a commonly used but now banned antihistamine, and Nizoral, an often-prescribed antifungal drug. Only 4 out of 17 pharmacists warned of the interaction between oral contraceptives and Rimactane, an antibiotic that could decrease the effectiveness of the oral contraceptive. Only 3 out of 61 pharmacists issued any verbal warnings about the interaction between Vasotec and Dyazide—two drugs for treating hypertension—which may lead to dangerously high levels of potassium in the blood.[28]

• In yet another study, concurrent use of terfenadine (SELDANE) and contraindicated drugs declined over time. The rate of same-day dispensing declined by 84%, from an average of 2.5 per 100 persons receiving terfenadine in 1990 to 0.4 per 100 persons during the first six months of 1994, while the rate of overlapping use declined by 57% (from 5.4 to 2.3 per 100 persons). Most cases involved erythromycin. Despite substantial declines following reports of serious drug-drug interactions and changes in product labeling, concurrent use of terfenadine and contraindicated antibiotics such as erythromycin and clarithromycin (BIAXIN) and antifungals such as ketoconazole (NIZORAL) continued to occur.[29]

*Patients*

For too many patients, the system is stacked against you—drug companies, doctors, and pharmacists are too often making decisions that ultimately derive from what is best for the drug companies, doctors, and pharmacists, and not necessarily from what is best for you. This web site has been researched and written to help you come out ahead in the struggle with our health care industry.

In the sections on Adverse Drug Reactions and Drug-Induced Diseases, you can learn which common medical problems—depression, insomnia, sexual disorders, parkinsonism, falls and hip fractures, constipation, and many others—can actually be caused by drugs. Once you recognize these problems, you will be enabled to better take care of yourself and your family, and bring such problems to an end by discussing safer alternatives with your physician.

On this web site, we list the drugs we and our consultants think you should not use. For each of these, we recommend safer alternatives. Each drug profile lists drug combinations that should not be used because of serious interactions.

In Protecting Yourself and Your Family from Preventable Drug-induced Injury, we present a detailed strategy, beyond information on specific adverse effects and drugs, to help you to use drugs more safely, including Ten Rules for Safer Drug Use and how to use and maintain your own Drug Worksheet for Patient, Family, Doctor, and Pharmacist. This is your personalized plan for avoiding becoming a victim of overprescribing or misprescribing.

Finally, in Saving Money When Buying Prescription Drugs, we discuss the latest information about generic drugs and show you how and why you can and should

save hundreds of dollars a year or more. In short, this web site is intended to help you and your family to improve your health by using drugs, if necessary, more carefully and recognizing those you should avoid.

~~~~

## Like what you've seen?

## Become a subscriber | Learn more about WorstPills.org

1   Ukens C. How mail order pharmacy gained in market share in 2003. *Drug Topics* Mar 22, 2004; 148.

2   Stagnitti MN. Trends in outpatient prescription drug utilization and expenditures,1997-2000: AHRQ Statistical Brief # 21, Feb 2004.

3   Stagnitti MN, Miller GE, Moeller JF. *Outpatient prescription drug expenses, 1999: MEPS Chartbook No. 12, ARHQ Pub. No. 04-0001*. Rockville, MD: Agency for Healthcare Research and Quality, 2003.

4   Liu GG, Christensen DB. The continuing challenge of inappropriate prescribing in the elderly: An update of the evidence. *Journal of the American Pharmaceutical Association* Nov 2002; 42: 847 - 857.

5   Goulding MR. Inappropriate medication prescribing for elderly ambulatory care patients. *Archives of Internal Medicine* Feb 9, 2004; 164: 305 - 312.

6   Lazarou J, Pomeranz BH, Corey PN. Incidence of adverse drug reactions in hospitalized patients: A meta-analysis of prospective studies. *Journal of the American Medical Association* Apr 15, 1998; 279: 1200 - 1205.

7   Rochon PA, Gurwitz JH. Optimising drug treatment for elderly people: The prescribing cascade. *British Medical Journal* Oct 25, 1997; 315: 1096 - 1099.

8   Monane M, Avorn J, Beers MH, Everitt DE. Anticholinergic drug use and bowel function in nursing home patients. *Archives of Internal Medicine* Mar 8, 1993; 153: 633 - 638.

9   Rochon PA, Gurwitz JH. Drug therapy. *The Lancet* Jul 1, 1995; 346: 32 - 36.

10  Everitt DE, Avorn J, Baker MW. Clinical decision-making in the evaluation and treatment of insomnia. *American Journal of Medicine* Sep 1990; 89: 357 - 362.

11  Avorn J, Everitt DE, Baker MW. The neglected medical history and therapeutic choices for abdominal pain: A nationwide study of 799 physicians and nurses. *Archives of Internal Medicine* Apr 1991; 151: 694 - 698.

12  Gonzales R, Steiner JF, Sande MA. Antibiotic prescribing for adults with colds, upper respiratory tract infections, and bronchitis by ambulatory care physicians. *Journal of the American Medical Association* Sep 17, 1997; 278: 901 - 904.

13  Nyquist AC, Gonzales R, Steiner JF, Sande MA. Antibiotic prescribing for children with colds, upper respiratory tract infections, and bronchitis. *Journal of the American Medical Association* Mar 18, 1998; 279: 875 - 877.

14  Schwartz B, Mainous AG, Marcy SM. Why do physicians prescribe antibiotics for children with upper respiratory tract infections?. *Journal of the American Medical Association* Mar 18, 1998; 279: 881 - 882.

15  Aronow WS. Prevalence of appropriate and inappropriate indications for use of digoxin in older patients at the time of admission to a nursing home. *Journal of the American Geriatric Society* May 1996; 44: 588 - 590.

16  Soumerai SB, McLaughlin TJ, Spiegelman D, Hertzmark E, Thibault G, Goldman L. Adverse outcomes of underuse of beta-blockers in elderly survivors of acute myocardial infarction. *Journal of the American Medical Association* Jan 8, 1997; 277: 115 - 121.

17  This estimate is from PhRMA, the prescription drug industry's U.S. trade association, and is based on data from 2002. Available at: http://www.phrma.org/publications/publications/2003-10-07.892.pdf

18  Stryer D, Bero LA. Characteristics of materials distributed by drug companies: An evaluation of appropriateness. *Journal of General Internal Medicine* Oct 1996; 11: 575 - 583.

19  Wilkes MS, Doblin BH, Shapiro MF. Pharmaceutical advertisements in leading medical journals: Experts' assessments. *Annals of Internal Medicine* Jun 1, 1992; 116: 912 - 919.

20  Drug advertising: Is this good medicine?. *Consumer Reports* Jun 1996; 61: 62 - 63.

21  The top 200 drugs. *American Druggist* Feb 1998; 46 - 53.

22  Cohen EP. Direct-to-the-public advertisement of prescription drugs. *New England Journal of Medicine* Feb 11, 1988; 318: 373 - 376.

23  The data on FDA advertising enforcement actions are derived from the FDA web site at: http://www.fda.gov/cder/warn/index.htm

24  *Medical Marketing and Media* Oct 20, 1990;

25  Rochon PA, Gurwitz JH, Simms RW, Fortin PR, Felson DT, Minaker KL, Chalmers TC. A study of manufacturer-supported trials of nonsteroidal anti-inflammatory drugs in the treatment of arthritis. *Archives of Internal Medicine* Jan 24, 1994; 154: 157 - 163.

26  Ferry ME, Lamy PP, Becker LA. Physicians' knowledge of prescribing for the elderly: A study of primary care physicians in Pennsylvania. *Journal of the American Geriatric Society* Sep 1985; 33: 616 - 625.

27  Cavuto NJ, Woosley RL, Sale M. Pharmacies and prevention of potentially fatal drug interactions. *Journal of the American Medical Association* Apr 10, 1996; 275: 1086 - 1087.

28  Headden S. Danger at the Drugstore. *U S News and World Report* Aug 26, 1996; 46 - 53.

29  Thompson D, Oster G. Use of terfenadine and contraindicated drugs. *Journal of the American Medical Association* May 1, 1996; 275: 1339 - 1341.

Copyright © 2015 Public Citizen's Health Research Group. All rights reserved.
https://www.worstpills.org/

Exhibit-T (T1,T2)

1

IN THE CIRCUIT COURT, FIFTH

JUDICIAL CIRCUIT, IN AND FOR

LAKE COUNTY, FLORIDA

CASE NO.:  2000-CF-002130

STATE OF FLORIDA,

       Plaintiff,

vs.

DONALD OTIS WILLIAMS,

       Defendant.

_____/

◻ ORIGINAL

TRANSCRIPT ON APPEAL

VOP HEARING

HELD BEFORE:   The Honorable Mark Nacke

DATE:          November 4, 2013

TIME:          1:27 p.m. - 2:06 p.m.

PLACE:         Lake County Judicial Center

                 550 West Main Street

                 Tavares, Florida 32778


This cause came on to be heard at the time and place aforesaid, when and where the following proceedings were transcribed by:


Cheryl McDonough, RPR, FPR

Kerr & Associates

614 North Sinclair Avenue

Tavares, Florida 32778

(352) 742-3144



Case: 2000 CF 002130

KERR & ASSOCIATES, INC.

1-800-246-1753

872

2

A P P E A R A N C E S:


WILLIAM M. GROSS, ESQUIRE

OF:  Office of the State Attorney

     550 West Main Street

     Tavares, Florida 32778

     P:  352-742-4236

          APPEARING ON BEHALF OF THE STATE


DONALD OTIS WILLIAMS, PRO SE

15

1    case since 2000.  I'm asking the Court if you won't rule

2    on it, post-conviction relief motion, if you'll at least

3    rule on the contents of it as defense to my violation of

4    probation.

5        THE COURT:  What do you mean though, the document

6    or --

7        MR. WILLIAMS:  Well, there's case law --

8        THE COURT:  -- are you going to present evidence?  I

9    don't --

10        MR. WILLIAMS:  -- in here and they go into the docket

11    numbers and they go into different areas in here.  I can

12    tell you this, Your Honor, there's different things and

13    I'm not sure that the fundamental right and the

14    fundamental and the plain error doctrine don't intertwine

15    with what's happened inside some of these cases here that

16    I have, some of them that I'm not so sure is maybe a

17    procedural default that they certainly look into the

18    federal law as plain error and some of these are that

19    there was no PSI, when it should have, there was a

20    required PSI to help when you're a first felony offender,

21    you're required to have post-sentence investigation

22    report, and then you have to have a post-sentence

23    sentence hearing.  You have to have a notice of a Public

24    Defender fees and have a hearing for that.  There's all

25    these things that never took place with me.  There was

16

1  times where I, where I had clearly, we have fundamental

2  error when I dismissed my attorney but then there was no

3  hearing for that afterwards.  And you can look, it's

4  straight on the face of the records, it's nothing that

5  tough to delve into, it's right there.  And there's also

6  the point, Your Honor, another fundamental error there

7  where Dr. Olander had alerted my Public Defender that I

8  was on medication at that time but he did not alert the

9  Court to that.  He did not.  He stayed silent on that.

10  He didn't tell the Court that I was on medication during

11  that hearing.

12      THE COURT:  Well, again, I mean, this is, this is

13  attacking the previous sentence and, you know, everything

14  leading up to the plea and that's, again, been -- that

15  issue or issues have been, as I understand it, you know,

16  litigated and that's not a defense to the violation here

17  and now --

18      MR. WILLIAMS:  Yes, sir, I --

19      THE COURT:  -- something that you're accusing

20  somebody of doing or not doing back in 2001.

21      MR. WILLIAMS:  What I -- I think Mr. Gross is going

22  to say something.  Pardon me, sir.

23      MR. GROSS:  Go right ahead, Mr. Williams.

24      MR. WILLIAMS:  I, the, the one thing which when we

25  had the Fifth District Court of Appeal, when they had

17

1    struck the petition that I had put in there, then they

2    had, they struck it for untimely, and then I went back

3    and I showed them that it was timely, that it was well

4    within the 30-day limit, not even having to count the

5    mailbox rule or anything like this, and then they

6    withdrew or they withdrew that ruling and then ruled that

7    it was frivolous.  All that, that had in that motion or

8    in that instrument there, on that case, which was

9    5D05-4254, was all fundamental error, and since I

10   couldn't put that in there, I couldn't put it, couldn't

11   put it in the circuit court, I couldn't put it in the

12   Fifth District Court of Appeal anymore, so I was stuck.

13   I mean, it's not, I don't think that we have, there's

14   case law in here, it says, you know, when you see an

15   error that there should, there should be time to correct

16   it.  And I think there's been several errors and they've

17   never been, they've never been addressed.

18        THE COURT:  Well, I mean, I will let you file any

19   documents and will determine, you know, tomorrow at the

20   hearing what, if we wind up having the rest of the

21   hearing, what the -- whether or not, you know, they're

22   valid.

23        MR. WILLIAMS:  I would just ask you, sir, and thank

24   you so much for that, I'd like to ask you just to

25   consider possibly waiving the order that has me from

18

1    prohibiting that just on the fundamental error issue.

2        THE COURT:  No, I'm not going to, I'm not going to go

3    there.  I'm saying that the documents that you file, I'm

4    not going to, I'm not ruling on it right now, I'm not

5    saying it's valid, I'll let you file it so it's in the

6    court file but I haven't ruled on, you know, whether or

7    not that you have any right to relief on it.

8        MR. WILLIAMS:  Yes, sir.  Okay, sir.

9        THE COURT:  And I'm letting it be filed in this

10   violation of probation context, not that it reverts or it

11   goes back to the original sentence, but as it might or

12   might not apply to the violation of probation.  That's

13   what's pending before us.

14       MR. WILLIAMS:  I have a copy of a letter I to

15   Mr. Maher on October the 10th, before -- or this was,

16   well, after I wrote Mr. Carranza about the issue.

17       MR. GROSS:  While you're scrolling through the laptop

18   in front of you, Judge, could I just interject something?

19       THE COURT:  Yes.

20       MR. GROSS:  I don't think we have received the latest

21   pleadings that Mr. Williams is talking about that he

22   wants to file, and it may be that he doesn't have an

23   extra copy for us.  Is that the fact?

24       MR. WILLIAMS:  No, sir, that's good, that's for

25   you.

1

IN THE CIRCUIT COURT, FIFTH
JUDICIAL CIRCUIT, IN AND FOR
LAKE COUNTY, FLORIDA
CASE NO.:  2000-CF-002130

STATE OF FLORIDA,

       Plaintiff,

vs.                                    ◻ **ORIGINAL**

DONALD OTIS WILLIAMS,

       Defendant.

_____/

TRANSCRIPT ON APPEAL

VOP HEARING

HELD BEFORE:   The Honorable Mark Nacke
DATE:          November 21, 2013
TIME:          1:47 p.m. - 5:18 p.m.
PLACE:        Lake County Judicial Center
               550 West Main Street
               Tavares, Florida 32778

This cause came on to be heard at the time and place aforesaid, when and where the following proceedings were transcribed by:

Cheryl McDonough, RPR, FPR
Kerr & Associates
614 North Sinclair Avenue
Tavares, Florida 32778
(352) 742-3144


Case: 2000 CF 002130

KERR & ASSOCIATES, INC.
1-800-246-1753

905

2

A P P E A R A N C E S:


WILLIAM M. GROSS, ESQUIRE

OF:  Office of the State Attorney

     550 West Main Street

     Tavares, Florida 32778

     P:  352-742-4236

          APPEARING ON BEHALF OF THE STATE


DONALD OTIS WILLIAMS, PRO SE

3

1                    P R O C E E D I N G S

2                    *  *  *  *  *  *

3          THE COURT:  Case 2004-CF-2130.  And, Mr. Williams, I

4    know that you've been representing yourself.  I know you

5    understand you have a right to an attorney to represent

6    you.  If you cannot afford to hire one, I can appoint the

7    attorneys who were previously appointed to represent you

8    or you can retain an attorney or represent yourself.

9    Which would you rather do?

10         MR. WILLIAMS:  I'll continue to represent myself,

11    Your Honor, if it pleases the Court.

12         THE COURT:  Yes, sir.

13         MR. WILLIAMS:  I have some things I need to inform

14    the Court of.  We had some witnesses that were scheduled

15    to be here and they are not here and they were not, some

16    of them were not able to make it here.  One of them would

17    rather have contempt than come here, as it was relayed to

18    me.  We have not been able to, in the two weeks that we

19    had from November the 5th to today, we have not been able

20    to secure a mental health expert.  The, the witnesses

21    that are here, that I see now, that I'm thankful that

22    they came, Nurse Oakley and Mr. Howard Lawrence, a mental

23    health specialist, and my former attorney, the chief

24    assistant public defender, Mark Jackson, and Detective

25    Steve Keller are here.

4

1   The other witnesses that I had where one was my

2   brother by phone, Ms. Harvey was to be here, to be by

3   phone, my son also, Lola Gonzalez was to be here present,

4   because I had documentation to show her, and a few other

5   witnesses, but they're not here.  And I'm at the mercy of

6   the Court.  I can, I can -- I don't have any excuses, I

7   have reasons, and I'd like to explain them to you.

8       Your Honor, I wasn't able to phone and keep in

9   contact with my investigator because I couldn't get to

10  the phone because the order stopped it November the 5th,

11  and so I couldn't get with him and to keep up to breast

12  with what was going on.  The only way, the only time I

13  seen him was yesterday when he brought the subpoenas

14  over.  I had no -- I have some, I have some things to --

15  if the Court would please look at these, if I'd had the

16  due process materials that we had, I'd been adjudicated

17  insolvent for due process cost, I could have kind of done

18  what I did before when we were having the murder trial,

19  Your Honor, because we had that less than two weeks, but

20  I had the self-addressed stamped envelopes, I had

21  interrogatories, and I could maintain contact with my

22  witnesses and I had the phone to do that every day.  I

23  just haven't had time, I just haven't had that available

24  to do that.  I've asked for it, but it's been denied.

25       MR. GROSS:  Judge, if Mr. Williams is asking for a

5

1    continuance, that's what I'm kind of reading, we have

2    four witnesses waiting, at least let's get those four

3    witnesses done.  They've been waiting here since 2:00

4    when the Defendant's investigator subpoenaed them, and

5    then obviously I'm going to be kicking and screaming

6    about a continuance, but at least we've got the witnesses

7    in the can, as they say in Hollywood.

8         THE COURT:  Okay.

9         MR. GROSS:  Thank you.

10        MR. WILLIAMS:  I apologize.

11        THE COURT:  That's all right.

12        MR. WILLIAMS:  That's totally correct.

13        THE COURT:  All right.  Who would you like to call

14   first?

15        MR. WILLIAMS:  I'm trying to get Mr. Mark Jackson out

16   here as quick as we can.

17        THE COURT:  Yes, sir, come on, yeah.

18        MR. WILLIAMS:  I believe he can -- right here would

19   be --

20        THE COURT:  You think it's going to be short?

21        MR. WILLIAMS:  It's very short.

22        THE COURT:  Okay.  All right, sir, would you raise

23   your right hand?

24        Do you solemnly swear the testimony you're about to

25   give will be the truth, the whole truth, and nothing but

6

1    the truth?

2         THE WITNESS:  Yes, sir, I do.

3         THE COURT:  Okay.  Mr. Williams, before you have

4    Mr. Jackson testify, I want to warn you that when he was

5    representing you, you had an attorney-client relationship

6    and there's possibly many things that you discussed that

7    may be privileged and that would not normally be subject

8    to, you know, somebody requiring Mr. Jackson to testify

9    to what was said.  However, by calling him as a witness

10   and asking him questions, you may get into areas where

11   you waive that attorney-client privilege as it may

12   pertain to whatever questions or subject that you're

13   questioning him about.  Do you understand that?

14        MR. WILLIAMS:  I understand, Your Honor.

15        THE COURT:  Okay.  Go ahead.

16                    MARK JACKSON,

17      Having been first duly sworn, testified under oath

18   as follows:

19                 DIRECT EXAMINATION

20   BY MR. WILLIAMS:

21      Q.  Mr. Jackson, would you look at this and see the stamp

22   on that, is that stamped September of 2001 by the Public

23   Defender's Office?

24      A.  Yes.

25        MR. WILLIAMS:  Okay.  I want you to -- if I could, if

7

1      I could stand?

2          THE COURT:  Yes, sir.

3  BY MR. WILLIAMS:

4      Q.  Isn't it true that we have, that is written in here

5  that I have been diagnosed as a bipolar manic depressive?

6          MR. GROSS:  Judge, I'm going object.  This is

7  hearsay.  I don't know who wrote this.  I know, from

8  having talked to Mr. Jackson, that his representation of

9  the Defendant was in 2010, and I was just told, as you

10 were, that this letter was written in 2001.  I don't know

11 how this is relevant and it's clearly hearsay.

12         MR. WILLIAMS:  Well, Your Honor, it's a document

13 that's stamped from the Public Defender's Office and it

14 was a prior letter that supported the letter that I sent

15 Mr. Jackson when he represented me in 2010.

16         MR. GROSS:  But the Defendant's violation, as you

17 recall, from September, when we started this hearing,

18 pertains to something that happened in October of 2010.

19 Mr. Jackson was not representing him at that time, nor

20 was he representing him at the time that this document --

21 and I'm not exactly sure which one it is, this is the

22 letter of Mr. Higgins?

23         MR. WILLIAMS:  No, this is --

24         MR. GROSS:  I don't know what that is, but --

25         MR. WILLIAMS:  This is the letter --

8

1          MR. GROSS:  -- the point is regardless --

2          MR. WILLIAMS:  This is the letter --

3          MR. GROSS:  -- it's irrelevant to the Defendant's --

4          THE COURT:  Objection sustained, finding it's

5     irrelevant.

6          MR. WILLIAMS:  I have a letter that I wrote

7     Mr. Jackson that I'd like to submit when he was

8     representing me.

9          MR. GROSS:  I don't know how that would be

10    relevant.

11         MR. WILLIAMS:  Your Honor --

12         MR. GROSS:  If Mr. Williams can share with us how

13    this would be relevant, he represented him from April

14    until June of 2010, then the Defendant went back out in

15    the community and ended up killing this lady in October

16    of 2010.  Mr. Williams' letter, I believe, was dated

17    during the time frame while he was sitting in jail from

18    April until June of 2010.  Maybe there's something

19    relevant in there, but I'm mystified.

20         MR. WILLIAMS:  Your Honor, this is, I mean, we're

21    going back just to 15 or 20 minutes ago, we go back with

22    the, with Mr. Gross going back to 2001 when I was doing

23    time in prison, he's went up through the years, he's got

24    his psychologist that went back into my, into the '70s,

25    I'm going back with a letter that was written on April

9

1    the 21st, 2010, six months prior to my arrest on the

2    charges of -- that I didn't commit -- the 2011 case.

3        MR. GROSS:  I'm not saying that it's inadmissible.

4    I'm just asking what possible relevance is there?

5        MR. WILLIAMS:  Well, you've seen it.

6        MR. GROSS:  I don't know what's in it though.

7        THE COURT:  What is relevant in that letter about

8    this violation of probation?

9        MR. WILLIAMS:  Well, Your Honor, it has -- the, the

10   whole purpose of this defense is a defense of insanity.

11   Through that time, insanity defense, I have a sleep

12   disorder.  It's been, it's been put down for year after

13   year after year that I've been hallucinating from sleep

14   depravation.  I have been diagnosed by no less than eight

15   psychiatrists.  And I am telling Mr. Jackson of this, of

16   this disease in here, and so it's something that's just

17   not popped up that I'm just making up over here, because

18   it's six months before that I was arrested, so it's not

19   six years ago or 12 years ago, it's six months.

20       THE COURT:  All right.  Objection's overruled.  It

21   will come in.

22   BY MR. WILLIAMS:

23   Q.  Mr. Jackson if you would, please, sir, would you look

24   through this and we'll just do this quickly, if you'll look

25   through this and see if it's the same letter that I wrote you

10

1    back in April of 2010, sir?

2        A.  Is there any kind of time stamp or anything on this

3    or was there envelope from this?

4        Q.  Probably on the envelope.

5        A.  Do you have the envelope?

6        Q.  No.  No.

7        A.  So what's your question?

8        Q.  Do you recognize this letter?  If this will jog your

9    memory, I have a Public Defender's interview.

10       A.  Well, that doesn't jog my memory.  I can tell the

11   Court, or if you're asking this, I did represent you and I

12   know that you wrote me letters.  That's -- I mean, I don't

13   specifically remember this letter from 2010.

14       MR. WILLIAMS:  Well, we had this introduced into the

15       2011 case, Your Honor, and it was indicated as J-25,

16       defense evidence description at trial 2-V.

17       THE COURT:  I'll take judicial notice of the record

18       in the 2011 case.

19   BY MR. WILLIAMS:

20       Q.  All right.  And do you recognize this as being one

21   from your office?

22       A.  This looks like one of our forms that we used back

23   then.  We don't use them anymore, but that does look like the

24   form that we used.

25       Q.  And does it say severe bipolar manic depressive?

11

1    A.  It does.

2    Q.  And on the other side does it say sleep disorder and

3  seizures?

4    A.  It says that, yes.

5    Q.  And this is dated -- well the arrest date is 4/1.

6  It's dated, it's dated 4/20/2010?

7    A.  That's what it says.

8    MR. WILLIAMS:  That's all, Your Honor.

9    THE COURT:  Any cross?

10    MR. GROSS:  Yes, sir.  First of all, I'd like to see

11    the document.

12                    CROSS-EXAMINATION

13  BY MR. GROSS:

14    Q.  Mr. Jackson, you represented the Defendant in the

15  spring of 2010 on a violation of probation in this case,

16  right?

17    A.  Correct.

18    Q.  And ultimately the case was settled in early June and

19  the Defendant was reinstated to probation in June of 2010; is

20  that right?

21    A.  It sounds right.

22    Q.  Okay.  You had no more contact with the Defendant or

23  this case until you got a subpoena to come here and testify;

24  is that right?

25    A.  Other than letters that he sent during his homicide

12

1   case.

2       Q.  All right.  Did you ever conclude that he appeared to

3   be insane in the time that you were dealing with him in April

4   through June of 2010?

5       A.  I, I didn't come to any conclusions as to his

6   sanity.

7       Q.  This document that may say severe bipolar, manic

8   depressed, depression, it's titled at the top G-5, which I

9   believe is a discovery, you know, number, and then the second

10  page is G-6, confidential initial interview form Public

11  Defender's Office, right?

12      A.  Yes, sir.

13      Q.  This is not any kind of a diagnosis from a doctor?

14      A.  No, sir.

15      Q.  And you don't know what the Defendant's mental status

16  was or was not on June the 18th through June -- excuse me,

17  October the 18th through October the 23rd, 2010, right?

18      A.  To my recollection, we didn't have him

19  evaluated (inaudible).

20      Q.  Right.  I'm talking about during the time when

21  Ms. Patrick and he were being sought?

22      A.  No, I don't know anything about it.

23          MR. GROSS:  Absolutely no idea.  Thank you.  Nothing

24      else.

25          MR. WILLIAMS:  I have a brief question.

13

1       THE COURT:  Yes, sir.

2       MR. GROSS:  Do you need these documents?

3       MR. WILLIAMS:  No, sir.

4                   REDIRECT EXAMINATION

5  BY MR. WILLIAMS:

6       Q.  Mr. Jackson, when you represented me on the

7  misdemeanor charge and then on the violation of probation

8  charge, you familiarized yourself with my past and being

9  represented by the Public Defender, correct?

10      A.  I familiarized myself by speaking with you about --

11      Q.  Did you go into my file before and look through

12  there?

13      A.  I don't recall if I did or not.

14      Q.  Do you recognize a name of a psychiatrist named

15  Dr. Jacquelyn Olander?

16      A.  No.

17      MR. WILLIAMS:  I have no questions, Your Honor.

18      MR. GROSS:  Nothing else on that point.

19      THE COURT:  All right.  Thank you.  Mr. Williams, did

20  you want these documents into evidence?

21      MR. WILLIAMS:  Please, sir.

22      THE COURT:  All right.  It will be a Composite

23  Exhibit Defense 4.

24      (Defendant's Exhibit 4 was admitted into evidence.)

25      UNIDENTIFIED SPEAKER:  Can I approach off the record