## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA  DIVISION

**DONALD OTIS WILLIAMS,**
    **Petitioner,**

**v.**                             **CASE NO: 5:16-CV-357-WFJ-PRL**

**SECRETARY, DEPARTMENT**
**OF CORRECTIONS, ET. AL.,**
    **Respondent(s)**
_____/

## SUPPLEMENAL APPENDIX

**Document:**                                     **Page No.s:**

- March 24, 2017 5th DCA Opinion ------------------------------------------A5-A7

- May 4, 2016  5th DCA Order --------------------------------------------------A8

- July 7, 2016 Florida Supreme Court Order -------------------------------------A9

- 5th DCA and AG Responsive Narratives --------------------------------A10-A13

- 5th DCA Case Number: 5D16-2358 --------------------------------------------A14

- Photo copy of 14 boxes containing over 100,000 concealed evidence at trial collected on August 28, 2018--------------------------------A15

- Photo copy of Dozens of Evidence Discs concealed at Trial Collected on December 12, 2018 and January 9, 2009 ----------------A16-A19

- Criminal Background of Daniel Lee Culverhouse ---------------------------A20

Document                                                      Page No's

- Criminal Background of Scott William Harrell ------------------------A21-A23

  Noting presiding Judge in Petitioner's Case ---------------------------------A23

  Honorable Mark Nacke in Harrell's Case --------------------------------------A23

- August 2, 2013 Request sent to L.C.D.C. Deputies ------------------------A24

  For Due Process Item but Denied --------------------------------------------A24

- August 28, 2018 Chronological Summary ------------------------------A25-A26

- August 28, 2018 Transcript of Proceeding ------------------------------------

- February 28, 2013 Trial Court Order ------------------------------------------A75

  CAPD William Helton Stone Written Proclamations at Petitioners-A76-A78

- August 22, 2017 Trial Court Order Granting Public Defender

  Discharge from Petitioner's Case ----------------------------------------A79

- Petitioner's USMC Military Service Record --------------------------  A80-A82

- Bi-polar, PTSD, and Depakote Warning Information --------------- A83-A102

- July 31, 2013 Grievance and Letter to LCDC --------------------------A103-105

- Medical Director Pleading to Re-administer Medications due to

  Self-representation -------------------------------------------------A103-A105

- August 21, 2013 Trial Transcript (see pages A176-A171)---------A106-A149

- August 2, 2013 Hearing Transcript --------------------------------A150 – A168

- August 1, 2013 Motion For Conflict Counsel ---------------------------A169

Document                                        Page Nos

o Public Defender Confirmation August 21, 2013

  Trial Proceeding was Mislabled as August 22, 2013 — A170-A171

  (Note: Supp. App Page A106)

A3

Donald Williams - Legal Mail
# U13479
Union Correctional Institution
P.O. Box 1000
Raiford, FL 32083

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY**, this Instrument was sent by U.S. Mail on September _____4_____, 2025 to the following parties:

1.      United States District Court
             207 Second Street, Room 337
             Ocala, Florida  34475

   2.      Attorney General of Florida
             444 Seabreeze Boulevard, Fifth Floor
             Daytona Beach, Florida 32778

## <u>OATH</u>

Under the penalty of perjury I DECLARE the foregoing statements are true and correct.

Dated: September _____4_____, 2025

Signed: Donald Otis Williams
             Donald Otis Williams   U13479
             Union Correctional Institution
             P.O. Box 1000
             Raiford, Florida 32083-1000

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

DONALD OTIS WILLIAMS,

     Petitioner,

v.                                                                          Case No. 5D16-2358

STATE OF FLORIDA,

     Respondent.

_____/

Opinion filed March 24, 2017

Petition Alleging Ineffectiveness
of Appellate Counsel,
A Case of Original Jurisdiction.

Donald Otis Williams, Raiford, pro se.

Pamela Jo Bondi, Attorney General,
Tallahassee, and Douglas T. Squire,
Assistant Attorney General, Daytona
Beach, for Respondent.

2017 MAY 22 AM 10:10
CLERK OF CIRCUIT
AND COUNTY COURT
LAKE COUNTY
TAVARES FLORIDA

WALLIS, J.

    Donald Otis Williams filed a petition pursuant to Florida Rule of Appellate

Procedure 9.141(d), alleging that his appellate counsel provided ineffective assistance by

not raising a claim that the trial court failed to offer counsel for the sentencing portion of

A 5

his violation of probation hearing.[1] We grant the petition and remand for further proceedings consistent with this opinion.

When reviewing a petition alleging ineffective assistance of appellate counsel, "we must determine whether counsel's performance was deficient and, if so, whether 'the deficiency of that performance compromised the appellate process to such a degree as to undermine confidence in the fairness and correctness of the appellate result.'" Pierce v. State, 121 So. 3d 1091, 1093 (Fla. 5th DCA 2013) (quoting Lopez v. State, 68 So. 3d 332, 333 (Fla. 5th DCA 2011)). Our court has held:

> [I]f a defendant waives the right to counsel at any stage of the criminal proceedings, the trial court must renew the offer of assistance of counsel at each subsequent stage of the proceedings. Sentencing is a critical stage in criminal proceedings; and, even if a defendant does not request appointment of counsel, this omission is not considered a knowing waiver of the right to counsel.

Hays v. State, 63 So. 3d 887, 888 (Fla. 5th DCA 2011) (alteration in original) (quoting Hardy v. State, 655 So. 2d 1245, 1247–48 (Fla. 5th DCA 1995)); see also Fla. R. Crim. P. 3.111(d)(5) ("[I]f a waiver is accepted at any stage of the proceedings, the offer of assistance of counsel shall be renewed by the court at each subsequent stage of the proceedings at which the defendant appears without counsel."). A trial court's failure to offer counsel for sentencing ordinarily constitutes fundamental error. Jackson v. State, 983 So. 2d 562, 575 (Fla. 2008). Thus, appellate counsel provides ineffective assistance by not raising the issue on appeal. Henretty v. State, 146 So. 3d 55, 56 (Fla. 1st DCA

---

[1] Petitioner raises two additional claims of ineffective assistance of appellate counsel that we deny without further discussion.

*Lake Co. case #*
*2000 CF 2130*



C. ALAN LAWSON
CHIEF JUDGE

THOMAS D. SAWAYA
WILLIAM D. PALMER
RICHARD B. ORFINGER
VINCENT G. TORPY, JR
KERRY I. EVANDER
JAY P. COHEN
WENDY W. BERGER
F. RAND WALLIS
BRIAN D. LAMBERT
JAMES A. EDWARDS
JUDGES

**DISTRICT COURT OF APPEAL**
FIFTH DISTRICT
300 SOUTH BEACH STREET
DAYTONA BEACH, FLORIDA 32114
(386) 947-1600   COURT
(386) 255-8600   CLERK

JOANNE P. SIMMONS
CLERK

CHARLES R. CRAWFORD
MARSHAL

May 4, 2016

Donald Otis Williams
Florida State Prison
7819 N.W. 228th Street
Raiford, FL 32026

Re: Notice of Appeal

Dear Mr. Williams:

Regarding your Notice of Appeal received April 29, 2016, this Court has precluded you from filing any pro-se pleadings. Please see the attached case law. Any pleadings filed by you are to be rejected by the clerk, unless reviewed and signed by an attorney licensed to practice in the State of Florida. Therefore, a new case will not be established on your behalf.

Sincerely,

Sheila N. Stanbro
Chief Deputy Clerk

Sns
Enclosure
cc: Lake County Clerk of Court

FAX NUMBER (386) 947-1562
E MAIL ADDRESS 5dca@flcourts.org

**PAGE # 2933**

A 8

# Supreme Court of Florida

### THURSDAY, JULY 7, 2016

**CASE NO.: SC16-990**
Lower Tribunal No(s).:
5D13-4404;
352000CF002130AXXXXX

DONALD OTIS WILLIAMS          vs.          STATE OF FLORIDA

Petitioner(s)                                    Respondent(s)

Petitioner has filed a petition to invoke this Court's all writs jurisdiction that the Court has treated as a petition for writ of mandamus. Respondent is requested to file a response to the above-referenced petition. Further, because this Court has determined that it would be helpful to the resolution of this case to have the benefit of a response from the lower tribunal, the Fifth District Court of Appeal is requested to file a response as well. See Fla. R. App. P. 9.100(e)(3). The responses shall be filed on or before July 22, 2016. The responses shall address whether the District Court has the authority to bar petitioner's appeal of right from the denial of his postconviction motion and whether the barring order can apply to a violation of probation proceeding which is distinct from the underlying conviction. The petitioner may file his reply on or before August 1, 2016.

A True Copy
Test:

John A. Tomasino
Clerk, Supreme Court

ca
Served:
WESLEY HAROLD HEIDT
DONALD OTIS WILLIAMS
HON JOANNE P. SIMMONS, CLERK

H

IN THE SUPREME COURT OF FLORIDA

DONALD OTIS WILLIAMS,

     Petitioner,

v.                              CASE NO. SC16-990

STATE OF FLORIDA,

     Respondent.

_____/

<u>RESPONSE TO EMERGENCY PETITION FOR ALL WRITS</u>

     COMES NOW, Respondent, through undersigned counsel, pursuant to this Honorable Court's request that the State of Florida file a response to the emergency petition for all writs, and submits the following response:

     1.    Petitioner's attachments include pages from a circuit court order, dated March 30, 2016, denying Petitioner's Amended Motion for Postconviction Relief and Supplement Motion for Postconviction Relief. Petitioner's attachments also include a letter from the Chief Deputy Clerk of the Fifth District Court of Appeal, dated May 4, 2016, rejecting Petitioner's notice of appeal.

     2.    On August 18, 2006, pursuant to <u>State v. Spencer</u>, 751 So.2d 47 (Fla. 1999), Petitioner was prohibited from filing any further pro se pleadings concerning Fifth Judicial Circuit Court Case No. 2000-2130-CF. <u>Williams v. State</u>, 936 So.2d 1157 (Fla. 5th DCA 2006).

     3.    In <u>State v. Spencer</u>, 751 So.2d 47 (Fla. 1999), this Court held that a litigant must first be provided notice and a

A10

reasonable opportunity to respond before being prohibited from further pro se attacks on his or her conviction and sentence as sanctions for prior repeated frivolous filings.

4. On December 9, 2014, the Fifth District Court of Appeal per curiam affirmed Petitioner's conviction and sentence for violating the conditions of his probation in 2000-CF-2130-04. <u>Williams v. State</u>, 156 So.3d 1104 (Fla. 5th DCA 2014).

5. The appeal at issue concerns a postconviction challenge to the above violation of probation proceeding. Therefore, the instant appeal is not a challenge to Petitioner's original plea, conviction, and sentence; and, the 2006 <u>Spencer</u> order should not apply.

6. However, the pages of the circuit order denying the Amended Motion for Postconviction Relief and Supplement Motion for Postconviction Relief included in Petitioner's exhibits show that Petitioner's 26 claims included repetitious and frivolous claims challenging his original plea, conviction, and sentence in case number 2000-CF-2130-04. Petitioner should be strongly cautioned against using the instant appeal to continue filing repetitious and frivolous pleadings concerning the proceedings in case number 2000-CF-2130 that occurred prior to the 2006 <u>Spencer</u> order.

## SIGNATURE OF ATTORNEY AND CERTIFICATE OF SERVICE

I certify that a copy hereof has been furnished by U.S. Mail to: Petitioner, Donald O. Williams, DC# U13479, Florida State Prison, 7819 N.W. 228th Street, Raiford, Florida 32026, on July 22, 2016.

Respectfully submitted,

PAMELA JO BONDI
ATTORNEY GENERAL


Douglas T. Squire
DOUGLAS T. SQUIRE
ASSISTANT ATTORNEY GENERAL
Florida Bar No. 0088730

OFFICE OF THE ATTORNEY GENERAL
444 Seabreeze Blvd., Suite 500
Daytona Beach, Florida 32118
Telephone: (386)238-4990
Facsimile: (386)238-4997
douglas.squire@myfloridalegal.com

3

A12

<u>CERTIFICATE OF COMPLIANCE WITH RULE 9.100(l)</u>

I CERTIFY that this response complies with the font
requirements of Fla. R. App. P. 9.100(l).

<u>Douglas T. Squire</u>
Douglas T. Squire
**Attorney for State of Florida**

<u>DESIGNATION OF E-MAIL ADDRESSES</u>

I hereby designate, pursuant to Rule 2.516, the following e-
mail addresses for the purpose of service of all documents required
to be served pursuant to Rule 2.516 in this proceeding:

Primary e-mail address: <u>crimappdab@myfloridalegal.com</u>;

Secondary e-mail address: <u>douglas.squire@myfloridalegal.com</u>

A13













**Subject: CRIMINAL HISTORY**
**Date: 07/17/2018**
**Client: DONALD WILLIAMS**

---

## DANIEL CULVERHOUSE

**2008 – Burglary ( Felony conviction ) & Grand Theft ( Felony conviction )**

**2010 – Burglary ( Felony conviction ) & Grand Theft ( Felony conviction )**

**2013 – Aggravated Assault ( Felony conviction )**

A20

11/4/13.    ▬▬ - Comprehensive Report - SCOTT WILLIAM HARRELL

Ethnicity: WHITE
Eyes: BLUE
Is Sex Offender: No
Source Name: FL DEPT OF CORRECTIONS
Source State: FL

Date Of Birth: ☐ Exact Match (08/25/
08/25/1960)
Age:              ☐ Not Provided
Address:          ☐ Crime State M.
Height:           ☐ Not Provided
Ethnicity:        ☐ Not Provided

## Crime Details - 09/28/1982 - FL

| | |
|---|---|
| OffenseDescription1: FRAUD-FALSE STATEMENT | Sentence: 000485 |
| Case Number: 283102 | Disposition: SENTENCED |
| Category: CRIMINAL/TRAFFIC | Offense Date: 09/28/1982 |
| NCICCode: 2607 | Disposition Date: 05/25/1986 |

**WARNING - Due to the quality of Criminal data entry - Data displayed may not pertain to your Subject.**
**Separate Criminal Search is highly suggested as well as Independent verification of anything displayed on this system.**

Name: SCOTT W HARRELL
SSN: ▬▬▬▬▬▬
DOB: 08/25/1960; Born 53 Years Ago
Gender: M
Birth Address: TN
Height: 64
Ethnicity: WHITE
Eyes: BLUE
Is Sex Offender: No
Source Name: FL DEPT OF CORRECTIONS
Source State: FL

### Match Indicators

First Name:   ☐ Exact Match
Middle Name:  ☐ Middle Initial Matched
(WILLIAM - SCOTT W HARRELL)
Last Name:    ☐ Exact Match
Date Of Birth: ☐ Exact Match (08/25/1960 -
08/25/1960)
Age:          ☐ Not Provided
Address:      ☐ Crime State Matched (FL)
Height:       ☐ Not Provided
Ethnicity:    ☐ Not Provided

## Crime Details - 03/03/1982 - FL

| | |
|---|---|
| OffenseDescription1: UTTERING FORGERY | Sentence: 000485 |
| Case Number: 283102 | Disposition: SENTENCED |
| Category: CRIMINAL/TRAFFIC | Offense Date: 03/03/1982 |
| NCICCode: 2502 | Disposition Date: 11/18/1982 |

**WARNING - Due to the quality of Criminal data entry - Data displayed may not pertain to your Subject.**
**Separate Criminal Search is highly suggested as well as Independent verification of anything displayed on this system.**

Name: SCOTT WILLIAM HARRELL
DOB: 08/25/1960, Born 53 Years Ago
Gender: M
Ethnicity: WHITE
Is Sex Offender: No

### Match Indicators

First Name:   ☐ Exact Match
Middle Name:  ☐ Exact Match
Last Name:    ☐ Exact Match

A21

2502

IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT
IN AND FOR LAKE COUNTY, FLORIDA
FELONY DIVISION

## JUDGMENT

FELONY DIVISION

2009 DEC -8 P 12: 52

CLERK OF CIRCUIT
AND COUNTY COURT
LAKE COUNTY
TAVARES FLORIDA

PROBATION VIOLATOR ☐        RETRIAL ☐

COMMUNITY CONTROL VIOLATOR ☐        RESENTENCE ☐

CASE # 2009 CF 001001

RECORDING SPACE

THE STATE OF FLORIDA        VS        SCOTT W HARRELL

PLAINTIFF                DEFENDANT

THE DEFENDANT, SCOTT W HARRELL BEING PERSONALLY BEFORE THIS COURT REPRESENTED BY LIZA HAMMOND,
APD, ATTORNEY OF RECORD, AND THE STATE BEING REPRESENTED BY SARA B. SMITH, ASA, AND HAVING

☐  Been tried and found guilty                    ☐  Entered a plea of guilty

☒  Entered a plea of nolo contendere              ☐  Admitted Violation

as to the following crime(s):

| COUNT | CRIME | OFFENSE STATUTE # | DEGREE OF CRIME | OBTS # | CASE # |
|---|---|---|---|---|---|
| 1 | UTTERING A FORGED CHECK | 831.09 | 3F | 3501103188 | 2009 CF 001001 |
| 2 | UTTERING A FORGED CHECK | 831.09 | 3F | 3501103188 | 2009 CF 001001 |
| 3 | UTTERING A FORGED CHECK | 831.09 | 3F | 3501103188 | 2009 CF 001001 |
| 4 | UTTERING A FORGED CHECK | 831.09 | 3F | 3501103188 | 2009 CF 001001 |
| 5 | UTTERING A FORGED CHECK | 837.09 | 3F | 3501103188 | 2009 CF 001001 |
| 6 | UTTERING A FORGED CHECK | 831.09 | 3F | 3501103188 | 2009 CF 001001 |
| 7 | FORGERY OF A CHECK | 831.01 | 3F | 3501103188 | 2009 CF 001001 |
| 8 | FORGERY OF A CHECK | 831.07 | 3F | 3501103188 | 2009 CF 001001 |
| 9 | FORGERY OF A CHECK | 831.07 | 3F | 3501103188 | 2009 CF 001001 |
| 10 | FORGERY OF A CHECK | 831.07 | 3F | 3501103188 | 2009 CF 001001 |
| 11 | FORGERY OF A CHECK | 831.07 | 3F | 3501103188 | 2009 CF 001001 |
| 12 | FORGERY OF A CHECK | 831.07 | 3F | 3501103188 | 2009 CF 001001 |
| 13 | GRAND THEFT - $300 OR MORE BUT LESS THAN $20 000 | 812.014(2c1) | 3F | 3501103188 | 2009 CF 001001 |





IFN# 2009130750, ELECTRONICALLY RECORDED IN THE PUBLIC RE

SCOTT W HARRELL                                                                    2009 CF 001901

☒    and no cause being shown why the defendant should not be adjudicated guilty, **IT IS ORDERED THAT** the
     defendant is hereby **ADJUDICATED GUILTY** of the above crime(s):

☐    and with good cause being shown, **IT IS ORDERED THAT ADJUDICATION OF GUILT BE WITHHELD;**

☒    and having been convicted or found guilty of, or having entered a plea of nolo contendere or guilty, regardless of
     adjudication, pursuant to section 943.325, Florida Statutes, effective July 1, 2003, any person who is convicted or
     was previously convicted in this state of any felony offense shall be required to submit two biological specimens
     to a Florida Department of Law Enforcement designated testing facility for inclusion in the DNA database, the
     defendant shall submit to the collection of two biological specimens (oral swabs) for DNA testing.

DONE AND ORDERED in open court in LAKE County, Florida this date November 23, 2009.

                                                JUDGE: HONORABLE MARK A NACKE

                              CERTIFICATE OF SERVICE

     I HEREBY CERTIFY THAT A COPY OF THE FOREGOING JUDGMENT AND/OR SENTENCE HAS BEEN
FURNISHED TO LIZA HAMMOND, COUNSEL FOR THE DEFENDANT, THIS _8_ DAY OF DECEMBER, 2009.

                                                DEPUTY CLERK
                                                LAKE COUNTY CLERK'S OFFICE

                                                                    A23



# Lake County Sheriff's Office
## Criminal Justice Operations

### INMATE REQUEST FORM

Inmate Name: Williams, Donald    Pod Assignment: C1B1    Date: 9-2-13

Inmate Number: 3 3051

State your request briefly and write clearly. If an interview is requested, state why this interview is necessary. A copy will be returned to you with the requested information. *Medical requests will not be accepted on this form.*

I have a request for:

☐ Chaplain
☐ Classification
☑ Commissary
☐ Food Service
☐ Laundry Officer
☐ Law Library

☐ Mail Officer
☐ Pod Officer
☐ Programs
☐ Property
☐ Other: _____

My request is: for 10 manila envelopes, (1) sheets of plain paper and 10 stamped envelopes — per case # 2000-CF-2130

Request Received By:
Staff Signature: _____    ID Number: 266    Date: 9-2-13

☑ Deputy Cannot Answer and Forwarded (Check Box if Forwarded)

Staff Member Response:

NO MORE PAPER + ENVELOPES PER ORDER OF CAPT. FAYETTE

Date Responded: 9-4-13    Staff Signature: POTRIAU    ID Number: 1532

LCDC 9.08
Rev.201009 Previous versions of this form are obsolete. The newest version is available at http://cjo.lcso.org/forms.asp

A24

# CHRONOLOGICAL SUMMARY OF PROCEEDINGS

JUDGE   MARK HILL                      CASE NUMBER  2011CF105 / 2000CF2130

CLERK   C. KOPPEL                      JURY ____  NON-JURY ____  HEARING  X

BAILIFF(S)  A. LOUPOS/M. URBAN         COURTROOM #  _____ 4A

R. HARNESS/C. ABREU                    DATE  AUGUST 28, 2018

COURT REPORTER    MARY SAMUEL

STATE OF FLORIDA                       HUGH D BASS JR
                                       STATE ATTORNEY
                VS

DONALD OTIS WILLIAMS                   ANA GOMEZ-MALLADA
DEFENDANT (SELF REPRESENTED)           STAND-BY ATTORNEY

| Date/Time | Summary |
|-----------|---------|
| 10:04 AM | COURT IN SESSION – ALL OFFICERS AND DEFT PRESENT |
|          | STATE INFORMS COURT OF STATUS OF THE CASES |
| 10:07 AM | STATE ADDRESSES ISSUES WITH PROVIDING DEFT WITH DISCOVERY |
| 10:09 AM | COURT ASKS DEFT IF HE STILL WISHES TO REPRESENT HIMSELF |
| 10:10 AM | DEFT REPLIES IN THE AFFIRMATIVE |
|          | COURT ADDRESSES DEFT AS TO DISCOVERY |
| 10:11 AM | DEFT REQUESTS HAVING ONE HAD UNCUFFED IN ORDER TO WRITE - GRANTED |
|          | DEFT INQUIRES AS TO HAVING ECR |
| 10:12 AM | DEFT RESPONDS TO DISCOVERY ISSUES |
| 10:13 AM | COURT ASKS FOR SPECIFIC LIST OF DISCOVERY THE DEFT IS MISSING |
|          | DEFT ADVISES HE IS UNSURE |
| 10:14 AM | DEFT ADVISES HIS INVESTIGATOR IS PRESENT |
|          | DEFT WISHES TO HAVE DISCOVERY PROVIDED TO INVESTIGATOR |
| 10:15 AM | STATE TO RETRIEVE ALL DISCOVERY |
|          | MIKE GRAVES PRESENT AND REPRESENTS TO COURT THAT ALL DISCOVERY THEY HAVE WILL BE DELIVERED TODAY AS WELL |
| 10:16 AM | COURT IS IN RECESS |
| 10:55 AM | COURT IN SESSION – ALL OFFICERS AND DEFT PRESENT |
|          | STATE LISTS NUMBER OF BOXES OF DISCOVERY AND RECITES RECEIPT |

A25

| | |
|---|---|
| | OF EVERY ITEM IN BOXES |
| 11:02 AM | COURT ASKS STATE IF THERE ARE ANY OTHER DOCUMENTS THAT HAVE NOT BEEN PRESENTED |
| | STATE CONFIRMS THIS IS ALL OF THE DISCOVERY |
| 11:03 | LOUIS GODFRIED, MIDIGATOR AND INVESTIGATOR ON BEHALF OF DEFT TO RECEIVE ALL DISCOVERY |
| | COURT ASKS DEFT TO SIGN THE RECEIPT OF DISCOVERY |
| 11:04 AM | MS. GODFRIED SIGNS THE RECEIPT OF DISCOVERY AND WILL CHECK TO ENSURE ALL DOCUMENTS ARE INCLUDED |
| | STATE AGAIN CONFIRMS THIS IS ALL DISCOVERY IN THE STATE'S POSSESSION |
| 11:05 AM | STATE TENDERS RECEIPT TO DEFT TO SIGN |
| 11:06 AM | STATE PROVIDES A BACKUP CD TO FILE IN THE COURT FILE AND A COPY TO MS. GODFRIED |
| 11:08 AM | STATE FILES IN OPEN COURT A COPY OF THE RECEIPT FOR THE COURT FILE |
| | MIKE GRAVES LISTS NUMBER OF BOXES OF DISCOVERY AND MS. GODFRIED HAS SIGNED RECEIPT |
| 11:09 AM | MR. GRAVES, AS OFFICER OF THE COURT, CERTIFIES THAT THERE IS NO OTHER DISCOVERY IN HIS POSSESSION THAN WHAT IS PROVIDED IN THE BOXES TO DEFT |
| 11:10 AM | STATE REPRESENTS THAT THEY ARE WORKING TO PROVIDE COPIES OF ALL MEDIA |
| 11:11 AM | INVESTIGATOR AND MR GRAVES MAKE AGREEMENT TO HAVE BOXES PICKED UP AT A LATER DATE |
| 11:12 AM | DEFT ADDRESSES 2 DEPOSITIONS AND THE MERITS OF THE WITNESSES |
| 11:14 AM | DEFT ADDRESSES CREDIBILITY OF MR GRAVES |
| | MS. GODFRIED AGREES TO PICK UP ALL DISCOVERY BY TOMORROW |
| 11:15 AM | DEFT ASKS COURT TO GIVE DATE OF NEXT HEARING – COURT CANNOT PROVIDE A DATE |
| | DEFT ADDRESSES A DEADLINE FOR A RESPONSE FROM ATTORNEY GENERAL IN CASE 00CF2130 |
| 11:19 AM | COURT IS ADJOURNED |
| | |
| | |
| | |
| | |

A26

| | Docket # | Effective Date | Count | Description | Text | Book | Page |
|---|---|---|---|---|---|---|---|
| 🔒 () ☐ | 523 | 02/28/2013 | 0 | STATE SUPPLEMENTAL DISCOVERY EXHIBIT | STATE SUPPLEMENTAL DISCOVERY EXHIBIT | | |
| 🔒 () ☐ | 524 | 02/28/2013 | 0 | DEFT PRES FOR | DEFT PRES FOR STATUS HEARING/MOTION HEARING; REPRESENTED HIMSELF; COURT DENIED PRO-SE MOTION TO EXCLUDE WITNESSES; PUBLIC DEFENDER TO PROVIDE DEFENDANT WITH COPIES OF CASE FILES. PRO-SE MOTION TO SUPPRESS WILL BE HEARD ON 4/2/13 @8:30 AM. | | |
| 🔒 () ☐ | 525 | 03/01/2013 | 0 | STATE SUPPLEMENTAL DISCOVERY EXHIBIT | STATE SUPPLEMENTAL DISCOVERY EXHIBIT | | |

Showing 501 to 525 of 1,965 entries

1 ... 20 **21** 22 ... 79

© 2019 - ShowCase is a registered trademark™ of CourtView Justice Solutions, Inc.

| Case Number: 35-2011-CF-000105-AXXX-XX | | |
|---|---|---|
| Defendant: DONALD OTIS WILLIAMS | | |
| Division: None | | |
| SA Number: | | |
| Effective Date | Count | Description |
| 08/16/2017 | | JUSTICE ADMINISRATIVE COMMISSION'S RESPONSE TO AMENDED MOTION TO INCUR COSTS FOR MITIGATION SPECIALIST JUSTICE ADMINISRATIVE COMMISSION'S RESPONSE TO AMENDED MOTION TO INCUR COSTS FOR MITIGATION SPECIALIST |
| 08/21/2017 | | STATE SUPPLEMENTAL DISCOVERY EXHIBIT |
| 08/22/2017 | | PRO SE MTN FOR MITIGATION SPECIALIST - GRANTED |
| 08/22/2017 | | MINUTES OF COURT PROCEEDING |
| 08/22/2017 | | POWER OF ATTORNEY POWER OF ATTORNEY |
| 08/22/2017 | | PD MTN TO W/DRAW AS COUNSEL (CONFLICT) - GRANTED - COURT ALLOWS PD TO W/DRAW AS STAND BY COUNSEL |
| 08/22/2017 | | PRO SE MTN FOR SECURED PHNONE USE - DENIED |
| 08/22/2017 | | CHRONOLOGICAL SUMMARY OF PROCEEDINGS |
| 08/22/2017 | | DEFENDANT PRESENT |
| 08/22/2017 | | PRO SE PETITION FOR WRIT OF MANDAMUS |
| 08/22/2017 | | CLERK'S WORKSHEET |
| 08/22/2017 | | PRO SE OBJECTION TO COURT ORDER DATED 04.24.17 & MTN TO AMEND COURT ORDER DATED 04.24.17 - DENIED |
| 08/22/2017 | | PRO SE MTN FOR MORE DEFINITIVE PLEADING RE: PD'S MTN TO WITHDRAW - W/DRAWN BY DEFT |
| 08/23/2017 | | SET ON CFMTN - MOTION HEARING DOCKET 09/20/2017 BEGINNING AT 1:30 PM NACKE, MARK A |
| 08/25/2017 | | ORDER DENYING MOTION (DEFENDANT'S) FOR STATE'S EVIDENCE AND CASE FILE |
| 08/25/2017 | | PRO SE MOTION FOR LEAVE OF COURT AND MOTION TO SUPPLEMENT ALL WRITS PETITION |
| 08/25/2017 | | COURT CLARIFICATION OF RULING FROM 08.22 - SEE CHRONOLOGICAL |
| 08/25/2017 | | MINUTES OF COURT PROCEEDING |
| 08/25/2017 | | DEFENDANT PRESENT |
| 08/25/2017 | | SET ON CFSC - STATUS CONFERENCE DOCKET 8/25/2017 BEGINNING AT 10:00 AM |



## ADMINISTRATIVE REMARKS (1070)

| DATE: 790123 | DATE: | BLOOD TYPE A+ |
| Articles UCMJ explained to me this date as required by Article 137, UCMJ. | Articles UCMJ explained to me this date as required by Article 137, UCMJ. | 790410 (DATE)  CLASS SWIMMER 5- |
| *Donald O Williams* (Signature) | (Signature) | *HSRhoten* BY DIRECTION |

790123
(DATE)

INSTRUCTION IN CODE OF CONDUCT FOR MEMBERS OF THE ARMED FORCES OF THE UNITED STATES COMPLETED ON THIS DATE.

*Donald O Williams*

_____
(DATE)

INSTRUCTION IN CODE OF CONDUCT FOR MEMBERS OF THE ARMED FORCES COM-PLETED THIS DATE AFTER SIX MONTHS OF ACTIVE SERVICE.

790123
(DATE)

I CERTIFY THAT I HAVE BEEN COUNSELED THIS DATE ON THE ASPECTS OF SGLI. CONCERNING COVERAGE. THE AUTOMATIC FEATURES PROVIDED BY LAW, AND THE METHOD IN WHICH I MAY ELECT A BENEFICIARY IAW THE CURRENT REVISION OF MCO 1741.8.

*Donald O. Williams*

790123
(DATE)

INSTRUCTION GIVEN ON TYPE OF DISCHARGE. BASIS FOR ISSUE. EFFECT ON RE-ENLISTMENT. VA BENEFITS AND CHARACTER OF SEPARATION IN ACCORDANCE WITH CURRENT REGULATIONS.

*Donald O. Williams*

SATISFACTORY ENTNAC COMPLETED BY DIS NACC ON  790302
(DATE)

THIS ENTNAC MAY BE USED AS BASIS FOR GRANTING SECURITY CLEARANCE WITHOUT FURTHER REVIEW.

*HSRhoten* BY DIRECTION

790123  ASSIGNED COMBAT SERVICE CODE ___ 0
(DATE)

*HSRhoten* BY DIRECTION

---

790113
(DATE)

INITIAL DRUG ABUSE ORIENTATION CONDUCTED IN ACCORDANCE WITH MCO 6710.1.

*HSRhoten* BY DIRECTION

790410
SNM selected outstanding recruit (honor graduate) of the platoon.
Bydir
*HSRhoten*

790410
REC REC HON GRAD ISS OF DRESS BLUE UNIF IAW MCO 10120.49 THIS ISS WILL NOT JEOPARDIZE ENTL TO SUBQ ISS OF DRESS BLUE UNIF.  /VERIFIED
X  *HSRhoten*

790625 MarBks, SubBase, Bangor, WA
I have been counseled IAW MCO 5521.3F on the responsibilities inherent in being granted a security clearance, the causes of security clearance termination and the serious consequences of termination for cause.

*Donald O Williams*          *R.C.Warden*
Member                       Witness

790703 MarBks, SubBase, Bangor, WA
Successfully completed defensive driving course on  790628 .

*I. S. Anderson*          Bydir

---

A 80

262 45 1  14

WILLIAMS, DONALD O.

| NAME (LAST, FIRST, MIDDLE) | SSN |



*This is to certify that*

WILLIAMS    DD 26245101¼

*has completed the course prescribed by the*

COMMANDANT OF THE MARINE CORPS FOR

MOS 0331, MACHINEGUNNER

*Given at*

*Infantry Training School*

Marine Corps Base, Camp Pendleton, California

*this ___14th___ day of ___June___ 19___79___*

J. P. GAGLIARDO, JR.
COLONEL, U. S. MARINE CORPS
COMMANDING

(16GB)

AYMC 184 (REV. 6-75) (Supersedes NAVMC 184) SN 000-00-000-4853 U/I: SH

PAGE # 3472

## PART IV—RECORD OF ACCESS

| COMMAND | LEVEL OR PROGRAM | FROM (Y, M, D) | AUTHORITY | TO (Y, M, D) | REMARKS |
|---------|------------------|----------------|-----------|--------------|---------|
| MarBks, NSB, Bangor Bremerton, WA 98315 | SECRET | 790625 | P. S. WEIGAND, LTSGL, CO | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

OPNAV 0-120/20 (9/78) (replaces OPNAV 562-    which may not be used)
CERTIFICATE OF PERSONNEL SECU-    INVESTIGATION, CLEARANCE AND ACL
(or use, see OPNAVINST 5510 1)
L N 0107-LF-055-2100    Please type

## PART I—IDENTIFICATION DATA

| NAME | DATE OF BIRTH | PLACE OF BIRTH | SOCIAL SECURITY NO |
|---|---|---|---|
| WILLIAMS, Donald Otis | 600729 | Kissimmee, Florida | 262 45 10 15 |

| STATUS ☐ OFFICER ☒ ENLISTED ☐ CIVILIAN | SERVICE: USMC | SERVICE DATE |
|---|---|---|
| ☒ U.S. NATIVE ☐ U.S. NATURALIZED _____ (date naturalized) | | 790122 |

☐ IMMIGRANT ALIEN _____ (see comments) (date acquired)    ☐ PHILIPPINE NONIMMIGRANT ALIEN (see comments)

## PART II—RECORD OF INVESTIGATION

| TYPE | AGENCY | DATE | CASE CONTROL # | TYPE | AGENCY | DATE | CASE CONTROL # |
|---|---|---|---|---|---|---|---|
| ENTNAC | DIS | 790302 | 790323169 | | | | |
| | | | | | | | |
| | | | | | | | |

## PART III—RECORD OF CLEARANCE

| DATE | CLEARANCE | BASIS/DATE | AUTHORIZING COMMAND (Typed name and signature) | REMARKS |
|---|---|---|---|---|
| 790615 | SECRET | ENTNAC/790302 | P. S. WEIGAND, LTCOL, USMC | Purple Heart The Medal for the Combat Wounded |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

DATE    COMMENTS

PAGE # 8246

# United States Marine Corps

*This is to certify that*

**WILLIAMS        DO 2624S1014**

*has completed the course prescribed by the*

COMMANDANT OF THE MARINE CORPS FOR

MOS 0331, MACHINEGUNNER

*Given at*

Infantry Training School

Marine Corps Base, Camp Pendleton, California

this ____ 14th day of ____ June ____ 19 __ 79

J. P. GAGLIARDO, JR.
COLONEL, U. S. MARINE CORPS
COMMANDING

AVMC 184 (REV. 5-76) (Supersedes NAVMC 184d) SN: 000-00-000-8903 U/I: SH

(16SD)

# POST TRAUMATIC STRESS DISORDER

## National Institute of Mental Health In Re PTSD

Information provided in Wikipedia date 8.14.13

## RE-EXPERIENCE SYMPTOMS: [Must Have One for at Least a Month]

The fear some experience in dangerous conditions is natural in that fear engages the person's defenses – to defend or to avoid. To "Fight or Flight" as is commonly termed is a response meant to protect a person from harm. But in Post-Traumatic Stress Disorder (PTSD) those who have this disorder experience danger at an extreme level and immense stress, anxiety and fright even when no danger is evident or threat present to non-suffers.

PTSD develops after a terrifying ordeal that involved physical harm or threat of physical harm. A person who develops PTSD may have been the one harmed, or witnessed a harmful event to loved ones or strangers. PTSD can be the result of a variety of traumatic events, such as rape, torture, kidnapped, held captive and child abuse. Anniversaries of the event can trigger panic and symptoms.

## SYMPTOMS AND SIGNS:

Flashbacks are caused by a person's thoughts and emotions and can be produced at any time or any place. "Words, objects, names that resemble the harmful event or place of event, and or the name or names of a person or thing (animal, street, road, town, house, etc.) can trigger the re-experience."

### AVOIDANCE SYMPTOMS: [Must Have Three for at Least a Month]

Staying away from places, events or objects that are reminders of the experience.

Feeling emotionally numb and strong guilt, depression, or worry.

Losing interest in activities that were enjoyable in the past.

Having trouble remembering the dangerous event.

Things that remind a person of a traumatic event can trigger avoidance symptoms.

The symptoms can cause a person to change normal routine and or common behavior patterns. [PTSD is more severe and lasts longer when the stressor is a human, and can be ignited by encounters of symptoms of someone who reminds one of the terrors.]

[Would it be outrageously unheard of and strikingly surprising for a person to try to meet the reoccurring event head on as an attempt to overcome it or defeat it instead of avoiding the traumatic cause that plagues a person?]

A83

# PTSD

## HYPERAROUSAL SYMPTOMS:

Easily startled and/or feeling tense and/or nervous and worrying and/or sleep deprivation and/or uncontrollable outburst and /or uncontrollable acts of physical anger and/or unnatural hyper activities.

Hyperarousal symptoms are usually constant instead of being triggered by post-traumatic events. Extraordinary stress and anger are exhibited in persons with these symptoms. Some people with PTSD do not show symptoms for months.

Teens exposed and harmed can develop disruptive, disrespectful, or destructive behavior. They may feel guilty for not preventing injury or deaths.

## WHO IS AT RISK:

There are studies that confirm a genetic link to a person more at risk to develop PTSD symptoms. Survivors of physical and/or sexual assault and/or child abuse and/or traumatic emotional events are more likely to develop PTSD.

Risk factors for PTSD include:

a) Living through dangerous events and traumas.

b) Having a history of mental illness.

c) Getting hurt.

d) Seeing people hurt or killed.

e) Feeling horror, helplessness, or extreme fear.

f) Having little or no social support after the event.

## PTSD DIAGNOSIS:

Symptoms usually begin within three months of the incident, but some symptoms become prevalent only years afterward. They must last more than a month to be considered PTSD. Symptoms make it hard to maintain normal lifestyle patterns, tasks, etc. To be diagnosed with PTSD a person must have all of the following for at least one month: a) At least one re-experiencing symptom; b) At least three avoidance symptoms; c) At least two hyperarousal symptoms.

PTSD can produce depression, alcohol and drug abuse, anxiety disorder and agitation. Obligations and relationships are difficult to keep.

A84

<u>SELLERS V PRINCIPI</u> .372 f. 3D 1318 (C.A. Fed 2004)

@ Page 1321   Citing the Diagnostic and Statistical Manual of Mental Disorders. Fourth Edition of the American Psychiatric Association (DSM-IV) "Rating agencies must be thoroughly familiar with this manual to properly implement the directives in §4.125 through §4.129 and to apply to the general rating formula for mental disorders in §4.130. The schedule for rating mental disorders is set forth as follows:"

\*         \*         \*

Anxiety Disorders

\*         \*         \*

9411 Post-traumatic Stress Disorders

\*         \*         \*

Chronic Adjustment Disorder

9440 Chronic Adjustment Disorder

General Rating Formula for Mental Disorders:

"Total occupational and social impairment due to such symptoms as gross impairment in thought processes or communication:  Persistent delusions or hallucinations: Grossly inappropriate behavior: Persistent danger of hurting self or others: Intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene): Disorientation to time or place: Memory loss for names of close relatives, own occupation, or own name. '<u>100%</u>' "

"Occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: Suicidal ideation: Obsessive rituals which interfere with routine activities: Speech intermittently illogical, obscure, or irrelevant: Near-continuous panic or depression affecting the ability to function independently, appropriately and effectively: Impaired impulse control (such as unprovoked irritability with periods of violence): Spatial disorientation: Neglect of personal appearance and hygiene: Difficulty in adapting to stressful circumstances (including work or a work like setting): Inability to establish and maintain effective relationships. '<u>70%</u>' "

"Occupational and social impairment with reduced reliability and productivity due to such symptoms as: Flattened affect: Circumstantial circumlocutory or stereotyped speech: Panic attacks more than once a week: Difficulty in understanding complex commands: Impa9irment of short and long-term memory (e.g. retention of only highly learned material, forgetting to complete tasks): Impaired judgment; Impaired abstract thinking Disturbances of motivation and mood: Difficulty in establishing and maintaining effective work and social relationships. '<u>50%</u>' "

@ 1328 (FN2) The DSM-IV describes PTSD as " A mental disorder characterized by the development of characteristic symptoms following exposure to an extreme traumatic stress or involving direct personal experience of an event that involves actual or threatened death or serious injury or other threat to one's physical integrity." DSM-IV § 309.81 at 424 (4th ed. 1994)

@1329 (FN3) According to the DSM-IV a person with PTSD may persistently re-experience the traumatic event in a number of ways, such as through distressing dreams: acting or feeling as if the traumatic event were reoccurring: or through intense psychological or physiological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event. DSM-IV §309.81 at 427-29 Additionally a person with PTSD may persistently avoid stimuli associated with the trauma, as indicated by efforts to avoid thoughts, feelings, or conversations associated with the trauma: efforts to avoid activities, places, or people that arouse recollections of the trauma or by an inability to recall an important aspect of the trauma. 1d.  A person with PTSD may also have persistent symptoms of increased arousal, such as difficulty falling asleep or staying asleep: irritability or outbursts of anger: difficulty concentrating:  hypervigilance: or an exaggerated startle response.

A86

# BIPOLAR DISORDER

Genetic factors contribute substantially to the likelihood of developing bipolar disorder and environmental factors are also implicated.

Individuals with bipolar disorder experience episodes of frenzied moods known as MANIA.

As mania becomes more severe, individuals begin to behave erratically and impulsively often making outrageous or uncommon decisions. Chronic mania develops uncontrollable destructiveness with massive sleep deprivation emerging in severe instances for persons suffering with bipolar disorder. 1 [One or more episodes of severe mania – see Criteria & Subtypes]. Some individuals can experience very distorted beliefs about the world known as psychosis.

There are wide-spread problems with social stigma, stereotypes, and prejudices against individuals with diagnosis of bipolar disorder.

MANIC EPISODES:

People with mania commonly experience increases in energy and decreased sleep and some people cannot rest or sleep for days or in chronic cases even weeks. A manic person may exhibit pressured or elevated speech and or racing thoughts and judgment is commonly severely impaired. [Note FDOC docs "a" & "e" ]

Mania is the defining feature of bipolar disorder. Mania is a distinct period of elevated or irritable behavior that lasts for at least a week. Persons in the manic state can be uncontrollable and behave abnormally. Sufferers can become aggressive, intolerant, or otherwise belligerent and intrusive. They may feel they are on a special mission, have delusional ideas. In extreme cases a person in the manic state can experience psychosis or a break with reality which can be accompanied by violent behavior. They can experience hallucinations and hear things no one else can and become volatile or mercurial. The onset of a manic episode is often foreshadowed by sleep disturbances. Appetite changes and increase in anxiety can occur up to three weeks before a manic episode develops.

DEPRESSION EPISODES:

In some cases a person suffering the depressive state of bipolar may become psychotic, a condition known as bipolar with psychotic features. The symptoms include hallucinations – which are usually unpleasant. [Sig. Doc 'b' ]

A82

# BIPOLAR DISORDER

## MIXED AFFECTIVE EPISODES:

In the context of bipolar disorder, a "mixed state" is a condition during which symptoms of mania and depression occur simultaneously. "Mixed State's are often the most dangerous period of bipolar disorder during which severe anxiety, panic disorder, hallucinations, suicide and other extreme complications increase greatly.

## ASSOCIATED FEATURES:

Difficulty maintaining relationships. Impaired memory

## ENVIRONMENTAL:

Evidence manifest environmental factors play a significant role in the development and course of bipolar disorder and that individual psychosocial variable may interact with genetic dispositions. There is increasingly consistent evidence from prospective studies that recent life events and interpersonal relationships contribute to the likelihood of onsets and reoccurrences of bipolar episodes. There have also been repeated findings that between a third and a half of adults diagnosed with bipolar disorder report traumatic/abusive childhood experiences which is associated with a more reoccurring disorder PTSD particularly stemming from a harsh environment.

## NEUROLOGICAL:

Bipolar can occur and be caused by a neurological condition [PTSD] or injury. Such injury noted is traumatic brain injury, temporal lobe epilepsy, etc.

## DIAGNOSIS:

By patient, family and friends

CT, MRI, PET images can manifest injuries and neurological findings

## BIPOLAR SPECTRUM:

M – Severe mania, full-blown manic episodes

D – Severe Depression

m – Less severe mania – hypomanic

d – Less severe depression

A88

# BIPOLAR DISORDER

## CRITERIA AND SUBTYPES:

Bipolar disorder – One or more episodes of mania [Some becoming severe are reported] Subcategories specify whether there has been more than one episode, and the type of the most recent episode. A depression or hypomanic episode is not required for diagnosis, but is frequently occurs. Bipolar 1 can cause severe social or occupational impairment and psychosis. [NOS – Not Otherwise Specified]

## RAPID CYCLING:

"Rapid Cycling" produces four or more episodes a year. Ultra-rapid (days) and ultra-ultra rapid or "Ultradian" (within a day) cycling has also been described. Similar symptoms are schizophrenia, attention deficit, hyperactivity disorder (ADHD).

## RECOVERY AND RECURRENCE:

A naturalistic study from first admission for mania or mix episode (Representing intervention, hospitalization in more severe cases) found that 50% achieved syndromal recovery (no longer meeting criteria for the diagnosis) within six weeks and 98% within two years. Within two years 72% achieved symptomatic recovery (no symptoms at all).

## HISTORY:

Manic psychosis has been termed "dual-form insanity".



# Depakote (Valproic Acid) Withdrawal Symptoms + How Long They Last

Depakote (Valproic acid) is a compound that is utilized as an anticonvulsant to help prevent seizures in epileptics. It also has mood stabilizing properties and is approved to help treat and prevent mania among individuals with bipolar disorder. In some cases it is prescribed for the treatment of migraine headaches as well. Other off-label uses for Depakote include: impulse control disorders and spasms.

Most people that use it for the intended purposes of treating epilepsy and/or mania in bipolar disorder find that it works quite well. Despite the fact that the drug can be very effective, the way it works is not well understood. Some hypothesize that it may work on voltage-dependent sodium channels and may increase GABA to prevent both seizures and mania. Studies in animals have lead researchers to believe that this may inhibit the reuptake of the neurotransmitter GABA in the brain.

Although many people take this medication for a period of time, some have a difficult time dealing with side effects. Various side effects include: hair loss, nausea, diarrhea, vomiting, indigestion, and vision problems. Additionally it may lead a person to gain weight and cause memory problems. The potentially debilitating side effects are reasons people typically end up withdrawing from this medication.

# Factors that influence Depakote (Valproic acid) withdrawal

When coming off of any medication, there are various factors that play a role in determining how long the withdrawal process takes as well as the severity of discontinuation symptoms. These factors include things like: the time span over which you took the drug, the dose that you were on, whether you quit cold turkey or tapered, as well as other personal factors.

## 1. Time Span

How long were you taking Depakote? Those who were on it for a long term may have a more difficult time withdrawing than someone who was on it for a shorter term. In general, the longer you were on a medication, the more your body becomes dependent on it for functioning. Someone who is on Depakote for a few months is likely going to have an easier time coming off of the drug than someone who was on it for years.

## 2. Dosage

Individuals that were on a higher dosage tend to have a more lengthy withdrawal than individuals on a lower dose. When you are on a high dose, your brain and body become used to the higher levels of the drug for functioning. Therefore it takes longer to taper as well as readjust after you quit from a high level of the medication.

The initial starting dose of this drug is 25 mg/kg per day in an extended release (ER) formula. The dose is then titrated upwards to the lowest possible dose that yields therapeutic effects. The maximum recommended dose



is 60 mg/kg per day. If you are at the upper end of the spectrum (e.g. 60 mg/kg per day), you may have a tougher time withdrawing.

## 3. Cold Turkey vs. Tapering

It is always recommended to conduct a gradual taper off of anticonvulsant medications. Since this is a drug that affects various neurotransmitters as well, it is important to gradually taper as opposed to quitting "cold turkey." By slowly tapering, you are giving your body and brain some time to gradually adapt as you get used to functioning with less of the drug.

If you quit cold turkey, you may experience more debilitating withdrawal effects for a longer period of time. Quitting cold turkey essentially strips your nervous system of a stimuli that it was used to receiving for a long period of time. In some cases, by not tapering, it is thought that you may shock the nervous system and it may take even longer to readjust to functioning without the drug.

Most sources suggest tapering at a rate of 20% to 25% every 2 weeks. You could taper slower or quicker, but this makes roughly for about a 2 month withdrawal period. Even 25% may be too quickly for you if you have been on the drug for a long period of time at a high dose. Take the time to work with a professional and come up with a custom plan to minimize withdrawal symptoms. To be on the safer side you could even reduce at a rate of 15% every 2 weeks.

## 4. Individual Factors

Other individual factors will play a role in determining the difficulty of your withdrawal. These factors include things like: social support, daily habits, and your individual sensitivity to drug withdrawal. People that get wrapped up in physical symptoms and/or those who constantly analyze every symptom that they experience during withdrawal may have a much more difficult time handling the process.

It is also important to note that some people may be on other drugs and/or transitioning to a new medication which may ease many of the withdrawal symptoms. It is important to avoid comparing yourself to what other people are experiencing and/or how long their withdrawal lasts. You may experience a much quicker withdrawal or yours may be much longer and more drawn out – it totally depends on your circumstances.

# Depakote Withdrawal Symptoms: List of Possibilities

Below are a list of possible symptoms that you may experience when coming off of Depakote. Keep in mind that you may not experience every symptom listed below and that the severity of what you experience will largely be based on individual circumstances.

- **Anger:** Some individuals report feeling anger to the point of rage when they initially come off of this drug. It may have to do with the fact that the drug itself tends to elicit a calming response – inhibiting the reuptake of GABA. When stopped, this may lead a person to feel more angry than usual.
- **Anxiety:** If you notice that you feel more anxious and less relaxed, it's largely due to withdrawal. It is pretty common to experience anxiety and have anxious thoughts when you initially stop this

medication. If you didn't have anxiety prior to taking this drug, you should gradually become less anxious over time.

- **Bipolar relapse:** For those who have bipolar disorder and are on the drug to help control manic cycling, you may experience mania when you quit. When you take away the drug that was helping control the cycling, it is possible to experience a shift in mood.

- **Concentration problems:** A very common problem that people report during the first couple weeks of withdrawal is concentration problems. These can be more severe if you quit *cold turkey* or taper too quickly. In general you may have a difficult time staying *focused and completing work or school-related tasks.*

- **Confusion:** There are a combination of symptoms that contribute to *feeling confused.* These include things like: foggy thinking, poor concentration, mood swings, memory issues, and physical symptoms. The confusion should ease up as your brain gradually begins to function without the drug.

- **Depression:** Another common symptom to experience is that of depression. Although Depakote *does not prevent cycling into depression,* coming off of it can lead a person to feel depressed. It could be in part due to neurotransmitter changes, particularly involving GABA.

- **Dizziness:** Perhaps the most common symptom associated with the withdrawal process is that of dizziness. Many people report feeling extremely dizzy and or have sensations of vertigo. If you feel dizzy, just know that it will improve in time. If you quit cold turkey, this may be significantly more severe.

- **Fatigue:** Do not be surprised if you feel pretty tired with low energy for the first couple weeks after you quit this drug. Do your best to work with the energy that you've got and eventually you should notice your energy levels increase.

- **Headache:** Many people experience general headaches when they stop this medication. Individuals that were taking Depakote for migraines may notice rebound migraines upon discontinuation.

- **Insomnia:** This drug tends to calm people down and can make individuals sleepy. When you discontinue, you may notice that you experience an inability to fall asleep at night. This may be in part due to anxiety and/or inadequate GABA.

- **Irritability:** It's pretty normal to feel irritable when withdrawing from this drug. Expect the irritability to slowly decline in intensity over the course of a few weeks following your last dose.

- **Mood swings:** It is common to experience general mood swings (non-bipolar) upon discontinuation of this medication. One moment you may feel very angry, the next depressed, and the next very anxious. Just know that you may experience some general fluctuation in moods as you recover from withdrawal – these will eventually subside.

- **Muscle weakness:** Some people tend to experience muscle weakness and/or pains when they initially quit this drug. This weakness should improve gradually over the course of a few weeks until you no longer feel weak.

- **Nausea:** In some cases, people end up feeling nauseated if they taper too quickly or during the first week of withdrawal. This nausea may be unpleasant, but keep in mind that it will eventually subside.

- **Seizures:** If you have epilepsy you may experience rebound seizures during withdrawal if you remain unmedicated. It is always important to make sure that you slowly taper from AED's or you could experience a seizure. If you are unsure of a good tapering protocol, talk to a professional.
- **Sleep changes:** You may experience changes in your sleep patterns during withdrawal. In other words, you may have difficulty falling or staying asleep or you may sleep too much. You may also have difficulty sleeping at normal times (e.g. sleepy during the day and unable to sleep at night).
- **Suicidal thinking:** In some cases, the depression that people deal with during *withdrawal can lead to* suicidal thinking. If you are feeling suicidal and haven't felt this way before taking the medication, *you* should recover to normal thinking in some time. In the meantime, be sure to see a therapist and talk about your feelings if they are extreme.
- **Tremors:** Withdrawal can lead some individuals to experience shakes or tremors upon discontinuation. These can be minimized if a proper tapering protocol is followed, but if a person quits too quickly, the tremors may be severe.
- **Vision changes:** It is common to experience vision changes while taking the drug. Some people experience similar vision changes when they withdraw as well. Over time your vision should return to normal functioning – give it some time.
- **Weight loss:** Since many people gain weight when they take Depakote, it should be obvious that they are going to lose it when they stop taking it. If you gained weight while on the drug, you should eventually lose most of it as time continues to pass. The weight loss will not be immediate, but should occur gradually.

Donald Otis Williams # U13479
Florida State Prison
7819 N.W. 228 Street
Raiford, FL 32026

A93

**PAGE # 2949**

PAGE # 53

**Side Effects May Include**

drowsiness, Blurred vision, breast development in males, bruises, buzzing or ringing in the ears, changes in sex drive, chills, confusion, constipation, diarrhea, difficulty urinating, disorientation, dizziness, dry mouth, enlarged breasts, fatigue, fluid retention, flushing, fragmented or incomplete movements, hair loss, hallucinations, headache, high fever, high or low blood sugar, inappropriate breast milk secretion, indigestion, inflammation of the mouth, itching and skin rash, lack of muscle control, loss of appetite, loss of coordination, low blood pressure, nausea, nervousness, numbness, poor bladder control, rapid heartbeat, red or brownish spots on the skin, seizures, sensitivity to light, severe muscle stiffness, sore throat, sweating, swelling of the testicles, taste disturbances, tingling sensation, tremors, vomiting, weakness, weight gain, yellow eyes and skin

**Withdrawal Symptoms May Include**

aggression, anxiety, balance issues , blurred vision, brain zaps, concentration impairment, constipation, crying spells, depersonalization, diarrhea, dizziness. electric shock sensations, fatigue, flatulence, flu-like symptoms, hallucinations, hostility, highly emotional, indigestion, irritability, impaired speech, insomnia, jumpy nerves, lack of coordination, lethargy, migraine headaches / increased headaches, nausea, nervousness, over-reacting to situations, paranoia, repetitive thoughts or songs, sensory & sleep disturbances, severe internal restlessness (akathisia), stomach cramps, tremors, tinnitus (ear ringing or buzzing), tingling sensations, troubling thoughts, visual hallucinations / illusions, vivid dreams, speech or visual changes / issues, worsened depression

**Other names for Doxepin Include:**



Doxepin is a Tricyclic Antidepressant that exerts its action on Serotonin and Norepinephrine but also blocks Dopamine and the histamine receptors. Histamine is involved in the immune response and Dopamine is a critical neurotransmitter that plays important roles in both the brain and body. Serotonin is primarily found in the gastrointestinal tract, central nervous system and in the blood platelets while Norepinephrine works as both a hormone and a neurotransmitter, stimulating the heart, sweat glands, blood vessels, large internal organs and the adrenals whereas Serotonin is involved in sleep, memory, regulation of the endocrine system, body temperature, mood and behavior and muscle movement. A study published in JAMA Internal Medicine in early 2015 found Sinequan (Doxepin) increased the risk of developing dementia. All Antidepressants can cause withdrawal symptoms if abruptly stopped or tapered too rapidly and Doxepin is no different. **<u>Contact Us</u> if you need help tapering Doxepin or have questions.**

A95

# What Is Depakote (Divalproex Sodium)?

Depakote is the brand name for divalproex sodium (also known as valproic acid), an anti-seizure drug used to treat epilepsy, some mood disorders (like bipolar disorder), and migraine headaches.

It's thought to work by increasing the amount (or mimicking the action) of a neurotransmitter, GABA, in the brain, but the exact mechanism is unknown.

Increasing levels of GABA may help prevent brain signals that lead to seizures.

Restoring the natural balance of chemicals in the brain is also believed to help lessen the severe mood swings associated with bipolar disorder (formerly known as manic depression).

The Food and Drug Administration (FDA) approved Depakote for epilepsy treatment in 1983.

It was approved to treat bipolar disorder in 1995, and in 1996 it was approved for use as a migraine prevention medication. Abbot Laboratories manufactures Depakote.

In 2012, Abbot Laboratories pleaded guilty to federal charges for marketing Depakote as a drug to control agitation and aggression in elderly nursing home patients.

They also marketed Depakote as a schizophrenia medication, even though their own studies showed no benefit.

Neither of these uses had FDA approval. Abbot agreed to pay $1.6 billion to settle the case.

A96

## Depakote Warnings

The FDA requires Depakote to carry a black-box warning because it can cause serious liver damage that could be fatal, especially in children younger than 2.

The risk of this happening is higher in the first six months of taking the drug. In some cases liver damage continued even after patients stopped taking Depakote.

There is an additional black-box warning linking Depakote to cases of life-threatening pancreatitis.

In some cases, patients who developed pancreatitis rapidly went from initial symptoms to death, so getting medical treatment quickly is essential.

If you develop abdominal pain, nausea, vomiting, and a stomach that is tender to the touch, call 911 immediately.

Pancreatitis was reported in people who took this drug for a short time as well as in those who took it for years.

You should not take Depakote if you have a history of liver disease, a urea cycle disorder, or a genetic disorder such as Alpers' disease (a progressive degenerative disease of the central nervous system that occurs mostly in infants and children), or Alpers-Huttenlocher syndrome (the formal name for Alper's Disease).

## Depakote and Pregnancy

The FDA warns Depakote can harm an unborn baby. Women who take this medication while pregnant could give birth to a child with serious birth defects.

The most common are those that affect the brain and spinal cord, particularly spina bifida or neural tube defects. These defects occur in one or two babies out of 100 that are exposed to Depakote before birth.

Unfortunately, these defects can develop in the very first month of pregnancy, before you even know you are pregnant.

Studies also show if you take Depakote during pregnancy, your child is at risk for having a lower IQ.

The FDA warns that women who take this drug should use effective birth control to prevent pregnancy.

Depakote passes into breast milk. There have not been reports of harm to breastfeeding infants, but talk to your doctor about any risks to your child before you begin breastfeeding.

Back to Top

# Depakote Side Effects

Because one of the risks of this drug is an increase in the chance of liver damage, you should be on the lookout for these symptoms:

- Nausea
- Vomiting that does not go away
- Loss of appetite
- Pain the in the right side of your stomach
- Dark urine
- Swelling of your face, hands, arms, feet, and legs
- Yellowing of your skin or eyes (jaundice)

Depakote can cause suicidal thoughts or actions. Call your doctor right away if you have any of these symptoms, especially if they are new:

- Thoughts of suicide or dying
- Attempts to commit suicide



- A depression that is new or getting worse
- Anxiety that is new or getting worse
- Feeling agitated or restless
- Panic attacks
- Trouble sleeping (insomnia)

This drug may cause life-threatening pancreatitis. Get emergency attention if you develop:

- Nausea
- Vomiting
- Abdominal pain, especially pain that radiates to the back or that feels worse after eating
- Tenderness when pressing on the stomach

Encephalopathy, a severe (sometimes fatal) brain disorder is a rare but possible side effect of this drug, especially in patients with certain metabolic disorders (urea cycle disorders).

Tell your doctor immediately if you develop unexplained weakness, vomiting, or sudden mental/mood changes like confusion.

Nausea is quite common when taking this medication. Between 10 and 20 percent of people who take Depakote report being nauseous at some point.

Common side effects of Depakote include:

- Diarrhea
- Dizziness
- Blurred or double vision
- Memory impairment
- Ringing in the ears

P99

- Shakiness or unsteadiness (tremors)
- Somnolence (excessive sleepiness)
- Hair loss
- Irregular or painful menstrual periods
- Weight gain

Serious side effects of Depakote include:

- Chest pain
- Easy bruising or unexplained bleeding
- Irregular heartbeat
- Swelling of hands or deet
- Nystagmus (involuntary eye movement)
- Feeling cold or shivering
- Rapid breathing or loss of consciousness

Seek immediate medical attention if you develop signs of a serious allergic reaction to this medication:

- Rash
- Itching
- Swelling (especially in the face, tongue, or throat)
- Severe dizziness
- Trouble breathing

Back to Top

# Depakote Interactions

A106

You should always tell your healthcare professional about all prescription, non-prescription, over-the-counter, illegal and recreational drugs, herbal remedies, nutritional and dietary supplements, and any other drugs and treatments you are taking.

Back to Top

# Depakote Dosage

Do not take more or less of this medication than your doctor prescribed. Always follow the dosing label to get the best results.

Your dose will depend on your condition and what works for you. Your doctor may change your dose occasionally to make sure you are getting the best results.

Do not crush or chew Depakote tablets or Depakote ER tablets. Swallow them whole.

Depakote Sprinkle Capsules may be swallowed whole, or broken open and sprinkled on a small amount of soft food like applesauce or pudding.

Once you have mixed the contents of the capsule with food it must be taken immediately; you can't save the dose for later.

Consider wearing a medic alert tag or carrying an ID card letting emergency healthcare providers know that you're on a seizure medication.

Drink plenty of water when you're taking this drug, your doctor may change your dose if you are not getting enough fluids.

# Depakote Withdrawal



Do not stop taking Depakote without talking to your healthcare provider first. Stopping a seizure medication like Depakote suddenly can cause serious withdrawal symptoms or other problems.

In a patient who has epilepsy, quitting abruptly can cause seizures that will not stop (status epilepticus).

## Depakote Overdose

If you suspect you've overdosed on this medication, seek emergency medical attention or call a poison help line at (800) 222-1222.

If you miss a dose, take the missed dose as soon as you remember.

Skip the missed dose if it is almost time for your next scheduled dose.

Do not "double up" on this medication to make up for a missed dose.

Back to Top

## Depakote FAQ

Q: I have taken Depakote for a little over a month. Though I am active, age 39, I feel like I have more fat, especially around my midsection. Currently I am only taking 500 mg. Is this perceived fat increase a result of the drug?

A: Depakote (divalproex sodium) is used for the treatment of bipolar disorder, epilepsy, chronic pain associated with neuropathy, and migraine headaches. The most common side effects with Depakote include nausea, vomiting, extreme drowsiness, dizziness, weakness, abdominal pain, stomach upset, rash, diarrhea, increased appetite, pain, tremor, weight gain, back pain, hair loss, headache, fever, loss of appetite, constipation, double/blurred vision, side-to-side eye movements, staggering, emotional upset, abnormal thinking, amnesia, flu syndrome, infection, bronchitis, runny nose,

A102

Donald O Williams, 33051
CIBI  L.C.D.C.
551 W Main St.
Tavares, Fl. 32778

July 31, 2013

Lake County Detention Center
Captain M. Fayette & Mr. Kevin Lenhart
551 W Main St.
Tavares, Fl. 32778

RE: State v Williams, Case # 2011-CF-105 & Grievance in Respect to Dr. Perez

Please be advised of the enclosed. I am preparing as diligently as I can for an upcoming hearing on August 8, 2013 and the subsequent First Degree Capital Murder Trial on August 12, 2013.

Please also understand the enclosed was not my fault - I don't need any more problems than I already have. I don't need to go to court non-medicated and preparing for trial non-medicated is going to be a hardship I will not be able to recover from.

Thank you for you very valuable time and attention to this matter.

Respectfully
Donald O Williams

CC: Honorable Mark A. Nacke
    Cynthia Oshea C.M.A.
    Tania Alvia, Esq.
    William M. Gross, Esq.

A103



# Lake County Sheriff's Office
## Criminal Justice Operations

### REQUEST FOR ADMINISTRATIVE REMEDY

*Per LCJ Policy 5.03.00 this form is to be used in the event a complaint cannot be resolved through informal channels or by the use of request forms. Inmate grievances which are determined to be unfounded/untruthful/frivolous will be considered the same as lying to staff members and appropriate measures may be imposed. Appropriate criminal charges for filing a false report and/or perjury may also be pursued.*

I.  Name: __Williams, Donald C__          Booking #: __10011704__

    Date: __July 31, 2013__    Pod: __CIBI__    Cell #: __53__

II. Grievance: ✓Original ___Appeal ___ Disciplinary Action Appeal

__On May 1, 2013 I was taken to medical by Cpl Wilman in respect to a 3
month psych appointment for assessment. I was told to sit down, the door of the mental
health office was closed and Cpl Wilman sat in front of the closed door (at no other
time since I came there in October 2010 thru May 1, 2013 has the door ever been
closed). Dr. Perez with Broward Lawrence in the room as well began to berate me due
to the State calling him as a witness during my upcoming trial - the assessment did not take
place between Dr. Perez & I, he was only interested in blaming me for the State's actions. I
was there to beg Dr. Perez for a blood test because he-to my knowledge-has only ordered one in about 3 years-since 10-24-10 arrest.__

*Do not write below this line. Attach additional sheets as necessary.*

Grievance Received By: _____    Date Received: __08/02/13__    ☑Forwarded

III. Investigation:

__You were informed your medication would be discontinued if
you did not attend your appointment. If you wish to
resume your medication, submit a medical Request.__

Investigation Completed By: _____

IV. Review Findings:

__Unfounded. copy forwarded to Mj. Mays.__

Date: __8/2/13__
Supervisor Signature: _____
Title: __Dr.__

A786

A104    A B6    A104

Booking # 10041704  July 31, 2013   Donald D Williams   Grievance P. 2.

It was extremely obvious I would not be released from that confined space until Dr. Perez-Espejo spent enough anger and contempt upon me to satisfy himself.

I could not return to those conditions again. I cannot afford to be placed back into the same circumstance - the same situation where its so obviously a predetermined hostile confrontation planned by those in the room. They wanted me inside the room, the door closed, and any exit blocked for intimidation purposes. This was obviously setup so Dr. Perez-Espejo could do what he wished. I said I could not return under those conditions again unless I was assured that the next assessment ~~was~~ concerned my medication and behavior and any questions, — NOT THE TRIAL ISSUE.

I, at times am claustrophobic, due to an earlier ~~reason~~ incident where as a child I was locked in a confined space. I again cannot afford to be placed in the same circumstance - the same situation where Dr. Perez-Espejo could have his way with me. If I was to be forced into the same condition I could not be responsible for my actions due to the possibility of having an anxiety attack or seizure when Dr. Perez-Espejo would be allowed to abuse his official capacity and go on a tangent-riding tirade due to his [unfounded] belief that I caused the State to subpoena him.

Please - with the above in mind - take into the following: On July 31, 2013 Cpl. Gilmore informed me that I had a mental health appointment. I told Cpl. Gilmore I could not attend due to Dr. Perez-Espejo's last outburst. Cpl. Gilmore gave me a refusal form which I signed and wrote on in restraints. Mr. Lawrence came to CIBI about the same time as Cpl. Gilmore as we were on the recreation court. Mr. Lawrence informed me the medications that are keeping me stable would be discontinued if I did not go and meet with Dr. Perez-Espejo. I had no other choice but to decline to be abused by Dr. Perez-Espejo again. And also understand that the May 1, 2013 incident was not the first time Dr. Perez-Espejo abused his professional standing and official capacity while employed by the Board of Lake County Commissioners in my regard (Williams v L.C. Bo.t.C.C., S. Dth. Corr., S.C.A. Case # 5113-cv-357oc).

Whereas I grieve due to the above and requests medications be readministered.

A105        AB A105

Vol. 26 (1 of 3)

1526

IN THE CIRCUIT COURT, FIFTH
JUDICIAL CIRCUIT, IN AND FOR
LAKE COUNTY, FLORIDA
CASE NO.:  2011-CF-000105

STATE OF FLORIDA,
      Plaintiff,

vs.

DONALD OTIS WILLIAMS,
      Defendant.
_____/

CERTIFIED
COPY

m/re-appt. counsel

JURY TRIAL
VOLUME XI OF XX
PAGES 1526 - 1569

HELD BEFORE:    The Honorable Mark A. Nacke
DATE TAKEN:    August 22, 2013
TIME:    8:35 a.m. - 1:47 p.m.
PLACE:    Lake County Judicial Center
    550 West Main Street
    Courtroom 6
    Tavares, Florida 32778


    This cause came on to be heard at the time and place
aforesaid, when and where the following proceedings were
reported by:

Cheryl McDonough, RPR, FPR
Kerr & Associates
614 North Sinclair Avenue
Tavares, Florida 32778
(352) 742-3144

1527

A P P E A R A N C E S:

WILLIAM M. GROSS, ESQUIRE
OF:  Office of the State Attorney
     550 West Main Street
     Tavares, Florida 32778
     P:  352-742-4236
          APPEARING ON BEHALF OF THE STATE

DONALD O. WILLIAMS, PRO SE

MICHAEL A. GRAVES, ESQUIRE
   and
JOHN N. SPIVEY, ESQUIRE
   and
WILLIAM L. GROSSENBACHER, ESQUIRE
   and
MORRIS D. CARRANZA, ESQUIRE
OF:  Office of the Public Defender
     123 North Sinclair Avenue
     Tavares, Florida 32778
     352-742-4270
          APPEARING ON BEHALF OF THE DEFENDANT

A107
AA1

1528

P R O C E E D I N G S

\* \* \* \* \* \*

1  THE COURT: Dr. Warren, Dr. Warren can you hear me?

2  THE WITNESS: Yes, Your Honor. How are you doing

3  this morning?

4  THE COURT: Just fine. You're on speaker phone in

5  court. The Defendant, State is present and we're on the

6  record.

7  Yes, sir, did you have a question?

8  THE WITNESS: I just wanted to notify you, sir, that

9  Katie Skorpinski who, of course, is the doctoral analyst

10  on this case and one of my students that testified in

11  this case already, I was not aware that I was going to be

12  testifying, I found out, you know, yesterday that the

13  defense would be calling me. And I wanted to let you

14  know and the Court know that I did ask her in general how

15  her testimony went, just as a matter of her professional

16  development. This was her first time testifying and so I

17  did in general ask her how her testimony went. We did

18  not talk in detail about her testimony, but I wanted you

19  to be aware of that, that she said it was fairly

20  straightforward and that she thought it went fairly well,

21  and that was the extent of the conversation, but I wanted

22  you to know that.

23  THE COURT: Okay.

1529

1    MR. GROSS:  The other subject is while, as long as

2    Dr. Warren is still on the line, has to do with his

3    funding.  He is a defense expert.  He is, you know, quite

4    well compensated, I believe, and rightfully so.  I'm not

5    criticizing you, Dr. Warren.  But I think that JAC is

6    going to pick up the tab for whatever his bill is, and so

7    I just wanted to bring that to everybody's attention.

8    THE COURT:  Okay.

9    THE WITNESS:  Yeah, I would just let you know that if

10   in general when the defendant is indigent, I do the no go

11   through the JAC and seek any witness fees for my lab or

12   for myself.  It's really not worthwhile.  So I will not

13   be submitting a witness fee.

14   MR. GROSS:  That unfortunately is a popular sentiment

15   among the providers, it's just not worth it for the small

16   amount of money they're getting from JAC.  It's sad.

17   Thank you, Dr. Warren.

18   THE COURT:  Did the clerk get a Skype address for

19   you?

20   THE WITNESS:  No, sir, not yet.

21   THE COURT:  Okay.  If you want to give us that now,

22   we will get back in touch with you.  It will be to close

23   as 9:00 as we can get it, but we might be a little later

24   than that.

25   MR. GRAVES:  Your Honor.

AY3 A109

1530

1    THE COURT: Okay.

2    THE WITNESS: Now, I'm fairly ignorant about Skype.

3  I have a dial pad that I can call a number. Is that how

4  that is accomplished or do you call me?

5    THE COURT: We will -- wait a second, we might --

6    MR. GRAVES: I have no problem with him on phone,

7  Your Honor.

8    THE COURT: Okay. We can just do it by phone?

9    MR. WILLIAMS: Yes, sir

10    MR. GROSS: That would be fine, Judge.

11    THE COURT: We can just do it by phone, if that's

12  okay with you.

13    THE WITNESS: That is fine, sir.

14    THE COURT: That might be easier for everybody.

15    THE WITNESS: Yes, sir.

16    THE COURT: Okay. And we've got your number already.

17  Okay. We will call you as soon as we're ready. Like I

18  said, we'll try to get it as close to 9:00 as we can. I

19  believe we're going to be probably 9:15 to 9:30 though.

20    THE WITNESS: Yes, sir, that's fine.

21    THE COURT: Okay. Thanks a lot.

22    THE WITNESS: Okay. Bye-bye.

23    MR. GROSS: Judge, if I could I know you have been

24  thinking about this issue involving the juror, but before

25  we do, Mr. Bowen is standing here waiting for a phone

1531

1   number for Mr. Coburn, also known as Buster, and we had

2   argued about that yesterday morning, I vented a little

3   bit.  I think that I can give the number to Mr. Coburn --

4   I mean, to Mr. Bowen on the strict assurance that it's

5   not going to be provided to a gentleman who I think is a

6   killer and Mr. Coburn, I believe, I don't know what he

7   feels, but he didn't want the number given out.  So if

8   Mr. Bowen is assuring the Court that it's not going to

9   get back to the Defendant, I'm giving him the number.

10  Also it's under the understanding that Mr. Coburn, who

11  lives up in Old Town or wherever that is, up in North

12  Florida someplace, is not going to be driven down here to

13  testify, and that was the agreement that Mr. Bowen and I

14  have just discussed.  If we're going to do him by phone,

15  I've got the number, Mr. Bowen wants to talk to him ahead

16  of time and probably schedule him for testimony and

17  that's fine.  But he's going to be by phone, and that's

18  fine with me as well.  It's going to be ten minutes.

19  It's just walking into a bathroom and seeing the

20  Defendant counting some money.

21       THE COURT:  Mr. Williams, is that okay with you, sir?

22       MR. GRAVES:  Yes, sir.  I have -- could I have just

23  one moment with my investigator.

24       THE COURT:  Yes, sir.

25       (Pause in the proceedings.)

1532

```
1          THE COURT:  Mr. Williams, before we go any further,

2     again, sir, you understand that you have a right to be

3     represented by an attorney and you can invoke that right

4     at any time, if you cannot afford to hire an attorney, I

5     can appoint the attorneys who were previously appointed

6     to represent you to represent you or you can hire an

7     attorney or represent yourself.  What would you like to

8     do?

9          MR. GRAVES:  Your Honor, upon speaking to my

10    investigator, I would move the Court to re-appoint

11    counsel.

12         THE COURT:  Okay.

13         MR. GROSS:  Who's going to tell them, you or me?

14         THE COURT:  I will.

15         MR. GRAVES:  If I may, Your Honor, I need to get this

16    on the record, about two weeks before this trial began, I

17    was taken off medication, through no fault of my own.  We

18    had an incident there with -- well, it was not an

19    incident, but it was a time that they took me into a

20    small office, which they do every three months and they

21    discuss my mental status.  At that point their main, the

22    main thing that they wanted to take me in there for was

23    to, to yell at me because of the doctor, the

24    psychiatrist, because he was being called to testify at

25    trial.
```

1533

1    They took me into a small room with three staff, one

2    of them was a corporal, and they closed the door, in

3    which they had never done before, and this altercation

4    there, and I couldn't understand why he was continually

5    admonished me and going on and on and on about this

6    trial, which had nothing to do with his treatment of me.

7    And I told him I wasn't going to come back in here in

8    that condition any longer, he could come to me.  Well, in

9    July, last part of July, they called me down there and I

10   told them I can't come down here like that anymore.  I'm

11   not going to be put in a room in there and screamed at

12   and yelled, this has nothing to do with the medication

13   that I'm on.

14       From that point on, he stopped medication.  And from

15   then on, as Dr. Mings has provided the Court earlier, his

16   concern was this was cycling, and I can understand it.

17   I'm feeling that way, and it's become worse and worse and

18   worse, and this is one of the reasons that I asked that

19   counsel be re-appointed.

20       The other, the other point, before we get to that is

21   I move for a mistrial due to the juror's outburst

22   yesterday.

23       MR. GROSS:  Well, apparently if the Defendant has

24   announced that he is going to represent -- have counsel

25   re-appointed, then he is no longer allowed to make

1534

1    motions, but his attorney certainly is.  I think the

2    first thing we do before you address any motions for

3    mistrial or address the jury as to what may very well

4    have simply been I'm choking or please don't choke, I

5    don't know exactly what was said, but whatever was said,

6    I think we need to bring Mr. Carranza over here and get

7    started.

8        THE COURT:  Yes.  All right.  Contact them.

9        MR. GROSS:  May I go upstairs see I have a cell phone

10   number for him?

11       (Pause in the proceedings.)

12       THE COURT:  Mr. Carranza, can you hear me.

13       MR. CARRANZA:  Hello.

14       THE COURT:  Can you hear me?

15       MR. CARRANZA:  Yes, sir.

16       THE COURT:  Mr. Carranza, we're in open court on the

17   speaker phone.  Mr. Williams is present.  Mr. Gross is

18   present for the State.

19       MR. CARRANZA:  Yes, sir.

20       THE COURT:  Mr. Williams has requested court

21   appointed counsel at this point and I'm appointing the

22   Public Defender's Office to represent him, and I just

23   wanted to let you know and see how quickly you and

24   Mr. Grossenbacher could, if that's who your supervisor is

25   going to assign to the case, you and Mr. Grossenbacher.

1535

1    MR. CARRANZA:  Yes, sir.  We were the original

2    attorneys on the case, so I'm assuming that we would get

3    the case back.

4    THE COURT:  Okay.

5    MR. CARRANZA:  How long would you need us in court,

6    Your Honor?

7    THE COURT:  As quickly as possible, as humanly

8    possible.

9    MR. CARRANZA:  Okay.  Can we have an hour?

10   THE COURT:  Yes, if that's what it's going to take,

11   it will have to do that.

12   MR. CARRANZA:  Okay.  Yes, sir.  We'll be there in an

13   hour.  I will contact Mr. Grossenbacher right now.

14   THE COURT:  Okay.  Thank you.

15   MR. CARRANZA:  Okay.  Thank you.  Bye-bye.

16   THE COURT:  Well, let's call Dr. Warren back up and

17   tell him it will probably be more like 10:30 to 11:00.

18   MR. GROSS:  Some time this afternoon, next month.

19   THE COURT:  Yeah.  All right.  We're in recess for

20   one hour.

21   (A recess was taken.)

22   MR. GROSS:  Your Honor, the Defendant's back in the

23   courtroom now.  Can we go back on the record?

24   THE COURT:  Yes.

25   MR. GROSS:  Obviously his attorneys are back.

1536

1    We have the Public Defender, we have two assistant Public

2    Defenders, Mr. Grossenbacher, Mr. Carranza, who were the

3    attorneys who had been working on the Defendant's case

4    for about two years before they were discharged, I think

5    at around the end of January of this year.

6    We have a jury that's been waiting since 8:30 or so

7    it's obvious to me that regardless that of where we go

8    from here, we're not going to need the jury today.  I

9    don't know what the Court's intentions, are but having

10   consulted with the attorneys, I think it's pretty clear

11   that regardless of what your ruling is, they don't need

12   to stay here.  So you might want to consider letting them

13   go, at least for today, we've got phone numbers, and

14   contact them if we need them back tomorrow or Friday or

15   Monday or whenever.  But beyond that, I'll defer to

16   counsel and let them that proceed.

17       MR. GRAVES:  May it please the Court?

18       THE COURT:  Yes, sir.

19       MR. GRAVES:  For the record, I'm Michael Graves, I'm

20   the Public Defender for the Fifth Judicial Circuit.  It's

21   our understanding that the Court earlier this morning at

22   the Defendant's request has appointed us to represent

23   Mr. Williams for the remainder of the trial.  It's

24   incumbent upon me to advise the Court I will not be the

25   handling the case itself.  I'm here to handle this matter

KERR & ASSOCIATES, INC.
1-800-246-1753

1537

1    only.  Certainly through previous work, Mr. Grossenbacher

2    and Mr. Carranza have a greater familiarity with the case

3    than I.  I think it was February 4th that the Court

4    entered the order relieving us of professional

5    responsibility, which was about three weeks after I was

6    sworn into office.

7         Pursuant to the Court's order and the Defendant's

8    request today, Judge, it's incumbent upon me on behalf of

9    Mr. Williams to move this Court, request for mistrial,

10   such that we can properly prepare to represent

11   Mr. Williams, both in the guilt phase and in any Phase II

12   that may result.

13        As the Court is aware, we have not represented

14   Mr. Williams for the better part of seven months.  It's

15   my understanding from talking to staff this morning that

16   there have been approximately 600 additional pages of

17   discovery that were generated after we were relieved from

18   professional responsibility.  There has been new

19   evidence, I believe, new DNA or scientific type evidence

20   that we have not had the opportunity to familiarize

21   ourselves with to make a determination whether additional

22   defense experts would be necessary in order for us not

23   only to possibly combat that evidence but to understand

24   that evidence such that we can appropriately

25   cross-examine any witnesses that the states may call.

1538

1    As the Court is also aware, Mr. Williams had listed a

2    number of my Assistant Public Defenders as witnesses,

3    including all of those who had any familiarity with the

4    case.  Therefore, we have appropriately been under the

5    rules of sequestration and have been unable to sit as

6    even standby counsel to observe and witness what has

7    occurred during the last week and a half of the testimony

8    in this trial.

9    So in order for us to at a minimum familiarize

10   ourselves with what has occurred as Mr. Williams has

11   represented himself would take a matter of weeks.  It's

12   my understanding that the testimony and the evidence in

13   the trial has been, of course, court reported being the

14   case in which the State is seeking the ultimate penalty,

15   but it has not been backed up with the Blue Man.  So even

16   if we were to request or order Madam Court Reporter what

17   we would hope would be the Court's expense, for an

18   expedited transcript of all of the testimony and evidence

19   that has occurred during the last week and a half, she

20   could give you the best estimate on that, but it's not a

21   matter of a day or two for that to occur.  I think we're

22   probably talking a matter of weeks for something that is

23   at this length.

24   Judge, we also have to look at the following:  The

25   Court has previously appointed Mr. Williams an

A 118    A-52

1539

1    investigator, slash, mitigation expert who has counseled

2    with us.  We have attempted to work with him as an office

3    to ensure Mr. Williams had all the discovery that we had,

4    so I've become familiar with him.  I've had an

5    opportunity to counsel with him this morning.  He has

6    given me some information which causes me some concern

7    with regards to Mr. Williams' mental competency to go

8    forward.

9        It's my understanding there had been some issues with

10   regard to sleep deprivation and lack of medication.  We

11   would need to check his inmate medical records to see

12   what his medication schedule is and in all likelihood

13   require an independent evaluation by an expert to

14   determine that competency.  We need to work on jury

15   instructions, both in the guilt phase, but more

16   importantly as well in any Phase II, because while not

17   diminishing the work that it would take to complete the

18   guilt phase instructions, as the Court is aware, the

19   penalty phase instructions, if there were to be a Phase

20   II in this case are, in my opinion, and I've been death

21   qualified prior to the time that they required death

22   qualification, as the law has evolved are much more case

23   specific with regards to definition of possible, request

24   for definition of possible specific mitigation or

25   mitigating factors to the jury.

1540

1    We also have to take a look at, while we are familiar

2  as an office, and I think Mr. Grossenbacher and

3  Mr. Carranza would correct me if I'm wrong, with the

4  direction that we were heading for possible mitigation.

5  It was, if I had to rate it, it would not be in its

6  infancy, but it's in its juvenile stages.

7    As well as it would be extraordinarily important for

8  us to have the ability to take a look at, in order to

9  prepare to go forward, what Mr. Williams has presented in

10  the way of mental health, family evidence, that quite

11  frankly would affect the presentation of mitigating

12  evidence in any Phase II.  In other words, what has he

13  done to his Phase II that we would have to present and

14  present it in manner that is flowing and consistent with

15  the evidence that he presented at trial.

16    Judge, also I would set forth, and I'm not even

17  familiar, and I don't think Mr. Carranza or

18  Mr. Grossenbacher are familiar with it at this time,

19  whether Mr. Williams has listed Dr. Mings.  He is an

20  expert, one of the last neuropsychologists, I think we

21  had asked to evaluate Mr. Williams for the purpose of

22  penalty phase.  He would certainly be called.  We would

23  intend to call him.  He just suffered a bicycle accident,

24  has a broken hip.  My understanding is he'll be out for a

25  minimum of two to three weeks.

1541

1    But the bottom line in all of this, Judge, is the

2    purpose for our motion is by any, in even the most

3    liberal standards of effective representation, we cannot

4    meet those levels if I were to put all 65 of my lawyers

5    throughout the circuit on this case between now and

6    tomorrow or now and Monday.

7    (Cell phone sounded.)

8    MR. CARRANZA:  I'm sorry, Your Honor.

9    MR. GRAVES:  I can't even get my lawyer prepared

10   enough to turn his phone off, Judge.

11   We can't meet any minimal standards.  We have that

12   obligation to the Court.  And I'm well aware that the

13   Court is going to do everything within its powers, as it

14   has, to guard Mr. Williams' constitutional rights.  We

15   also have ethical responsibilities.  We will do as the

16   Court instructs us to do, but to zealously and vigorously

17   Mr. Williams within the bounds of the law is going to

18   require substantial time and preparation.

19   I don't have to remind this Court, and I certainly

20   don't have to remind Mr. Gross, as we have done this

21   dance, not like this, for many, many times over many,

22   many years, these proceedings, should the State prevail

23   in their request for punishment, is going to be reviewed

24   time and time again on many different levels.  The

25   effective assistance of counsel will be dissected by

A121

1542

```
 1        capital collateral relief lawyers, not only on a State

 2        but on a Federal level.

 3            I am aware that there is certain bodies of law, and

 4        I'm only familiar with noncapital cases, Judge, that when

 5        a Defendant has moved forward pro se to the day of trial,

 6        and at the day of trial has said, I want a lawyer and the

 7        Court has appointed a lawyer and denied the continuance

 8        at that point, prior to starting the case, that basically

 9        there is some authority that indicates that the Defendant

10        has made their own bed and must lie in it.

11            This isn't an armed robbery case, Judge.  It is well

12        established, has been for decades, that death is

13        different.  We are aware, keenly so, and I think

14        Mr. Williams is aware, I just met him for the first time

15        in court today, the procedural posture is of his own

16        making.  But where the State seeks the penalty of death

17        and we have hyper constitutional and procedural

18        protections, I would submit to the Court that the only

19        protection of those due process rights his right to

20        confrontation of witnesses, both his right to present a

21        meaningful penalty phase, mitigation evidence, and more

22        importantly, again, on any level, the right to an

23        effective counsel, but not just merely a lawyer, is to

24        declare a mistrial in this cause.

25            MR. GROSS:  Judge, the argument that death is
```

1543

 1    different is rather tired and rather vague.  As a matter

 2    of fact, we hear it all the time and what it really means

 3    is let's just ignore the rules because death is

 4    different, so we just suspend the rules.  Well, that's

 5    not the case.

 6        There's is a case called Jones, which is a death

 7    case, double murder, 449 So.2d 253, 1984 Florida Supreme

 8    Court, in which almost the same issue came up.  I haven't

 9    had a chance to read very much yet, so I'm certainly not

10    going profess to know everything about all the cases that

11    I'm going to give you, but I will read to you one

12    paragraph in the third page of the opinion.  Defendant

13    urges that during the guilt phase of his trial he

14    unequivocally requested appointment of some attorneys or

15    other counsel and that the trial erred in not appointing

16    counsel at that time.  The Defendant's argument is

17    without merit.  This request occurred on second day of

18    the trial, after the jury was selected, and after the

19    State had commenced its case.  The request for counsel

20    was accompanied by a motion for a continuance.  The trial

21    court properly advised the Defendant that he had

22    previously fired court appointed counsel, refused other

23    counsel, and had chosen to exercise his constitutional

24    right to represent himself after a proper inquiry.  The

25    Court properly exercised its discretion in refusing to

1544

1    prevent the Defendant to delay the proceedings further by

2    withdrawing from that choice during the course of the

3    trial.  And they go on to explain why they feel that the

4    Defendant under those procedural circumstances was not

5    entitled to a reversal.

6         I'm just a concerned as you are that we not court

7    disaster on appeal.  I've talked to the Attorney

8    General's Office.  Obviously we've had what 45, 50

9    minutes to try to figure out exactly whether this is an

10   elephant with our blinds on, blinders on or not, and

11   feeling our way along here over the last 45 minutes, it

12   seems to be the consensus within the wise suits that I've

13   talked to, that a short continuance to give the Defendant

14   and his attorneys an opportunity to consult, to give the

15   attorneys an opportunity to familiarize themselves with

16   what they've missed is sufficient to allow them to then

17   come in and represent the Defendant to the extent that

18   they can.

19        And I understand that this is not an ideal situation

20   for anybody, but as the courts have indicated, the

21   Defendant is the one who's put us all in it position.

22   The Defendant is the one who has been basically, I don't

23   want to say jerking the system around, but perhaps

24   causing us to be in this problem certainly.  And so to

25   the extent that the attorneys are not as prepared as they




1545

1    would have been had they been working on this case for

2    the last six months, that is to be put exclusively at the

3    Defendant's feet.  And so I think that he should would be

4    estopped from complaining that his attorneys aren't

5    prepared.  He's the one who's put us in this position.

6        I would suggest, once again, our jurors certainly

7    aren't going to be needed today, and at the very minimum,

8    I don't see that we're going to be presenting any

9    evidence today, that you read these cases, don't throw

10   the baby out with the bath water quite yet, and maybe

11   we'll find more law, we can meet this evening or tomorrow

12   morning or whatever and see where we go from here.

13       But I am proposing that we don't need to mistry this

14   case and send this jury home after all of this evidence

15   has been presented.  I strongly suggest that we take our

16   time, figure out where we go from here, and not act

17   precipitously and perhaps by Friday or by Monday our

18   colleagues in the Public Defender's Office will be able

19   to do very good job of representing the Defendant.  I do

20   believe they will from this point forward.

21       THE COURT:  One concern I did have is I recall during

22   voir dire that, and I'm not sure that this juror is, I

23   mean, that the person in the venire was chosen to sit on

24   the jury, but I think one gentleman had a trip planned,

25   had airline tickets for, I think he said like, what, the

1546

1    29th or 30th, and we assured him that, no, it's not going

2    to go that long.  So I don't know --

3        MR. GROSS:  I don't believe --

4        THE COURT:  -- if that individual --

5        MR. GROSS:  I don't believe that gentleman who was

6    talking about September the 1st, I believe there was a

7    lady on August the 29th, I don't believe either one of

8    them ended up on the jury, but you can certainly inquire

9    of them before we send them home and apologize for

10   bringing them in today for nothing, if anybody has any

11   conflicts that would prevent them from being here all

12   next week.  Because I can see now if we get started on

13   Friday, we're going to be here almost all week.  And if

14   we start on Monday, we definitely will be here all week

15   at the pace we've been going.  Maybe with Mr. Carranza

16   and his speedy habits we could get a quicker pace, but

17   it's still going to take the vast majority of the week.

18       MR. GRAVES:  Don't dare me, Mr. Gross, I may bring

19   Mr. Spivey in and you'll be here for three weeks.

20       MR. GROSS:  May I approach the bench?

21       THE COURT:  Yes.

22       MR. GRAVES:  Judge, if I might respond very

23   briefly --

24       THE COURT:  Yes, sir.

25       MR. GRAVES:  -- with some concerns?

1547

1    Certainly we're not asking the Court to suspend the

2    constitution or the rules of procedure.  We're asking the

3    Court to guard Mr. Williams' constitutional rights in a

4    time when we do that for defendants in spite of

5    themselves.

6    I get a kick out of the fact that whenever reach

7    post-conviction relief or in this status, all of sudden

8    the Assistant Public Defenders are the greatest lawyers

9    in the world.  I ask for guidance.  I think the Court's

10   aware, I'm in 32nd year as a criminal defense lawyer.

11   I've tried 15 capital cases.  We've talked about going

12   forward on Friday, giving us an opportunity to

13   familiarize ourselves with what has occurred during the

14   last week and a half.  How?  By discussion with the

15   Defendant.  Who, quite frankly, has been representing

16   himself in such a fashion that it would not demonstrate

17   he would be able to relate to us issues, testimony, that

18   we would believed to be necessary for appropriate

19   representation, for preparation of the remainder of the

20   guilt phase.

21   We don't know what these witnesses have said, good or

22   bad, or his capability of relating that to us.  Without

23   the Blue Man, we can't go through and listen to what has

24   occurred day and night, which we would if it was

25   required.  The only way we can figure out what's happened

1548

1   in this case is, Judge, is by a record.  That's a record

2   that can't be done between now and Thursday.

3       And I know while this case has certainly been the

4   focus of this Court's attention and Mr. Gross's

5   attention, it has not been the focus of my office's

6   attention since we were removed.  They only attention

7   we've paid is when I was going to have to provide three

8   Assistant Public Defenders for the possibility of being

9   called as witnesses.

10      Mr. Carranza is preparing a number of other capital

11  cases and has been.  Mr. Grossenbacher is likewise

12  handling murder cases as well.  I guess what I'm saying

13  is we haven't kept up with what's going on.  Not Been our

14  job, not been our responsibility.  So it's a lot easier

15  for it to be said, familiarize ourselves between now and

16  a date uncertain.

17      I'm looking for guidance on how we're supposed to do

18  it and do it such that we can in any way be effective and

19  I just, in my experience don't know how that could be

20  done.

21      MR. GROSS:  I would propose, since Mr. Graves asked,

22  that we have a meeting on the record with the Defendant

23  present and the Court and go over the testimony from

24  start to finish.  We can familiarize them.  I know

25  Mr. Grossenbacher was here for at least part of the

1549

1    Defendant's opening.  I saw him sitting back there.  The

2    rule hasn't been invoked, by the way, so I guess anybody

3    could come in and watch.  But that's an imperfect way of

4    quickly bringing the attorneys up to speed.  And I'm not

5    suggesting that they will do as good a job, I mean, they

6    might, but I can't tell you in good conscience that

7    they'll do as good a job as had they been working on this

8    case diligently for the last six months.

9        I'm saying that if they are not as effective as they

10    would have been, it's the Defendant's fault, not yours,

11    not mine, not the Public Defender's Office, but the

12    Defendant's fault.  And I do believe that he would be

13    estopped from complaining on appeal that his attorneys

14    had not done as good a job as perhaps Mr. Graves would

15    have done on his best day.

16        Ultimately, it's your call.  I don't believe that

17    right now you should throw out this trial simply because

18    Mr. Graves is predicting that he can't be ready.  I think

19    we should make every effort to try to do so.

20        I do agree with Mr. Graves on one point, and that is

21    that a competency evaluation would be a good idea.

22    Dr. Perez, who is familiar with the Defendant, has been

23    treating him as his psychiatrist for the last three years

24    almost, is available.  He's in the jail today actually.

25        MR. GRAVES:  In all deference, Mr. Gross, I

1550

1    apologize, we will pick the expert that we want to

2    evaluate our client with regard to his competency.

3        MR. GROSS:  Well, I don't know that that's true.  I'm

4    suggesting that Dr. Perez is available today, can do a

5    psych competency eval because the Court can appoint him

6    as an expert to advise the Court as to whether the

7    Defendant is competent or not.  And, of course, Mr.

8    Graves can hire anybody he wishes.

9        THE COURT:  Well, the only thing about taking it

10   under advisement, what are we going to do with our

11   jury.

12       MR. GROSS:  Send them home for today and they, I know

13   they have all given phone numbers.  Once you make a

14   definitive ruling on where we go from here, we can

15   certainly advise them.

16       MR. GRAVES:  There's one thing Mr. Gross and I can

17   agree on, Judge, I don't think we're going anywhere

18   today.  And in all the cases I've handled with Mr. Gross,

19   his position of the import of certain evidence with

20   regard to, you know, the Court, Mr. Gross laying out what

21   has occurred, doesn't always match what my perception of

22   the import of evidence is.

23       THE COURT:  All right.  I'm going to take the motion

24   under advisement.  I'll make a decision this afternoon.

25   But I would like to let our jurors go.  I would like to

1551

1    ask them though if, you know -- we did say we were going

2    in, may go into a third week, we're probably going to be

3    the better part of that entire week next week if we

4    continue on.

5        MR. GROSS:  Are you going to inquire then if they are

6    all with us until Friday?

7        THE COURT:  Yes.

8        MR. GROSS:  Very good.

9        MR. GRAVES:  If the Court were to deny my motion for

10   mistrial, I don't at all mean for this, and I don't think

11   Mr. Gross would take it or the Court would take it as any

12   form of waiver of my position, but if the Court were to

13   deny my motion and we get into talking about scheduling,

14   I think we have to take a look at the time for

15   preparation for the remainder of the guilt phase, and if

16   there is a penalty phase, any appropriate time between

17   the verdict and the beginning of Phase II, which may

18   require some additional time, Your Honor.

19       MR. GROSS:  I think we can still get it done by next

20   Friday, regardless.  If we get started by Monday, we

21   should be finished by Friday with everything.

22       THE COURT:  All right.  Well, I'll take it under

23   advisement and make a decision by early afternoon.

24       MR. GROSS:  Very good.  Do you want to call us back

25   into the courtroom or do you want to just send us an



1552

1     order or what?

2          THE COURT:  I'll send an order.  Right now I wanted

3     to go get, I wanted to get the jury and get them in here

4     and, you know, ask them about next week.

5          MR. GRAVES:  Would you like us to be available,

6     Judge, pursuant to your order if we have to talk about

7     any scheduling issues?

8          THE COURT:  Yes, please.

9          MR. GRAVES:  Because I would like to be personally

10    present and I was scheduled to be in Ocala.  If you'll

11    write me a doctor's note to tell Judge Hodges I'm going

12    to be here.

13         THE COURT:  Okay.

14         THE BAILIFF:  Ready for them?

15         THE COURT:  Let's get the jury.  They're going to

16    have to come in through the courtroom.

17         THE BAILIFF:  Yes.

18         MR. GROSS:  When you're addressing the issue of

19    mistrial, are you also going to address the issue of

20    another evaluation of the Defendant?

21         THE COURT:  Yes.

22         MR. GROSS:  Okay.

23         (Pause in the proceedings.)

24         MR. GRAVES:  Judge, as the Court's waiting, one of

25    things that struck me about Mr. Gross's request with

1553

1    regard to Dr. Perez, is Dr. Perez, and I think we had him

2    testify in regards to some Target issues on the Target

3    case.

4        MR. GROSS:  Okay.

5        MR. GRAVES:  He had indicated at that time that he

6    was not, didn't intend to be a forensic psychiatrist.

7    He's a treating physician.  And the roles of determining

8    competency, sanity and the like there's a divide, so I

9    think before the Court orders Dr. Perez, maybe an inquiry

10   should be done whether Dr. Perez feels that it's within

11   his sphere of competence to go forward.

12       MR. GROSS:  I don't know.  Mr. Graves may be

13   absolutely right.  I just know he's here today so he's

14   very convenient, but Mr. Graves may be right, maybe he's

15   not the type of doctor to do a competency eval.

16       MR. GRAVES:  He also has, sir -- well, we can get

17   into that later.  That's fine.

18       (Pause in the proceedings.)

19       (The jury entered the courtroom and the following

20   proceedings were held:)

21       THE COURT:  Please be seated.  First thing, members

22   of the jury, were you all able to abide the Court's

23   instructions about not discussing the case among

24   yourselves or with anyone else and don't get, not getting

25   any information about the case from any source outside of

1554

1    this courtroom?

2         JURORS:  (Respond in the affirmative.)

3         THE COURT:  For the record, all the jurors indicated

4    that they have abided by the Court's instructions.

5         Members of the jury, at this time some matters have

6    come up that the Court has to take into consideration,

7    and what we're going to do is release you today.  But

8    before we do that, it appears that as far as scheduling

9    is concerned, this very well may go the entire week next

10   week.  Does anybody have any conflict in their scheduling

11   that they absolutely could not attend the entire week

12   next week?

13        JURORS:  (Respond in the negative.)

14        THE COURT:  Good.  Okay.  What we will do is, the

15   other thing I want to do is make sure, we had you give

16   the bailiff phone numbers where you could be reached at

17   any time.  Are all those still good numbers?

18        JURORS:  (Respond in the affirmative.)

19        THE COURT:  Because we're going to contact you to let

20   you know when you need to come back in.  Okay.  So at

21   this time --

22        UNIDENTIFIED JUROR:  Will it be tomorrow or you don't

23   know until next week.

24        THE COURT:  We don't know, it might be tomorrow, but

25   at this time I can't tell you when, okay, that you'll

1555

1    have to back in, but we will notify you today.

2        UNIDENTIFIED JUROR:  You'll let us know?

3        THE COURT:  Yes, we'll let you know today about when

4    we'll need you back.

5        UNIDENTIFIED JUROR:  Thank you, sir.

6        THE COURT:  All right.  Again, you know, we got a

7    break, so please, I know there's been a lot of, you know,

8    television news, articles about it, there have been some

9    TV, there's been, I'm sure, some newspaper coverage, so

10   be very careful, have a family member or friend screen

11   anything you're watching to make sure that, you know,

12   something about the case doesn't come up.

13       Remember, don't discuss the case among yourselves or

14   anyone else.  Don't get any information about the case at

15   all from any source outside the courtroom.  Don't do any

16   investigation or research on the case or the people and

17   places involved.  Don't try to look, visit any of the

18   places that you've heard about during the trial and don't

19   try to get any maps, you know, on Google or anything else

20   about the case.

21       Okay.  And we will contact you then and let you know

22   when you need to be back.  Okay.  Thank you.

23       (The jury exited the courtroom and the following

24   proceedings were held:)

25       THE COURT:  I think they're going to be coming back

1556

1    out this way.  Can everyone be back at 1:30?

2         MR. GROSS:  Sure.

3         MR. GRAVES:  Yes, sir.

4         (The jury exited the courtroom and the following

5    proceedings were held:)

6         THE COURT:  Anything else before we adjourn?

7         MR. GROSS:  1:30 here?

8         THE COURT:  1:30, we're adjourned until 1:30.

9         (A recess was taken.)

10        THE COURT:  Anything else before I render my

11   decision?

12        MR. GROSS:  No, sir.

13        MR. GRAVES:  Judge, I think that we faxed to you and

14   Mr. Gross, Johnny Lee Jones at 740 So.2d 520, which was

15   the follow-up, 15 years later, from the Supreme Court

16   with regard to the case that Mr. Gross cited earlier, and

17   that was where the Supreme Court reversed Mr. Jones

18   without going into how he thought it would be

19   distinguished.  We know the Court knows how to read the

20   case.  It's pretty important.  In the secondary Jones

21   decision reversed and remanded based upon the trial

22   court's failure to make specific written findings with

23   regards to the Defendant's competency, which we believe

24   would be an umbrella over the whole issue of his ability

25   to go forward in Jones and represent himself, which makes

1557

1    that case substantially factually distinguishable to us.

2         MR. GROSS:  Have you had a chance to read the second

3    Jones opinion that the Public Defender's Office sent us?

4         THE COURT:  Yes.

5         MR. GROSS:  I think it really doesn't shed any light

6    on the issues here today at all because it's really the

7    Florida Supreme Court expressing their dismay with the

8    fact that the trial judge for 12 years didn't do what the

9    Supreme Court had told them to do, him to do, and that

10   was to do a competency eval.  After, I believe, was it

11   ineffective assistance, isn't that how it came back

12   before the Court, I think it was post-conviction motion,

13   but I don't think it has a lot to do with what we're here

14   on today.

15        I did find a case, or actually Mr. Buxman did, out of

16   California, for what it's worth, which is right on the

17   money with the issue that we're dealing with today, but I

18   assume the Court's already ruled, so it's just another

19   case in which somebody who wanted to represent himself

20   all of a sudden realized in the middle of the trial, oh,

21   maybe I really do need a lawyer, and this same issue came

22   up, you know, should it be delayed and the California

23   Supreme Court said no.

24        MR. GRAVES:  And I would only add, Judge, ain't

25   nothing they do in California I think we need to follow

1558

1    here.  It think we need a continuance.

2          MR. GROSS:  I said for what it's worth.

3          THE COURT:  All right.  Based on all the factors in

4    this particular case, I know that we were -- the Public

5    Defender's Office was representing the Defendant for over

6    two years and we were at the eve of trial when

7    Mr. Williams decided to represent himself, so that had

8    the advantage of getting this case prepared for trial,

9    therefore, I'm going to deny the motion for mistrial and

10   I'm going to resume trial on Monday and I'll entertain

11   motions to determine competency or motions to appoint

12   experts at any time.

13         MR. GRAVES:  Judge, in that regard, and not to be

14   deemed as waiver, because we will -- would Mr. Gross

15   agree that we are continuing in our motion for mistrial

16   and continuance and that any matter or discussion I have

17   with regard to scheduling or trying to abide by the

18   Court's order, such that we can represent him as best as

19   possible, is not constituting a waiver of our claims.

20         MR. GROSS:  I would agree that they have preserved

21   that issue certainly.

22         THE COURT:  Yes, I do too, and I understand that and

23   the Court will not consider it a waiver to, you know,

24   schedule, continue on and scheduling and representing the

25   Defendant.

1559

1    MR. GRAVES:  Judge, the first matter I would like to

2    bring up is Madam Court Reporter has a backup recording

3    system.  We understand that all it is, is a backup.  It's

4    not intended to capture everything that goes on in the

5    courtroom as the Blue Man would, but there are certain

6    instances at trial that we believe it would be helpful

7    for us to have that recording available for our

8    inspection.  She's indicated that they are not allowed to

9    release any of those recordings absent court order, so I

10   would ask the Court to enter an order allowing Madam

11   Clerk to make those available to us for our inspection.

12       THE COURT:  Okay.

13       MR. GROSS:  I certainly don't object, Judge.

14       THE COURT:  Okay.  Then the request is granted

15   ordering that to be produced to you.

16       MR. GRAVES:  Thank you.  Secondarily, the Court has

17   previously appointed by court order Jay Bowen as

18   Mr. Williams' investigator, I guess, slash mitigation

19   specialist in the case and he's done substantial work and

20   had substantial contact with Mr. Williams.  He has been

21   ordered that he be paid through JAC.  I would ask that

22   the Court allow us to continue to use him, continue under

23   that order, such that he can be reimbursed and to assist

24   us in trying to make up time, since he is a valuable base

25   of knowledge, and we would just continue him, he would



1560

1   bill and JAC would pay him.  We'll deal with the

2   objection the JAC always has when it comes up.

3       THE COURT:  I just authorized another 100 hours, but

4   that was a couple days ago, I know part of that has

5   probably been used, but that's where we're sitting right

6   now.

7       MR. GRAVES:  I think that will be more than

8   substantial, Judge.

9       THE COURT:  Okay.

10      MR. GRAVES:  Certainly on any issues regarding

11  services of subpoenas and things like that, we can use

12  the Public Defender's staff, but basically he will assist

13  as an informational source for us.

14      THE COURT:  I think that the only way, yeah, that we

15  could do that is just that because you need to get

16  information from Mr. Bowen about, you know, his

17  investigation and such before this --

18      MR. GRAVES:  Correct.

19      THE COURT:  -- he'll allowed to give you information

20  based on that, based on that authorized payment.

21      MR. GRAVES:  Yes, basically, Judge, and I'll pen an

22  order to that effect, if necessary.

23      THE COURT:  Okay.

24      MR. GRAVES:  Basically it's for him to transmit that

25  information and knowledge working under the previous



1561

1      court order to us that cannot be replicated by the Public

2      Defender's Office.

3          THE COURT:  Correct.

4          MR. GRAVES:  Has the State has found anything out

5      about their suggestion of Dr. Perez?

6          MR. GROSS:  Actually, Dr. Perez is experienced in

7      doing competency evals.  However, he's going to be out of

8      town for the next couple of days, so I'm in process of

9      finding somebody else.  And as soon as I get a name, I

10     will ask the Court to appoint that person.  I'm looking

11     for somebody who can evaluate the Defendant right away,

12     and that's the hard part.

13         But Dr. Mings, as we have indicated, actually is

14     still in the hospital today, so he's unavailable.  And he

15     would have been perfect, because he has evaluated the

16     Defendant for this very issue in the past.

17         I'm not saying that I really believe that the

18     Defendant is incompetent at this point.  You and I have

19     been able to watch him throughout seven days of trial and

20     he has been lucid and rational in his thought processes.

21     He has been questioning the various witnesses and seems

22     to make a significant amount of sense for a layperson

23     who's not crazy.

24         However, he did say that he's off his meds.  I did

25     find out today that the meds that he's taking are not

1562

1  antipsychotics, they are a mood stabilizer and

2  antidepressant.  He has been off them since about three

3  weeks ago, July 29th, so the record as it stands right

4  now is how is the Supreme Court going to review or

5  receive that information.  In an abundance of caution, I

6  think he probably should be checked out again, but I'm

7  not suggesting in any way that the Defendant is

8  incompetent.

9      MR. GRAVES:  I'm not suggesting Mr. Gross would

10  suggest blasphemy in this case.  Judge, we're making this

11  request based upon information we have received that we

12  believe falls within the attorney-client purview.  We're

13  making it in good faith.  Before the Court would just

14  accept Mr. Gross's suggestion for basically the Court

15  appointed professional, we would ask to be allowed to

16  review it, make objection, and if we have one we're going

17  to submit, it would before the Court in order to make

18  that addition.  This is not to be confused with court

19  appointing a State's expert under the rule and procedure

20  allowing the Court to appoint one, which is, of course,

21  doesn't stop us from doing it.

22      MR. GROSS:  I will go ahead --

23      MR. GRAVES:  We been working over the lunch hour

24  trying to find somebody.

25      MR. GROSS:  We're both doing the same thing.  I will

1563

1    certainly send over the name as soon as I've been able to

2    find somebody and let the defense make whatever objection

3    they wish, although time is of the essence if we're going

4    to have this evaluation done before we resume on Monday.

5    Again, I don't know that we need to, because unless the

6    Court is concerned about the Defendant's competency, I

7    believe Mr. Graves' concerns shouldn't stop the trial.

8         MR. GRAVES:  It wasn't us who brought up the idea of

9    a court appointed expert, Judge, when we were talking

10   about issues of competency.  I was more than willing to

11   do this as a matter of attorney-client privilege.  I

12   would ask the Court to make a finding that any findings

13   or information, until otherwise listed as a witness or

14   presented by motion, which of course we then would have

15   to disclose, this falls under the purview of the

16   attorney-client privilege such that I have had to now

17   disclose in order for a motion for mistrial and the like,

18   my intent to go forward and hire a confidential

19   psychological expert at the expense of the due process

20   funds of the Public Defender's Office, the Court may well

21   be aware there's a very poorly reasoned Fourth District

22   Court of Appeal decision which might suggest in certain

23   circumstances expert reports, even when decided they will

24   not be used by the defense, would be subject to discovery

25   upon request by the State.

1564

1    Specifically in this case, if the Court were to find

2    that we go forward, what we believe is and what we are

3    announcing now is intended to be a confidential

4    psychological evaluation for the benefit of not only

5    determining possible competency issues but continuing

6    investigation for the purposes of possible mitigation,

7    that that not be discoverable pursuant to the

8    attorney-client privilege, if and until we list that

9    individual as a witness, which of course then presents us

10   with the obligation that we would need to.

11   This is a unique situation.  Normally in getting a,

12   as the Court's well aware, us doing a confidential

13   psychological, it would be done without court order

14   because we're paying for it.  It would be done without

15   the State's knowledge.  And the only reason we've had to

16   reveal our intent to the Court, as an officer of the

17   court, was in laying out the reasons and the rationale

18   that we believe the mistrial is in order.

19   If the Court is intent upon appointing your own

20   experts or the expert that you're appointing pursuant to

21   the rules, we're aware that timeliness is next to

22   godliness here, Judge, and I think we can get somebody

23   just as easily as the State can in a timely in nature,

24   but we of course want somebody that's competent

25   THE COURT:  Well, I'm not doing it on the Court's own

1565

1    motion, because I don't have any information that would

2    lead me to believe that there's any good faith basis for

3    it.  We saw the Defendant yesterday late afternoon until

4    5:00 and just briefly this morning, but I don't have any

5    good faith basis to make my own motion to appoint an

6    expert to evaluate him for competency.

7         MR. GRAVES:  We can go forward on our own absent

8    that.

9         THE COURT:  Yes, sir.

10        MR. GRAVES:  I guess just what I wanted, I'd ask the

11   Court to make the specific finding that absent any of the

12   existing rules of criminal procedure, it will be part of

13   the attorney-client privilege.

14        THE COURT:  Yes, sir.

15        MR. GRAVES:  Thank you very much.

16        THE COURT:  Any else?

17        MR. GROSS:  No, sir.

18        THE COURT:  All right.  We're adjourned.

19        UNIDENTIFIED SPEAKER:  Excuse me, Your Honor?

20        THE COURT:  Yes.

21        UNIDENTIFIED SPEAKER:  Since the Public Defender's

22   now on the case, could I have a court order from you

23   ceasing the Defendant being allowed to use the telephone

24   unmonitored?

25        THE COURT:  Yes, ma'am.

1566

1    UNIDENTIFIED SPEAKER:  Thank you.

2    MR. GRAVES:  How about ceasing the Defendant to use

3    the telephone unmonitored except when speaking to the

4    Public Defender.  It's our numbers that are in there,

5    Judge, they should have it in their system.

6    THE COURT:  No, he's been --

7    MR. GRAVES:  I understand he's had unfettered

8    unmonitored use.

9    THE COURT:  Yes.

10   UNIDENTIFIED SPEAKER:  I just want to make sure.

11   THE COURT:  That's the only thing that she's talking

12   about, discontinue that service.

13   MR. GRAVES:  Right.

14   THE COURT:  No other inmate is entitled to it.

15   MR. GRAVES:  Right.

16   MR. GROSS:  Just so that I understand where we're

17   going, on Monday morning we're going to resume?

18   THE COURT:  We're going to resume trial.

19   MR. GROSS:  I want --

20   THE COURT:  Unless, again, I'll entertain any motions

21   unless, you know, we've got --

22   MR. GROSS:  Sure.

23   THE COURT:  -- some other motion that's going to

24   prevent that.

25   MR. GROSS:  Yes, sir.  But at this juncture we

1567

1   probably won't see you again until Monday morning and

2   we'll resume at 8:30?

3       THE COURT:  Yes, sir.

4       MR. GROSS:  And so you're going to notify all the

5   jurors of that?

6       THE COURT:  Yes.

7       MR. GROSS:  And remind them, I'm sure, that they

8   aren't supposed to read or hear anything about the case,

9   discuss it with anybody.

10      Bottom line is, next week the Defendant is still in

11  his case, he's presenting whatever he wishes, and then

12  we have at least a day of rebuttal, maybe a day and a

13  half.  So if I could get some idea of when the defense,

14  once they've had a chance to kind of familiarize

15  themselves, just a ballpark estimate when they think they

16  might be finished by close of business Friday or by

17  Saturday or by Sunday, some time, then we can start

18  scheduling our witnesses and hopefully not have any more

19  dead time as we've had this last week.

20      And then I suppose the defense is declining my offer

21  to get together with them and the Court and the court

22  reporter and try to bring them up to speed, if they're

23  willing to do that, let me know, otherwise, I'm going

24  assume they're rejecting the offer.

25      MR. GRAVES:  Judge, we've been on the case four

1568

1    hours.  This exactly what I'm talking about.  I've been

2    put in position of rejecting offers in a case we have no

3    knowledge about.

4         MR. GROSS:  I'm not saying --

5         MR. GRAVES:  I'm not rejecting the offer.

6         MR. GROSS:  I'm not saying he's rejecting, I'm just

7    asking, are you it or no?

8         MR. GRAVES:  No.

9         MR. GROSS:  Okay.  When do you want to meet?

10        MR. GRAVES:  I don't know.

11        MR. GROSS:  All right.  Let me know.

12        MR. GRAVES:  We'll let you know, Judge, we're still

13   trying to put a calendar together.

14        THE COURT:  Understood.

15        MR. GRAVES:  And assemble the crew.  In spite of the

16   fact, which I always like to mention, Mr. Gross will

17   never even tell me in all these years who he's going to

18   call next.

19        MR. GROSS:  I'm not asking who you're calling.

20        MR. GRAVES:  We should and we will make every effort

21   by the end of the business day tomorrow to be able to

22   give him what we believe in good faith an idea of when we

23   believe we'll rest.

24        THE COURT:  Okay.

25        MR. GRAVES:  And the only other matter I would ask

1569

1    is, and we will be as judicious, I'll be happy to tell

2    Mr. Gross and the Court, if we want to avail ourselves of

3    this, that there might be certain witnesses or parts of

4    certain witnesses that we ask Madam Court Reporter to

5    expedite, and I'm going ask that that be regarding of the

6    tax payer dollar, under the circumstance be done out of

7    Court funds instead of Public Defender due process.

8    That's all.

9        THE COURT:  Okay.

10        MR. GRAVES:  And of course we make that subject to

11    Court approval.

12        THE COURT:  Yes, sir.

13        MR. GRAVES:  That's all I have, Judge.

14        THE COURT:  Okay.  We're adjourned.

15        (The proceedings were adjourned at 1:47 p.m. to be

16    resumed at 2:00 p.m., August 23rd, 2013.)

17

18

19

20

21

22

23

24

25

1

IN THE CIRCUIT COURT, FIFTH
JUDICIAL CIRCUIT, IN AND FOR
LAKE COUNTY, FLORIDA
CASE NO.:  2011-CF-000105

STATE OF FLORIDA,

      Plaintiff,

vs.

DONALD OTIS WILLIAMS,

      Defendant.

_____/

TRANSCRIPT ON APPEAL

HELD BEFORE:    The Honorable Mark A. Nacke
DATE TAKEN:     August 2, 2013
TIME:           10:02 A.M. - 10:44 A.M.
PLACE:          Lake County Judicial Center
                550 West Main Street
                Tavares, Florida 32778

    This cause came on to be heard at the time and place
aforesaid, when and where the following proceedings were
reported by:

Cheryl McDonough, RPR, FPR
Kerr & Associates
614 North Sinclair Avenue
Tavares, Florida 32778
(352) 742-3144

KERR & ASSOCIATES, INC.
1-800-246-1753

2970

2

A P P E A R A N C E S:

WILLIAM M. GROSS, ESQUIRE

OF:  Office of the State Attorney

     550 West Main Street

     Tavares, Florida 32778

     P:  352-742-4236

          APPEARING ON BEHALF OF THE STATE


DONALD OTIS WILLIAMS, PRO SE

3

P R O C E E D I N G S

\* \* \* \* \* \*

THE COURT:  All right.  We're here in the case of
State of Florida versus Donald Otis Williams, Case Number
2011-CF-105.  I set this hearing this morning because I
received a copy of a motion for appointment of conflict
counsel from the Defendant.  I received that yesterday,
August 1st, 2013.  I wanted to hear it as quickly as
possible because we are so near to trial at this time.

Mr. Williams, you want to go ahead and argue your
motion?

MR. WILLIAMS:  Well, Your Honor, the Court, just --
can I tell you how that came about?

THE COURT:  Yes, sir.

MR. WILLIAMS:  As the Court knows, I just got phone
privileges to phone people, and the first phone call I
made was to an investigative services, because I was
trying to get that, and the woman's name was Cynthia
O'Shea, and she suggested that I file this motion based
on what I told her.  She started -- she also suggested
that I contact a Tania Alavi, which is an attorney in
Ocala.  I don't have that motion.

THE COURT:  Yeah, that's the name of the person that
you put in your motion.

MR. WILLIAMS:  I don't have anything based on to

 

4

1    support this motion other than what Ms. O'Shea told me

2    that she asked me did I want to defend myself.  I said,

3    well, I fear I do not have any other choice.

4    I said the His Honor found that counsel was not efficient

5    and he gave me the option of representing myself or

6    retaining private counsel.  She told me that is not

7    always the case.  And I told her I said, well, I, you

8    know, it's kind of, it's getting down to the nitty-gritty

9    right now.  I said, this is, this case is set to go and

10   there's no, you know, we're not stopping it.  And she

11   told me that I needed to put that in irregardless of,

12   that's why I put it in.

13        THE COURT:  Response?

14        MR. GROSS:  Yes, Your Honor, first of all,

15   Mr. Williams' allegation that I would agree to this

16   motion is total nonsense, another example of him not

17   telling us the truth.

18        MR. WILLIAMS:  Well, that's -- excuse me.  And I

19   really -- pardon me.  That was based on, honest to God,

20   that was based on Ms. O'Shea's, when I called her back,

21   she called and she was supposed to have talk and said

22   there would be no, you would not disagree or not fight

23   it, is what she told me.

24        MR. GROSS:  I've never spoken to Ms. O'Shea.  I have

25   no idea who she is.  I do know Tania Alavi.  I know she's

5

1    a good lawyer.  I think she's probably death qualified by

2    now, but I don't think she'll be ready in a week.  There

3    is absolutely no reason for you to conclude that there is

4    some sort of a conflict that would require the

5    appointment of conflict counsel.

6        You have already evaluated this issue a couple of

7    times, at least twice that I can recall, and determined

8    that his attorneys were not ineffective in their

9    representation.  That would be the only basis upon which

10   the Court could appoint conflict counsel, if the Court

11   determined that either, A, there was some sort of a

12   conflict, or B, that they were providing ineffective

13   assistance.  There is nothing in this record to suggest

14   that either one of those is the case and we're opposed to

15   it.

16       THE COURT:  Mr. Williams, again, I've already found

17   that they, that your previous counsel were not

18   ineffective.  So what is the, I mean, I read this to say

19   that the conflict is that you were lied to by them.

20       MR. WILLIAMS:  That's, that's the truth too.  That is

21   absolutely true.

22       I want to say one more word, please, Your Honor.  I

23   know that Mr. Gross was on the verge of calling me

24   another liar or saying that I was another incident of

25   lying, but that again, what I just told you that

6

1    Ms. O'Shea told me that there would be no opposition to

2    that motion by, by Mr. Gross, and that's after I called

3    her back, so --

4        THE COURT:  Well, the reason that it came out that

5    way is because the way you wrote it, you didn't say that

6    Ms. O'Shea or Ms. Alavi said that there wouldn't be any,

7    you know, you wrote it as if you were saying it, that you

8    knew that.

9        MR. WILLIAMS:  And the other, after the deposition

10   that Mr. Gross and I had went to or deposed, when I

11   deposed Mr. Amer, the FDLE biologist, I got the, I got

12   the feeling that that, that something wasn't right,

13   because I went through our discussion about some

14   stipulations there, I didn't gather anything from him

15   that he had ever spoken to her, and I didn't really, it

16   didn't click in my mind until after got out of the room

17   or I would have asked him then.  He is a -- the problem

18   is that they did lie to me and --

19       THE COURT:  Well, you indicated that there was

20   numerous instances or you wrote that there were numerous

21   instances which those falsehoods were acknowledged by

22   Assistant State Attorney Gross in open court to be acts

23   that dismiss counsel.

24       MR. WILLIAMS:  Well, they did, I mean, they did lie

25   to me and --

7

1    THE COURT:  What were those falsehoods?

2    MR. WILLIAMS:  Mr. Gross acknowledged those lies,

3  because they -- one, they told me that I could not direct

4  my defense.  Two, that I could not -- when and I told

5  them there would be no mitigation, they said that's not,

6  that's not up to you, that's up to us.  And then it just

7  it just snowballed after that.  They lied to me right

8  straight off.  And I told this Court before several times

9  that I could not be represented by counsel that lied to

10  me.  I mean, it's like having your wife cheat on you, you

11  just cannot go back and do that again.

12    THE COURT:  Anything else, Mr. Gross?

13    MR. GROSS:  Well, yes.  I have never, ever suggested

14  that the attorneys for the Defendant when they

15  represented him or since then have lied, ever.  I don't

16  know what they said to the Defendant, so how would I know

17  whether it was a lie or not?

18    I found a case, I found a case which I gave to you

19  and I gave to Mr. Williams' attorneys that says that if

20  the Defendant wants to raise an insanity defense, that's

21  his decision, not the attorneys' decision to make.  I

22  don't know if that case has been overruled or not.  We

23  never really got into that because he fired his lawyers.

24  However -- and then filed his own notice of intent to

25  rely upon insanity.  But I can guarantee you that I have

8

1    never, ever seen any signs that the attorneys lied to him

2    and that's outrageous for him to suggest otherwise.

3         Can I have just a minute to talk to Mr. Carranza, who

4    just happens to be in the audience?

5         THE COURT:  Yes.

6         (Pause in the proceedings.)

7         MR. GROSS:  Judge, I would ask Mr. Carranza if he can

8    just shed some light on the accusations that have been

9    made.

10        THE COURT:  Yes, sir.  Raise your right hand.

11        (The witness was duly sworn by the Court.)

12        THE WITNESS:  Yes, sir.

13                    MORRIS D. CARRANZA,

14        Having first been duly sworn, was examined and

15   testified as follows:

16                    DIRECT EXAMINATION

17   BY MR. GROSS:

18        Q.  You were lead counsel on this case?

19        A.  I was actually second chair.

20        Q.  Second chair?

21        A.  Mr. Grossenbacher was first chair.

22        Q.  And you worked on the case for a number of months, if

23   not years, before Mr. Williams was allowed to represent

24   himself?

25        A.  Yes, sir.

9

1      Q.  Did you ever tell him that he would have no say-so in

2  his own defense?

3      A.  Attorney-client privilege at this point is waived,

4  I'm assuming?

5          MR. GROSS:  Yes, sir, it has been.

6          THE COURT:  Yes, sir, it's waived, and I will so find

7      that it has been waived.

8          Well, let me, first of all, Mr. Williams, do you

9      understand that based on these allegations that you're

10     waiving, by making the allegations you're waiving

11     attorney-client privilege as it pertains to the issues in

12     your motion?

13         MR. WILLIAMS:  Yes, sir.

14         THE COURT:  And do you wish to do that or do you want

15     to invoke attorney-client privilege?

16         MR. WILLIAMS:  No, sir, I waive.

17         THE COURT:  Okay.

18         THE WITNESS:  No, we never told him that he could not

19     direct the defense.  We did advise him that the insanity

20     defense, there were going to be issues with that because

21     we had four psychologists throughout the state evaluate

22     him and none of them had concluded that he was insane at

23     the time of the offense, and as a result, there would be,

24     you know, it would be hard to present the defense of

25     insanity without a psychologist and/or some type of

10

1    mental health expert to testify to that fact, that he was

2    insane at the time of the offense.

3         We did tell him that there was an issue regarding

4    that. We spoke about it at length. However, we never

5    told him that, you know, we wouldn't do one thing or the

6    other. We were still in the process of discussing his

7    defense and advising him what we could do, what we

8    couldn't do, what we thought was relevant, what we

9    thought wasn't relevant. And obviously he made the final

10   decision when it comes to the defenses because he is the

11   client.

12   BY MR. GROSS:

13        Q.  Did he ask that you file an insanity defense?

14        A.  Towards the end of our representation of him, and I

15   believe once we were off the case, he did tell us that he

16   wanted us to do that. And I believe, and I may be wrong, but

17   I believe that Mr. Grossenbacher might have filed some

18   paperwork, and that was after we had already been relieved.

19   And we did speak about insanity at length and that, you know,

20   we were in the process of doing all that when we got off the

21   case. However, we never told him that we weren't going to do

22   that.

23        Q.  Do you remember me giving you a case that said that,

24   you know, it was the Defendant's decision?

25        A.  Yes.

 

11

1    Q.  And if push had come to shove and you were still on

2    the case, would you have filed the insanity defense even if

3    you thought it wasn't supported by any experts?

4        A.  I mean, pursuant to the case law, yes.

5        MR. GROSS:  As to the mitigation, I believe he's

6    suggesting, if I'm not mistaken, Mr. Williams, you

7    correct me if I'm wrong, but I understood Mr. Williams to

8    say that the defense was going to be presenting a

9    mitigating case even if he didn't want one presented.

10   Have I got you right?

11       MR. WILLIAMS:  That is exactly right.

12   BY MR. GROSS:

13       Q.  Is that true?

14       A.  I was in charge of the mitigation aspect of the case

15   and I was the one that retained all the experts and

16   retained our mitigation specialist, had spoken to the doctors

17   and spoken to his family and conducted all the testing that we

18   did over at Shands, et cetera, et cetera, so I was the one

19   dealing with mitigation.  Mr. Grossenbacher was more of the

20   guilt phase attorney.  I remember having some conversations

21   with Mr. Williams, and I remember him telling me at some point

22   that, you know, if it would come back with first degree

23   murder, he didn't want any mitigation presented, et cetera, et

24   cetera.  And I remember specifically telling him, you know,

25   that if that happens, that we need to present mitigation in

12

1    order to save his life should we get there.  And I remember

2    him and I having discussions, I remember me specifically

3    telling him, you know, Mr. Williams, we cannot let the State

4    just kill you and just lay down, we should and we need to

5    present mitigation on your behalf if he's -- if you're found

6    guilty of first degree murder, and him and I spoke about that

7    at length regarding that.  There were times that he was for

8    that.  There were times that he wasn't for that.  And

9    obviously in preparation for the case and in dealing with

10   these types of cases, this happens a lot with clients where

11   sometimes they want to present mitigation, sometimes they

12   don't, depending on the day, but we did have those

13   discussions.

14        Q.  So he's accusing you of flat out lying.  You might

15   have had a disagreement about strategy or hadn't really

16   resolved the way to go as far as whether you were going to

17   present it or not present it, but did you ever lie to him

18   about it?

19        A.  No.  No, sir.

20        Q.  Thank you.  Nothing else.

21        A.  We were honest with him about everything and we spent

22   a lot of time discussing with him possible defenses, possible

23   mitigation, and every single time that we had an expert, we

24   had many of them talk to him, come back and explain to him

25   what their conclusion was and how it could help us or how it

13

1    wouldn't help us, but we always kept Mr. Williams up to date

2    with what was going on and we always had several -- we always

3    had discussions regarding not just mitigation but the defense

4    for phase one as well.

5            THE COURT:  Okay.  Mr. Williams, any questions?

6            MR. WILLIAMS:  Yes.

7                        CROSS-EXAMINATION

8    BY MR. WILLIAMS:

9        Q.  Mr. Carranza.

10       A.  Yes, sir.

11       Q.  There was, there was a time when you and

12   Mr. Grossenbacher were talking to me there at the jail, and

13   you know it as well as I do, if you remember correctly, when

14   we were talking about mitigation and I told you that there

15   would be no mitigation and you told me, unfortunately, that's

16   not up to you, that's up to us, and that was exactly the same,

17   that was exactly the right words that you did, you said, and

18   that was right before or right after, subsequent, that when I

19   was talking to Mr. Grossenbacher about the insanity plea.  You

20   do not remember that?

21       A.  What I remember was, and I don't remember the exact

22   conversation, but I remember back then, I call you Donnie, if

23   you remember, and I remember you saying, you know, if they

24   come back with first degree murder, I'm just going to let them

25   kill me.  I'm not going present anything.  And I remember me

14

1    telling you, Donnie, we can't just let them kill you.  We're

2    not going do that.  We had a discussion about how precious

3    life is, et cetera, et cetera.  I said, Donnie, we're not

4    going to let them kill you.  Come on, man.  Those were the

5    discussions back and forth.

6        Q.  I believe, sir, if you recall, you were wearing a

7    black and white shirt and you asked me something about Bonnie

8    or something.  Okay.  And that was the day that you were

9    wearing that, and I suppose you wear that more than one day,

10   you may wear it more than once a week, but that was when the

11   days that you were wearing that, and I remember very vividly,

12   very distinctly that you told me that mitigation was not up to

13   me, that it was up to you.  And from that point on, sir, that

14   our relationship just went downhill.  I would not have you

15   represent me like that.  That was -- and then, and then to

16   find out, through all of the people, Mr. Gross, that you did

17   not control the mitigation aspect or you did not control

18   whether I chose to plead insanity or not, and I -- and there

19   was a proceeding that we had where Mr. Gross says, you can

20   tell these attorneys to do this, they'll have to do what you

21   tell them to do, but after you told me that, it was not up to

22   me about mitigation, sir, that is -- that was the end.

23       A.  Is there a question?

24       MR. WILLIAMS:  No.

25       THE COURT:  Any other questions?



2983 A163

15

1    MR. WILLIAMS:  No, sir.

2    THE COURT:  Thank you.

3    THE WITNESS:  Thank you.

4    MR. GROSS:  Just to remind you, Your Honor, the only

5    time that I told Mr. Williams anything about what he

6    should tell or could tell his attorneys and that they

7    would have follow his instructions was in the context of

8    an insanity defense, and that was at the time that you

9    and I were both trying to talk him out of firing his

10   lawyers, and at that point I had the case that said that

11   it was the Defendant's decision, and I remember

12   distinctly that I stood up, looked him right in the eye

13   and said, if you and they have a disagreement about the

14   question of filing the insanity defense, you have the

15   right to tell them and the case says that they have to

16   follow your instructions.  It had nothing at all to do

17   with mitigation.

18   The only time that's ever been brought up in the

19   courtroom, the Defendant announced once in passing that

20   should he be convicted, he had no intention of filing or

21   presenting any mitigation.  I don't know if that's still

22   his intention or not.  However, Mr. Carranza wasn't there

23   at that time.  He was already off the case by at least a

24   month when that subject was brought up.  And I said

25   nothing, which is rare for me.  I would think that this

16

1    is another example of a baseless motion.

2        There has been no lying to the Defendant.  There may

3    have been some disagreement, but no lying.  There is no

4    conflict.  There never has been a conflict.  It's

5    intriguing to me that when the Defendant is asking you to

6    find that they were ineffective, he never mentions

7    anything about any dispute about mitigation, it only

8    comes up now.  That was never brought up.  And he says

9    that was the at the point or it was at that point that

10   the relationship went downhill, he just told us, and yet

11   it never came up.  It was always about this other

12   allegation about the insanity defense.  So I think this

13   is another example, like the Fifth District Court of

14   Appeals has found of a frivolous, nonsensical, baseless

15   motions wasting the Court's time once again today.

16       MR. WILLIAMS:  Your Honor, may I say one final word?

17       THE COURT:  Yes, sir.

18       MR. WILLIAMS:  The one other, the proceeding that we

19   had before this, Mr. Gross mentioned the Fifth District

20   Court of Appeal case that was ruled frivolous on me and

21   in passing I told him that the Federal Court didn't see

22   it that way.  I filed in the Federal Court a federal

23   habeas corpus in 2004.  That Fifth District Court of

24   Appeal was a petition for writ of mandamus to try to save

25   the medical records at the jail so I could get them.  I



17

1   asked Judge Semento to give me the records and he would

2   not do it, so I had to go to the Fifth District Court of

3   Appeal and I asked him and then I told him I wanted to

4   withdraw the petition and just tell them that they could

5   file a letter to them, they didn't have to go through the

6   formal writ to do this.

7       Well, then, therefore it went to the order to show

8   cause and then I just went ahead and let it all out and

9   told them the whole basis about that 2000 case there.

10  When they found that that was a frivolous motion or

11  frivolous pleading, I spent 60 days in a box, 364 days of

12  my gain time was taken out.  I got some of my teeth

13  kicked out in the box.  But while this was going, was

14  ticking around, federal habeas, the federal habeas corpus

15  was granted and I went down to Marion County in front of

16  Judge, Magistrate, Judge Gary R. Jones and Senior Judge

17  William Terrell Hodges was presiding over this case.

18  Also I almost had that case won but I could not bring

19  enough witnesses to the Court to persuade the Court to

20  see what the truth actually was actually, but as far as

21  the Fifth District Court of Appeal ruling my motion

22  frivolous, it was not, because in that ruling that the

23  Federal Court dissented on that case that I had showed

24  otherwise.

25      THE COURT:  All right.  I do not find that there is a



2986

18

1    conflict with your previous counsel, so I am not going

2    appoint conflict counsel.

3        Mr. Williams, again, you have a choice of me

4    appointing your previous counsel to represent you or to

5    retain an attorney or to represent yourself.  How do you

6    wish to proceed?

7        MR. WILLIAMS:  I'm forced to represent myself, Your

8    Honor.

9        THE COURT:  Okay.  Also I wanted to bring up a couple

10   of other things, and that is, and I think you also filed

11   these motions today regarding investigative costs and

12   expert services --

13       MR. WILLIAMS:  Please --

14       THE COURT:  -- so I want to take care of that.

15       MR. GROSS:  Is that what you have just given me

16   today?

17       MR. WILLIAMS:  I believe so.

18       THE COURT:  Yes, that's what it is.

19       MR. GROSS:  I've never seen these, Judge, I haven't

20   even opened the envelope yet

21       MR. WILLIAMS:  It may be --

22       THE COURT:  And again, I sometimes get the different

23   doctors confused.  Dr. Cibula, is that the Shands Doctor.

24       MR. GROSS:  Very good.  Yes, sir

25       THE COURT:  Okay.

| Case Number:  35-2011-CF-000105-AXXX-XX | | |
|---|---|---|
| **Defendant:  DONALD OTIS WILLIAMS** | | |
| **Division:  None** | | |
| **SA Number:** | | |

| Effective Date | Count | Description |
|---|---|---|
| 08/01/2013 | | ADDENDUM TO DEFENSE WITNESS LIST<br>DEFENSE'S SUPPLEMENTAL WITNESS LIST |
| 08/01/2013 | | PRO SE MOTION<br>PRO SE MOTION TO EXCUSE WITNESS |
| 08/01/2013 | | RETURN OF SERVICE |
| 08/01/2013 | | PRO SE MOTION<br>PRO SE MOTION FOR APPOINTMENT OF CONFLICT COUNSEL |
| 08/01/2013 | | PRO SE REQUEST<br>COPY OF INMATE REQUEST FORM |
| 08/02/2013 | | CHRONOLOGICAL SUMMARY OF PROCEEDINGS<br>CHRONOLOGICAL SUMMARY OF PROCEEDINGS |
| 08/02/2013 | | PRO SE MOTION<br>PRO SE EMERGENCY MOTION FOR COURT APPROVAL REGARDING<br>INVESTIGATIVE SERVICES, COSTS AND FEES |
| 08/02/2013 | | PRO SE REQUEST<br>PRO SE REQUEST TO CLERK |
| 08/02/2013 | | RETURN OF SERVICE:  STATE SUBPOENA FOR TRIAL<br>RETURN OF SERVICE:  STATE SUBPOENA FOR TRIAL |
| 08/02/2013 | | ORDER<br>AMENDED ORDER AUTHORIZING COSTS |
| 08/02/2013 | | DEFT PRES FOR<br>DEFT PRES FOR MOTION HRG; COURT DENIED PRO-SE MOTION FOR<br>APPOINTMENT OF CONFLICT COUNSEL |
| 08/02/2013 | | PRO SE REQUEST<br>PRO SE REQUESTS TO THE CLERK |
| 08/02/2013 | | PRO SE MOTION<br>PRO SE EMERGENCY MOTION FOR COURT APPROVAL<br>REGARDING EXPERT SERVICES, COSTS AND FEES |
| 08/02/2013 | | ORDER<br>ORDER AUTHORIZING COSTS |
| 08/02/2013 | | ORDER<br>ORDER AUTHORIZING TRANSCRIPTION AND COSTS |
| 08/05/2013 | | PRO SE CORRESPONDENCE TO CLERK<br>PRO SE CORRESPONDENCE TO CLERK |

A169



LAW OFFICES OF

# PUBLIC DEFENDER
### SEVENTH JUDICIAL CIRCUIT
## FLAGLER, PUTNAM, ST. JOHNS & VOLUSIA COUNTIES

**JAMES S. PURDY**
PUBLIC DEFENDER

July 7, 2016

Donald Otis Williams, #U13479
Florida State Prison
7819 N.W. 228th Street
Raiford, FL 32026-1000

Dear Mr. Williams:

I have received your letter asking about the proceedings held on 8/21/13 in your capital case, and also asking about your closed VOP appeal.

As to the capital case, you are correct that in my earlier letter I misstated the date of the court proceedings in question - as we both well know, your trial took place in 2013, and my reference in the letter to 2015 was in error. I have inquired of the court reporter about 8/21/13, and her response was that the proceedings held on 8/21/13 were inadvertently labeled 8/22/13. I have accordingly enclosed a copy of the transcript of the proceedings which were held in your capital case on 8/21 and mislabeled 8/22. The enclosed transcript is part of the record that is now before the Florida Supreme Court.

As to your closed VOP appeal, I see that Judge Nacke renewed the offer of counsel in the proceedings that were held in that case on November 4, November 5, and November 21, 2013. I also see that Judge Nacke entered a written order on May 30, 2013, allowing you to represent yourself in that case, presumably after either holding a full-dress Faretta hearing or else after noting on the record that he had allowed you to represent yourself in your more-or-less contemporaneous capital trial. A full Faretta hearing does not have to be held at each critical stage of criminal proceedings; a single such hearing is sufficient, provided the offer of counsel is renewed at each critical stage, as it was in your VOP case. See Cuyler v. State, 131 So. 3rd 827 (Fla. 1st DCA 2014).

If you believe that Mrs. Reeves of this office provided you with ineffective

A170

assistance of appellate counsel, in that she did not supplement the record with the proceedings of May 30, 2013, then as you correctly state, your recourse is to file a petition to that effect in the Fifth DCA by February, 2017. There is no action this office can take on your behalf in the VOP case at this time, since we have power to act only in those cases in which we are currently court-appointed. We are, of course, appointed to represent you in your capital appeal throughout the time that appeal is pending, but our representation ended in the VOP matter in 2014 when the Fifth DCA granted our motion to withdraw as counsel. If you do file a petition seeking relief in the VOP case, you should probably ask for conflict-free counsel to be appointed to assist you in obtaining a transcript of the proceedings held before Judge Nacke on May 30, 2013.

I will, of course, write as soon as I hear anything from the Florida Supreme Court regarding your capital case.

Very truly yours,

Nancy Ryan
Division Chief

NR/lp

encl.

A171